**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| COUNCIL ON AMERICAN-ISLAMIC RELATIONS, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 09-2030 (CKK) |
| v. | ) ) | Judge Colleen Kollar-Kotelly |
| PAUL DAVID GAUBATZ; CHRIS GAUBATZ, a.k.a. "David Marshall"; and JOHN AND JANE DOE NOS. 1-10, | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS**

Plaintiff, Council on American-Islamic Relations Action Network, Inc., mistakenly identified in the original Complaint in shorthand only as "Council on American-Islamic Relations" (hereinafter, "CAIR" or "Plaintiff"), hereby responds to the motion to dismiss filed by Defendants Paul David and Chris Gaubatz.  (Doc. 34.)

Not content with using the Internet to criticize CAIR and articulate assorted conspiracy theories regarding CAIR and other Muslim and Islamic organizations and individuals, Defendants Paul David Gaubatz and Chris Gaubatz concocted a scheme to burglarize CAIR and then use the fruits of their unlawful endeavor to promote and enrich themselves.  Now the thieves, the Gaubatzes, ask the Court to dismiss this case and absolve them from liability for their brazen and admitted serial theft of documents and surreptitious recording of meetings and conversations, all accomplished by securing an internship with CAIR by misrepresentation, deceit, and outright lies.

In support of their request that the Court effectively condone their disturbing and unlawful conduct, Defendants can muster only (1) a non-prejudicial technical oversight in the

manner by which counsel for CAIR identified the plaintiff in the Complaint, and (2) an unavailing attempt to characterize CAIR's injuries and damages as consisting solely of traditional defamation-type harm to reputation based more on Defendants' own desire to litigate a defamation case rather than CAIR's actual claims and allegations.

Defendants' motion is otherwise a hodgepodge of attempts to mischaracterize and misconstrue the pleading requirements for certain offenses, the allegations in the Complaint, or both.  Ultimately though, the mistake in the omission of Plaintiff's full name in the original Complaint easily can be cured without prejudice to anyone and, thus, Defendants fail to identify any valid basis for the dismissal of the Complaint.  Defendants' motion serves only to distract from the issues in the case—Defendants' admitted burglary and theft—and to create delay and needlessly increase the cost of litigation.  Accordingly, Defendants' motion should be denied.

## I.      STANDARD OF REVIEW

The Federal Rules of Civil Procedure require only that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  "[D]etailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss; a plaintiff need only provide the "grounds" of "entitle[ment] to relief" and furnish something "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly,* 550 U.S. at 555-56; *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. ---- (2009) (quoting *Twombly*, 550 U.S. at 570); *Atherton v. Dist. of Columbia Office of the Mayor*,

567 F.3d 672, 681 (D.C. Cir. 2009).  A complaint is plausible on its face "when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. at 1949.

## II.    ARGUMENT

### A.    The Complaint Contains a Misnomer of a Party, But Such Is Not a Basis for Dismissal, Can Be Readily Cured, and Has Prejudiced No One

Defendants' principal argument for dismissal seizes upon a misnomer.  The original

Complaint identified the "Council on American-Islamic Relations" as the plaintiff.  It should

have instead read "Council on American-Islamic Relations Action Network, Inc." which, as

Defendants note in their motion, was originally incorporated in 1994 as "Council on American-

Islamic Relations, Inc." and changed its name in 2007.

While this should and will be cured, it did not cause Defendants any prejudice or

confusion.  Indeed Defendants did not raise the issue at the outset or before agreeing to an entry

of a preliminary injunction by the Court ordering them to return to the plaintiff identified in the

Complaint documents that they had stolen from that entity.  Defendants articulated no difficulty

in understanding what it was they were required to do.  Instead, they have attempted to construct

a basis for dismissal out of an inconsequential and non-prejudicial misnomer.

Courts generally allow amendments to change or correct the name of a party, whether

corporation or individual, where such change does not have the effect of substituting another

party, and the court conceives it has jurisdiction of such party.  "Under modern practice, …

[w]here the proper party is before the court, although there under a wrong name, and if the

plaintiff, he is the party having the cause of action, and, if the defendant, he is the party the

plaintiff intended to sue and did sue, and the court considers such defendant within its

jurisdiction, an amendment of process and pleading will be allowed to change or correct the

name of either plaintiff or defendant to cure the misnomer." *A.H. Fischer Lumber Co. v. A.H. Fischer Co., Inc.*, 162 F.2d 872, 873 (4th Cir. 1947) (denying dismissal where word "Inc." was omitted from party's name and "Lumber" was added where "[t]he defendant was engaged in some branch of the lumber or woodworking business, there was no other corporation in the locality with a similar name, and nobody was misled in the first case").

In *A.H. Fischer*, the Fourth Circuit showed little patience for hyper-technical arguments based upon minor deviations in the names given for the parties:

> A suit at law is not a children's game, but a serious effort on the part of adult human beings to administer justice; and the purpose of process is to bring parties into court. If it names them in such terms that every intelligent person understands who is meant, as is the case here, it has fulfilled its purpose; and courts should not put themselves in the position of failing to recognize what is apparent to everyone else.

162 F.2d at 873.  More recently, the Court of Claims explained that

> There is a strong judicial policy toward merit-based decisions, and against throwing out claims because of a minor technicality.  The difference between an abbreviation and a full word should not be sufficient to dismiss an action. Otherwise, we would create a system that would make the medieval writ system look highly functional and modern.

