**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS ACTION NETWORK, INC., *et al.*,

      Plaintiffs,

    v.

PAUL DAVID GAUBATZ, *et al.*,

      Defendants.

Civil Action No. 09-02030 (CKK)

**MEMORANDUM OPINION AND ORDER**
(September 17, 2012)

Plaintiffs Council on American-Islamic Relations Action Network, Inc. ("CAIR-AN") and CAIR-Foundation, Inc. ("CAIR-F") bring this action against two sets of defendants: David Gaubatz and Chris Gaubatz (together, the "Gaubatz Defendants"); and the Center for Security Policy, Inc. ("CSP") and three of its employees, Christine Brim, Adam Savit, and Sarah Pavlis (collectively with CSP, the "CSP Defendants"). Plaintiffs allege that Defendants conceived and carried out a scheme to place Chris Gaubatz in an internship with CAIR-AN under an assumed identity, which allowed him to remove and copy thousands of Plaintiffs' internal documents and to record private conversations involving Plaintiffs' employees without consent or authorization. Plaintiffs contend that Defendants thereafter publicly disclosed and published the contents of those documents and recordings. In this action, Plaintiffs seek relief under the Federal Wiretap Act, 18 U.S.C. §§ 2510-2522, the District of Columbia analog (the "D.C. Wiretap Act"), D.C.

CODE §§ 23-541-23-556, the Stored Communications Act, 18 U.S.C. §§ 2701-2712, and the common law of the District of Columbia.[1]

There are two motions pending before the Court: the CSP Defendants' [97] Motion to Dismiss Certain Claims ("Motion to Dismiss"); and Plaintiffs' [112] Motion for Leave to File Third Amended Complaint ("Motion to Amend"). Through their Motion to Dismiss, the CSP Defendants argue that Plaintiffs cannot recover against them under the Federal and D.C. Wiretap Acts or the Stored Communications Act. Through their Motion to Amend, Plaintiffs seek to add a third set of Defendants—namely, the Society of Americans for National Existence ("SANE") and its President, David Yerushalmi ("Yerushalmi"). Plaintiffs also look to assert additional claims against all Defendants, narrow the scope of their demand for damages, and add certain clarifying allegations in support of extant claims. Upon careful consideration of the parties' submissions, the relevant authorities, and the record as a whole, the CSP Defendants' Motion to Dismiss shall be GRANTED IN PART and DENIED IN PART and Plaintiffs' Motion to Amend shall also be GRANTED IN PART and DENIED IN PART. (See infra Part IV.)

## I. BACKGROUND

### A.    Factual Background

The following factual background is derived from the well-pleaded factual allegations in the Second Amended Complaint. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."). The Court shall also provide parallel citations to, and relevant allegations from, Plaintiffs' proposed Third Amended Complaint.

---

[1]  The Federal Wiretap Act and the Stored Communications Act are commonly used shorthands for Titles I and II of the Electronic Communications Privacy Act of 1986 (the "ECPA"), 18 U.S.C. §§ 2510-2712.

1.      The Parties

CAIR-AN is a self-described national Muslim advocacy group with a mission that includes enhancing the understanding of Islam and promoting a positive image of Muslims in the United States.  (Second Am. Compl., ECF No. [76], ¶ 10; Third Am. Compl., ECF No. [112-1], ¶ 10.)  CAIR-F is an organization supporting CAIR-AN and its mission.  (Second Am. Compl. ¶ 11; Third Am. Compl. ¶ 11.)   Both CAIR-AN and CAIR-F are non-profit corporations incorporated in the District of Columbia.  (Second Am. Compl. ¶¶ 10-11; Third Am. Compl. ¶¶ 10-11.)  They share physical office space in the District of Columbia that is generally closed to the public and accessible to third parties only upon invitation.  (Second Am. Compl. ¶¶ 10-11, 27; Third Am. Compl. ¶¶ 10-11, 34.)

Chris Gaubatz is David Gaubatz's son.  (Second Am. Compl. ¶¶ 12-13; Third Am. Compl. ¶¶ 12-13.)  CSP is a non-profit corporation incorporated and located in the District of Columbia.  (Second Am. Compl. ¶ 14; Third Am. Compl. ¶ 14.)  Christine Brim, Adam Savit, and Sarah Pavlis are all employed by CSP.  (Second Am. Compl. ¶¶ 15-17; Third Am. Compl. ¶¶ 15-17.)  SANE is a non-profit corporation incorporated and located in Arizona.  (Third Am. Compl. ¶ 19.)  Yerushalmi is SANE's President and CSP's General Counsel.  (Id. ¶ 18.)

2.      Chris Gaubatz's Internship with CAIR-AN

Sometime prior to April 2008, Defendants[2] conceived a plan to infiltrate Plaintiffs' offices with the aim of obtaining Plaintiffs' internal documents and recording conversations involving Plaintiffs' employees.   (Second Am. Compl. ¶ 19; Third Am. Compl. ¶ 21.)  According to their plan, Chris Gaubatz would attempt to secure an internship with CAIR-AN under an assumed identity and deliver any materials that he was able to obtain from Plaintiffs'

---

[2]  Unless otherwise indicated, references to "Defendants" include SANE and Yerushalmi.

offices to David Gaubatz and the CSP Defendants for further dissemination.  (Second Am. Compl. ¶ 19; Third Am. Compl. ¶ 21.)

Consistent with the agreed-upon plan, Chris Gaubatz sought and obtained an internship with the office for CAIR-AN Maryland/Virginia in April 2008.  (Second Am. Compl. ¶ 20; Third Am. Compl. ¶ 26.)  But in June 2008, after it was announced that the office for CAIR-AN Maryland/Virginia would be closing, Chris Gaubatz sought an internship at CAIR-AN's headquarters in the District of Columbia.  (Second Am. Compl. ¶¶ 10, 21; Third Am. Compl. ¶¶ 10, 27.)

Chris Gaubatz obtained his internship with CAIR-AN under false pretenses.  During the application process, Chris Gaubatz, acting on Yerushalmi's advice, made false statements and omitted important facts about his background, interests, and intentions.  (Second Am. Compl. ¶¶ 22-23; Third Am. Compl. ¶¶ 28-30.)   Among other things, he used an assumed name and represented that he was a student at a liberal arts college, that his father was in the construction business, and that he was a practicing Muslim.  (Second Am. Compl. ¶ 22; Third Am. Compl. ¶ 28.)  When Chris Gaubatz made these representations, he knew them to be false, and he made them in order to induce Plaintiffs to repose trust and confidence in him so that he might obtain an internship with CAIR-AN.  (Second Am. Compl. ¶¶ 23-25; Third Am. Compl. ¶¶ 30-32.)  He succeeded and was hired as an intern.  (Second Am. Compl. ¶ 29; Third Am. Compl. ¶ 36.)

As a condition of, and in consideration for, his internship, Chris Gaubatz signed a confidentiality and non-disclosure agreement.  (Second Am. Compl. ¶¶ 29, 102; Third Am. Compl. ¶¶ 36, 112.)  The agreement provides:

Non-Disclosure of "Confidential Information"

> I agree that I shall not at any time after the termination of my internship with CAIR, use for myself or others, or disclose or divulge to others . . . any trade secrets, confidential information, or any other proprietary data of CAIR in violation of this agreement . . . . The intern further agrees to take and protect the secrecy of, and to avoid disclosure or use of, the "Confidential Information" in order to prevent it from falling into public domain or into the possession of persons not bound to maintain the confidentiality of Confidential Information.

(Second Am. Compl., Ex. A at 1-2.)  Defendants were aware of the confidentiality agreement because Chris Gaubatz told them that he had signed it.  (Id. ¶ 31; Third Am. Compl. ¶ 38.)

    3.    The Collection of Materials

Chris Gaubatz worked as an intern for CAIR-AN until August 2008, though he returned to perform additional work over a weekend in September 2008.  (Second Am. Compl. ¶ 32; Third Am. Compl. ¶ 39.)  During the course of his internship, he sought to collect information about Plaintiffs and their employees with the intention of publicly disclosing that information for profit and in order to cast Plaintiffs in a negative light.  (Second Am. Compl. ¶ 36; Third Am. Compl. ¶ 45.)  To that end, he physically removed more than twelve thousand of Plaintiffs' internal documents without authorization and delivered those documents to David Gaubatz. (Second Am. Compl. ¶¶ 37-38; Third Am. Compl. ¶¶ 46-47.)  Electronic documents, including e-mails and computer-generated spreadsheets, were obtained by accessing Plaintiffs' computers and computer systems with user-names and passwords that were not assigned to him.  (Second Am. Compl. ¶¶ 40-41; Third Am. Compl. ¶¶ 49-50.)