*Hemphill Contracting Co. v. United States*, 34 Fed. Cl. 82, 86 (Fed. Cl. 1995) (granting motion to amend to correct misnomer of plaintiff from "Hemphill Contracting Company, Inc." to "Hemphill Contracting Co., Inc."); *see also Hilgraeve Corp. v. Symantec Corp.*, 212 F.R.D. 345, 347-48 (E.D. Mich. 2003) (granting motion to amend complaint to correct name of plaintiff from "Hilgraeve Corporation" to "Hilgraeve, Inc." because "Defendant has adduced no evidence that the *entity* bringing this suit … would change following the proposed amendment to the complaint").  In other words, "[a] little common sense goes a long way …." *Id.*

As Defendants themselves document in their motion, Plaintiff is typically referred to in all manner of contexts as either "Council on American-Islamic Relations" or by the shorthand

acronym "CAIR."  The various instances identified by Defendants (including declarations of

Nadhira Al-Khalili[1] submitted in this and another case) of CAIR officers, directors, or employees

referring to the entity for or with which they work as "Council on American-Islamic Relations"

or "CAIR" only confirm this fact.  Indeed, in his book *Muslim Mafia* and on his blog, Defendant

Paul David Gaubatz employs the very same terms in describing the target of his criticisms and

accusations and in describing the events underlying this lawsuit.

      Seeking to construct a mountain out of a molehill, Defendants contend that counsel's

imprecise naming of the plaintiff in drafting the Complaint requires dismissal of all of CAIR's

claims with prejudice.  But the omission of two words and an abbreviation from the name of a

plaintiff in the Complaint, a plaintiff everyone—including Defendants—know as "CAIR" causes

no confusion nor prejudice.  First, employing a shortened and nearly identical version of an

official corporate name does not equate to the "use of … a separate entity," as Defendants claim.

(Mem. at 3.)  Moreover, Defendants do not explain how or why the use of a trade name, or even

the "use of … a separate entity" (whatever that may denote), is improper.[2]

      Most significantly, there is no prejudice to Defendants due to the misnomer in the

Complaint.  In the book *Muslim Mafia* and on his website, Defendant Paul David Gaubatz

repeatedly and exclusively identified as "CAIR" or "Council on American-Islamic Relations" the

entity from which he and his son had stolen documents and about which he was making

---

[1] CAIR notes that Ms. Al-Khalili, CAIR's Legal Counsel, is a woman, not a man as counsel for Defendants seems to assume.  (*See* Mem. at 3.)  Had defense counsel conferred with their clients, one of whom actually worked with Ms. Al-Khalili, they should have been able to inform them of her gender.

[2] Defendants' citation to the PACER docket sheet in the *Savage* case (Mem. at 3-4 & Horowitz Decl., Exhs. 12 & 13) is particularly non-probative.  "Council on American-Islamic Relations, Inc." was named **as a defendant** in that case, in fact by Mr. Horowitz himself as counsel for the plaintiff.  CAIR obviously had no control over who the plaintiff and/or Mr. Horowitz chose to name as a defendant and the fact that a single attorney appeared for all of the defendants and may not have quibbled about the use of an older, since-changed corporate name among a list of defendants that clearly encompassed CAIR is proof of nothing.

accusations.  Defendants feign "confusion," but neither Defendants nor their attorneys could reasonably have been confused about who was suing them (*i.e.*, the entity located at 453 New Jersey Avenue, SE in Washington, DC, for whom Chris Gaubatz worked as an intern during the summer of 2008, and from which Defendants stole numerous documents), nor to whom they were returning stolen property.  Is there any doubt that they could not have been compelled to return the property to someone other than the entity from whom they took it?

Moreover, as Defendants themselves demonstrate in the assorted public filings available from the District of Columbia, a search of those records would have revealed to Defendants only one active corporation containing the words "Council on American-Islamic Relations," and that is Council on American-Islamic Relations Action Network, Inc."  (*See* Horowitz Decl., Exh. 4.)

If Defendants had suffered from any confusion at all as to who was suing them, they should have raised that question in response to CAIR's motion for preliminary injunction. Instead, Defendants affirmatively agreed to subject themselves to the Court's jurisdiction and the entry of a preliminary injunction and appear to have had no difficulty in identify and returning documents they had stolen from the party that had sued them.  Accordingly, any inaccuracy or lack of precision in the Complaint is purely a matter of technical legal parlance, which can be corrected in short order with no prejudice to anyone.  *Cf. Flynn v. Pulaski Const. Co., Inc.*, 2006 WL 47304, at *6 (D.D.C. Jan. 6, 2006) (stating rules "do[] not allow the Defendant to hide behind *de minimis* or hyper-technical defects in the Complaint").

### B.    The First Amendment Does Not Bar This Litigation

### 1.    <u>This Action Does Not Implicate the First Amendment</u>

To the extent Defendants contend that the First Amendment operates as any kind of general bar upon or limitation of the claims asserted by CAIR (*see* Mem. at 11-13, 32), they

quite simply are incorrect.  For example, at the end of the brief, Defendants invoke the First Amendment generally, decrying the state of affairs "[i]f the press or publishers had to prove the purity of their sources before publishing …."  (Mem. at 32.)  But it is not the conduct of Defendants' "sources" of which CAIR complains—it is the malicious, unethical, and potentially criminal conduct of ***Defendants themselves*** that is at issue in this case.

Even presupposing that Defendants could properly be characterized as members of the press (which CAIR has neither alleged nor admitted, and Defendants have not themselves even affirmatively claimed), "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news."  *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991).

Information sought to be published, whether truthful or not, must have been obtained lawfully.  *Id.*  A publisher "has no special immunity from the application of general laws" and "has no special privilege to ivade the rights and liberties of others."  *Id.* at 679.  "Accordingly, enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations."  *Id.* (refusing to apply any heightened scrutiny to enforcement of state promissory estoppel law against newspaper); *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 521 (4th Cir. 1999) (same with respect to state law breach of duty of loyalty and trespass claims).

As has been made very clear by the Supreme Court, "[t]he press may not with impunity break and enter an office or dwelling to gather news," *Cohen*, 501 U.S. at 669, or "disregard promises that would otherwise be enforced under state law."  *Id.* at 672; *see also Desnick v. Am. Broad. Cos.*, 44 F.3d 1345, 1355 (7th Cir. 1995) ("the media have no general immunity from tort or contract liability").  In absolutely no way can Defendants claim or imply that the First

Amendment somehow protects their conduct in intruding upon CAIR's property, deceiving

CAIR, breaching contractual and fiduciary duties to CAIR, stealing CAIR's property, and

violating CAIR's reasonable expectations of confidentiality.