Chris Gaubatz also used a concealed electronic device to make audio and video recordings of conversations involving Plaintiffs' employees without authorization and consent. (Second Am. Compl. ¶ 42; Third Am. Compl. ¶ 51.)  He was able to compile over fifty computer

5

discs containing recordings of Plaintiffs' employees.  (Second Am. Compl. ¶ 44; Third Am. Compl. ¶ 53.)  The Gaubatz Defendants delivered the recordings to CSP and Christine Brim who, with the assistance of the other CSP Defendants, organized and edited the recordings. (Second Am. Compl. ¶¶ 44-46; Third Am. Compl. ¶¶ 53, 55-56.)

4.      Agreements Between Defendants

In June 2007, before Chris Gaubatz sought an internship with CAIR-AN, David Gaubatz entered into a written agreement with SANE.  (Third Am. Compl. ¶ 22.)  Pursuant to this agreement, executed by Yerushalmi on SANE's behalf, SANE engaged David Gaubatz to "serve as the Director of the Mapping Shari'a in America: Knowing the Enemy Project."  (Id., Ex. A at PDG000010.)  The two-page agreement does not specify the nature of the services David Gaubatz was expected to provide or the contours of the referenced project.  (Id., Ex. A at PDG000010-11.)  It does, however, speak of "field work" and contemplate that David Gaubatz would oversee the collection of "field data."  (Id., Ex. A at PDG000010.)  "All work product, including written, electronic, and digital material collected . . . [would] be the exclusive property of SANE."  (Id.)  Subsequently, although it is not entirely clear when, David Gaubatz and SANE terminated their original agreement through a settlement.  (Id. ¶ 54.)  In their written settlement agreement, David Gaubatz represented that he was "in possession of the materials collected during and in furtherance of the [Mapping Shari'a] Project, including the printed materials, video, and audio tapes."  (Id., Ex. C at PDG000012.)  David Gaubatz agreed to deliver all such materials to CSP.  (Id., Ex. C at PDG000013.)

David Gaubatz also entered into two written agreements with CSP.  (Second Am. Compl. ¶ 35; Third Am. Compl. ¶ 42.)  One of these agreements, entered into in September 2008, contemplated that members of David Gaubatz's "team" would "secure volunteer positions within

The Council on American-Islamic Relations" and "secretly record (using audio and video recording devices) activities they observe within CAIR offices and other locations or events, as directed by [CSP] in its sole discretion."  (Third Am. Compl., Ex. B at CSP000176.)

          5.      The Public Disclosure of Materials

Defendants publicly disclosed the documents and recordings that they obtained from Plaintiffs.  The CSP Defendants provided a compilation of recordings to the third-party publisher of WND Books and a website identified as WorldNet Daily, http://www.wnd.com (last visited September 4, 2012).  (Second Am. Compl. ¶ 47; Third Am. Compl. ¶ 57.)  Meanwhile, David Gaubatz posted documents and recordings on his blog, David Gaubatz, http://dgaubatz.blogspot.com (last visited September 4, 2012).  (Second Am. Compl. ¶¶ 56-57; Third Am. Compl. ¶¶ 66-67.)  In addition, David Gaubatz and a co-author wrote a book about Chris Gaubatz's internship with CAIR-AN.  (Second Am. Compl. ¶ 48; Third Am. Compl. ¶ 58 see also P. David Gaubatz & Paul Sperry, Muslim Mafia: Inside the Secret World That's Conspiring to Islamize America (1st ed., WND Books 2009).)  In that book, the authors characterize Chris Gaubatz's internship as a "six-month counterintelligence operation," admitting that Chris Gaubatz "routinely load[ed] the trunk of his car with boxes of sensitive documents and deliver[ed] them into the custody of investigative project leader P. David Gaubatz."  (Second Am. Compl. ¶ 50; Third Am. Compl. ¶ 60.)  The book references and quotes from materials obtained from Plaintiffs' offices, including internal memoranda, minutes of board meetings, budget reports, real estate records, bank statements, strategy papers, employee evaluations, and e-mails.  (Second Am. Compl. ¶ 51; Third Am. Compl. ¶ 61.)

7

B.      *Procedural Background*

CAIR-AN filed its original Complaint on October 29, 2009, naming as defendants the Gaubatz Defendants and ten John and Jane Does whose identities were then unknown but who were alleged to have participated in and benefitted from the activities alleged in the Complaint. (See Compl., ECF No. [1], ¶¶ 12-14.)   CAIR-AN asserted a single claim under the Stored Communications Act and common law claims for conversion, breach of fiduciary duty, breach of contract, and trespass.  (See id. ¶¶ 49-77.)

Contemporaneous with the filing of the Complaint, CAIR-AN moved for a temporary restraining order and a preliminary injunction.  (See Mem. in Supp. of Pl.'s Mot. for a TRO & Prelim. Inj., ECF No. [2-1].)  On November 2, 2009, after repeated efforts to contact the Gaubatz Defendants proved fruitless, the Court held an *ex parte* hearing to address CAIR-AN's request for a temporary restraining order.  (See Min. Entry (Nov. 2, 2009).)  On November 3, 2009, the Court granted in part and denied in part CAIR-AN's motion for a temporary restraining order, temporarily prohibiting the Gaubatz Defendants from making certain uses of materials obtained from Plaintiffs' offices and requiring the return of such materials to CAIR-AN's counsel.  See Council on American-Islamic Relations v. Gaubatz, 667 F. Supp. 2d 67 (D.D.C. 2009).

On November 19, 2009, CAIR-AN and the Gaubatz Defendants jointly moved for a consent order granting CAIR-AN's motion for a preliminary injunction.  (See Joint Mot. to Enter Consent Order Granting Prelim. Inj., ECF No. [19].)   That same day, the Court entered the proposed consent order.  (See Consent Order Granting Prelim. Inj., ECF No. [22].)  Pursuant to that order, the Gaubatz Defendants are (1) enjoined from making any use, disclosure, or publication of any document obtained from any office or facility of CAIR-AN, any recording of meetings of or conversations involving CAIR-AN's officials or employees, and any copies of

8

such documents or recordings, (2) required to remove from any website or blog under their control any such documents or recordings, and (3) required to return any such documents or recordings, including any copies, to CAIR-AN's counsel.  (See id. ¶¶ 1-4.)  Subsequently, the Court clarified that its order permits the Gaubatz Defendants' counsel, but not the Gaubatz Defendants themselves, to retain copies of the documents at issue for indexing purposes.  (See Order (Dec. 10, 2009), ECF No. [30], at 2.)   Absent further action from the Court, the preliminary injunction will remain in effect throughout this action.  (See Consent Order Granting Prelim. Inj., ECF No. [22], ¶ 5.)

Following resolution of CAIR-AN's motion for a preliminary injunction, the Court granted CAIR-AN leave to depose CSP based on CAIR-AN's representations that CSP was believed to be in possession of materials obtained from Plaintiffs' offices.  (See Order (Dec. 10, 2009), ECF No. [30], at 4.)   CAIR-AN subsequently deposed Christine Brim as CSP's designated agent under Federal Rule of Civil Procedure 30(b)(6).  (See Tr. of Dep. of Christine Brim, ECF No. [48-3].)