### 2.   Plaintiff Does Not Seek Damages for Injury to its Reputation or State of Mind

Defendants wrongly characterize the Complaint as seeking solely what they describe as

"publication damages" and argue that such claims are precluded by the First Amendment absent

proof of actual malice.  (Mem. at 13-17.)  It is true that the law does not permit a plaintiff to

recover defamation-type damages under non-reputational tort claims.  But the "defamation-type

damages" which the First Amendment precludes absent satisfaction of constitutional libel

standards are claims for injury to reputation and state of mind resulting from publication.  *See*

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988).  The Complaint does not seek either type of

damages.[3]

The Supreme Court has recognized that other types of damages can result from

publication and that those types of damages *are* recoverable without proof of actual malice.

*Cohen*, 501 U.S. at 670-71 (holding plaintiff could recover damages for loss of his job and

diminishment of his earning capacity resulting from newspaper's publication of his identity in

breach of its promise not to do so).  Accordingly, libel standards apply only to damage claims for

reputational or state of mind injuries from a publication; they do not apply to damage claims for

---

[3] CAIR does, of course, dispute the truth of Defendants' accusations and conspiracy theories.  Defendant Paul David Gaubatz's book, however, devotes little time to actually making the central allegation that CAIR supports or is somehow connected with terrorist groups.  Much of the book is devoted to critiquing CAIR and/or its representatives for their handling of civil rights matters, alleged over-sensitivity to discrimination against Muslims, alleged inconsistency and/or inaccuracy of public statements made by CAIR, and the allegedly authoritarian manner in which the organization is run.  Whether accurate or not, such petty accusations have nothing to do with terrorism. The fact is that Defendant Paul David Gaubatz's book simply does not connect CAIR to terrorism in any way, though he has certainly promoted it as if it does.  Contrary to Defendants' claims (Mem. at 15), *Muslim Mafia* is a decidedly unserious book that only warrants CAIR's attention due to the criminal and tortious conduct which it admits Defendants perpetrated upon CAIR.

injuries other than harm to reputation that may have resulted from publication. *Id.* at 669-71.

As alleged in the Complaint, the documents stolen by Defendants include, among other things, (1) materials subject to the attorney-client privilege and/or work product doctrine; (2) proprietary materials; (3) confidential materials; and (4) other internal or otherwise non-public CAIR documents reflecting internal or otherwise non-public CAIR affairs.  The Complaint further alleges that Defendants disclosed these documents to others, including but not limited to publication for general consumption in the book *Muslim Mafia* and on Paul David Gaubatz's blog.  Such disclosures (both by general publication and in more limited fashion to third parties) vitiated the confidentiality of those materials and information and thereby substantially diminished the value and injured CAIR's rights to use and protect that information.

These are not injuries to reputation or state of mind; they are injuries to CAIR's ability to use and economically benefit from its non-public information.  In fact, it is disclosure (not necessarily publication) that produces the injury.  The same injuries would have been suffered even if Defendants had never posted or published any documents or information for access by the general public.  To be sure, Defendants' publication of certain documents and information therefrom may have magnified the extent of the injury, but it was not an essential component of the injury itself.

Further, the Complaint asserts claims for damages reflecting Defendants' unjust enrichment by virtue of their unlawful conduct, punitive damages, and exemplary damages. Defendants do not even attempt to argue that these damages are "publication damages" barred by the First Amendment.  (*See* Mem. at 14 n.7 (specifically excluding "Claim for Relief Number 5" from First Amendment analysis).)

At any rate, "[a] motion to dismiss is not the proper method for determining what

damages are recoverable in an action.  Thus, a motion to dismiss will not lie on the ground that the damages claimed are remote, uncertain, or speculative in character, and cannot be the subject of recovery."  71 C.J.S. Pleading § 649; *see also Mancuso v. Santucci*, 69 A.2d 274, 275 (D.C. 1949) ("An improper measure of damages is not a ground for dismissal.  For, as it has been held: 'allegations of damages are essential in a bill of complaint, but they do not constitute the cause of action.'") (footnotes omitted).And this case is still at a very early stage.  CAIR is only beginning to learn the extent of that which Defendants stole and what and to whom they disclosed those stolen materials.  To the extent Defendants complain that the Complaint does not set out all of CAIR's damages exhaustively and in detail, such would have been impossible at the time the Complaint was filed because CAIR could only infer what precisely it was that Defendants had stolen.  Accordingly, in addition to being unsupported by the allegations in the Complaint, Defendants' argument that CAIR's only damages are constitutionally-protected "publication damages" is wrongly premised on a speculative assumption made by Defendants prior to any discovery in the case.  *See Steele v. Isikoff*, 130 F. Supp. 2d 23, 29 (D.D.C. 2000) (Kollar-Kotelly, J.) (dismissing plaintiff's claims to the extent they called for reputational damages, but refusing to dismiss claims altogether as allegations in complaint potentially encompassed both reputational and non-reputational harm and, because discovery had not yet taken place, the nature of plaintiff's damages claims were not definite**).**

## B.    Plaintiff Has Stated a Claim for Conversion

Defendants present three arguments challenging CAIR's claim for conversion:  (1) that taking files meant to be shredded is not conversion, (2) that publication damages cannot be recovered on a claim for conversion, and (3) that the illicit copying of digital files does not constitute conversion.  (Mem. at 17-20.)  Each of these arguments either fails or is inapposite.

1.      **The Complaint Is Not Premised Solely Upon Theft of Documents Chris Gaubatz Was Instructed to Shred and, Even if It Were, Theft Under Such Circumstances Still Constitutes Conversion**

With respect to the first contention, Defendants incorrectly limit the Complaint to the allegation that Chris Gaubatz stole documents that were intended for shredding. But the allegations are not so limited. (*See* Compl. ¶¶ 28, 29, 50.) While Defendants criticize CAIR for not specifically alleging that the documents they stole from CAIR had been bound for the shredder (Mem. at 5), in challenging the conversion claim Defendants conversely seek to read CAIR's Complaint as if it ***only*** alleges that they stole documents to which Chris Gaubatz was given access for the purpose of shredding them.