On December 20, 2009, the Gaubatz Defendants moved to dismiss the original Complaint.  On March 1, 2010 and April 12, 2011, Plaintiffs moved to amend the Complaint. The Court resolved all these motions on June 24, 2011, granting in part and denying in part the Gaubatz Defendants' motion to dismiss and granting both of Plaintiffs' motion to amend.  See Council on American-Islamic Relations Action Network, Inc. v. Gaubatz, 793 F. Supp. 2d 311 (D.D.C. 2011).  First, the Court  granted Plaintiffs leave to amend the Complaint to (1) clarify that references to the "Council of American Islamic Relations" in the Complaint are to CAIR-AN, (2) add CAIR-F as a second plaintiff, (3) add the CSP Defendants as defendants, (4) assert statutory claims under the Federal Wiretap Act, the D.C. Wiretap Act, and common law claims

for unjust enrichment and tortious interference with contract, and (5) introduce a handful of supplemental factual allegations in support of extant claims.  See id. at 322-30.  Second, the Court granted the Gaubatz Defendants' motion to dismiss insofar as it sought dismissal of Plaintiffs' claim for the conversion of electronic data (one component of Count Three of the Second Amended Complaint) and otherwise denied the motion, including insofar as it sought dismissal of Plaintiffs' claim for the conversion of physical documents (the remainder of Count Three of the Second Amended Complaint).  See id. at 330-45.

After the CSP Defendants filed an Answer to the Second Amended Complaint, the Court held a scheduling conference.  (See Scheduling and Procedures Order (Sept. 1, 2011), ECF No. [99].)  The Court set a schedule for discovery, which remains ongoing, and for the briefing of the CSP Defendants' pending Motion to Dismiss.  (See id. at 5-6.)  The parties briefed the Motion to Dismiss between September 1, 2011 and November 8, 2011.  (See Mem. of P. & A. in Supp. of Mot. to Dismiss Counts I & II ("CSP Defs.' MTD Mem."), ECF No. [97]; Mem. of P. & A. in Opp'n to Mot. to Dismiss Counts I & II ("Pls.' MTD Opp'n"), ECF No. [102]; Reply Br. Mem. of P. & A. in Supp. of Mot. to Dismiss Counts I & II, ECF No. [108].)

On March 2, 2012, within the Court-ordered deadline for amendments to pleadings, Plaintiffs filed another motion to amend their Complaint.  (See Pls.' Mot. for Leave to File Third Am. Compl. & Mem. in Supp. of Mot. for Leave to File Third Am. Compl., ECF No. [111].)  Before receiving a response from Defendants, the Court denied the motion without prejudice, with leave to renew after certifying compliance with the meet-and-confer requirements of Local Civil Rule 7(m) and providing "a more particularized discussion as to why leave to amend should be granted as to each of the five principal changes identified."  (Min. Order (Mar. 5, 2012).)  The parties then briefed the pending Motion to Amend between March 5, 2012 and

10

April 12, 2012.  (See Pls.' Mot. for Leave to File Third Am. Compl. & Mem. in Supp. of Mot. for Leave to File Third Am. Compl. ("Pls.' MTA Mem."), ECF No. [112]; Resp. Br. Mem. of P. & A. in Opp'n to Pls.' Mot. for Leave to File Third Am. Compl. ("Defs.' MTA Opp'n"), ECF Nos. [113, 116]; Pls.' Reply to Defs.' Opp'n to the Mot. for Leave to File the Third Am. Compl., ECF Nos. [118, 119].)

Both pending motions are fully briefed and ripe for a decision.  In an exercise of its discretion, the Court finds that holding oral argument on the pending motions would not be of assistance in rendering a decision.  See LCvR 7(f).

## II.  LEGAL STANDARDS

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. (8)(a), "in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  Rule 12(b)(6) provides a vehicle for parties to challenge the sufficiency of a complaint on the ground that it "fail[s] to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  When presented with a motion to dismiss for failure to state a claim, the district court must accept as true the well-pleaded factual allegations contained in the complaint. Atherton v. D.C. Office of Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009), cert. denied, __ U.S. __, 130 S. Ct. 2064 (2010).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  Twombly, 550 U.S. at 555.  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009) (quoting <u>Twombly</u>, 550 U.S. at 557).   Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Iqbal</u>, 556 U.S. at 678.   The plaintiff must provide more than just "a sheer possibility that a defendant has acted unlawfully."  <u>Id.</u>   When a complaint's well-pleaded facts do not enable a court, "draw[ing] on its judicial experience and common sense," "to infer more than the mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief.  <u>Id.</u> at 679.

Under the Federal Rules of Civil Procedure, a party may amend its pleadings once as a matter of course within a prescribed time period.  <u>See</u> FED. R. CIV. P. 15(a)(1).   Where, as here, a party seeks to amend its pleadings outside that time period or for a successive time, it may do so only with the opposing party's written consent or the district court's leave.  <u>See</u> FED. R. CIV. P. 15(a)(2).   The decision whether to grant leave to amend a complaint is entrusted to the sound discretion of the district court, but leave "should be freely given unless there is a good reason, such as futility, to the contrary."  <u>Willoughby v. Potomac Elec. Power Co.</u>, 100 F.3d 999, 1003 (D.C. Cir. 1996), <u>cert. denied</u>, 520 U.S. 1197 (1997).   As the Supreme Court has observed:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.   In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

Foman v. Davis, 371 U.S. 178, 182 (1962).  "[A] district court has discretion to deny a motion to

amend on grounds of futility where the proposed pleading would not survive a motion to

dismiss."  Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 945 (D.C. Cir. 2004),

cert. denied, 545 U.S. 1104 (2005).   Review for futility is practically "identical to review of a

Rule 12(b)(6) dismissal based on the allegations in the amended complaint."  In re Interbank

Funding Corp. Secs. Litig., 629 F.3d 213, 215-16 (D.C. Cir. 2010) (quotation marks omitted).

Because leave to amend should be liberally granted, the party opposing amendment bears the

burden of coming forward with a colorable basis for denying leave to amend.  Abdullah v.

Washington, 530 F. Supp. 2d 112, 115 (D.D.C. 2008).[3]

## III.  DISCUSSION

The Court shall first address the CSP Defendants' Motion to Dismiss.  (See infra Part

III.A.)  Thereafter, the Court shall turn to Plaintiffs' Motion to Amend.  (See infra Part III.B.)

   *A.*      *The CSP Defendants' Motion to Dismiss*

The CSP Defendants seek the dismissal of Counts One and Two of the Second Amended

Complaint.  The Court addresses each count in turn.

   1.      Count One of the Second Amended
              Complaint (the Federal and D.C. Wiretap Acts)

Plaintiffs bring Count One of the Second Amended Complaint under the Federal Wiretap

Act (Title I of the ECPA), 18 U.S.C. §§ 2510-2522, and the D.C. Wiretap Act, D.C. CODE §§ 23-

---

[3]  Briefly, the Court notes that, in connection with the pending motions, Defendants repeatedly
intimate that Plaintiffs' factual allegations should be required to meet a higher substantive
burden—either in connection with the notice pleading requirements of Federal Rule of Civil
Procedure 8 or the futility analysis called for in connection with a motion to amend brought
under Federal Rule of Civil Procedure 15—because the parties have engaged in some discovery.
The CSP Defendants cite no authority in support of this radical position.  The reason is simple:
there is none.

541-23-556.  Both statutes proscribe, among other conduct, the intentional interception of oral communications.  See 18 U.S.C. § 2511(1)(a); D.C. Code § 23-542(a)(1).  Of the various Defendants in this case, only one—Chris Gaubatz—is alleged to have directly intercepted oral communications.  Plaintiffs nonetheless contend that they can pursue claims under the Federal and D.C. Wiretap Acts against the CSP Defendants, and offer a handful of theories in support of that contention.  The Court addresses each theory in turn.

i.     Procurement Liability.

Plaintiffs allege that the CSP Defendants "procured Defendant Chris Gaubatz to intercept the oral communications of Plaintiffs' employees."  (Second Am. Compl. ¶ 74; see also Third Am. Compl. ¶ 84.)  In their Motion to Dismiss, the CSP Defendants concede that the D.C. Wiretap Act explicitly contemplates a civil right of action against a party who has "procured" another person to intercept oral communications.  (See CSP Defs.' MTD Mem. at 25 ("[T]he D.C. Wiretap Act retains a civil remedy for a 'procurement' violation.").)  See also D.C. Code § 23-554(a)(1) ("Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this subchapter shall . . . have a civil cause of action against any person who . . . procures any other person to intercept, disclose, or use [wire or oral] communications.").  Thus, the only question raised here is whether such a right of action exists under the Federal Wiretap Act.