However Defendants may attempt to spin it, the Complaint plainly alleges that Chris Gaubatz "accessed, inspected, and reviewed documents that he was not authorized to access, review, or inspect" (Compl. ¶ 28), that he "physically removed in excess of 12,000 internal, sensitive CAIR documents from CAIR's premises that he was not authorized to so remove" (*id.* ¶ 29), and that Defendants "remov[ed] numerous documents from [CAIR's] premises without CAIR's authorization or consent" (*id.* ¶ 50). To be sure, the Complaint references Defendant Paul David Gaubatz' admissions in the book *Muslim Mafia* (*id.* ¶ 35), but any limitation that might arguably be applied to his admissions have no bearing upon the scope of the ***allegations*** in the Complaint.

Moreover, even as to documents intended for shredding, Defendants' conduct constituted an unlawful exercise of ownership, dominion or control over CAIR's property in denial or repudiation of its rights thereto. Defendants attempt to analogize the Complaint's allegations to the facts in *Pearson v. Dodd*, 410 F.2d 701 (D.C. Cir. 1969), in which the court found that no conversion occurred where documents had been "removed from the [plaintiff's] files a[t] night, photocopied, and returned to the files undamaged before office operations resumed in the

11

morning" such that the plaintiff was never deprived of their use.  *Id.* at 707.

But the facts alleged are not analogous to the facts of *Pearson*.  First, the defendants in *Pearson* were not the thieves, but rather reporters who ultimately made public disclosures of information contained within documents stolen **by others**.  *See* 410 F.2d at 703.  There was no allegation in *Pearson* that the defendant-reporters had conspired in or solicited the theft and copying of the documents, only that they had received the copies and had been made aware of the manner in which they had been obtained.  *See id.*  Here, by contrast, Defendants **are** the thieves.  As made clear in one of the passages from *Pearson* quoted (though not emphasized) by Defendants, "[w]here there is intrusion, the intruder should generally be liable whatever the content of what he learns."  (*See* Mem. at 19 (quoting *Pearson*, 410 F.2d at 705.)

In other words, while the First Amendment might protect the publication of stolen information by a reporter who was not himself party to the theft thereof, it does not provide license to invade, intrude, upon and steal the property of others.  If it did, any thief could immunize himself from prosecution simply by publishing that which he had stolen.

Second, Defendants are not alleged to have merely copied documents which remained otherwise subject to CAIR's custody and control.  Instead, Defendants took them, supplanting CAIR's dominion and control over the documents and replacing it with their own.  CAIR determined that the documents should be disposed of in a particular fashion and communicated explicit instructions to its agents—a clear and intended exercise of its property rights.  Defendants interfered with those instructions, not only dispossessing CAIR of the original documents but further depriving it of the ability to determine how and in what manner they would be maintained and/or disposed of.

The use or transfer of property entrusted to a person without authorization and in

12

contravention of the owner's express instructions as to what is to be done with the property

constitutes conversion. *See Fotos v. Firemen's Ins. Co. of Washington, DC*, 533 A.2d 1264,

1267 (D.C. 1987) ("A bailee's unauthorized transfer of goods in breach of a bailment contract is

an 'exercise of ownership, dominion and control' inconsistent with the bailor's rights, and thus

constitutes conversion.") (citing *Lipman v. Petersen*, 575 P.2d 19, 21 (Kan. 1978) (when person

is entrusted with goods of another, putting goods in hands of third person without authorization

constitutes conversion)).[4]  In *Pearson*, Senator Dodd's property rights were not interfered with or

supplanted in such a manner.

Further, in *Pearson* the value of the documents at issue was limited to "their usefulness as

records of the business" and none of them contained or embodied "information or ideas whose

economic value depends in part or in whole upon being kept secret."  *Id.* at 707.  As detailed

above (*supra* at \_) and previously recognized by the Court (Doc. 10 at \_), such is not the case

here.  A number of the documents stolen by Defendants contain proprietary and/or attorney-

client privileged information, matter whose value depends upon confidentiality.

### 2.     Again, CAIR Is Not Seeking to Recover Publication Damages

Improperly relying again on *Pearson* and reiterating their misapprehension of CAIR's

damages claims, Defendants make what amounts to little more than a rhetorical point that

"injuries from intrusion and injuries from publication should be kept clearly separate."  (Mem. at

19 (quoting *Pearson*, 410 F.2d at 705.)  But CAIR is not seeking to recover damages resulting

from publication in the sense of defamation, but rather damages resulting from Defendants' theft

of its property.  The Complaint clearly alleges that the documents stolen by Defendants included

---

[4] *See also* Restatement (Second) Torts § 228 (1965) ("One who is authorized to make a particular use of a chattel, and uses it in a manner exceeding the authorization, is subject to liability for conversion to another whose right to control the use of the chattel is thereby seriously violated.").

documents containing confidential, proprietary, and/or privileged information.  (*See* Compl. ¶¶ 5, 37, 39, 42.)  To be sure, some (though certainly not all) of the documents stolen by Defendants may be worth nothing more than the nominal value of the paper on which they are printed,[5] but Defendants' own block quote from *Pearson* makes clear that "a judgment for conversion can be obtained with only nominal damages …."  (*See* Mem. at 19 (quoting *Pearson*, 410 F.2d at 707.)

### 3.    Defendants' Theft of Electronic Files Also Constitutes Conversion

Anticipating (though not acknowledging) the difference between after-hours copying of documents as was at issue in *Pearson* and the permanent, physical removal of original documents, Defendants claim that they cannot be liable for conversion based upon copying files from CAIR's computers.  However, as detailed previously, there is a difference between holding a thief liable for conversion (which CAIR seeks to do here) and holding a third party recipient of illicitly copied documents liable for conversion (as the plaintiff sought to do in *Pearson*).  Further, *Pearson* limits its holding to situations where the value of the documents at issue is limited to "their usefulness as records of the business" and none of them contained or embodied "information or ideas whose economic value depends in part or in whole upon being kept secret."  410 F.2d at 707.  Here, the Complaint alleges that among the documents stolen were privileged, proprietary, and otherwise confidential materials.  (Compl. ¶¶ 36-37, 39.)