The Federal Wiretap Act makes it a criminal offense for any person to "procure[] any other person to intercept" an oral communication.  18 U.S.C. § 2511(1)(a).  Prior to 1986, the Federal Wiretap Act also allowed plaintiffs to bring a civil action against a party who had "procure[d]" another person to intercept oral communications.  18 U.S.C. § 2520 (1970).  But

14

Congress deleted the procurement language from the civil liability provision when it amended

the statute in 1986.  Today, the civil liability provision states, in relevant part:

> [A]ny person whose wire, oral, or electronic communication is
> intercepted, disclosed, or intentionally used in violation of this
> chapter may in a civil action recover from the person or entity,
> other than the United States, which engaged in that violation such
> relief as may be appropriate.

18 U.S.C. § 2520(a) (2011).  The first clause defines the universe of individuals with standing to

bring suit—i.e., "any person whose wire, oral, or electronic communication is intercepted,

disclosed, or intentionally used in violation of th[e] chapter."  Id.  The remainder of the provision

defines the universe of defendants subject to suit—i.e., any person "which engaged in that

violation."  Id.  Viewed in its full context, the phrase "that violation" plainly incorporates the

description set forth in the first clause, meaning that it "refers only to illegal interception

disclosure, or use, and *not* to procuring interception by another."  Peavy v. WFAA-TV, Inc., 221

F.3d 158, 169 (5th Cir. 2000), cert. denied, 532 U.S. 1051 (2001); see also Hurst v. Phillips, No.

04-2591 M1/P, 2005 WL 2436712, at *3 (W.D. Tenn. Sept. 30, 2005); Gunderson v. Gunderson,

No. 02-1078-CVW-ODS, 2003 WL 1873912, at *2 (W.D. Mo. Apr. 14, 2003); Buckingham v.

Gailor, No. 00-CV-1568, 2001 WL 34036325, at *6 (D. Md. Mar. 27, 2001), aff'd, 20 F. App'x

243 (4th Cir. 2001) (per curiam); but see Lonegan v. Hasty, 436 F. Supp. 2d 419, 427-28

(E.D.N.Y. 2006).  In short, the plain language of the statute limits civil liability to interception,

disclosure, and use.  As one court of appeals has observed, "if Congress did *not* intend to delete a

civil procurement action, it can amend [the statute]."  Peavy, 221 F.3d at 169.  Congress has not

done so, even though the interpretation the Court adopts today has been the clear majority

position for well over a decade.  Therefore, Plaintiffs cannot pursue a claim for procurement

liability against the CSP Defendants (or, for that matter, against any other Defendant) under the

Federal Wiretap Act.   (See Second Am. Compl. ¶ 74; see also Third Am. Compl. ¶ 84.) However, Plaintiffs' procurement theory under the D.C. Wiretap Act, which has not been and cannot be challenged on this basis, remains viable.

ii.     Secondary Liability.

Plaintiffs allege that the CSP Defendants "conspired with" or "aided and abetted" Chris Gaubatz in violating the Federal and D.C. Wiretap Acts.  (Second Am. Compl. ¶¶ 75-76; see also Third Am. Compl. ¶¶ 85-86.)   In their Motion to Dismiss, the CSP Defendants argue that Plaintiffs cannot pursue such a "secondary liability" theory because it is not cognizable under either statute.   (See CSP Defs.' MTD Mem. at 8-9, 24-25.)   In opposition, Plaintiffs maintain only that a secondary liability theory is viable under the Stored Communications Act, but they offer no rejoinder to the CSP Defendants' argument that, as a purely legal matter, no such theory is available under the Federal and D.C. Wiretap Acts.   (See Pls.' MTD Opp'n at 3-22.)   Based on the absence of a meaningful response, the Court shall exercise its discretion to treat the argument that this theory is legally untenable as conceded.   See Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), aff'd, 98 F. App'x 8 (D.C. Cir. 2004) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."); accord Lewis v. District of Columbia, No. 10-5275, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011) (per curiam).   In any event, a theory of secondary liability under these statutes would fail for substantially the same reasons why such a theory fails under the Stored Communications Act.   (See infra Part III.A.2.i.) See also Kirch v. Embarq Mgmt. Co., No. 10-2047-JAR, 2011 WL 3651359, at *7 (D. Kan. Aug. 19, 2011); In re Toys R Us, Inc., Privacy Litig., No. 00-CV-2746, 2001 WL 34517252, at *7

16

(N.D. Cal Oct. 9, 2001).  Accordingly, Plaintiffs may not pursue a claim for secondary liability against the CSP Defendants (or any other Defendant) under the Federal or D.C. Wiretap Acts.

iii.      Primary Liability.

Plaintiffs allege that the CSP Defendants are "primarily liable" under the Federal and D.C. Wiretap Acts because they "willfully disclosed and used or endeavored to disclose and use the contents of the intercepted communications."  (Second Am. Compl. ¶ 77; <u>see also</u> Third Am. Compl. ¶ 87.)  <u>See also</u> 18 U.S.C. § 2511(1)(c)-(d); D.C. CODE § 23-542(a)(2)-(3).  The CSP Defendants argue that this theory must fail for two basic reasons.

First, the CSP Defendants contend that Plaintiffs have failed to adduce sufficient factual allegations to support an inference that Plaintiffs' employees had a reasonable expectation that their communications would not be subject to interception.  (<u>See</u> CSP Defs.' MTD Mem. at 10-14.)  <u>See also</u> 18 U.S.C. § 2510(2) (defining an "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation").  The CSP Defendants' argument may or may not turn out to have merit after the parties have had an opportunity to develop the evidentiary record, but it is woefully premature at this point.  As the CSP Defendants themselves observe, the relevant inquiry calls for the consideration of a host of intensely fact-bound circumstances.  (<u>See</u> CSP Defs.' MTD Mem. at 12.)  Requiring Plaintiffs to set forth such detailed factual allegations in their Complaint would take us far beyond the realm of notice pleading.  At this early stage of the proceedings, Plaintiffs' allegations are sufficient to permit an inference that the communications at issue were made with a reasonable expectation that they would not be subject to interception.  (<u>See</u> Second Am. Compl. ¶¶ 3, 6, 27, 23, 29-30, 42-43, 63, 70, 78; <u>see also</u> Third Am. Compl. ¶¶ 3, 6, 34, 36-37, 51-52, 73 80, 88.)  <u>Cf. Colandrea v. Town</u>

17

of Orangetown, 490 F. Supp. 2d 342, 347-48 (S.D.N.Y. 2007) (declining to rule on whether communications were made with a reasonable expectation of non-interception at the motion to dismiss stage).

Second, the CSP Defendants contend that Congress has established a "one-party consent" rule available to private parties as a basis for avoiding liability and that Plaintiffs' efforts to "plead around" the rule are unavailing.  (See CSP Defs.' MTD Mem. at 10, 14-24.)  True, Congress has created an exception to criminal and civil liability for a private party "where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."  18 U.S.C. § 2511(2)(d); see also D.C. CODE § 23-542(d)(3). However, this is a defense and, as such, Plaintiffs need not anticipate it or "plead around" it.  See Doe v. Smith, 429 F.3d 706, 709 (7th Cir. 2005) (holding that 18 U.S.C. § 2511(2)(d) reflects a defense that cannot justify dismissal); see also Flying Food Grp., Inc. v. NLRB, 471 F.3d 178, 183 (D.C. Cir. 2006).

In short, the CSP Defendants' arguments regarding primary liability are not amenable to resolution at this stage of the proceedings.  The CSP Defendants may re-raise such arguments, if

appropriate, upon further development of the factual record. At this time, Plaintiffs are entitled to conduct discovery on their primary liability theory.[4]

\* \* \*

For the reasons set forth above, insofar as it seeks dismissal of Count One of the Second Amended Complaint, the CSP Defendants' Motion to Dismiss shall be GRANTED IN PART and DENIED IN PART. Specifically, Count One shall be DISMISSED insofar as Plaintiffs seek to hold the CSP Defendants (or any other Defendant) liable (1) under the Federal or D.C. Wiretap Acts using a theory of secondary liability and (2) under the Federal Wiretap Act using a theory of procurement liability. Plaintiffs are, however, entitled to conduct discovery on their theories that the CSP Defendants are (1) primarily liable under either the Federal or D.C. Wiretap Acts or (2) liable under a procurement theory under the D.C. Wiretap Act only.