Even if Defendants' general proposition that taking a copy of an electronic file does not amount to conversion is correct and is applicable to Defendants' circumstances in this case, it remains a matter of fact to be determined in the course of the litigation which, if any, of the documents stolen from electronic sources and whether those documents (even if merely copies)

---

[5] Indeed, anyone who may have actually credited the claims made in the book *Muslim Mafia* or on Paul David Gaubatz's blog will be disappointed to learn that a fair portion of the supposedly damning stockpile of documents stolen by Defendants and on which those claims are supposedly based consist of old newspaper articles, magazines, and restaurant delivery menus.  Nonetheless, they are CAIR's to dispose of as they choose.

contained information with independent economic value.  As the Court has already recognized, one of the documents posted by Paul David Gaubatz on his website was a donor list in the form of a computer-generated spreadsheet.  (*See* Doc. 10 at 16.)  Moreover, until it can be determined precisely what electronic files Defendants stole, it cannot be known whether Chris Gaubatz merely stole copies or whether he affirmatively removed documents.

### C.    Plaintiff Has Stated a Claim for Breach of Contract

Defendants' only challenges to the breach of contract claim are (1) that the contract is between Chris Gaubatz and CAIR; and (2) that there was no consideration**.**  The first argument flows from Defendants' flawed contention that "CAIR … does not exist."  (Mem. at 2.)  But the United States Supreme Court has itself observed that "a contract is not avoided by misnaming the corporation with which it is made." *County of Moultrie v. Fairfield*, 105 U.S. 370, 377 (1881).  It is well understood that a mere misnomer of a corporation in a written instrument or other business transaction is not material in its consequences "if the identity of the corporation intended is clear or can be ascertained by proof."  6 William M. Fletcher, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 2444 (1996).  Moreover, "'A contract entered into under an assumed, ficititious, or representative name is generally valid and binding." *Carroll v. Sparks*, 218 A.2d 517, 518 (D.C. 1966) (quoting 17 Am.Jur.2d Contracts § 295, p. 712 (1964)).  "[A]s long as the identity of the corporation can be reasonably established from the evidence[,] ... [e]rror in the use of the corporate name will not be permitted to frustrate the intent which the name was meant to convey."  6 FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 244; *see also In re B-F Bldg. Corp.,* 284 F.2d 679, 680 (6th Cir.1960) ("[T]he misdescription of the name of the bankrupt [corporation] d [oes] not affect the validity of the contract where the intention was to bind the bankrupt corporation.").

As to Defendants' second argument, to state a breach of contract claim a complaint need not allege specifically that the contract was supported by consideration. *See Santana Row Hotel Partners, L.P. v. Zurich Am. Ins. Co.*, 446 F. Supp. 2d 1108, 1115 (N.D. Cal. 2006) (holding plaintiff "need not allege consideration in pleading breach of contract"). Accordingly, lack of consideration is a defense that may be pled by a defendant, but need not be negated in the complaint. At any rate, the Complaint alleges the existence of a contract and thereby implicitly alleges the existence of consideration. *Id.* ("In any event, in alleging the existence of a contract, Plaintiff has implicitly alleged that consideration also existed for entering into the contract."). Further, the Complaint attaches a copy of the form of the contract, which itself states "FOR GOOD CONSIDERATION, and in consideration of being a CAIR intern …." (Compl., Exh. A.)

Defendants claim that "the job itself can't be the consideration because the pleading alleges that defendant worked for CAIR for months before signing the document and past conduct cannot be consideration for a later contract." (Mem. at 21.) But the Complaint ***does not*** allege that Chris Gaubatz "worked for CAIR for months before signing the document"; rather, it alleges that he first "sought and obtained an internship ***with CAIR's Maryland-Virginia chapter office***" (Compl. ¶ 16 (emphasis added)) and then later sought and obtained an internship with CAIR's national office located in Washington, D.C. and that he signed the Confidentiality and Non-Disclosure Agreement at that time (*id.* ¶¶ 17, 23). [fnThe Complaint does not, as Defendants claim, "make CAIR-Virginia and CAIR[] a single entity." (Mem. at 21.) Further, even if CAIR's Maryland-Virgnia chapter office and CAIR's national office were or were alleged to be the same corporate entity, ***continued*** employment most certainly can serve as consideration for a contract entered into during the course of an employment relationship. *Kauffman v. Int'l Brotherhood of Teamsters*, 950 A.2d 44, 48 (D.C. 2008).

**D.      Plaintiff Has Stated a Claim for Breach of Fiduciary Duty**

Defendants argue that CAIR has failed to allege facts establishing a fiduciary relationship, that "[i]t is not enough to say that Chris Gaubatz was an intern."  (Mem. at 21-22.) To the contrary, the existence of a principal-agent relationship itself triggers certain fiduciary duties as a matter of law.  Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters concerned with his agency.  *See PM Servs. Co. v. Odoi Assoc.*, 2006 WL 20382, at *27 (D.D.C. Jan. 4, 2006) (citing Restatement (Second) of Agency § 387); *see also Fiber Optics Tech., Inc. v. Mowry*, 2003 WL 21772020, at *4 (Conn. Super. Ct. July 15, 2003) ("Even without a contractual obligation, 'the very relationship [between employer and employee] implies that the principal has reposed sonic trust or confidence in the agent and that the  agent or employee is obligated to exercise the utmost good faith, loyalty and honesty toward his principal or employer ….'") (quoting *Town & Country House & Homes Serv. v. Evans*, 189 A.2d 390 (Conn. 1963)); *BIEC Int'l, Inc. v. Global Steel Servs., Ltd.*, 791 F. Supp. 489, 548 (E.D. Pa. 1992) ("Under Pennsylvania law, the duty of an employee not to disclose the secrets of his employer may arise either from an express contract, or may be implied from the confidential relationship existing between the employer and employee.").