> 2. Count Two of the Second Amended
> Complaint (the Stored Communications Act)

Plaintiffs bring Count Two of the Second Amended Complaint under the Stored Communications Act (Title II of the ECPA), 18 U.S.C. §§ 2701-2712. Specifically, Plaintiffs claim that Defendants violated 18 U.S.C. § 2701(a), which provides:

> [W]hoever--
>
> (1)   intentionally accesses without authorization a facility through which an electronic communication service is provided; or

---

[4]   Because the Court concludes that Plaintiffs' primary liability theory under the Federal and D.C. Wiretap Acts survives the CSP Defendants' motion to dismiss on this basis, it need not address Plaintiffs' alternative argument that they can pursue their claim under the theory that Chris Gaubatz was acting as the CSP Defendants' agent in intercepting oral communications. (See Pls.' MTD Opp'n at 10-11.) However, if the Court were required to reach that question, it would find that Plaintiffs' agency theory under the Federal and D.C. Wiretap Acts would fail for the same reasons such a theory fails under the Stored Communications Act. (See infra Part III.A.2.ii.)

> (2)    intentionally exceeds an authorization to access that facility;
>
> and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 2701(a).  Congress created a civil cause of action for violations of Section 2701(a) (and other parts of the Stored Communications Act not at issue in this case) through 18 U.S.C. § 2707(a).  That section provides:

> [A]ny . . . person aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity . . . which engaged in that violation such relief as may be appropriate.

Id. § 2707(a).  Plaintiffs offer two theories as to how the CSP Defendants may be held liable under these provisions.  The Court addresses each theory in turn.

### i.    Secondary Liability.

Of the various defendants, only Chris Gaubatz is alleged to have accessed Plaintiffs' computers and computer servers, networks and systems.  (See Second Am. Compl. ¶¶ 3, 37, 40-41, 60, 62, 80-85.)  The other Defendants, including the CSP Defendants, are sued under a theory that they "conspired with" or "aided and abetted" Chris Gaubatz in doing so.  (See id. ¶¶ 82-83; see also Third Am. Compl. ¶¶ 92-93.)  However, such a theory of liability is not, as a matter of law, cognizable under the Stored Communications Act.  When Congress created a civil right of action for violations of the Stored Communications Act in Section 2707(a), it, not surprisingly, limited the right of action to "violation[s] of th[e] chapter."  18 U.S.C. § 2707(a).  And Section 2701(a), the provision Plaintiffs claim was violated in this case, only proscribes "intentionally access[ing]" or "intentionally exceed[ing] an authorization" a facility through which an

electronic communication service is provided. Id. § 2701(a). Critically, in delineating the boundaries of criminal liability under Section 2701(a) and civil liability under Section 2707(a), Congress made no mention of conspiracy, aiding and abetting, or any other form of secondary liability. The statute's plain language shows that Congress had one category of offenders in mind—i.e., those who directly access, or exceed their authority to access, a facility through which an electronic communication service is provided.

"When a statute is precise about who can be liable courts should not implicitly read secondary liability into the statute." Freeman v. DirecTV, 457 F.3d 1001, 1006 (9th Cir. 2006) (quotation marks and notations omitted); accord Doe v. GTE Corp., 347 F.3d 655, 658 (7th Cir. 2003); see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 182 (1994) ("[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors."); Dinsmore v. Squadron, Ellenoff, Plesent, Shienfeld & Sorkin, 135 F.3d 837, 842 (2d Cir. 1998) (extending the Supreme Court's reasoning in Central Bank of Denver to conspiracy liability). In this case, the statute's plain language, structure, and history all suggest that Congress had no intention of permitting plaintiffs to bring civil actions for violations of the Stored Communications Act under a theory of secondary liability. See 18 U.S.C. § 2707; S. Rep. No. 99-541, at 43 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3597; see also Garback v. Lossing, No. 09-cv-12407, 2010 WL 3733971, at *6 n.6 (E.D. Mich. Sept. 20, 2010) ("Congress did not expressly provide for secondary liability for violations of [18 U.S.C.] §§ 2701 and 2707 and [plaintiff] offers no persuasive authority for implying such liability."); Jones v. Global Info. Grp., Inc., Civil Action No. 3:06-00246-JDM, 2009 WL 799745, at *3 (W.D. Ky. Mar. 25, 2009) ("[S]ince Congress did

not criminalize the actions of aiding and abetting violations of 18 U.S.C. § 2701 as part of that statute, and § 2707 authorize[s] awards of damages to private parties but does not mention aiders or abettors or other secondary actors, this court will not infer secondary civil liability pursuant to 18 U.S.C. § 2707.").  Accordingly, Plaintiffs may not pursue claims against the CSP Defendants (or any other Defendant) under a theory of secondary liability.

ii.      Primary Liability.

In addition to their secondary liability theory, Plaintiffs contend that they "have adequately pled a claim against Defendant CSP for primary liability because the Second Amended Complaint pleads that Gaubatz and CSP had an agreement under which Gaubatz would infiltrate and steal documents and emails and record conversations from Plaintiffs in order to turn them over to CSP, and thus Plaintiffs have pled the existence of an agency relationship between these two defendants."[5]  (Pls.' MTD Opp'n at 21.)  At the outset, it is important to make two overarching observations about Plaintiffs' primary liability theory.

First, Plaintiffs confine their argument to CSP.  Plaintiffs do not contend that they have adequately pled a claim for primary liability against the remaining CSP Defendants: Christine Brim, Adam Savit, and Sarah Pavlis.  (See id.)  Accordingly, Plaintiffs have conceded that they cannot pursue claims against these three defendants under a theory of primary liability.

---

[5]  Because Plaintiffs concede that they must plead facts that plausibly support an inference that an agency relationship existed between CSP and Chris Gaubatz, the Court has no occasion to address that precise question at this time.  But see Cumis Ins. Soc., Inc. v. Peters, 983 F. Supp. 2d 787, 796 (N.D. Ill. 1997) ("While the existence and extent of [an] agency relationship is a question of fact, the plaintiff must sufficiently allege that an agency relationship existed in order for his complaint to survive a Rule 12(b)(6) motion to dismiss."); see also Acosta Orellana v. CropLife Int'l, 711 F. Supp. 2d 81, 111 n.36 (D.D.C. 2010); Kiobel v. Royal Dutch Petroleum Co., 621 F.2d 111, 195 n.56 (2d Cir. 2010); Lachmund v. ADM Investor Servs. Inc., 191 F.3d 777, 782 (7th Cir. 1999).

Second, as to CSP, Plaintiffs' primary liability theory is a recent invention, raised for the very first time in opposition to the CSP Defendants' Motion to Dismiss. Significantly, when they set forth the scope of their claim in the Second Amended Complaint, Plaintiffs asserted only that CSP "conspired with" and "aided and abetted" Chris Gaubatz in violating the statute. (Second Am. Compl. ¶¶ 82-83.) Nowhere in their description of Count Two did Plaintiffs even intimate that CSP could be held liable under a theory of primary liability and/or as Chris Gaubatz's alleged principal. (See id. ¶¶ 79-85.) "It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv., 297 F. Supp. 2d 165, 170 (D.D.C. 2003) (quotation marks omitted). For this reason alone, Plaintiffs' newly minted primary liability claim against CSP must fail.

Moreover, even assuming, counterfactually, that Plaintiffs had asserted a primary liability claim against CSP in the Second Amended Complaint, that claim would still fail. According to Plaintiffs, "[s]everal facts support a finding that CSP and Chris Gaubatz consented to a principal-agent relationship, including [1] Gaubatz's delivery of stolen documents to CSP pursuant to a prior agreement, [2] Gaubatz and CSP being a party to an agreement for Gaubatz to pursue an internship with Plaintiffs under an assumed identity and steal confidential documents and record oral conversations, [3] Chris Gaubatz and CSP being party to at least two written agreements for Gaubatz to give CSP documents stolen from Plaintiffs[,] . . . . [4] Gaubatz informing CSP of the confidentiality agreement he signed with Plaintiffs, and [5] Gaubatz and his father giving documents and at least 51 discs of recordings and oral communications to CSP." (Id. at 11 (citing Second Am. Compl. ¶¶ 4, 19, 31, 35, 44) (citations omitted).)