An intern—just like an employee or independent contractor—is an agent.  "A gratuitous agent is subject to the th[is] rule … as fully as is an agent who is paid for his services." Restatement (Second) Agency § 387, cmt. c; *see also* 3 Am. Jur. 2d Agency § 205 (2009) ("The agent or employee is bound to exercise the utmost good faith, loyalty, and honesty toward the principal or employer, regardless of whether the agency is one coupled with an interest, or the compensation given the agent is small or nominal, or that it is a gratuitous agency."); 3 Am. Jur.

2d Agency § 208 (2009) ("A gratuitous agent, insofar as exercising good faith is concerned, is held to the same obligation as any other agent.").

Further, the Complaint alleges that CAIR entrusted Chris Gaubatz with general access to CAIR's facilities, but that he failed to abide by the instructions and directives given him and exceeded the scope of any authority conferred upon him to access CAIR's internal documents and non-public meetings and conversations.  (Compl. ¶¶ 21, 43-47.)  The District of Columbia does not ascribe to a narrow or stagnant understanding of a fiduciary, instead it has "deliberately left the definition of 'fiduciary relationship' flexible so that the relationship may change to fit new circumstances in which a special relationship of trust may properly be implied."  *High v. McLean Fin. Corp.*, 659 F. Supp. 1561, 1568 (D.D.C. 1987) (applying District of Columbia law). Recognizing the broad scope of such relationships, the district court, applying District of Columbia law, in *Church of Scientology Int'l v. Eli Lilly and Co.* quoted the Southern District of New York:

> Broadly stated a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another.  It is said that the relationship exists in all cases in which influence has been acquired and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another....

848 F. Supp. 1018, 1028 (D.D.C. 1994) (quoting *Schmidt v. Bishop*, 779 F. Supp. 321, 325 (S.D.N.Y. 1991)).  CAIR entrusted Defendant Chris Gaubatz with access to CAIR's facilities and confidential information, including attorney-client privileged documents.  Even if alleging Defendant Chris Gaubatz worked as an intern for CAIR were not enough to establish a fiduciary relationship, the additional facts alleged in the Complaint make clear that CAIR placed trust in and relied upon him.

### E.       Plaintiff Has Stated a Claim for Trespass

Defendants, citing no authority, appear to argue that an element of a trespass claim is that "the premises were private or not open to the public." (Mem. at 22.) To the extent Defendants' point is that the Complaint does not allege that CAIR's offices were not open to the public, such is neither an element of trespass nor required to be specifically pled. District of Columbia law, relying upon the Restatement (Second) of Torts, defines trespass as "the intentional intrusion of a person or thing upon property that invades and disrupts the owner's exclusive possession of that property." *Daily v. Exxon Corp.*, 930 F. Supp. 1, 2 (D.D.C. 1996) (citing *Carrigan v. Purkhiser*, 466 A.2d 1243, 1244 (D.C. 1983) and Restatement (Second) of Torts §§ 158-59 (1965)). Trespass does not include as an element the non-public nature of the property.

To be sure, express or implied consent can serve as *a defense* to trespass. One way in which a property owner can consent to a trespass is by making the property open to the public, thus providing implied consent to enter the property at least so long as the person entering upon the property acts consistent with the purposes of the owner's business or facility.[6] As alleged in the Complaint (and as Defendants would be hard-pressed to deny), Defendants did not act consistent with CAIR's purposes or authorization. (Compl. ¶¶ 27, 43-47.) Therefore, even assuming that CAIR was required to negate a potential defense of implied consent, it did so.

Moreover, to the extent Defendants are suggesting CAIR has not alleged that its offices are private property or that CAIR did not consent to Defendants' intrusion, that suggestion is simply inaccurate. Though it may not employ the particular phrase "private property," the Complaint repeatedly alleges that Defendants accessed, entered, and/or removed documents from

---

[6] *See* 75 Am.Jur.2d Trespass § 73 (2009) ("When a business, public facility, or common area is open to the public, a person who enters the facility, at a reasonable time and in a reasonable manner, has the implied consent of the owner or the possessor to be there, and so long the person does not engage in an act inconsistent with the purposes of the business or facility, there is no trespass.").

"CAIR's offices," "CAIR's facilities," "CAIR's premises," and "CAIR's property." (Compl. ¶¶ 15, 21, 22, 23, 29, 30, 43, 50, 68-70.) As to lack of consent, the Complaint repeatedly alleges that Defendants' actions were "without any consent or authorization" and/or "without CAIR's consent or authorization" (Compl. ¶¶ 3, 4, 28, 31, 43-47) and that their access to CAIR's property was obtained by and/or premised upon misrepresentations as to Defendant Chris Gaubatz's identity and purpose (*id.* ¶¶ 2, 15-16, 18-22, 69), thus invalidating any consent CAIR may have given. *United States v. Kearney*, 498 F.2d 61, 66 (D.C. Cir. 1974) (holding consent to entry obtained by defendants' misrepresentation of identity and intentions was "not with the will of the occupants"); *Dine v. Western Exterminating Co.*, 1988 WL 25511, at *11 n.14 (D.D.C. Mar. 9, 1988) (specifically announcing court's intention to follow Restatement (Second) of Torts § 892B in instructing jury as to principle that consent is vitiated by a substantial mistake of fact).

Defendants also contend that no damages resulted from their trespass, citing *Decker v. Dreisen-Freedman, Inc.*, 144 A.2d 108 (Mun. Ct. App. D.C. 1958). While *Decker* does state that "[i]n case of actual injury to realty resulting from trespass the measure of damages is the difference between the value of the realty before the injury and its value after the injury," *id.* at 110, in no way does it support the proposition that "actual injury to realty" is a necessary element to a claim for trespass. Indeed, *Decker* goes on to state, ***in the very same paragraph***, that "[i]n any event, proof of trespass would warrant recovery of nominal damages." *Id.* Accordingly, *Decker* merely stands for the proposition that, in a case of actual injury, damages are measured a certain way.