One problem with Plaintiffs' argument is that it relies on a tortured reading of the allegations that actually appear in the Second Amended Complaint; those allegations, insofar as

they are reasonably specific and not conclusory, largely pertain to David Gaubatz's, and not Chris Gaubatz's, direct dealings with CSP. Even affording the Second Amended Complaint a generous construction, there is relatively little in the way of specific allegations suggesting that Chris Gaubatz had a direct relationship with CSP, let alone an agency relationship. This disconnect becomes only more pronounced in Plaintiffs' proposed Third Amended Complaint, in which Plaintiffs specifically identify several agreements that they claim provide the structure to the alleged conspiracy between the Defendants, all of which were entered into by David Gaubatz, not Chris Gaubatz. (See Third Am. Compl. ¶¶ 22, 43, 54.).

But a more pressing problem is that the five allegations that Plaintiffs rely upon, whether they are considered together or independently, do not plausibly suggest that an agency relationship existed between CSP and Chris Gaubatz. Most notably, these allegations do not suggest that CSP had "the right to control and direct [Chris Gaubatz] in the performance of his work and the manner in which the work [was] to be done"—the *sine qua non* of an agency relationship. Judah v. Reiner, 744 A.2d 1037, 1040 (D.C. 2000) (quotation marks omitted).[6] Nor do these five allegations indicate that CSP selected and engaged Chris Gaubatz, paid Chris Gaubatz wages, had the power to discharge Chris Gaubatz, or that Chris Gaubatz's duties were part of CSP's regular business. See id. At best, Plaintiffs' allegations suggest that CSP and Chris Gaubatz had an ordinary, arms-length contractual relationship. Plaintiffs' allegations

---

[6]  Both Plaintiffs and the CSP Defendant assume that District of Columbia law applies in this context. (See Pls.' MTD Opp'n at 10-11; CSP Defs.' MTD Reply at 6.) The Court need not, and does not, question this assumption. See Patton Boggs LLP v. Chevron Corp., 683 F.3d 397, 403 (D.C. Cir. 2012).

simply do not plausibly suggest that an agency relationship existed between CSP and Chris Gaubatz.  Accordingly, Plaintiffs may not pursue a claim for primary liability against CSP.[7]

* * *

To summarize, the CSP Defendants' Motion to Dismiss shall be GRANTED IN PART and DENIED IN PART.  Specifically, Count One of the Second Amended Complaint (Federal and D.C. Wiretap Acts) shall be DISMISSED insofar as Plaintiffs seek to hold the CSP Defendants (or any other Defendant) liable (1) under the Federal or D.C. Wiretap Acts using a theory of secondary liability and (2) under the Federal Wiretap Act using a theory of procurement liability.  Count Two of the Second Amended Complaint (Stored Communications Act) shall be DISMISSED (1) against the CSP Defendants (and any other Defendant) insofar as Plaintiffs rely on a theory of secondary liability and (2) against the CSP Defendants insofar as Plaintiffs rely on a theory of primary liability.

B.      *Plaintiffs' Motion to Amend*

Through their Motion to Amend, Plaintiffs request leave to amend the Second Amended Complaint to (1) add SANE and Yerushalmi as a third set of defendants, (2) assert claims for fraud and trade secret misappropriation against all Defendants, (3) narrow the scope of their demand for damages, and (4) add certain clarifying allegations in support of extant claims.  (See Comparison of Second Am. Compl. and Proposed Third Am. Compl., ECF No. [112-2].)  Because leave to amend is to be "freely given," and because the grounds stated for Defendants' opposition are insufficient to warrant denying the relief sought, the Court shall GRANT the

---

[7]  Because the Court's decision does not turn on a purely legal matters, its logic cannot readily be applied across all Defendants.

motion in large part.   However, because the addition of certain claims would be futile, the motion shall also be DENIED in part.

        1.    <u>Scope</u>

The Court begins by addressing the five proposed changes and how they relate to this case.  The bottom line is that, while Plaintiffs' proposed amendments would certainly expand the scope of this case, they would not radically reshape the litigation.  <u>See</u> <u>Smith v. Cafe Asia</u>, 598 F. Supp. 2d 45, 48 (D.D.C. 2009) ("Courts generally consider the relation of the proposed amended complaint to the original complaint, favoring proposed complaints that do not radically alter the scope and nature of the case.") (quotation marks omitted).

        i.    SANE and Yerushalmi.

First, Plaintiffs propose to add SANE and Yerushalmi as defendants.  The Second Amended Complaint named as defendants five John and Jane Does whose identities were then unknown but who were alleged to have participated in, aided and abetted, or benefited from the Gaubatz Defendants' and CSP Defendants' misconduct.  (<u>See</u> Second Am. Compl. ¶ 18.)  After Plaintiffs filed and everyone had answered the Second Amended Complaint, the parties proceeded to conduct discovery in earnest.  During discovery, Defendants produced to Plaintiffs two agreements between David Gaubatz and SANE, both executed by Yerushalmi on SANE's behalf, and a third agreement between David Gaubatz and CSP.  Pursuant to the first agreement, SANE engaged David Gaubatz to "serve as the Director of the Mapping Shari'a in America: Knowing the Enemy Project."  (Third Am. Compl., Ex. A at PDG000010.)  The agreement contemplated that David Gaubatz would perform unspecified "field work" and oversee the collection of "field data."  (<u>Id.</u>)  "All work product, including written, electronic, and digital material collected . . . [would] be the exclusive property of SANE."  (<u>Id.</u>)  The second, undated

agreement terminated the first agreement.  (Id., Ex. C at PDG000012-13.)  In this agreement, David Gaubatz represented that he was "in possession of the materials collected during and in furtherance of the [Mapping Shari'a] Project, including the printed materials, video, and audio tapes" and agreed to deliver all such materials to CSP.  (Id.)  In the third agreement, CSP engaged David Gaubatz to organize a "team" to "secure volunteer positions within The Council on American-Islamic Relations" and "secretly record (using audio and video recording devices) activities they observe within CAIR offices and other locations or events, as directed by [CSP] in its sole discretion."  (Third Am. Compl., Ex. B at CSP000176.)  According to Plaintiffs' theory, these three agreements evidence a "potentially far-reaching relationship between David Yerushalmi, SANE, CSP and the Gaubatzes" to "commit the torts and statutory violations enumerated in the Third Amended Complaint."  (Pls.' MTA Mem. at 2-3.)

Federal Rule of Civil Procedure 21 allows a district court to add a party "at any time" and "on just terms."  FED. R. CIV. P. 21.  Rule 20, in turn, defines the contours of permissive joinder, providing that parties may be joined as defendants in a single action if (1) "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and (2) "any question of law or fact common to all defendants will arise in the action."  FED. R. CIV. P. 20(a)(2).  When asked to decide whether permissive joinder is appropriate, the district court should be guided by the underlying aims of joinder, which include promoting judicial economy, expediting the resolution of disputes, and eliminating unnecessary litigation.  Swan v. Ray, 293 F.3d 1252, 1253 (11th Cir. 2002).  In this case, Plaintiffs contend that SANE and Yerushalmi are participants in the same overarching scheme to infiltrate Plaintiffs' offices with the aim of obtaining Plaintiffs' internal documents and recording conversations involving Plaintiffs' employees.  (See Third

Am. Compl. ¶¶ 2-5.)  Plaintiffs intend to pursue essentially the same set of legal claims and theories, with minor variations, against all Defendants.  (See id. ¶¶ 79-163.)

In sum, Plaintiffs claim that SANE and Yerushalmi are liable on essentially the same legal theories and the same set of facts.  As a result, granting Plaintiffs leave to name SANE and Yerushalmi as defendants in this action will promote judicial economy, expedite the resolution of Plaintiffs' claims, and eliminate unnecessary litigation.  In short, it aligns with the general preference "toward entertaining the broadest possible scope of action [that is] consistent with fairness to the parties."  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724 (1966).

ii.     Claims for Fraud and Trade Secret Misappropriation.

Second, Plaintiffs propose to add claims for fraud and trade secret misappropriation against all Defendants.  (See Third Am. Compl. ¶¶ 142-63.)  Both claims are based on the same nucleus of facts set forth in the Second Amended Complaint.  In other words, the claims basically "state an alternative theory of recovery."  Foman, 371 U.S. at 182.

iii.    Damages Demand.