Indeed, the Restatement expressly states that "[o]ne is subject to liability to another for trespass, ***irrespective of whether he thereby causes harm to any legally protected interest of the other***, if he intentionally … enters land in the possession of the other, or causes a thing or third

20

person to do so ….."  Restatement (Second) of Torts § 158 (1965); *see also id.* § 163 ("One who intentionally enters land in the possession of another is subject to liability to the possessor for a trespass, although his presence on the land causes no harm to the land, its possessor, or to any thing or person in whose security the possessor has a legally protected interest.").

F.      **Plaintiff States a Claim Under the Electronic Communications Privacy Act**

Defendants challenge CAIR's claim under the Electronic Communications Privacy Act (ECPA), specifically 18 U.S.C. § 2701(a), arguing that "CAIR's offices are not a communications facility" and that an item is not in "electronic storage" if it is on "an end user's computer."  (Mem. at 23.)  Both arguments stray far beyond the statutory language and misapply case law relating to an entirely different factual scenarios and/or different provisions of the ECPA and other electronic privacy laws.

With respect to the first argument, § 2701(a) does not use the term "communications facility," but rather "facility through which an electronic communication service is provided." "Electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).  The term "facility" is not defined by the statute, but *Black's* defines "facility" as "[s]omething that is built or installed to perform some particular function …."  *Black's Law Dictionary* at 531 (5th Ed. 1979).  While Defendants' statement that "CAIR's offices are not a communications facility" may be correct, it is stated too broadly to have any significance to the question at hand.

The question is not whether CAIR's offices are a "facility" within the meaning of § 2701(a), as the Defendants would have the court believe, but whether the computers and/or network and email servers that CAIR provides to its employees are such facilities.  The law makes clear that they are.  "Numerous courts have found that employers which provide their employees with "'the ability to send or receive electronic communications' are 'person[s] or

entit[ies] providing a wire or electronic communications service' …." *Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, 2007 WL 4394447, at *6 (E.D. Pa. Dec. 13, 2007) (citations omitted). Accordingly, accessing electronic communications maintained on a company computer server or system falls within the scope of § 2701(a). *Bloomington-Normal Seating Co., Inc. v. Albritton*, 2009 WL 1329123, at *4 (N.D. Ill. May 13, 2009) ("A defendant violates the [ECPA] when he intentionally accesses his co-worker' email accounts without authorization."); *Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967, 976 (M.D. Tenn. 2008) ("[W]here the facts indisputably present a case of an individual logging onto another's email account without permission and reviewing the material therein, a summary judgment finding of an [ECPA] violation is appropriate.") (internal citation omitted); *Freedom Calls Foundation v. Bukstel*, 2006 WL 845509, at *27 (E.D.N.Y. March 3, 2006) (holding emails sent to work email account and stored on employer's computer system were subject to ECPA, but that employer had right to search emails because it had provided employee "the ability to send and receive electronic communications"); *Bohach v. City of Reno*, 932 F. Supp. 1232, 1236 (D. Nev. 1996) (holding City was provider of "electronic communications service" where it provided personnel terminals, computer, software, and pagers and, by virtue of § 2701(c)(1), could access communications in storage anywhere thereon).

Defendants' second argument (that any electronic communications they obtained were not "in electronic storage in such system") yet again ignores the law, this time the second prong of § 2510(17)'s definition of "electronic storage" and is refuted by the case law they cite. *Theofel v. Farey-Jones*, 359 F.3d 1066 (9th Cir. 2004), twice referenced by Defendants, specifically holds that an email message that remains on a server after delivery falls within the second prong of the statutory definition of "electronic storage." *Id.* at 1075.

Defendants' final point referencing a purported "requirement that the electronic communication must be 'in transit' and not stored on an end user's computer" is a wide of the mark reference to the case law interpreting the use of the word "intercept" in the Wiretap Act, as amended by Title I of the ECPA.  *See* 18 U.S.C. § 2511(1)(a) (providing criminal penalties for "any person who … intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, oral, or electronic communication …").  But § 2701—Title **II** of the ECPA—applies where a person "intentionally accesses" or "exceeds an authorization to access" a facility through which an electronic communication service is provided "and thereby obtains, alters, or prevents authorized access to a wire or electronic communication ***while it is in electronic storage in such system*** …."  18 U.S.C. § 2701(a) (emphasis added).  The three block quotes provided by Defendants on page 24 of their brief all address the interpretation of the word "intercept" for purposes of the Wiretap Act.

### G.      CAIR Is a Real Party in Interest

Defendants' contention that CAIR is not a real party in interest is premised on its fallacy that "CAIR … does not exist."  (Mem. at 2.)  As detailed previously, the Council on American-Islamic Relations Action Network, Inc. does indeed exist and the misnomer in the Complaint referring only to the abbreviated "Council on American Islamic Relations" is readily remedied.

Defendants are correct that Rule 17(a) requires that all actions be prosecuted in the name of the real party in interest, but it also provides that:

> No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Fed. R. Civ. P. 17(a).  Here, the Complaint was, in fact, brought in the name of the real party in interest, although that party was mistakenly identified by an abbreviated name.  Accordingly, no substitution is actually even required, only a clarification and supplementation of the name of the plaintiff.

In any event, the Defendants would be hard pressed to find, and apparently did not find any authority supporting the dismissal of a complaint *with prejudice* for failure to include the real party in interest.  Surely someone's attempt to prosecute the rights of a third party and the dismissal of that effort based on the fact that the rights sought to be vindicated belong to another would not preclude that other from later acting in his own right.  At most, dismissal should be without prejudice so that the proper party can assert its rights if it so chooses.  Because no statute of limitations issues are presented in this case, even if the Complaint of "Council on American-Islamic Relations" were dismissed today, there would be no legal or procedural obstacle to the proper plaintiffs, Council on American-Islamic Relations Action Network, Inc. and CAIR-Foundation, Inc., d.b.a. "Council on American-Islamic Relations," immediately bringing its own action.  Accordingly, dismissal is unwarranted as a matter of judicial economy.