Third, Plaintiffs propose to narrow the scope of their demand for damages to reflect that they no longer seek damages for lost donations or diminished political contacts.  (See Third Am. Compl., Prayer for Relief ¶¶ 5, 7-9.)  So far as the Court can tell, Defendants do not actually oppose this aspect of Plaintiffs' Motion to Amend.  (See Pls.' MTA Mem. at 1.)  In any event, the proposed amendment would only narrow the scope of Defendants' potential liability and further simplify this case.

iv.     Clarifying Allegations.

Fourth, and finally, Plaintiffs propose to add various clarifying allegations in support of extant claims.  While the Court does not believe that the addition of these factual allegations is

likely to change the outcome of the legal issues presented in this case, that is of no matter. Plaintiffs' proposed factual allegations fine-tune the basis for the relief they seek in this action. As the Court has previously observed, "[f]actual allegations of this kind, which clarify but do not reshape the action, are rarely a bad thing." Council on American-Islamic Relations Action Network, Inc., 793 F. Supp. 2d at 394.

### 2.   Undue Delay, Prejudice, and Bad Faith

Our jurisprudence reflects a longstanding preference for allowing a plaintiff to "test his claim on the merits" if it "may be a proper subject of relief." Foman, 371 U.S. at 182.  As a result, "[o]nly limited circumstances justify a district court's refusal to grant [] leave to amend: undue delay, bad faith on the part of the moving party, or undue prejudice to the opposing party." Sinclair v. Kleindienst, 645 F.2d 1080, 1085 (D.C. Cir. 1981).  Because leave to amend should be "freely given," FED. R. CIV. P. 15(a)(2), the party opposing amendment bears the burden of demonstrating undue delay, bad faith, or prejudice.  City of New York v. Grp. Health Inc., 259 F.3d 151, 157 (2d Cir. 2011); see also Abdullah, 530 F. Supp. 2d at 115.

In this case, the crux of Defendants' opposition is that Plaintiffs' Motion to Amend—and, more specifically, Plaintiffs' proposal to add SANE and Yerushalmi as defendants—"is a transparent litigation tactic undertaken in bad faith and with serious irremediable, prejudicial harm to all Defendants."  (Defs.' MTA Opp'n at 1.)  According to Defendants, Plaintiffs "have known of their potential claims against Yerushalmi and SANE since February 2011," but make this "last-minute" Motion to Amend "to deprive CSP Defendants of their choice of legal counsel and to prejudice the other defendants and those putative party-defendants Plaintiffs now seek to add."  (Id. at 1-2.)  For the reasons set forth below, the Court finds that Defendants have failed to

carry their burden of demonstrating that Plaintiffs can be charged with bad faith or undue delay, or that amendment would result in undue prejudice.

As an initial matter, it is worth noting that Plaintiffs first filed their Motion to Amend within the deadline expressly contemplated by the Court's scheduling order. (See Scheduling & Procedures Order (Sept. 1, 2011) at 5.) When the Court went about the task of structuring a schedule for the fair and efficacious resolution of this case, it was not oblivious to the fact that matters uncovered during the course of discovery might very well lead to the desire to add or alter parties, claims, and factual allegations. Nonetheless, to ensure that any appropriate amendments were filed with enough time for the parties to conduct any additional discovery concerning those amendments, the Court set a specific deadline for motions to amend. See FED. R. CIV. P. 16(b)(3)(A) ("The scheduling order must limit the time to join other parties, amend the pleadings, complete discovery, and file motions."). The fact that Plaintiffs acted within the specific time constraints contemplated by the Court is an important consideration counseling against a finding that Plaintiffs acted with undue delay in filing the pending motion. Indeed, Plaintiffs acted as the Court expected.

Defendants nonetheless fault Plaintiffs for not filing their motion earlier, averring that Plaintiffs' counsel had raised similar allegations concerning SANE and Yerushalmi's involvement in the events underlying this case in other, unrelated proceedings as early as February 2011. (See Defs.' MTA Opp'n at 2-3, 6-10.) But even if Plaintiffs' counsel had some basis to believe that SANE and Yerushalmi were somehow implicated in these events in February 2011, Plaintiffs did not unduly delay moving to amend the Complaint by waiting until they received document responses from the extant Defendants between December 2011 and February 2012. As set forth elsewhere (see supra Part III.B.1.i), those document productions

30

included the three agreements that serve as the factual predicate for Plaintiffs' present contention that Defendants, including SANE and Yerushalmi, were all involved in the same alleged overarching scheme to infiltrate Plaintiffs' offices with the aim of obtaining Plaintiffs' internal documents and recording conversations involving Plaintiffs' employees.  Plaintiffs' allegations against SANE and Yerushalmi may or may not have passed muster even in the absence of these agreements.  See FED. R. CIV. P. 11(b)(3) ("By presenting to the court a pleading . . . an attorney or unrepresented party certifies to the best of [her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . [that] the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.").  But regardless of whether or not that would be the case, it certainly was not unreasonable for Plaintiffs to defer asserting claims against SANE and Yerushalmi until they had more concrete evidence in hand, especially given that the extant Defendants' discovery responses were still outstanding and Plaintiffs' deadline to seek leave to amend under the Court's scheduling order had not yet expired.  Ultimately, Plaintiffs motion to amend came relatively close in time after they had a meaningful opportunity to review Defendants' document productions, and within the specific deadline contemplated by the Court.  It was not unduly delayed.

Furthermore, to warrant denial of leave to amend, any delay in seeking leave must be accompanied by a showing of bad faith or prejudice.  See Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C., 148 F.3d 1080, 1084 (D.C. Cir. 1998).  To reiterate, Defendants, as the parties opposing amendment, bear the burden of establishing bad faith or prejudice.  See City of New York, 259 F.3d at 157; Abdullah, 530 F. Supp. 2d at 115.  Defendants offer two reasons why the Court should find that they have satisfied their burden.  The Court addresses each in turn.

First, Defendants contend that the CSP Defendants will be prejudiced because Yerushalmi "will have to withdraw" as one of their attorneys in this case once named as a defendant.  (Defs.' MTA Opp'n at 1.)  Defendants argue that "when a party is effectively denied legal counsel of its choosing as a result of a tardy amendment to the complaint, it is proper and appropriate to deny such requests to amend on grounds of undue prejudice.  (<u>Id.</u> (citing <u>Atchinson v. District of Columbia</u>, 73 F.3d 418, 426-28 (D.C. Cir. 1996).)  As an initial matter, the authority relied upon by Defendants, <u>Atchinson</u>, does not even remotely support such an expansive proposition and is, moreover, wholly distinguishable from the circumstances presented here.  That case addressed the question of whether the district court acted within its discretion in denying a motion for leave to amend filed "a few days before trial was to begin," when the plaintiff sought to assert claims against a government official in his personal capacity for the first time, despite having made prior representations that the official was sued solely in his official capacity and despite the fact that, had the amendment been brought sooner, the official might have sought private counsel in lieu of joint representation with the government.  <u>See</u> <u>Atchinson</u>, 73 F.3d at 424-28.  The CSP Defendants are not similarly situated.   Even assuming, *arguendo*, that Yerushalmi ultimately withdraws as the CSP Defendants' counsel in this case, the CSP Defendants will be afforded a fair opportunity to select alternate counsel of their choosing.  That said, it is not even clear whether that would be necessary because the CSP Defendants are also represented by two other attorneys from two separate organizations, and have been for quite some time (indeed, for as long as they have been defendants in this case).  (<u>See</u> Appearance of Counsel, ECF No. [91]; Notice of Appearance, ECF No. [109].)  On this record, the Court finds that Defendants have failed to carry their burden of showing that any inconvenience that they

might experience as a result of Yerushalmi's potential withdrawal would outweigh Plaintiffs' interest in testing the merits of their claims.