### H.    CAIR Has Standing

Defendants contend CAIR lacks standing because it lacks an injury in fact.  (*See* Mem. at 27-30.)  First, to the extent this argument is based upon the purported "non-existence" of CAIR, the argument is a red herring for the reasons previously stated.  *See Hilgraeve Corp. v. Symantec Corp.*, 212 F.R.D. 345, 347, 349 (E.D. Mich. 2003) (rejecting dismissal argument based upon lack of standing resulting from misnomer in complaint resulting in identification of entity that "legally does not exist").

Anticipating the correction of the misnomer in the Complaint, Defendants argue that no

amendment of the Complaint should be permitted to create jurisdiction where it did not

previously exist.  (*See* Mem. at 33-34.)  But that would not be the effect of the correction of the

misnomer in the Complaint.  In the cases relied upon by Defendants the court dismissed the case

because the plaintiff named in the original complaint was not the proper party from the outset

and, therefore, the substitution of a new plaintiff would not change the fact that the plaintiff

named in the case to that point lacked standing to assert the claims at hand.  *Compare Lans v.*

*Gateway 2000, Inc.*, 84 F. Supp. 2d 112 (D.D.C. 1999) (in patent infringement case, refusing to

permit substitution of current owner of patent for originally named plaintiff who had owned

long-since assigned patent); *Vianix Del. LLC v. Nuance Communications, Inc.*, 2009 WL

1364346 (D. Del. May 12, 2009) (refusing to permit plaintiff asserting copyright infringement

claims to substitute owner of copyright for party originally named as plaintiff who was not legal

owner because original plaintiff "could not have suffered an invasion of its legally protected

interest" and, therefore, did not have Article III standing when complaint was filed).

But CAIR has and has always had standing to assert these claims against Defendants and

the defect, if any, in the Complaint is only that the plaintiff is identified ***incompletely***, not that

the wrong plaintiff is identified altogether.  *See Hilgraeve Corp.*, 212 F.R.D. at 347, 349

(allowing amendment under such circumstances).  To the extent there is a defect in the manner in

which CAIR is identified in the original Complaint, such is at most a defective allegation of

jurisdiction which the law recognizes may be cured without necessity of dismissal and refiling.

*See* 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the

trial or appellate courts."); *Stafford v. Mobil Oil Corp.*, 945 F.2d 803, 806 (5th Cir. 1991) (party

may amend to make complete statement of jurisdiction).  Defendants have suffered no prejudice

and the misnomer does not affect the Court's underlying jurisdiction because the party

referenced in the Complaint (albeit incompletely) would remain before the Court even after the amendment.

To the extent Defendants' standing argument is premised on CAIR's supposed lack of damages, that suggestion is simply not true and not inconsistent with the presence of an injury in fact in any event. Defendants incorrectly assert that "CAIR has not pled any facts to establish even a possibility of damages" (Mem. at 28), but again, Defendants ignore clear and simple language in the Complaint. CAIR specifically alleged that Defendants stole and disclosed to others privileged, proprietary, and confidential documents. The law recognizes that intangible information such as donor lists and proprietary fundraising strategies have an economic value. By stealing and widely disclosing such information, Defendants have diminished, if not completely extinguished, that value. These are real and compensable damages suffered by CAIR.[7]

Further, "injury in fact" and "damages" are not synonymous for purposes of standing. The Complaint alleges (and Defendants have largely admitted) that they stole numerous documents from CAIR and recorded meetings and conversations in violation of duties owed to CAIR and the conditions of Chris Gaubatz's authorization to access CAIR's premises. The theft alone is an injury in fact, even if that which was stolen was entirely worthless. Whatever the value of what was stolen, CAIR suffered an invasion of its legally protected interests. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (stating plaintiff must suffer an "'injury in fact'-an invasion of a legally protected interest"). Accordingly, CAIR plainly has standing.

### I.     The Case Is Not Moot

Finally, Defendants incorrectly contend that the case is moot. (Mem. at 30-32.)

---

[7] Defendants assert in passing that the amount in controversy is less there $75,000, but this contention is premised entirely on the argument that the damages sought in the Complaint are "protected publication damages" barred by the First Amendment. (Mem. at 30.) As detailed elsewhere herein, that is not the case.

Specifically, Defendants state that "[b]y stipulation, CAIR has received the items set forth in the Preliminary Injunction" and that "[t]here are no longer any issues with respect to loss of documents or damage to documents." (Mem. at 30.)  Neither statement is accurate.  CAIR has never stipulated that it has received all of the items covered by the preliminary injunction.  CAIR has received a number of documents from counsel for Defendants, but it has not had the opportunity to investigate or confirm whether such documents reflect the full extent of the items stolen by Defendants by, among other things, deposing Defendants.  It is simply not true to suggest that all parties have agreed that all of the stolen documents have been returned.  In fact, counsel for Defendants have acknowledged that Defendants gave some of the items at issue to third parties.

Nor is it accurate to say that there are no damages issues remaining.  CAIR has requested not only injunctive relief (which, in any event, it has only received preliminarily at this juncture), but compensatory, statutory, and punitive damages.  As detailed previously, although damages may be only nominal as to certain documents stolen by Defendants, there are documents at issue that have real economic value which was diminished by Defendants' conduct.  What that value was and how much it was diminished is very much an unresolved issue in the case and a subject of a request for additional relief by CAIR.

## CONCLUSION

Try as they might, Defendants cannot make this a case about their claimed "right" to publish documents, albeit stolen, because they relate to "matters of great public concern." (*See* Mem. at 33.)  Nor can they conjure a basis for dismissal of this action, ***with prejudice*** no less, from an inconsequential and entirely non-prejudicial mistake in identifying the full name of the

plaintiff in this action.  For all of the reasons stated above, the Court should deny Defendants'

Motion to Dismiss.

Respectfully submitted,

Dated:  January 15, 2010

/s/Daniel Marino
Daniel Marino (DC Bar No. 416711)
Tillman Finley (DC Bar No. 477737)
LUQUE GERAGOS MARINO LLP
910 17th Street N.W., Suite 800
Washington, D.C. 20006

*Attorneys for Plaintiff Council on American-Islamic Relations*