Second, Defendants contend that the CSP Defendants will be unduly prejudiced because SANE and Yerushalmi, if named as defendants, will have at their disposal "client confidences and information for use in potential cross-claims against these very same clients and third-party claims against yet other clients associated with [the] CSP Defendants." (Defs.' MTA Opp'n at 1.) But Defendants never explain why this alleged prejudice would be attributable to granting leave to amend and not the mere fact that Plaintiffs intend to assert claims against SANE and Yerushalmi. Defendants do not suggest that, if Plaintiffs' are denied leave to amend now, that the statute(s) of limitations or some other bar would preclude Plaintiffs from simply commencing a separate civil action against SANE and Yerushalmi. In that event, the same issues concerning "client confidences" would arise, only in a different format and procedural posture. The only difference would be that the parties, and the Court, would lose the benefit of resolving related claims against related parties in a single, expeditious action.[8] In the absence of some explanation as to why the alleged prejudice would be attributable to granting leave to amend, and not some other circumstances, the record before the Court is insufficient to conclude that Defendants have carried their burden of showing undue delay, bad faith, or prejudice.

---

[8] Regardless, the Court is not persuaded that any such alleged prejudice can be attributed to Plaintiffs and not Defendants themselves. By Defendants' own account, Plaintiffs' counsel had raised her suspicions about SANE and Yerushalmi's involvement in the events underlying this case as early as February 2011, and again in May 2011. (See Defs.' MTA Opp'n at 2.) The Court did not grant Plaintiffs leave to add the CSP Defendants as defendants in this case until June 2011 and Yerushalmi did not enter an appearance until July 2011. (See Appearance of Counsel, ECF No. [90].) Even thereafter, Defendants should have been on notice of a potential problem because Plaintiffs had directed aspects of their discovery requests to identifying the role that SANE and Yerushalmi played in this case. As such, the CSP Defendants and Yerushalmi, and not Plaintiffs, must bear much of the blame for the current state of affairs.

3.      <u>Futility</u>

Finally, Defendants contend that leave to amend should be denied because amendment would be futile.  The vast majority of Defendants' futility arguments are obviously improper at this procedural posture.  For those most part, Defendants' arguments clearly depend and rely upon materials outside the four corners of the pleadings.  (<u>See</u> Defs.' MTA Opp'n at 14, 19-22.) Others ask the Court to credit Defendants' account of what certain agreements truly concerned over contrary allegations in the Third Amended Complaint.  (<u>See</u> <u>id.</u> at 22-25).  Such arguments are premature and a waste of the parties' time and the Court's limited resources.  Defendants will have an opportunity to raise their arguments, if appropriate, in a motion for summary judgment following the close of all discovery.

However, to the extent Defendants' arguments mirror those arguments concerning Counts One and Two of the Second Amended Complaint first raised in the CSP Defendants' Motion to Dismiss, the Court concurs that amendment is futile for the reasons set forth in detail previously.  (<u>See</u> <u>supra</u> Part III.A.).  First, Plaintiffs cannot pursue a claim against either SANE or Yerushalmi under the Federal Wiretap Act using a theory of procurement liability (<u>see</u> Third Am. Compl. ¶ 84) because such a theory is not cognizable under the statute (<u>see</u> <u>supra</u> Part III.A.1.i).  Second, Plaintiffs cannot pursue a claim against either SANE or Yerushalmi under the Federal and D.C. Wiretap Acts using a theory of secondary liability (<u>see</u> Third Am. Compl. ¶¶ 85-86), because such a theory is not cognizable under the statutes (<u>see</u> <u>supra</u> Part III.A.1.ii). Third, Plaintiffs cannot pursue a claim against either SANE or Yerushalmi under the Stored Communications Act using a theory of secondary liability (<u>see</u> Third Am. Compl. ¶¶ 92-93) because such a theory is not cognizable under the statute (<u>see</u> <u>supra</u> Part III.A.2.i).  Accordingly, the Court shall DENY Plaintiffs' Motion to Amend with respect to those proposed changes.

\* \* \*

In the end, with few exceptions, Defendants have failed to discharge their burden of coming forward with a colorable basis for denying leave to amend.  See Abdullah, 530 F. Supp. 2d at 115.  The Court concludes that granting leave to amend is appropriate in this case, except insofar as it has found that amendment would be futile.  Accordingly, Plaintiffs' Motion to Amend shall be GRANTED IN PART and DENIED IN PART.  Specifically, the motion shall be DENIED insofar as Plaintiffs seek to assert claims against either SANE or Yerushalmi (1) under the Federal Wiretap Act using a theory of procurement liability, (2) under the Federal or D.C. Wiretap Acts using a theory of secondary liability, and (3) under the Stored Communications Act using a theory of secondary liability.  Plaintiffs' motion shall otherwise be GRANTED.

For purposes of expediency, the Court shall simply direct the Clerk of the Court to accept Plaintiffs' Third Amended Complaint for filing, with the understanding that the aforementioned claims (and any other claims previously dismissed) are not viable.  In addition, in order to facilitate the prompt resolution of this litigation, the Court shall require Plaintiffs to effect service of the Summons and Third Amended Complaint upon SANE and Yerushalmi by no later than October 1, 2012.  See FED. R. CIV. P. 21 (providing a district court may impose "just terms" on the addition of any party).  If Plaintiffs fail to effect service of process by the designated date, the Court will dismiss this action without prejudice against SANE and Yerushalmi.   No extensions will be granted absent compelling circumstances.

### IV.  CONCLUSION AND ORDER

For the reasons set forth above, it is, this 17th day of September, 2012, hereby

**ORDERED** that the CSP Defendants' [97] Motion to Dismiss is GRANTED IN PART and DENIED IN PART:

      (a)      Count One of the Second Amended Complaint (Federal and D.C. Wiretap Acts) is DISMISSED insofar as Plaintiffs seek to hold the CSP Defendants (or any other Defendant) liable (1) under a theory of secondary liability, with respect to both the Federal and D.C. Wiretap Acts and (2) under a theory of procurement liability, with respect to the Federal Wiretap Act only.

      (b)      Count Two of the Second Amended Complaint (Stored Communications Act) is DISMISSED (1) against the CSP Defendants (and any other Defendant) insofar as Plaintiffs rely on a theory of secondary liability and (2) against the CSP Defendants insofar as Plaintiffs rely on a theory of primary liability.

      (c)      The motion is otherwise DENIED.

It is **FURTHER ORDERED** that Plaintiffs' [112] Motion to Amend is GRANTED IN PART and DENIED IN PART:

      (a)      The motion is DENIED insofar as Plaintiffs seek to assert claims against either SANE or Yerushalmi (1) under the Federal Wiretap Act using a theory of procurement liability, (2) under the Federal or D.C. Wiretap Acts using a theory of secondary liability, and (3) under the Stored Communications Act using a theory of secondary liability.

      (b)      Plaintiffs' motion is otherwise GRANTED.

It is **FURTHER ORDERED** that the Clerk of the Court shall accept Plaintiffs' [112-1] Third Amended Complaint for filing.  By no later than <u>October 1, 2012</u>, Plaintiffs shall effect service of the Summons and Third Amended Complaint on SANE and Yerushalmi and file proof of service with the Court.  If Plaintiffs fail to effect service of process by the designated date, the

Court will dismiss this action without prejudice against SANE and Yerushalmi.  No extensions will be granted absent compelling circumstances.

It is **FURTHER ORDERED** that, on <u>November 5, 2012, at 9:00 a.m.</u>, a Status Hearing shall be held before Judge Colleen Kollar-Kotelly in Courtroom 28A of the United States Courthouse for the United States District Court for the District of Columbia at 333 Constitution Ave., N.W., Washington, D.C. 20001.

\*   \*   \*

As a result of the Court's prior decisions and today's decision, the following claims in the Third Amended Complaint are <u>not</u> viable:

(1)     Count One (Federal and D.C. Wiretap Acts), insofar as Plaintiffs: (a) seek relief under the Federal Wiretap Act against any Defendant under a theory of procurement liability; or (b) seek relief under either the Federal or D.C. Wiretap Acts against any Defendant under a theory of secondary liability;

(2)     Count Two (Stored Communications Act), insofar as Plaintiffs: (a) seek relief against any Defendant under a theory of secondary liability; or (b) seek relief against the CSP Defendants under a theory of primary liability; and

(3)     Count Three (Conversion) insofar as Plaintiffs seek relief against any Defendant for the conversion of electronic data.

**SO ORDERED.**

\_\_\_\_\_/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge