**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS ACTION NETWORK, INC., *et
al*.,

        Plaintiffs,

    -v.-

PAUL DAVID GAUBATZ, *et al*.,

        Defendants.

CIVIL NO: 1:09-cv-02030-CKK-JMF

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**&**

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants Center for Security Policy ("CSP"), Christine Brim, Adam Savit, and Sarah Pavlis (collectively "CSP Defendants"), Society of Americans for National Existence ("SANE"), David Yerushalmi, Paul David Gaubatz ("Dave Gaubatz"), and Chris Gaubatz (Dave and Chris Gaubatz collectively "Gaubatz Defendants"), by and through the undersigned counsel, hereby move for summary judgment on all causes of action pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h)(1), and in accord with this Court's Scheduling and Procedures Order (Doc. No. 150).

In support of this motion, Defendants rely upon the pleadings and papers of record, as well as their statement of undisputed material facts attached hereto, associated declarations, depositions, evidentiary exhibits, and Defendants' memorandum of points and authorities filed concurrently with this motion.

As more fully set forth in Defendants' memorandum of points and authorities, the undisputed factual record in this matter exonerates entirely the CSP Defendants, SANE, and Yerushalmi from liability for any of the wrongdoing alleged in the Third Amended Complaint ("TAC") and further establishes that Plaintiffs have failed to carry their burden with respect to the Gaubatz Defendants, thereby providing the basis for summary judgment for all Defendants as a matter of law.

WHEREFORE, Defendants respectfully request that this court grant their motion and enter judgment in their favor on all causes of action. Additionally, Defendants request that this court grant such other and further relief as permitted by law.


[Signature pages follow.]

Respectfully submitted,

/s/ David Yerushalmi
David Yerushalmi, Esq. (DC Bar No. 978179)
LAW OFFICES OF DAVID YERUSHALMI, P.C.
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20001
david.yerushalmi@verizon.net
Tel: (646) 262-0500; Fax: (801) 760-3901
*Lead Counsel for Defendants Center for Security Policy,*
*Christine Brim, Adam Savit, Sara Pavlis, and SANE*

/s/ Robert J. Muise
Robert J. Muise, Esq. (D.C. Court Bar No. MI 0052)
AMERICAN FREEDOM LAW CENTER
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel (734) 635-3756 / Fax (801) 760-3901
rmuise@americanfreedomlawcenter.org
*Co-Counsel for Defendants Center for Security Policy,*
*Christine Brim, Adam Savit, Sara Pavlis, SANE, and David*
*Yerushalmi*

/s/ J. Thomas Smith
J. Thomas Smith (admitted *pro hac vice*)
J. THOMAS SMITH ATTORNEY AT LAW
2020 Fieldstone Parkway, Suite 900-264
Franklin, TN 37069-4337
Tel: (615) 790-2150
jthomsmith@gmail.com
*Co-Counsel for Defendants Center for Security Policy,*
*Christine Brim, Adam Savit, Sara Pavlis, and SANE*

/s/ Martin Garbus
Martin Garbus (admitted *pro hac vice*)
Eaton & Van Winkle LLP
3 Park Avenue, 16th Floor
New York, NY 10016
Tel: (212) 561- 3625
mgarbus@evw.com
*Co-Counsel for Gaubatz Defendants*

<u>/s/ Dan Horowitz</u>
Dan Horowitz (admitted *pro hac vice*)
Law Office of Daniel Horowitz
P.O. Box 1547
Lafayette, California 94549
Tel: (925) 283-1863
horowitz@whitecollar.us
*Co-Counsel for Gaubatz Defendants*

<u>/s/ J. William Eshelman</u>
J. William Eshelman  (D.C. Bar No. 141317)
1747 Pennsylvania Avenue NW, Suite 300
Washington, DC 20006
Tel: 202- 454-2830
WEshelman@butzeltp.com
*Co-Counsel for Gaubatz Defendants*

## LIST OF EXHIBITS

| Exhibit | Name of Exhibit |
| --- | --- |
| Exhibit A | Declaration of Robert J. Muise, Esq. |

Exhibit 1: Gaffney Deposition Transcript (December 26, 2012)

Exhibit 2: Awad Deposition Transcript (January 9, 2013)

Exhibit 3: Saylor Deposition Transcript (January 8, 2013)

Exhibit 4: CSP Deposition Transcript Vol. 1 (January 17, 2013)

Exhibit 5: CSP Deposition Transcript Vol. 2 (January 18, 2013)

Exhibit 6: Donvito Deposition Transcript (January 7, 2013)

Exhibit 7: Yerushalmi Deposition Transcript (January 17, 2013)

Exhibit 8: Dave Gaubatz Deposition Transcript (January 14, 2013)

Exhibit 9: SANE Deposition Transcript (January 18, 2013)

Exhibit 10: Chris Gaubatz Deposition Transcript (January 10, 2013)

Exhibit 11: Brim Deposition Transcript (January 15, 2013)

Exhibit 12: Al-Khalili Deposition Transcript (January 9, 2013)

Exhibit 13: Wazir Deposition Transcript (January 3, 2013)

Exhibit 14: Pls.' Third Supplement to Initial Disclosures

Exhibit 15: Pls.' Answers to CSP Defs.' First Set of Interrogs.

Exhibit 16: Pls.' First Suppl. to Answers to CSP Defs.' First Set of Interrogs.

Exhibit 17: Pls.' Second Suppl. to Answers to CSP Defs.' First Set of Interrogs.

Exhibit 18: Pls.' Resp. to CSP Defs.' Second Req. for Prod.

Exhibit 20: Pls.' Suppl. Resp. to CSP Defs.' Second Req. for Prod.

Exhibit 21: Pls.' Third Supp. to Answers to CSP Defs.' First Set of Interrogs.

Exhibit 22: October 24, 2012, email from Al-Khalili re: stipulations

Exhibit 23: CSP-Manifold Productions, Inc. agreement

Exhibit 24: Publius Productions, LLC-SANE contract

Exhibit 25: SANE-Dave Gaubatz contract

Exhibit 26: SANE-Dave Gaubatz Mapping Sharia project contract

Exhibit 27: SANE-Dave Gaubatz Mapping Sharia project settlement agreement

Exhibit 28: CSP-Dave Gaubatz contract

Exhibit 29: CSP-Chris Gaubatz contract

Exhibit 30: Chris Gaubatz's Answers to Pls.' First Set of Interrogs.

Exhibit 31: Dave Gaubatz's Answers to Pls.' First Set of Interrogs.

Exhibit 32: Transcripts of relevant Audio-Video Recordings

Exhibit 33: Dave Gaubatz's Answers to Pls.' Third Set of Interrogs.

Exhibit 34: Confidentiality Agreements signed by CAIR-F interns

Exhibit 35: Pls.' Certificate of Completion issued to Dave Marshall

Exhibit 36: CSP Defs.' Answers to Pls.' First Set of Interrogs.

Exhibit 37: April 2, 2009, email from Dave Gaubatz to Brim

Exhibit 38: April 3, 2009, email from Brim to Dave Gaubatz

Exhibit 39: April 4, 2009 email and letter attachment from Dave Gaubatz to Brim

Exhibit 40: CSP-Dave Gaubatz termination agreement

Exhibit 41: Dave Gaubatz's Answers to Pls.' Second Set of Interrogs.

Exhibit 42: Chris Gaubatz's Answers to Pls.' Second Set of Interrogs.

Exhibit B        Declaration of Frank J. Gaffney, Jr.

Exhibit C        Declaration of Christine Brim

Exhibit D        Declaration of Adam Savit

Exhibit E        Declaration of Sarah Pavlis

Exhibit F        Declaration of David Yerushalmi

    Exhibit 1: CAIR-AN corporation document filings

    Exhibit 2: CAIR-F corporation document filings

    Exhibit 3: CAIR-F IRS form 1023 tax filings for IRC § 501(c)(3) reinstatement

    Exhibit 4: HLF Trial: List of co-conspirators

    Exhibit 5: HLF Trial: Government trial brief

    Exhibit 6: HLF Trial: Court's memorandum opinion order re: CAIR-AN's motion

    Exhibit 7: HLF Trial: Government brief opposing CAIR-AN's motion

    Exhibit 8: HLF Trial: Muslim Brotherhood planning memo re: Civilization Jihad

    Exhibit 9: HLF Trial: Government's Philadelphia Meeting Participant Chart

    Exhibit 10: HLF Trial: Trial Tr. (pt. 1) discussing evidence referenced in Ex. 13

    Exhibit 11: HLF Trial: Trial Tr. (pt. 2) discussing evidence referenced in Ex. 13

    Exhibit 12: FBI letter to Senator Jon Kyl

    Exhibit 13: Dept. of Justice letter to Congresswoman Myrick

    Exhibit 14: Dave Gaubatz's military awards and citations

    Exhibit 15: Pls.' Memorandum for cross-motion for summary judgment in *Saiyed v. Council on Am.-Islamic Relations Action Network, Inc*., Case No. 1:10-cv-0022 & 23

**TABLE OF CONTENTS**

SECTION TITLES                                                                                    FACTS (¶)

I.      BACKGROUND ................................................................................. 1-36

        A.    Defendant CSP.................................................................................. 1-4

        B.    Plaintiffs Council on American-Islamic Relations Action Network, Inc.
              ("CAIR-AN") and CAIR-Foundation, Inc. ("CAIR-F") ................................. 5-28

        C.    CSP Decided to Initiate a Film Documentary Proposal to Study
              Islamism in America with a focus on the Muslim Brotherhood-Hamas-
              CAIR Conspiracy ................................................................................. 29-36

II.     THE CAIR DOCUMENTARY FILM PROJECT IN FORMATION ................. 37-56

        A.    Preparatory Work: The Publius Contract ........................................... 37-41

        B.    Publius-SANE Contract; SANE-Gaubatz Contract ......................... 42-52

        C.    Manifold Drops Out; SANE's Contractual Involvement Ends; CSP
              Contracts Directly with Dave Gaubatz ............................................. 53-55

        D.    CSP-Chris Gaubatz Contract ................................................................56

III.    THE CAIR DOCUMENTARY FILM PROJECT IN PROGRESS ................. 57-116

        A.    Chris Gaubatz Volunteers at CAIR-MD/VA Offices ...................... 57-62

        B.    The CAIR-Morris Days Fraud .......................................................... 63-77

        C.    None of the Actions of Chris Gaubatz at CAIR-MD/VA Are a Basis for
              Any of Plaintiffs' Claims against Any of the Defendants .............................. 78-80

        D.    Chris Gaubatz Begins His Volunteer Internship at Plaintiffs' Offices ........... 81-85

        E.    Chris Gaubatz Did Not Enter into a Confidentiality Agreement, Oral or
              Written, with Plaintiffs ..................................................................... 86-107

        F.    Chris Gaubatz Used an Alias for His Internship ......................................... 108-116

IV.     DEFENDANTS'    RELATIVE    PARTICIPATION    IN,    AND
        KNOWLEDGE OF, THE ALLEGED ACTS RELEVANT TO
        PLAINTIFFS' CLAIMS .................................................................... 117-237

        A.    CSP Defendants and David Yerushalmi ...................................... 117-212

              1.  CSP ........................................................................................ 117-76

                  a.  Contractual Methodology of the CAIR Documentary Film
                      Project ..................................................................................... 117-28

                  b.  Legal Guidelines for the CAIR Documentary Film Project ........... 129-138

                  c.  Access to Plaintiffs' Offices ......................................................139

                  d.  No Written or Oral Agreement Relating to Confidentiality .............. 140-44

e.    No Fiduciary Duty ............................................................ 145-59

f.    Record Only Conversations to Which Chris Gaubatz Was a Party ........................................................................................ 160-63

g.    CSP Only Disclosed 16 Edited, Short Clips Taken from the Audio-Video Recordings to World Net Daily ("WND") ................. 164-65

h.    Taking Possession of Plaintiffs' Documents Was Never Part of the CAIR Documentary Project ........................................ 166-71

i.    CSP Did Not Profit in Any Way from the CAIR Documentary Film Project ........................................................................... 172-76

2.    Christine Brim's Limited Role in the CAIR Documentary Film Project ............................................................................................ 177-94

3.    David Yerushalmi's Limited Role in the CAIR Documentary Film Project ............................................................................................ 195-204

4.    Adam Savit's Limited Role in the CAIR Documentary Film Project ..... 205-08

5.    Sarah Pavlis's Limited Role in the CAIR Documentary Film Project .... 209-12

B.    SANE's Limited Role in the CAIR Documentary Film Project ................. 213-220

C.    Gaubatz Defendants ................................................................. 221-37

V.    **PLAINTIFFS' HAVE NO COMPENSABLE CONTRACTUAL OR COMMON LAW DAMAGES** ................................................................. **238-45**

## PLAINTIFFS' STATEMENT OF ISSUES AND UNDISPUTED FACTS

**I.    BACKGROUND.**

**A.    Defendant CSP.**

1.    CSP is an I.R.C. § 501(c)(3) non-profit, Washington, D.C.-based think tank founded in 1988 by former Reagan administration official Frank Gaffney, which focuses on research and educating policy makers and the public about national security issues based on President Reagan's policy of peace through strength.

Record: Gaffney Decl. at ¶ 1 at Ex. B; Gaffney Dep. at 15:6-18:9 at Ex. 1 to Muise Decl. at Ex. A.

2.    Gaffney began his public service career in the 1970s, working as an aide in the office of Democratic Senator Henry M. Jackson.  From August 1983 until November 1987, Gaffney held the position of Deputy Assistant Secretary of Defense for Nuclear Forces and Arms Control Policy in the Reagan Administration.  In April 1987, Gaffney was nominated to the position of U.S. Assistant Secretary of Defense for International Security Policy.  Gaffney served as the acting Assistant Secretary for seven months.

Record: Gaffney Decl. at ¶ 2 at Ex. B.

3.    One area of specific concern to CSP, even prior to September 11, 2001, was the threat to our national security from the global Islamist movement, led violently by Al Qaeda and similar groups, but more stealthily, both abroad and in the U.S., by the Muslim Brotherhood affiliated groups.

Record: Gaffney Decl. at ¶ 3 at Ex. B; Gaffney Dep. at 83:7-83:15; 84:23-86:2 at Ex. 1 to Muise Decl. at Ex. A.

4.    CSP's work in this area has included the publication of a seminal work entitled, *Sharia:*

*The Threat to America; An Exercise in Competitive Analysis; A Report of Team "B" II.*  The co-participants and co-authors of this study included some of this nation's most-esteemed national security experts.  The purpose of this report was to provide a scholarly and seriously researched study of the "threat doctrine" followed by the Muslim Brotherhood affiliated groups and the specific threats they posed in their efforts to gain footholds within U.S. political, educational, and civic institutions, not unlike the threat posed by the Soviets during the Cold War.

Record: Gaffney Decl. at ¶ 4 at Ex. B; Gaffney Dep. at 104:8-13; 301:7-23 at Ex. 1 to Muise Decl. at Ex. A.

**B.    Plaintiffs Council on American-Islamic Relations Action Network, Inc. ("CAIR-AN") and CAIR-Foundation, Inc. ("CAIR-F").**

5.    Nihad Awad Hammad (who also uses a shortened version of this legal name as an alias— Nihad Awad) founded CAIR-AN in 1994 along with Omar Ahmad and Rafeeq Jabeer.

Record: Awad Dep. at 42:9-25; 68:15-72:3 at Ex. 2 to Muise Decl. at Ex. A.

6.    CAIR-AN was initially named Council on American-Islamic Relations, Inc. and used and uses the name CAIR publicly as a *de facto* d/b/a for CAIR-AN since its founding.

Record: Saylor Dep. at 50:24-51:7 at Ex. 3 to Muise Decl. at Ex. A.

7.    "CAIR" is not a registered trade name or otherwise legal d/b/a in the District of Columbia.

Record: Yerushalmi Decl. at ¶ 7 at Ex. F.

8.    CAIR-AN changed its name from Council on American-Islamic Relations, Inc. to its current name Council on American-Islamic Relations Action Network, Inc. on June 15, 2007. CAIR-AN had its corporate authority revoked on September 8, 2008, and that corporate status remains revoked.

Record: Yerushalmi Decl. at ¶¶ 4-6 at Ex. F.

9.    From CAIR-AN's founding until the creation of CAIR-F, Nihad Awad served as CAIR-AN's executive director and has served continuously on its board of directors from its inception until today.

Record: Awad Dep. at 51:1-54:11; 74:3-74:9 at Ex. 2 to Muise Decl. at Ex. A.

10.    CAIR-F was created on February 15, 2005.

Record: Yerushalmi Decl. at ¶ 8 at Ex F.

11.    CAIR-AN owns the real property at 453 New Jersey Avenue SE, Washington, D.C., the location of Plaintiffs' offices as set forth in the TAC at ¶¶ 10-11 ("Offices").

Record: Saylor Dep. at 40:21-40:24 at Ex. 3 to Muise Decl. at Ex. A.

12.    CAIR-F occupies the Offices as a tenant by virtue of some kind of oral agreement.

Record: Saylor Dep. at 44:13-45:9 at Ex. 3 to Muise Decl. at Ex. A.

13.    Since the founding of CAIR-F, CAIR-AN employed no employees or interns.  The only employees and interns at Plaintiffs' Offices were employees and interns of CAIR-F.

Record: Saylor Dep. at 40:9-20 at Ex. 3 to Muise Decl. at Ex. A.

14.    Since the founding of CAIR-F, CAIR-AN has had no officers, only a board of directors.

Record: Saylor Dep. at 49:16-22 at Ex. 3 to Muise Decl. at Ex. A.

15.    CAIR-AN owns the Offices and the trademarks and related intellectual property.  CAIR-AN owns no other property such as equipment or inventory (*i.e.*, documents).

Record: Saylor Dep. at 41:21-42:2; 153:18-156:9 at Ex. 3 to Muise Decl. at Ex. A.

16.    The only public website Plaintiffs claim formally represents their operations is located at www.cair.com.   The website, which is owned by CAIR-AN; mentions only a singular, historically continuous entity called the Council on American-Islamic Relations, referred to in shorthand as CAIR or CAIR National; claims CAIR is the organization begun in 1994, and

3

makes no reference at all to the separate organizations CAIR-AN or CAIR-F.  When CAIR-F solicits donations, it makes no distinction between CAIR-AN and CAIR-F.

Record: Saylor Dep. at 56:19-57-1; 126:10-23;   at Ex. 3 to Muise Decl. at Ex. A; Yerushalmi Decl. at ¶¶ 11-13 at Ex. F.

17.    Plaintiffs, through their authorized designee Corey Saylor, their chairman and executive director, Nihad Awad, and their senior in-house legal counsel, Nadhira Al-Khalili, have provided widely conflicting testimony and court pleadings about who Plaintiffs are, what role the entity "CAIR" plays in all of this, and which entity was actually in privity with Chris Gaubatz as an intern.  While first swearing under oath in answers to interrogatiroes that it was this third entity, non-party CAIR that had the relationship with Chris, ultimately, Plaintiffs changed their tune and have denied that this non-party CAIR has any involvement in this litigation.

Record: Muise Decl. at ¶¶ 17, 20-22, 24 at Ex. A; Awad Dep. at 49:3-68:14 at Ex. 2 to Muise Decl. at Ex. A; Saylor Dep. at 50:24-51:18;:56:19-59:25; 60:24-61:18; 124:4-25 at Ex. 3 to Muise Decl. at Ex. A; Al-Khalili Dep. at 8:12-35:36:24; 38:4-55:18 at Ex. 12 to Muise Decl. at Ex. A.

18.    In 2007 in a federal criminal trial, which concluded upon retrial (after a hung jury in the first trial) with multiple guilty verdicts against the Holy Land Foundation for Global Relief and Development along with seven individuals ("HLF Trial"), the U.S. Government named CAIR-AN,[1] along with a host of other individuals and organizations, including notably the Islamic Society of North America ("ISNA") and the North American Islamic Trust ("NAIT"), as unindicted co-conspirators and/or joint venturers in a massive conspiracy to fundraise for, and otherwise pursue, the terrorist agenda of the Muslim Brotherhood and the Palestine Committee, a

---

[1] While the Government refers to CAIR-AN only as "CAIR," CAIR-F did not exist during the period relevant to the HLF Trial. *See generally U.S. v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011).

public relations and fund raising arm of Hamas in the United States.

> Record: Yerushalmi Decl. at ¶ 11 at Ex. F; *see generally U.S. v. El-Mezain*, 664 F.3d 467

(5th Cir. 2011).

19.    In preparing for retrial, the Government explained in its trial brief CAIR-AN's

involvement in the Muslim Brotherhood-Hamas conspiracy:

> As described above, and as the government established at the last trial, the
> defendants, through the HLF, were engaged in a conspiracy to support Hamas
> through their membership in the Palestine Committee, an organization created by
> the U.S. branch of the Muslim Brotherhood to assist Hamas, which itself is the
> Palestinian branch of the Muslim Brotherhood.  Along with the HLF, whose
> function was to raise funds on behalf of Hamas, the Palestine Committee oversaw
> the Islamic Association for Palestine ("IAP"), the United Association for Studies
> & Research ("UASR") and, later on, the Council on American Islamic Relations
> ("CAIR").

> Record: Yerushalmi Decl. at ¶ 12 at Ex. F.

20.    During the original HLF Trial (in 2007) and just before the retrial (in 2008), CAIR-AN,

on its behalf, and ISNA and NAIT, jointly on their behalf, filed separate motions asking the trial

court to rule that the Government's naming of CAIR-AN, ISNA, and NAIT was improper and

unconstitutional and further to strike the designations as co-conspirators.

> Record: Yerushalmi Decl. at ¶ 13 at Ex. F.

21.    The Government resisted every effort by CAIR-AN, ISNA, and NAIT to have the public

designation of "unindicted co-conspirator" removed from the court record and concluded as

follows in its brief to the court:

> Indeed, CAIR's request to strike its name from the government's co-conspirator's
> list is moot, since its conspiratorial relationship with the Holy Land Foundation
> for Relief and Development (HLF) was confirmed by testimony and documentary
> evidence admitted at trial prior to the date CAIR even filed its brief.

> Record: Yerushalmi Decl. at ¶ 14 at Ex. F.

22.    The trial court ruled that while the public filing of the co-conspirator list was improper, it

refused to strike the designation, ruling:

> Finally, CAIR, NAIT and ISNA ask the Court to strike their names from any public document filed or issued by the government. While it is clear from the *Briggs* line of cases that the Government should have originally filed the unindicted co-conspirators' names under seal, the Court declines to strike CAIR, ISNA and NAIT's names from those documents. The Government has produced ample evidence to establish the associations of CAIR, ISNA and NAIT with HLF, the Islamic Association for Palestine ("IAP"), and with Hamas. While the Court recognizes that the evidence produced by the Government largely predates the HLF designation date, the evidence is nonetheless sufficient to show the association of these entities with HLF, IAP, and Hamas. *See U.S. v. Ladd*, 218 F.3d at 704-05 ("the Government must prove by a preponderance of the evidence that a conspiracy existed"). Thus, maintaining the names of the entities on the List is appropriate in light of the evidence proffered by the Government.

> Record: Ex. 6 at 14-15 to Yerushalmi Decl. at Ex. F.

23. Subsequently, NAIT appealed to the United States Court of Appeals for the Fifth Circuit complaining about the trial court's failure to strike the unindicted co-conspirator designations and expunge its name from the Government's trial brief. While the Fifth Circuit agreed that the public filing of the unindicted co-conspirator list was a Fifth Amendment violation, it refused to strike the list or expunge any mention of NAIT. (CAIR-AN did not appeal.)

> Record: *U.S. v. Holy Land Found. for Relief & Dev.*, 624 F.3d 685, 691 (5th Cir. 2010) ("As the district court observed, however, the proceedings at trial did include some context for NAIT's inclusion, in the form of evidence tending to support some past ties between NAIT and the HLF.").

24. Evidence introduced at the HLF Trial and linked to the Muslim Brotherhood-Palestine Committee conspiracy was a "planning memo" which describes the purpose of the "legal" organizations, such as CAIR-AN, that the Muslim Brotherhood sought to establish in the United States:

> The process of settlement is a 'Civilization-Jihadist Process' with all the word means. The Ikhwan [Muslim Brotherhood] must understand that their work in

America is a kind of grand Jihad in eliminating and destroying the Western civilization from within and 'sabotaging' its miserable house by their hands and the hands of the believers so that it is eliminated and Allah's religion is made victorious over all other religions.

Record: Yerushalmi Decl. at ¶ 15 at Ex. F.

25.    Key evidence introduced in the HLF Trial was used by the Government to demonstrate that these plans for a Civilization-Jihadist Process were part of the 1993 Philadelphia planning meeting carried out by Muslim Brotherhood and Hamas operatives, a meeting which the FBI secretly recorded pursuant to a lawful court order, the entire transcript of which was introduced into the record at the HLF Trial.[2]

Record: Yerushalmi Decl. at ¶ 16 at Ex. F; *see generally U.S. v. El-Mezain*, 664 F.3d 467, 487 (5th Cir. 2011).

26.    Two of the participants at this Muslim Brotherhood-Hamas planning meeting were Omar Ahmad and Nihad Awad, two of the three founders of CAIR-AN.  Ahmad co-founded CAIR-AN, along with CAIR-AN's executive director Awad, in 1994 soon after this meeting.  Ahmad served as CAIR-AN's chairman of the board until 2005, and Awad still serves on the boards of Plaintiffs CAIR-AN and CAIR-F and as Plaintiff CAIR-F's executive director.

Record: Yerushalmi Decl. at ¶ 17 at Ex. F.

27.    The FBI has publicly stated that it will have no formal liaison contacts with CAIR-AN and CAIR-F precisely because of the evidence that linked Plaintiffs and their senior management to Hamas and its purposes.

Record: Yerushalmi Decl. at ¶ 18 at Ex. F.

---

[2] The full transcript is available from the U.S. District Court, Northern District of Texas, website (http://www.txnd.uscourts.gov/judges/hlf2.html) in 35 parts as Government Exhibits "Philly Meeting," Nos. 1-18E and posted under the documents introduced into evidence on September 29, 2008.

28.     In response to a letter from former Congresswoman Sue Myrick, at the time a member of the House Permanent Select Committee on Intelligence, the U.S. Department of Justice wrote in relevant part: "Enclosed are four copies of the trial transcripts on CD-ROM that contain testimony and other evidence that was introduced in that trial [HLF Trial] which demonstrated a relationship among CAIR, individual CAIR founders, and the Palestine Committee.  Evidence was also introduced that demonstrated a relationship between the Palestine Committee and HAMAS, which was designated as a terrorist organization in 1995."

        Record: Yerushalmi Decl. at ¶ 19 at Ex. F.

    C.    **CSP Decided to Initiate a Film Documentary Proposal to Study Islamism in America with a focus on the Muslim Brotherhood-Hamas-CAIR Conspiracy.**

29.     After years of focused study of the national security threat from global and domestic Islamism and the U.S.-based efforts of the Muslim Brotherhood to provide material support of terrorism from within the Homeland, CSP decided in late 2007 and early 2008 to initiate a documentary film proposal to study Islamism and the Muslim Brotherhood organizations in the U.S.

        Record: Gaffney Dep. at 83:7-15; 89:9-90:14; 100:6-12; CSP Dep. at 32:10-33:6; 34:17-35:11 at Ex. 4 to Muise Decl. at Ex. A; CSP Dep. at 175:10-185:13 at Ex. 5 to Muise Decl. at Ex. A.

30.     Initially, the documentary film proposal ("CAIR Documentary Film Project") was to be a proposal for distribution of a documentary film based upon taped interviews with experts in the field of national security relating to the Muslim Brotherhood and CAIR-AN with the possibility of obtaining video of public events (called "B-roll") involving Plaintiffs and other Muslim Brotherhood operatives.

        Record: CSP Dep. at 35:13:36:25 at Ex. 4 to Muise Decl. at Ex. A; Donvito Dep. at 46:7-

48:25; 78:3-79:24;165:19-166:16 at Ex. 6 to Muise Decl. at Ex. A.

31.     Prior to the start of the events alleged in the TAC, CSP determined that CAIR-AN would be a focus of the CAIR Documentary Film Project based upon its central role in the Muslim Brotherhood conspiracy as described in the HLF Trial evidence.

        Record: Gaffney Dep. at 286:18-288:3 at Ex. 1 to Muise Decl. at Ex. A; CSP Dep. at 33:8-34:3 at Ex. 4 to Muise Decl. at Ex. A.

32.     Eventually, CSP, Publius, and Dave Gaubatz decided to obtain "B-roll" of an intern volunteering inside offices of an affiliate of Plaintiffs, oftentimes referred to as CAIR MD/VA in Herndon, Virginia ("CAIR-MD/VA").  Subsequently, Dave Gaubatz decided to have his son, Chris Gaubatz, accept an internship at Plaintiffs' Offices in Washington, D.C.

        Record: CSP Dep. at 11:13-17 at Ex. 4 to Muise Decl. at Ex. A.

33.     B-roll is a technical term for "general imagery" or more specifically "referring to visuals which support the audio that's gathered in an interview."

        Record: Donvito Dep. at 46:25-47:14 at Ex. 6 to Muise Decl. at Ex. A; CSP Dep. at 35:13-26:25 at Ex. 4 to Muise Decl. at Ex. A.

34.     Paul Donvito, the professional film documentarian utilized early in the CAIR Documentary Film Project (but who had left the project in March 2008 prior to Chris Gaubatz's volunteer internship at Plaintiffs' Offices), CSP, and the Gaubatz Defendants, have described the B-roll, which was to be obtained through an inconspicuous button camera, as audio-video recordings of a volunteer at Plaintiffs' offices in a natural setting.

        Record: Donvito Dep. at 17:5-19; 22:3-23:25; 26:11-20; 29:22-30:6; 46:25-47:14 at Ex. 6 to Muise Decl. at Ex. A; CSP Dep. at 35:13-36:25 at Ex. 4 to Muise Decl. at Ex. A; Dave Gaubatz Dep. at 84:23-85:13; 94:7-11; 122:7-124:10 at Ex. 8 to Muise Decl. at Ex. A.

35.    The purpose of the B-roll was not investigative or to expose Plaintiffs' confidences, secrets, or proprietary information, but rather cinematic.  Specifically, the B-roll of a volunteer in Plaintiffs' offices was to capture background and context of the broader examination of the Muslim Brotherhood's operations in the U.S.

Record:  Donvito Dep. at 17:5-19; 22:3-23:25; 26:11-20; 29:22-30:6; 46:25-47:14; 165:19-166:16 at Ex. 6 to Muise Decl. at Ex. A; CSP Dep. at 35:13-36:25 at Ex. 4 to Muise Decl. at Ex. A; Dave Gaubatz Dep. at 84:23-85:13; 94:7-11; 122:7-124:10 at Ex. 8 to Muise Decl. at Ex. A.

36.    Specifically, as explained by Donvito, the B-roll was "to provide a visual context for the interviews which were being done openly and by experts on all sides of the issues."

Record: Donvito Dep. 165:19-166:16 at Ex. 6 to Muise Decl. at Ex. A.

## II.    THE CAIR DOCUMENTARY FILM PROJECT IN FORMATION.

### A.    Preparatory Work: The Publius Contract.

37.    Defendant CSP, through its president and chief executive officer, Frank Gaffney, contacted Michael Pack of Manifold Productions, Inc. ("Manifold"), to assist Defendant CSP in putting together a documentary film proposal that, if successfully produced, would examine Islamist and Muslim Brotherhood activities in the U.S.  Manifold was chosen because of its technical and professional expertise in producing documentaries, which Defendant CSP did not possess ("CAIR Documentary Film Project" referenced above).

Record: Gaffney Dep. at 71:5-71:22; 72:8-73-1; 108:6-24; 146:22-147:11; 155:1-9 at Ex. 1 to Muise Decl. at Ex. A.

38.    To effect these purposes, Defendant CSP and Manifold created Publius Productions, LLC ("Publius"), in which both entities had a 50 percent ownership interest.  Manifold was to act as

the producer of the documentary and Defendant CSP was primarily to finance the project.

Record: CSP Dep. at 90:13-91:20 at Ex. 4 to Muise Decl. at Ex. A; Muise Decl. at ¶ 25 at Ex. A.

39.     On or about January 4, 2008, Michael Pack, on behalf of Publius, contracted with Paul Donvito to provide research and technical support to Publius to carry out its duties on the CAIR Documentary Film Project.

Record: Donvito Dep. at 128:20-130:1 at Ex. 6 to Muise Decl. at Ex. A.

40.     Internally, Publius referred to the CAIR Documentary Film Project as a "film proposal" called "Islam and America."

Record: Donvito Dep. at 17:5-19 at Ex. 6 to Muise Decl. at Ex. A.

41.     As noted above in ¶ 30, at these initial stages, there was no plan to obtain B-roll from inside Plaintiffs' Offices, but rather to obtain B-roll at public events sponsored by Plaintiffs or other Muslim Brotherhood affiliated organizations.

Record: CSP Dep. at 35:13:36:25 at Ex. 4 to Muise Decl. at Ex. A; Donvito Dep. at 46:7-48:25; 78:3-79:24;165:19-166:16 at Ex. 6 to Muise Decl. at Ex. A.

**B.      Publius-SANE Contract; SANE-Gaubatz Contract.**

42.     To obtain this B-roll, Defendant CSP reached out to Defendant SANE through its then-president Defendant Yerushalmi.  (Defendant Yerushalmi serves, and at all times relevant to this litigation served, as general counsel to Defendant CSP).

Record: Gaffney Dep. at 113:20-21; 291:11-292:2 at Ex. 1 to Muise Decl. at Ex. A; Yerushalmi Dep. at 52:21-53-6; 53:14-56:3; 73:1-75:1 at Ex. 7 to Muise Decl. at Ex. A; CSP Dep. at 69:18-71:16 at Ex. 4 to Muise Decl. at Ex. A; SANE Dep. at 72:13-76:9 at Ex. 9 to Muise Decl. at Ex. A.

43.     Defendant CSP sought to know if Defendant SANE, which had extensive experience sending researchers into mosques presenting as worshippers to gather data for a lengthy, multi-year research project called Mapping Sharia, had any personnel that could obtain inconspicuous audio-video recordings for B-roll legally and without mishap at various public events.

Record: Gaffney Dep. at 113:20-21; 291:11-292:2 at Ex. 1 to Muise Decl. at Ex. A; Yerushalmi Dep. at 52:21-53-6; 53:14-56:3; 73:1-75:1 at Ex. 7 to Muise Decl. at Ex. A; CSP Dep. at 69:18-71:16 at Ex. 4 to Muise Decl. at Ex. A; SANE Dep. at 72:13-76:9 at Ex. 9 to Muise Decl. at Ex. A.

44.     Defendant SANE, through its president, recommended Dave Gaubatz to Defendant CSP to supervise all field research based upon three key elements: (1) Dave Gaubatz had managed one of two phases of the field research of the Mapping Sharia project over a period of six months in which he and the research team he hired, trained, and supervised successfully gathered data from mosques across the country without any mishap or illegality.  This data ultimately led to the publication of the Mapping Sharia research project in two separate, respected peer-reviewed journals; (2) before hiring Dave Gaubatz for the Mapping Sharia research, Yerushalmi researched Dave Gaubatz's military and law enforcement background and had concluded that Dave Gaubatz was an experienced and highly respected military law enforcement officer and intelligence officer, having served in military uniform and as a civilian intelligence officer for more than two decades, including as an agent operating behind enemy lines during the Iraq War; and (3) Yerushalmi knew Gaubatz personally and trusted that he would carry out any tasks professionally and legally.

Record: SANE Dep. at 72:13-76:9 at Ex. 9 to Muise Decl. at Ex. A; Yerushalmi Dep. at 69:18-75:1; 163:18-165:1 at Ex. 7 to Muise Decl. at Ex. A; Yerushalmi Decl. at ¶ 20.

45.    Dave Gaubatz currently suffers from, and during the period of time relevant to this litigation has suffered from, a debilitating form of post-traumatic stress disorder ("PTSD"), which affects his physical health, his memory, and his ability to comprehend communications. He suffers from PTSD in large part from his duties in combat during the Iraq War.

Record: Dave Gaubatz Dep. at 16:2-21; 17:1-10; 17:18-18:24; 21:3-6; 22:13-18; 23:6-24; 274:8-276:10 at Ex. 8 to Muise Decl. at Ex. A.

46.    Neither CSP, SANE, nor Yerushalmi knew at any time relevant to this litigation that Dave Gaubatz was suffering from PTSD.  Had SANE or Yerushalmi known of the seriousness of Dave Gaubatz's PTSD, neither would have recommended him for his role in the CAIR Documentary Film Project.  Additionally, had they known Dave Gaubatz suffered from PTSD, they would not have been involved in the CAIR Documentary Film Project had Dave Gaubatz been involved.  Had CSP known of Dave Gaubatz's PTSD, it would not have agreed to his involvement in the CAIR Documentary Film Project.

Record: Gaffney Decl. at ¶ 5 at Ex. B; Yerushalmi Decl. at ¶ 21 at Ex. F.

47.    Because Dave Gaubatz had an ongoing contractual relationship with SANE to conduct the field research for the Mapping Sharia project ("Mapping Sharia Contract"), SANE, CSP and Dave Gaubatz decided it would be logistically easier and more comfortable for Dave Gaubatz if he contracted directly with SANE to provide the field research services required to obtain the B-roll for the CAIR Documentary Film Project.  It was understood that SANE would in turn contract with Publius to provide Dave Gaubatz's services to obtain the B-roll.

Record: CSP Dep. at 69:18-71:16 at Ex. 4 to Muise Decl. at Ex. A; SANE Dep. at 37:9-15; 39:4-19; 40:8-41:15 at Ex. 9 to Muise Decl. at Ex. A.

48.    Ultimately, SANE entered into a contract with Publius to provide researchers to obtain B-

roll ("Publius-SANE Contract") and simultaneously SANE entered into a contract with Dave

Gaubatz ("SANE-Gaubatz Contract") to perform any and all services required of SANE under

the Publius-SANE contract, in effect creating a relationship between Publius and Dave Gaubatz.

Record: Muise Decl. at ¶¶ 27-28 at Ex. A.

49.    The Publius-SANE Contract expressly and substantively created an independent

contractor relationship between SANE and Publius.

Record: Muise Decl. at ¶ 27 at Ex. A.

50.    The SANE-Gaubatz Contract expressly and substantively created an independent

contractor relationship between SANE and Dave Gaubatz.

Record: Muise Decl. at ¶ 28 at Ex. A.

51.    The SANE-Gaubatz Contract was an entirely different contract and an entirely different

contractual relationship between SANE and Dave Gaubatz than the Mapping Sharia Contract.

The Mapping Sharia Contract was entered into on Jun 25, 2007, for a period of one-year and

only related to research conducted in U.S. mosques for the Mapping Sharia research project and

had nothing whatsoever to do with the CAIR Documentary Film Project or any matters relating

to this litigation.  Under the Mapping Sharia Contract, SANE paid Dave Gaubatz for his services

separate and apart from any funding from any source relating to the CAIR Documentary Film

Project.  Dave Gaubatz's relationship to SANE for purposes of the Mapping Sharia project was

terminated by a settlement and release agreement that had nothing to do with the CAIR

Documentary Film Project.

Record: Muise Decl. at ¶¶ 28-29 at Ex. A; SANE Dep. at 25:7-37:15 at Ex. 9 to Muise

Decl. at Ex. A; Yerushalmi Dep. at 36:12-37:1; 37:3-5; 39:15-16.

52.    The SANE-Gaubatz Contract was entered into on or about March 18, 2008, and, per its

terms, for a period of between 90 days to 120 days.  The parties all understood that SANE was merely acting as a contractual intermediary and that all funding to pay Dave Gaubatz for the services contemplated under the SANE-Gaubatz Contract would be paid by CSP, either through Publius or directly from CSP.  SANE's sole and only role in the CAIR Documentary Film Project from the execution of the Publius-SANE Contract and the SANE-Gaubatz Contract was to transfer 100 percent of the funding received pursuant to the Publius-SANE Contract to Dave Gaubatz under the SANE-Gaubatz Contract.

Record: CSP Dep. at 69:18-71:16 at Ex. 4 to Muise Decl. at Ex. A; SANE Dep. at 37:9-15; 39:4-19; 40:8-41:15 at Ex. 9 to Muise Decl. at Ex. A.

### C.    Manifold Drops Out; SANE's Contractual Involvement Ends; CSP Contracts Directly with Dave Gaubatz.

53.    By the end of March 2008, only a few weeks after the Publius-SANE Contract and the SANE-Gaubatz Contract were entered into, Manifold and CSP agreed that Manifold would no longer participate in the CAIR Documentary Film Project.

Record: CSP Dep. at 31:13-20; 52:6-53-5 at Ex. 4 to Muise Decl. at Ex. A.

54.    From the end of March 2008 upon the termination of Manifold's involvement in the CAIR Documentary Film Project, CSP operated Publius to oversee the CAIR Documentary Film Project.

Record: CSP Dep. at 31:13-20; 52:6-53-5 at Ex. 4 to Muise Decl. at Ex. A.

55.    Sometime between August 21, 2008, and September 15, 2008, SANE's involvement as a contractual intermediary in the CAIR Documentary Film Project came to an end and on September 15, 2008, CSP entered into a contract directly with Dave Gaubatz to continue his services to provide field researches to obtain B-roll from Plaintiffs' Offices ("CSP-Gaubatz Contract").

15

<u>Record</u>: Muise Decl. at ¶ 30 at Ex. A; CSP Dep. at 71:17-72:11 at Ex. 4 to Muise Decl. at Ex. A.

### D.    CSP-Chris Gaubatz Contract.

56.    On February 9, 2009, after all field work had ended on the CAIR Documentary Film Project and months after Chris Gaubatz had terminated his internship at Plaintiffs' Offices, CSP entered into a contract with Chris Gaubatz to review potential B-roll audio-video recordings he obtained from CAIR-MD/VA offices and Plaintiffs' Offices ("Audio-Video Recordings"), assess them, and log them in some coherent fashion ("CSP-C. Gaubatz Contract").   The CSP-C. Gaubatz Contract lasted for five months.

<u>Record</u>: Muise Decl. at ¶ 31 at Ex. A; Chris Gaubatz Dep. at 64:12-65:10 at Ex. 10 to Muise Decl. at Ex. A; Brim Dep. 208:2-14 at Ex. 11 to Muise Decl. at Ex. A.

## III.    THE CAIR DOCUMENTARY FILM PROJECT IN PROGRESS.

### A.    Chris Gaubatz Volunteers at CAIR-MD/VA Offices.

57.    In mid-March 2008, Publius, Dave Gaubatz, and CSP, decided that Dave Gaubatz would employ, train, and supervise researchers to volunteer at offices affiliated with Plaintiff CAIR-AN, or at CAIR-AN itself, and use an audio-video recorder in an attempt to capture B-roll for the documentary film proposal.

Record: Donvito Dep. at 17:5-19; 22:3-23:25; 26:11-20; 29:22-30:6; 46:25-47:14 at Ex. 6 to Muise Decl. at Ex. A; CSP Dep. at 11:13-16; 35:13-36:25 at Ex. 4 to Muise Decl. at Ex. A; Dave Gaubatz Dep. at 84:23-85:13; 94:7-11; 122:7-124:10 at Ex. 8 to Muise Decl. at Ex. A.

58.    Publius personnel assisted Dave Gaubatz in obtaining the audio-video recording device, which was a kind of button-camera ("Recording Device") intended to be worn inconspicuously on the outer clothing of the researcher.

<u>Record</u>: Donvito Dep. at 36:21-37:22; Dave Gaubatz Dep. 104:8-20 at Ex. 8 to Muise Decl. at Ex. A; Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 3 at Muise Decl. at ¶ 32 at Ex. A.

59.    The audio-video quality of the Recording Device was poor.  Audio from the Recording Device was poorer than what could be heard by the listener (*i.e.*, less than "earshot"), and the video was similarly of a poor quality.

<u>Record</u>: Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 3 at Muise Decl. at ¶ 32 at Ex. A.

60.    Chris Gaubatz began his volunteer work at CAIR-MD/VA offices in Herndon, Virginia, in or about late March 2008.

<u>Record</u>: Chris Gaubatz Dep. at 21:14-22:5 at Ex. 10 to Muise Decl. at Ex. A.

61.    Khalid Iqbal, the executive director of CAIR-MD/VA, supervised Chris Gaubatz's volunteer work at CAIR-MD/VA.

<u>Record</u>: Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 4 at Muise Decl. at ¶ 32 at Ex. A.

62.    During his volunteer work at CAIR-MD/VA, Chris Gaubatz entered into no agreements regarding confidentiality, he was never instructed about the confidential or proprietary nature of any of the material he came in contact with, and his supervisor gave him expressed authority to review any of the materials he came across at CAIR-MD/VA to learn more about CAIR, and he would even encourage Chris to take the material home to study.

<u>Record</u>: Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 4 at Muise Decl. at ¶ 32 at Ex. A; Chris Gaubatz Dep. at 267:1-268:8 at Ex. 10 to Muise Decl. at Ex. A.

B.      The CAIR-Morris Days Fraud.

63.     In or about April or May 2008, in the course of his volunteer work at CAIR-MD/VA, Chris Gaubatz came across documents evidencing a massive fraud involving dozens of clients of CAIR-MD/VA.

Record: Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 4 at Muise Decl. at ¶ 32 at Ex. A.

64.     This fraud has resulted in several federal lawsuits by former clients of CAIR-MD/VA, one of which is currently pending in this Court.

Record: Yerushalmi Decl. at ¶ 22 at Ex. F.

65.     Chris Gaubatz discovered that CAIR-MD/VA had hired Morris Days as its "Resident Attorney" and "Civil Rights Manager."

Record: Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 4 at Muise Decl. at ¶ 32 at Ex. A.

66.     Days, however, was not an attorney, and in the course of his employment, Days defrauded dozens of CAIR-MD/VA clients ("Morris Days Fraud").

Record: Yerushalmi Decl. at ¶ 22 at Ex. F.

67.     The Morris Days Fraud was known to those who worked at CAIR-MD/VA but not to the victims and not to the public.

Record: Yerushalmi Decl. at¶ 22 at Ex. F.

68.     The Morris Days Fraud included not only the fraud by Days, but also a massive cover-up and participation in the on-going fraud by Plaintiffs.

Record: Yerushalmi Decl. at ¶ 22 at Ex. F.

69.     For example, during the Morris Days Fraud, Iqbal served as both the executive director of

CAIR-MD/VA and as an officer and director of operations of CAIR-F in Washington, D.C.

Record: Yerushalmi Decl. at ¶ 22 at Ex. F.

70.    Part of Iqbal's responsibilities at CAIR-F was to supervise Plaintiffs' chapter organizations, such as CAIR-MD/VA.

Record: Yerushalmi Decl. at ¶ 22 at Ex. F.

71.    Iqbal learned that Days was defrauding CAIR clients as early as July 2007, but waited to terminate Days until February 2008, and even then only after too many CAIR clients threatened to sue and expose the Morris Days Fraud.

Record: Yerushalmi Decl. at ¶ 22 at Ex. F.

72.    When CAIR clients-victims would approach CAIR-MD/VA officials in 2007 through August 2008 to complain about the way Days was handling their litigation matters, CAIR-MD/VA officials and Plaintiffs would deny any wrongdoing, claim that Days was an "independent contractor" (even as Plaintiffs represented to the public that Days was their CAIR-MD/VA chapter "Resident Attorney" and "Civil Rights Manager"), and that the only recourse for the CAIR victims-clients was to contact Days or find other counsel.

Record: Yerushalmi Decl. at ¶ 22 at Ex. F.

73.    In or about May 2008, and as part of the cover-up, officials from both Plaintiffs and CAIR-MD/VA decided to close down CAIR-MD/VA.

Record: Yerushalmi Decl. at ¶ 22 at Ex. F.

74.    During this massive cover-up, in or about April or May 2008, Iqbal instructed Chris Gaubatz to shred boxes of documents which included evidence of the Morris Days Fraud.

Record: Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 4 at Muise Decl. at ¶ 32 at Ex. A.

75.    During the CAIR Documentary Film Project, Yerushalmi served as general counsel to CSP, and in that capacity, provided legal counsel to his client and to Dave Gaubatz when such legal counsel was sought.

Record: Yerushalmi Dep. at 70:9-24 at Ex. 7 to Muise Decl. at Ex. A; Dave Gaubatz Dep. at 63:21-64:1; 78:18-21; 98:10-99:1; 166:8-12; 171:10-24; 205:12-19; 269:13-270:7 at Ex. 8 to Muise Decl. at Ex. A; Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 6, 8 at Muise Decl. at ¶ 33 at Ex. A.

76.    During this time, Dave Gaubatz provided Yerushalmi with some of the documents evidencing the Morris Days Fraud and asked Yerushalmi (1) if he thought the documents evidence a serious crime; and (2) what Chris Gaubatz's duties were relative to the evidence and relative to Iqbal's instructions to destroy the evidence.

Record: Dave Gaubatz Dep. at 133:2-134-11 at Ex. 8 to Muise Decl. at Ex. A; Yerushalmi Dep. at 82:4-83:19 at Ex. 7 to Muise Decl. at Ex. A; Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 8 at Muise Decl. at ¶ 33 at Ex. A.

77.    Upon review of the limited documents made available to him, Yerushalmi advised Dave Gaubatz that it was his professional opinion that the documents he had reviewed evidenced a serious crime involving a massive fraud and advised Dave Gaubatz, per Yerushalmi's testimony, as follows:

> A.    I have a specific recollection of on two or three occasions receiving some documents relating to what we all have come to know as the Morris Days affair from Paul David Gaubatz, who informed me that they were removed from the CAIR Herndon, Virginia, offices.
>
> When he provided those to me he did so in the context of asking for legal advice.  Again, I can't speak to what was in Paul David Gaubatz's mind, but I had understood that that query was based upon my position as the general counsel for the Center for Security Policy, and my prior agreement to respond to legal queries regarding the documentary film proposal research matters.
>
> Paul David Gaubatz was of the view that the documents that he provided

to me, and others that he did not provide to me, evidenced a serious criminal fraud. My review of those documents, based upon my experience of some 28 years as a litigator dealing with white collar crime, malpractice, organizational crimes, was that, in fact, those documents were, in fact, evidence of a serious criminal fraud.

Mr. Gaubatz, Paul David Gaubatz explained to me that his son, Chris Gaubatz, had been instructed to shred these documents. He asked me what legal advice I would give regarding the handling of those documents.

My legal advice at the time was that there are three bases for Chris Gaubatz to have documents: One, is if the organization provided expressed authority for Chris Gaubatz to have documents and remove them; the second was implied authority.

Would a reasonable person under the circumstances understand there to be authority to remove documents? And the third is what I term for Paul David Gaubatz, legal authority.

It would be absolutely forbidden for Chris Gaubatz to knowingly or with a reckless disregard of the truth before him destroy evidence of a crime. And if he were asked to do so, he should not.

And because of other aspects of statutory law and common law, he would have a duty to preserve the evidence and to provide it within a reasonable period of time to law enforcement.

Record: Yerushalmi Dep. at 82:4-83:19 at Ex.7 to Muise Decl. at Ex. A; Dave Gaubatz Dep. at 132:13-134:11 at Ex. 8 to Muise Decl. at Ex. A; Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 6 at Muise Decl. at ¶ 33 at Ex. A.

### C. None of the Actions of Chris Gaubatz at CAIR-MD/VA Are a Basis for Any of Plaintiffs' Claims against Any of the Defendants.

78. Plaintiffs have expressly stipulated that no audio recordings recorded by Chris Gaubatz at CAIR-MD/VA during his volunteer work at CAIR-MD/VA are a basis for any of their respective claims against any of the Defendants.

Record: Muise Decl. at ¶ 24 at Ex. A.

79. Plaintiffs have expressly stipulated that taking possession of documents from CAIR-MD/VA's offices in Herndon, Virginia, by Chris Gaubatz is not a basis for any of their respective claims against any of the Defendants.

Record: Muise Decl. at ¶ 24 at Ex. A.

80.    Plaintiffs have alleged no proprietary interest in CAIR-MD/VA, which had closed down prior to Chris Gaubatz obtaining his position as a volunteer intern at Plaintiffs' Offices.

Record: Muise Decl. at ¶ 24 at Ex. A; Al-Khalili Dep. at 73:22-74:4 at Ex. 12 to Muise Decl. at Ex. A.

### D.    Chris Gaubatz Begins His Volunteer Internship at Plaintiffs' Offices.

81.    After the CAIR-MD/VA offices closed down, Iqbal recommended to Chris Gaubatz and to CAIR-F that Chris Gaubatz volunteer at Plaintiffs' Offices as an intern without receiving any financial benefit from Plaintiffs whatsoever.  Chris informed his father who in turn informed CSP.

Record: Chris Gaubatz Dep. at 195:10-24; 244:3-245:19 at Ex. 10 to Muise Decl. at Ex. A; Dave Gaubatz Dep. at 140:15-141:20; 150:17-151:25 at Ex. 10 to Muise Decl. at Ex. A.

82.    In fact, Chris Gaubatz had already volunteered at Plaintiffs' offices in early April 2008 for several days while he was still formally a volunteer at CAIR-MD/VA ("Pre-Internship Period").

Record: Chris Gaubatz Dep. at 22:17-21 at Ex. 10 to Muise Decl. at Ex. A.

83.    During the Pre-Internship Period, Chris Gaubatz was taken to a storage room in Plaintiffs' Offices and asked to move boxes and to mark certain files for shredding.

Record:  Muise Decl. at ¶ 36 at Ex. A; Pls.' external hard drive exhibit, file named "April 2008 – Exhibit 3."

84.    At no time during the Pre-Internship Period was Chris Gaubatz required or asked to sign a confidentiality agreement; at no time was he informed that his work involved confidential or proprietary information; at no time was he told not to remove documents or not to make copies of documents for his own use.

Record: Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 4 at Muise Decl. at ¶ 32 at Ex. A; Saylor Dep. at 142:1-12 at Ex. 3 to Muise Decl. at Ex. A.

85.    On or about June 16, 2008, Chris Gaubatz began his volunteer internship at Plaintiffs' Offices.

Record: Wazir Dep. at 190:4-19 at Ex. 13 to Muise Decl. at Ex. A.

**E.    Chris Gaubatz Did Not Enter into a Confidentiality Agreement, Oral or Written, with Plaintiffs.**

86.    During the entire period of Chris Gaubatz's volunteer internship at Plaintiffs' Offices, his direct supervisor was Raabia Wazir.

Record: Saylor Dep. at 104:1-6 at Ex. 3 to Muise Decl. at Ex. A.

87.    Raabia Wazir was the CAIR-F employee responsible for overall supervision of all interns.

Record: Saylor Dep. at 88:6-9 at Ex. 3 to Muise Decl. at Ex. A; Wazir Dep. at 20:23-21:3; 49:18-50:15; 57:11-23; at Ex. 13 to Muise Decl. at Ex. A.

88.    In addition, while there were several departments to which various interns were assigned, which would require the intern to report to a different CAIR-F employee-supervisor, Chris Gaubatz was assigned exclusively to the "outreach" department, for which Wazir was the CAIR-F employee responsible for supervising Chris Gaubatz.

Record: Wazir Dep. at 49:18-21; 131:6-17 at Ex. 13 to Muise Decl. at Ex. A; Saylor Dep. at 104:1-6 at Ex. 3 to Muise Decl. at Ex. A.

89.    On his first formal day of his volunteer internship on or about June 16, 2008, along with another volunteer intern, Chris Gaubatz met with Wazir for a kind of orientation.

Record: Wazir Dep. at 125:18-24 at Ex. 13 to Muise Decl. at Ex. A

90.    While Wazir presented what she claimed to be a confidentiality agreement for Chris

Gaubatz to sign, when Chris Gaubatz asked her if he should sign it then, Wazir told him to "read it on your own time."

    <u>Record</u>: Wazir Dep. at 191:12-192:10 at Ex. 13 to Muise Decl. at Ex. A; Chris Gaubatz Dep. at 111:14-112:8 at Ex. 10 to Muise Decl. at Ex. A.

91.    During this meeting, Wazir made no effort whatsoever to explain the purported confidentiality agreement to Chris Gaubatz or to tell him of its importance or of the importance of confidentiality generally to Plaintiffs.

    <u>Record</u>: Wazir Dep. at 191:12-198:10; 203:21-204:4 at Ex. 13 to Muise Decl. at Ex. A; Chris Gaubatz Dep. at 111:14-112:8 at Ex. 10 to Muise Decl. at Ex. A.

92.    Indeed, in her deposition, Wazir likened the signing of this purported confidentiality agreement to clicking on an iTunes button agreeing to all of the terms of the download without reading the agreement.

    <u>Record</u>: Wazir Dep. at 127:13-129:6; at Ex. 13 to Muise Decl. at Ex. A.

93.    Wazir testified she did not even have a recollection of ever having read the purported confidentiality agreement herself nor did she recall ever signing such an agreement when she was an intern.

    <u>Record</u>: Wazir Dep. at 31:18-25; 127:7-12 at Ex. 13 to Muise Decl. at Ex. A

94.    Wazir conceded that the declaration she had signed under oath on behalf of Plaintiff CAIR-AN's application for a preliminary injunction in this matter (Doc. No. 7-1) ("Wazir Declaration"), which stated that Chris Gaubatz signed a confidentiality agreement, was "mistaken."

    <u>Record</u>: Wazir Dep. at 191:12-198:10; 203:21-204:4 at Ex. 13 to Muise Decl. at Ex. A

95.    Chris Gaubatz never read or signed the purported confidentiality agreement Wazir

provided him nor any other such agreement, nor did he ever orally agree to be subject to any form of confidentiality.

Record: Chris Gaubatz Dep. at 112:21-25; Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 4 at Muise Decl. at ¶ 32 at Ex. A.

96. Wazir was the CAIR-F employee purportedly responsible for obtaining signed confidentiality agreements from the outreach volunteer interns.

Record: Wazir Dep. at 114:17-22 at Ex. 13 to Muise Decl. at Ex. A; Pls.' First Suppl. Answers to CSP Defs.' First Set of Interrogs., Ans. No. 14, at Muise Decl. at ¶ 18 at Ex. A.

97. Plaintiffs claim Chris signed the alleged confidentiality agreement provided to him on June 16, 2008. They make no claims and provide no evidence that he signed an agreement prior to the two days he volunteered in April 2008.

Record: Pls.' First Suppl. Answers to CSP Defs.' First Set of Interrogs., Ans. No. 14, at Muise Decl. at ¶ 18 at Ex. A; Wazir Dep. at 190:4-19 at Ex. 13 to Muise Decl. at Ex. A.

98. Plaintiffs swore that anyone who enters Plaintiffs' Offices must sign a confidentiality agreement; yet, Chris signed no such confidentiality agreement, and Plaintiffs never asked him to do so in April 2008.

Record: Saylor Dep. at 101:21-102:12 at Ex. 3 to Muise Decl. at Ex. A.

99. Plaintiffs had absolutely no written or oral policies, procedures, or rules for the volunteer interns regarding the existence of, or the treatment of, confidential, proprietary, or personal information. Specifically, Wazir testified that she provided no such oral or written instructions, and Plaintiffs stipulated there was no handbook or manual with such procedures that would have been provided to Chris.

Record: Wazir Dep. at 25:7-28:8; 29:15-31:17; 44:17-45-16; 78:3-14; 80:3-82:8 at Ex. 13

25

to Muise Decl. at Ex. A; Dave Gaubatz Dep. at 212:6-217:6 at Ex. 8 to Muise Decl. at Ex. A.

100.    At no time did Wazir or anyone at Plaintiffs' Offices provide Chris Gaubatz with any manual or written or oral set of rules, policies, or procedures relating to the existence of, or the treatment of, confidential, proprietary, or personal information.

Record: Saylor Dep. at 88:10-13; 90:3-92:15; 104:1-106:14 at Ex. 3 to Muise Decl. at Ex. A; Chris Gaubatz Dep. at 252:22-253:21 at Ex. 10 to Muise Decl. at Ex. A.

101.    At no time did Wazir or anyone at Plaintiffs' Offices ever inform Chris Gaubatz that he was being provided confidential, proprietary, or private information.

Record: Wazir Dep. at 25:7-28:8; 29:15-31:17; 44:17-45-16; 78:3-14; 80:3-82:8 at Ex. 13 to Muise Decl. at Ex. A; Dave Gaubatz Dep. at 212:6-217:6 at Ex. 8 to Muise Decl. at Ex. A; Saylor Dep. at 88:10-13; 90:3-92:15; 104:1-106:14 at Ex. 3 to Muise Decl. at Ex. A; Chris Gaubatz Dep. at 252:22-253:21; 266-4:25 at Ex. 10 to Muise Decl. at Ex. A.

102.    In answers to interrogatories seeking a list of interns who interned at Plaintiffs' Offices during Chris Gaubatz's volunteer internship, Plaintiffs identified 20 other interns besides Chris Gaubatz.

Record: Pls.' First Suppl. Answers to CSP Defs.' First Set of Interrogs., Ans. No. 1, at Muise Decl. at ¶ 18 at Ex. A; Pls.' Second Suppl. Answers to CSP Defs.' First Set of Interrogs., Ans. No. 1 at Muise Decl. at ¶ 19 at Ex. A.

103.    Thus, with Chris Gaubatz and the other three Dave Gaubatz-hired researchers volunteering at Plaintiffs' Offices, there were a total of 24 volunteer interns working at Plaintiffs' Offices during the time period relevant to this litigation.

Record: Dave Gaubatz's Answers to Pls.' Third Set of Interrogs. at Ans. No. 1 at Muise Decl. at ¶ 38 at Ex. A.

104.    Plaintiffs could produce only 13 signed confidentiality agreements from among the 24 volunteer interns.

Record: Muise Decl. at ¶ 39 at Ex. A.

105.    According to Plaintiffs' answers to interrogatories and Wazir's initial testimony during her deposition, Wazir, as Chris Gaubatz's immediate supervisor in the "outreach" department, would have given him the confidentiality agreement, witnessed his signature, and signed it herself.

Record: Wazir Dep. at 114:17-22 at Ex. 13 to Muise Decl. at Ex. A; Pls.' First Suppl. Answers to CSP Defs.' First Set of Interrogs., Ans. No. 14, at Muise Decl. at ¶ 18 at Ex. A..

106.    Subsequently, Wazir changed her testimony during her deposition to state that Yasser Tabbara, as the director of community development and her superior as director of "outreach," would have been the CAIR-F employee designated to sign the confidentiality agreement for interns under her supervision.

Record: Wazir Dep. at 86:9-22; 116:18-117:9 at Ex. 13 to Muise Decl. at Ex. A;

107.    Not a single one of the 13 signed confidentiality agreements was signed by Wazir or by Tabbara.

Record: Muise Decl. at ¶ 39 at Ex. A.

**F.    Chris Gaubatz Used an Alias for His Internship.**

108.    Chris Gaubatz presented himself to "CAIR" a/k/a "CAIR National" as an applicant for a position as a volunteer intern after Iqbal suggested it upon the closing of CAIR-MD/VA.

Record: Chris Gaubatz Dep. at 196:10-24; 247:14-249:21 at Ex. 10 to Muise Decl. at Ex. A.

109.    "CAIR" a/k/a "CAIR National" was in fact the single organization with historical continuity back to the founding organization in 1994, Council on American-Islamic Relations,

Inc., which operated under an unregistered d/b/a as CAIR. At no time did Chris Gaubatz know about or understand that CAIR-F existed, that it was the party to whom he applied, or the party for whom he volunteered.

Record: Chris Gaubatz Dep. at 247:14-249:21 as Ex. 10 to Muise Decl. at Ex. A.

110.    The only organization Chris Gaubatz, Dave Gaubatz, the CSP Defendants, and Yerushalmi understood existed was the organization "CAIR" or "Council on American-Islamic Relations" or "CAIR National" that presented itself on the www.cair.com website and which presented itself on that website as a single entity that had historical continuity since its founding in 1994.

Record: Chris Gaubatz Dep. at 247:14-249:21 as Ex. 10 to Muise Decl. at Ex. A; Dave Gaubatz Dep. at 270:14-271:16 at Ex. 8 to Muise Decl. at Ex. A; CSP Def. at 186:11-188:7 at Ex. 5 to Muise Decl. at Ex. A; *see* ¶ 16, *infra*.

111.    Chris Gaubatz informed his father about this opportunity and Dave Gaubatz instructed him to apply for the position as a volunteer intern.

Record: Dave Gaubatz Dep. 140:15-141:20; 151:19-25 at Ex. 8 to Muise Decl. at Ex. A.

112.    Chris Gaubatz presented himself to CAIR-AN using the alias "David Marshal," which he had used earlier at CAIR-MD/VA.

Record: Chris Gaubatz Dep. at 24:4-6 at Ex. 10 to Muise Decl. at Ex. A.

113.    Chris Gaubatz used this alias at CAIR-MD/VA and Plaintiffs' Offices as a security measure so that CAIR-MD/VA and CAIR-AN would not suspect that he was related to Dave Gaubatz, who was known to CAIR-AN as a vocal critique of CAIR-AN.

Record: Chris Gaubatz Dep. at 27:10-28:20 at Ex. 10 to Muise Decl. at Ex. A; Dave Gaubatz Dep. at 247:13-248:19 at Ex. 8 to Muise Dec. at Ex. A.

114.   Chris Gaubatz also sent an email "resume" to CAIR-AN's employee-lawyer, Nadhira Al-Khalili, which contained additional information that was not true.  Specifically, the following information was not true: he was attending Ferrum College and he had worked in a family-owned construction business.  The CSP Defendants, SANE, and Yerushalmi were not aware that Chris had provided Plaintiffs this additional information.

Record: Chris Gaubatz Dep. at 25:18-20 at Ex. 10 to Muise Decl. at Ex. A; Chris Gaubatz Dep. at 25:18-20 at Ex. 10 to Muise Decl. at Ex. A; Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 20 at Muise Decl. at ¶ 32 at Ex. A; *see* ¶ 139, *infra*.

115.   At no time during the application process, nor during the time he served as a volunteer intern at Plaintiffs' Offices, did Chris Gaubatz intend (1) not to conduct himself as a volunteer intern; or (2) to violate any statutory, contractual, or common law duty owed to CAIR-MD/VA, CAIR-AN, or to any organization affiliated with CAIR-AN.

Record: Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 3 at Muise Decl. at ¶ 32 at Ex. A.; Chris Gaubatz Dep. at 244:3-245:19 at Ex. 10 to Muise Decl. at Ex. A; Dave Gaubatz Dep. at 151:19-154:1 at Ex. 8 to Muise Decl. at Ex. A.

116.   On or about September 3, 2008, upon the completion of his volunteer internship, Chris Gaubatz received a "Certificate of Completion" from "CAIR" for successfully fulfilling his duties as a volunteer intern.

Record: Muise Decl. at ¶ 40 at Ex. A.

IV.    **DEFENDANTS' RELATIVE PARTICIPATION IN, AND KNOWLEDGE OF, THE ALLEGED ACTS RELEVANT TO PLAINTIFFS' CLAIMS.**

      **A.**    **CSP Defendants and David Yerushalmi.**

          **1.**    **CSP.**

               **a.**    **Contractual Methodology of the CAIR Documentary Film Project.**

117.    CSP, acting through Publius, desired to obtain useable B-roll for the CAIR Documentary Film Project.  To do so, Publius desired to utilize the professional services of Dave Gaubatz, who had proven himself to be a capable professional with the ability to employ, train, and supervise researchers operating with an alias to obtain B-roll.

    Record: *See* ¶¶ 30-42, *supra*.

118.    To facilitate a relationship with Dave Gaubatz, CSP turned to Yerushalmi, who at the time served as general counsel to CSP and as president of SANE.  Yerushalmi recommended Dave Gaubatz.

    Record: *See* ¶¶ 42-44, *supra*.

119.    Because Dave Gaubatz had an existing contractual relationship with SANE (albeit entirely unrelated to the CAIR Documentary Film Project), CSP, Publius, SANE, and Dave Gaubatz decided to have SANE be contractually responsible to pay Dave Gaubatz.  As a result, Publius entered into the Publius-SANE Contract and SANE entered into the SANE-Gaubatz Contract.

    Record: *See* ¶¶ 47-52, *supra*.

120.    All of the parties understood that CSP was responsible to fund Publius, which in turn would fund SANE, which in turn would fund Dave Gaubatz, who in turn would pay his employees, which he termed researchers, to obtain B-roll at Plaintiffs' Offices. .

    Record: *See* ¶ 52, *supra*.

121.    Publius's roll, through Manifold, was to provide the professional documentarian expertise to the CAIR Documentary Film Project.  When Manifold ended its involvement in the CAIR Documentary Film Project in March 2008, CSP effectively stood in the shoes of Publius and funded SANE or Dave Gaubatz directly. .

Record: *See* ¶¶ 52-55, *supra*.

122.    Contractually and factually, Dave Gaubatz was responsible for all aspects of obtaining the B-roll, including employing the researchers, training them in how they were to obtain volunteer positions at Plaintiffs' Offices or chapter offices, and supervising the researchers during their volunteer internships.  The researchers would be his employees, and while Publius or CSP could ultimate reject a proposed researcher, Dave Gaubatz chose the researches he felt would act professionally.

Record: *See* ¶¶ 48-50, *supra*; Dave Gaubatz Dep. at 67:7-23; 72:1-6; 78:18-79:20; 80:2-6; 82:18-22; 84:10-21; 97:16-20; 100:2-101:22; 102:10-103:3; 107:6-108:25; 122:13-134:11; 151:19-154:1; 163:22-167:8; 170:22-173:3;  at Ex. 8 to Muise Decl. at Ex. A; CSP Dep. at 12:1-24; 24:22-25:19; 61:15-65:7; at Ex. 4 to Muise Decl. at Ex. A; CSP Dep. at 185:14-186:9 at Ex. 5 to Muise Decl. at Ex. A; Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 3-4, 9, 11-14, 21 at Muise Decl. at ¶ 32 at Ex. A; Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 3-6, 9-10 at Muise Decl. at ¶ 33 at Ex. A; CSP Defs.' Answers to Pls.' First Set of Interrogs. at Ans. No. 11 at Muise Decl. at ¶ 41 at Ex. A.

123.    Contractually and factually, Dave Gaubatz was responsible for deciding to attempt to obtain useable B-roll from CAIR-MD/VA offices (April-May 2008) and to have Chris Gaubatz take a position as a volunteer intern at Plaintiffs' Offices (June-September 2008).

Record: *See* ¶¶ 48-50, 122, *supra*.

124.    Ultimately, Dave Gaubatz employed as his employees Chris Gaubatz, Charity Zhe, Stephanie Creswell, and Daniel Ryder to act as researchers and to obtain B-roll from Plaintiffs' Offices.

Record: Dave Gaubatz Dep. at 100:14-16; 262:17-22 at Ex. 8 to Muise Decl. at Ex. A.

125.    Contractually and factually, Dave Gaubatz's only reporting responsibility to CSP relating to his decision to employ specific researchers was to brief CSP on who he hired and why, and where they would be interning.

Record:   Dave Gaubatz Dep. at 102:10-103:3; 107:6-108:25; 122:13-134:11; 151:19-154:1; 163:22-167:8; 170:22-173:3  at Ex. 8 to Muise Decl. at Ex. A

126.    CSP agreed with and accepted Dave Gaubatz's judgment regarding the use of Chris Gaubatz as a volunteer to obtain B-roll and the selection of CAIR-MD/VA and Plaintiffs' Offices for the volunteer work.

Record: CSP Dep. at 11:13-17 at Ex. 4 to Muise Decl. at Ex. A.

127.    Contractually and factually, Dave Gaubatz supervised and managed all the day-to-day work relating to the researchers he employed to volunteer at Plaintiffs' Offices for purposes of obtaining B-roll for the CAIR Documentary Film Project.

Record: See ¶¶ 48-50, 122, supra; CSP Defs.' Answers to Pls.' First Set of Interrogs. at Ans. Nos. 9, 11 at Muise Decl. at ¶ 41 at Ex. A; Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 3-6, 8-10 at Muise Decl. at ¶ 33 at Ex. A; Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 3-4, 9, 11-14, 21 at Muise Decl. at ¶ 32 at Ex. A.

128.    Contractually and factually, CSP had no day-to-day involvement in the work supervised by Dave Gaubatz and had no substantive contact with the researchers during their respective volunteer internships at Plaintiffs' Offices.

<u>Record</u>: *See* ¶¶ 48-50, 122, *supra*; Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 3-4, 9, 11-14, 21 at Muise Decl. at ¶ 32 at Ex. A; Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 3-6, 8-10 at Muise Decl. at ¶ 33 at Ex. A.

**b.      Legal Guidelines for the CAIR Documentary Film Project.**

129.    CSP contracted for and expected Dave Gaubatz and his researchers to conduct themselves legally at all times and to fulfill all legal duties owed to all third-parties, including Plaintiffs.

<u>Record</u>: CSP Defs.' Answers to Pls.' First Set of Interrogs. at Ans. Nos. 9, 11 at Muise Decl. at ¶ 41 at Ex. A; Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 3-6, 8-10 at Muise Decl. at ¶ 33 at Ex. A; Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 3-4, 9, 11-14, 21 at Muise Decl. at ¶ 32 at Ex. A.

130.    To support this end, CSP asked its general counsel, Yerushalmi, to provide legal advice when asked regarding various aspects of the CAIR Documentary Film Project.  Yerushalmi agreed and served in this capacity.

<u>Record</u>: *See* ¶ 75, *supra*; Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 6 at Muise Decl. at ¶ 33 at Ex. A.

131.    Prior to the start of Chris Gaubatz's volunteer work at CAIR-MD/VA, Dave Gaubatz asked Yerushalmi if his son could use an alias as a security measure that would not create a link to Dave Gaubatz.  It was Dave Gaubatz's idea for Chris Gaubatz to use an alias.

<u>Record</u>: Dave Gaubatz Dep. at 249:6-250:12 at Ex. 8 to Muise Decl. at Ex. A.

132.    Yerushalmi responded to this inquiry with the following advice:

> A.      Paul David Gaubatz asked me whether I considered or thought that using a nom de guerre as a volunteer intern at -- in Herndon, Virginia's CAIR offices would pose any legal issues.
>         I explained at the time to Mr. Gaubatz that using an alias in some

circumstances would not cause or raise legal issues. At the time I explained to him that the circumstances that I thought would provide the environment for such use of an alias so that it would neither violate laws or create issues of civil liability would be as follows:

One, he should not present any false documentation; two, he should take no compensation for any work or even out-of-pocket expenses; three, he should conduct himself legally and perform whatever responsibilities he had properly with the intent to do so.

In addition, he should have no intent to violate laws, breach agreements, or any duties otherwise incumbent upon him. In addition, I advised that it would be inappropriate to accept any special duties that would give rise to a claim of a fiduciary.

Q.      Did you know --

A.      One second, I'm not done. I'm just pausing to make sure I've covered the legal advice I gave Mr. Gaubatz at the time.

In that context, I told him that I did not believe that using an alias would create any legal risk or at least no material legal risk. There are legal risks in everything we do every day. But I didn't believe it was a material legal risk if those conditions were met.

Record: Yerushalmi Dep. at 68:25-70:4 at Ex. 7 to Muise Decl. at Ex. A.

133.    In addition, prior to the start of Chris Gaubatz's volunteer work at CAIR-MD/VA, Dave

Gaubatz asked Yerushalmi about the legal use of an inconspicuous audio-video recording device,

and Yerushalmi responded as follows:

Prior to the internship in Herndon, Virginia, and it would have been in and around the time that I gave legal advice regarding the alias I explained that if one were to record a conversation in a clandestine fashion, one would have to be a party to the conversation.

And furthermore, there could be no purpose, current, past -- or I would rather say, there could be no purpose, past or present, during the recording or even subsequently to use the recording in any way that would violate a law or breach a duty of CAIR [sic: care] owed.

Record: Yerushalmi Dep. at 76:24-77:8 at Ex. 7 to Muise Decl. at Ex. A.

134.    In the context of this advice regarding the "one-party rule" for audio recordings,

Yerushalmi specifically advised Dave Gaubatz as follows:

Q.      What was your understanding of the type of recording device that Chris Gaubatz would be using during his internship at the CAIR office in Washington, D.C.?

A.      I had no idea.  I was not involved in that at all.  The only thing I would say to that is that when I was asked initially prior to the CAIR Herndon, Virginia, internship about the one-party consent rule, the one thing I did advise Paul David Gaubatz about was that the device could not be such that it could penetrate walls or glass.

It had to be essentially a device that re -- that could record audio that was audible to the wearer.  It couldn't have a better audio than the wearer's natural hearing.  Having reviewed the audio/videos in context in this litigation, its abilities were far inferior to the natural ear, it appears to me.

Record: Yerushalmi Dep. at 93:2-93:16 at Ex. 7 to Muise Decl. at Ex. A.

135.    At some point during Chris Gaubatz's volunteer work at CAIR-MD/VA and prior to his internship at Plaintiffs' Offices, Dave Gaubatz asked Yerushalmi whether he thought certain documents Chris Gaubatz had access to at CAIR-MD/VA were evidence of a serious crime and under what circumstances would Chris Gaubatz be legally permitted to obtain documents from CAIR-MD/VA's offices.  Mr. Yerushalmi responded as follows:

A.      I have a specific recollection of on two or three occasions receiving some documents relating to what we all have come to know as the Morris Days affair from Paul David Gaubatz, who informed me that they were removed from the CAIR Herndon, Virginia, offices.

When he provided those to me he did so in the context of asking for legal advice.  Again, I can't speak to what was in Paul David Gaubatz's mind, but I had understood that that query was based upon my position as the general counsel for the Center for Security Policy, and my prior agreement to respond to legal queries regarding the documentary film proposal research matters.

Paul David Gaubatz was of the view that the documents that he provided to me, and others that he did not provide to me, evidenced a serious criminal fraud.  My review of those documents, based upon my experience of some 28 years as a litigator dealing with white collar crime, malpractice, organizational crimes, was that, in fact, those documents were, in fact, evidence of a serious criminal fraud.

Mr. Gaubatz, Paul David Gaubatz explained to me that his son, Chris Gaubatz, had been instructed to shred these documents.  He asked me what legal advice I would give regarding the handling of those documents.

My legal advice at the time was that there are three bases for Chris Gaubatz to have documents:  One, is if the organization provided expressed authority for Chris Gaubatz to have documents and remove them; the second was implied authority.

Would a reasonable person under the circumstances understand there to be authority to remove documents?  And the third is what I term for Paul David

Gaubatz, legal authority.

It would be absolutely forbidden for Chris Gaubatz to knowingly or with a reckless disregard of the truth before him destroy evidence of a crime. And if he were asked to do so, he should not.

And because of other aspects of statutory law and common law, he would have a duty to preserve the evidence and to provide it within a reasonable period of time to law enforcement.

Record: Yerushalmi Dep. at 82:4-83:19 at Ex. 7 to Muise Decl. at Ex. A.

136.    During Chris Gaubatz's volunteer internship at Plaintiffs' Offices, Dave Gaubatz only sought Yerushalmi's advice relating to whether he thought certain information Chris Gaubatz had access to at Plaintiffs' Offices amounted to evidence of tax fraud by Plaintiffs, and whether receipt of funds from abroad might violate the federal laws requiring persons and entities to register as foreign agents. In that context, Yerushalmi responded as follows:

THE WITNESS:        During the internship in Washington, D.C., I do not recall being asked legal advice regarding the propriety of removal of documents. That question had been previously raised in Herndon, and my advice was then, and I think it was understood clearly by Paul David Gaubatz that there were three bases that would permit Chris Gaubatz to remove documents from CAIR.

The first was if CAIR officials expressly authorized Chris Gaubatz to remove documents. The second was if CAIR officials provided what we would call "implied authority," that is to say, a reasonable person under the circumstances would construe the -- the conduct or the speech of CAIR officials to authorize taking of documents. And the third was the legal authority.

The one area that we did discuss, and Paul David Gaubatz sought my legal advice on, were specific documents relating to tax fraud and for the receipt of funds from abroad.

BY MR. ABBAS:

Q.      And did he seek your advice regarding those documents -- strike that.

Did you understand that the documents he was seeking your advice in regards to the tax fraud in receipt of foreign fundings or documents taken from the CAIR office in Washington, D.C.?

MR. MUISE:  Objection. Vague.

THE WITNESS:        Again, it is a vague question.

MR. MUISE:  Calls for speculation.

THE WITNESS:        And it also calls for speculation.

But let me try to answer as follows:  I had understood that additional documents had been removed from CAIR National's office by Chris Gaubatz. It was entirely unclear to me, however, that those documents fell within that third category we've discussed, legal authority as opposed to expressed and implied

36

authority.

In other words, in CAIR National, I recall Paul David Gaubatz explaining to me that Chris' job was to take documents out of CAIR National. I remember Paul David Gaubatz expressly telling me that no one at CAIR National had advised Chris Gaubatz about the confidentiality of any of the documents that he had access to under any circumstance, or that anyone at CAIR National had instructed Chris Gaubatz about the proprietary nature of any of the documents that he had access to, or that anyone at CAIR National had advised Chris Gaubatz about the personal or private nature of any of the documents or information that Chris Gaubatz had available to him at CAIR National.

He further informed me that on many occasions there was no confidentiality agreement, there was no special relationship. He was engaged in no conduct other than the conduct, the rather mundane conduct of all the other interns. Indeed, Paul David Gaubatz informed me that it was his understanding from Chris Gaubatz that CAIR National's offices were run in absolutely slipshod, haphazard, unregulated fashion.

That there was no real instructions, in fact, there was no instructions per se to the interns. There was no manual. There were no written rules, no written procedures, no written policies. That most of the time they were engaged in banter and makeshift work, just to look busy, literally.

That the conversations had between the interns and between the interns and the employees ranged from the absurd to the trivial, that nothing was discussed of serious import.

It was in that context that I was informed of additional documentation that Paul David Gaubatz believed evidenced tax fraud and receipt to funds from abroad. I do not have any specific recollection, however, of being asked about a specific document as I do the Morris Days affair and providing specific legal advice on those matters.

Record: Yerushalmi Dep. at 102:18-105:15 at Ex. 7 to Muise Decl. at Ex. A; *see also*:

Yerushalmi Dep. at 107:10 to 108:14; 110:9-113:3 at Ex. 7 to Muise Decl. at Ex. A.

137.    The final area of legal advice Yerushalmi provided Dave Gaubatz regarding the logistics

of the CAIR Documentary Film Project related to documents available to Chris Gaubatz on

computers located in Plaintiffs' Offices. Yerushalmi responded as follows:

Q.    Did David Gaubatz tell you from where in the offices of -- strike that.

Did David Gaubatz tell you during Chris Gaubatz's internship at the CAIR office in Washington, D.C., from where Chris Gaubatz was removing documents from the CAIR office in Washington, D.C.?
MR. MUISE: Objection. Vague.
THE WITNESS:    Certainly not specifically with regard to any specific documents. I do recall two categories of discussions. I just say I don't know if

there was one conversation about them or multiple.

I do know that some of the documents Chris removed from CAIR National's office were in the storage areas, and I recall it was oftentimes in that discussion, Paul David Gaubatz explaining to me that that is where Chris was instructed to go to gather documents to take on various public events.

I remember one conversation where I had asked him as we discussed the haphazard running of the office in CAIR Washington, D.C., if there was any rhyme or reason, if there was any order, if there was any instruction, if there were any policies about which documents Chris should go and obtain to take for public dissemination.

And Paul David Gaubatz explained to me very clearly that there was absolutely none. That his supervisor, Ms. Wazir, would simply send him down to get the documents. That she was immature, that she did not supervise Chris Gaubatz's activities or any other interns for that matter.

Perfectly pleasant girl, I remember him explaining to me at one point. But not as supervisor in the sense of providing any kind of real instruction. And that was a common complaint among the interns. I remember that conversation.

In addition, I remember at some point Paul David Gaubatz explaining to me that Chris was encouraged to take documents to read up about CAIR, Islam. And then a third conversation or series of conversations when Mr. Gaubatz explained to me, Paul David Gaubatz, that Chris was oftentimes asked to work on computers.

And in the course of that conversation I explained to Paul David Gaubatz that under no circumstance should Chris take any documents from any kind of network, shared server or e-mail server.

I would note that subsequent to that, and conversations about that, Paul David Gaubatz assured me that that's one thing Chris understood from him expressly, that under no circumstances was he to remove any documents even with authority, even with authority from a shared drive, a network or e-mail server.

Record: Yerushalmi Dep. at 114:8-116:7 at Ex. 7 to Muise Decl. at Ex. A.

138. During the course of the CAIR Documentary Film Project, the CSP Defendants, Yerushalmi, and SANE had absolutely no knowledge that Dave Gaubatz and the researchers he employed to volunteer at Plaintiffs' Offices had violated any statutory, contractual, or common law duty owed to Plaintiffs and had absolutely no knowledge that Dave Gaubatz and the researchers he employed to volunteer at Plaintiffs' Offices were not abiding strictly by the legal advice provided to Dave Gaubatz by Yerushalmi or that Dave Gaubatz was not abiding strictly by the terms of the SANE-Gaubatz Contract or its subsequent replacement, the CSP-Gaubatz

Contract.

Record: CSP Defs.' Answers to Pls.' First Set of Interrogs. at Ans. Nos. 4-5, 9 at Muise Decl. at ¶ 41 at Ex. A; CSP Dep. at 22:5-24:21; 41:6-42:21; 49:15-50:13 at Ex. 4 to Muise Decl. at Ex. A; SANE Dep. at 40:8-41:15; 54:14-56:4 at Ex. 9 to Muise Decl. at Ex. A;

### c.    Access to Plaintiffs' Offices: Use of an Alias.

139.    CSP, through its general counsel Yerushalmi, had advised Dave Gaubatz that the use of an alias pursuant to the legal instructions provided to Dave Gaubatz by Yerushalmi was acceptable.  At no time, however, during the course of the CAIR Documentary Film Project, did the CSP Defendants, Yerushalmi, or SANE, learn that Chris Gaubatz had submitted a written resume that contained false facts about a college he attended and about work in a family construction business.

Record: Gaffney Decl. at ¶ 6 at Ex. B; Brim Decl. at ¶ 4 at Ex. C; Savit Decl. at ¶ 5 at Ex. D; Pavlis Decl. at ¶ 5 at Ex. E; Yerushalmi Decl. at ¶ 23 at Ex. F.

### d.    No Written or Oral Agreement Relating to Confidentiality.

140.    Chris Gaubatz did not sign any agreement relating to confidentiality or non-disclosure with Plaintiffs (or with CAIR-MD/VA).

Record: *See* ¶¶ 62, 84, 86-107, 136-138, *supra*.

141.    Chris Gaubatz did not enter into any expressed or implied oral agreement of confidentiality or non-disclosure with Plaintiffs.  Indeed, no employee or representative of Plaintiffs ever even raised the matter of the confidential, proprietary, or personal nature of the information available to Chris Gaubatz during his volunteer internship at Plaintiffs' Offices.

Record: *See* ¶¶ 62, 84, 86-107, 136-138, *supra*.

142.    CSP, Yerushalmi, and Brim were never informed by Dave Gaubatz prior to or during

Chris Gaubatz's volunteer work at CAIR-MD/VA or during his internship at Plaintiffs' Offices that Chris Gaubatz signed any confidentiality or non-disclosure agreement with Plaintiffs or otherwise orally agreed that the materials he was given access to (*i.e.*, the recorded conversations or the documents) were confidential or proprietary.

Record: *See* ¶¶ 62, 84, 86-107, 136-138, *supra*.

143.    As part of Yerushalmi's legal advice to Dave Gaubatz regarding the one-party consent rule, it was made clear to Dave Gaubatz that the researchers Dave Gaubatz employed for the CAIR Documentary Film Project were not to accept or be privy to confidential or proprietary information, and if they were exposed to such information, not to record it or disclose it to any third-party.

Record: *See* ¶¶ 62, 84, 86-107, 136-138, *supra*.

144.    During the course of the CAIR Documentary Film Project, the CSP Defendants, Yerushalmi, and SANE had absolutely no knowledge of any statutory, contractual, or common law duty of confidentiality or non-disclosure owed to Plaintiffs by Chris Gaubatz or any of the other researchers employed by Dave Gaubatz for the CAIR Documentary Film Project.

Record: *See* ¶¶ 62, 84, 86-107, 136-138, *supra*.

### e.    No Fiduciary Duty

145.    Based upon the information provided to them from Dave Gaubatz and from the Audio-Video Recordings provided to CSP, the CSP Defendants, Yerushalmi, and SANE, had absolutely no knowledge of any fiduciary duty owed to Plaintiffs by Chris Gaubatz.

Record: *See* ¶¶ 62, 84, 86-107, 132, 136-138, *supra*.

146.    Plaintiffs have effectively conceded that Chris Gaubatz never entered into a written or oral agreement that would normally give rise to a fiduciary relationship.  In other words, there

was no general agreement or specific agreement, either as a volunteer intern or in the context of a confidentiality agreement, that gave rise to a fiduciary duty.

Record: *See* ¶¶ 86-107, *supra*.

147.    Rather, Plaintiffs claim it arose "on the very first date [sic] of his internship."  According to Plaintiffs, the evidence for this self-generating fiduciary relationship is the fact that Chris Gaubatz was given tasks to perform, and he did them without protest.  Plaintiffs do not set out what those tasks were, nor do they provide any evidence of those tasks other than to point to various segments of the Audio-Video Recordings.

Record: Pls.' Answers to CSP Defs.' First Set of Interrogs., Ans. No. 16, at Muise Decl. at ¶ 15 at Ex. A.

148.    None of the Audio-Video Recordings cited by Plaintiffs, which purportedly give rise to some implied fiduciary duty, involved any expressed heightened duty of care or obvious disclosure of confidential or proprietary information.

Record: Muise Decl. at ¶¶ 34-37 at Ex. A; Savit Decl. at ¶ 6 at Ex. D.

149.    Plaintiffs nowhere allege, explain, or provide evidence for how a given task gives rise to a fiduciary duty or what the specific fiduciary duty is that arose implicitly as a result of any given task.

Record: *See* ¶ 148, *supra*.

150.    Moreover, Plaintiffs nowhere allege, explain, or provide evidence for how the given task, which Plaintiffs assert Chris Gaubatz completed without complaint, gives rise to a breach of a given fiduciary duty by the mere disclosure of the Audio-Video Recordings of the task's assignment.

Record: *See* ¶ 148, *supra*.

151.    None of the Audio-Video Recordings Plaintiffs claim evidence a breach of fiduciary duty expressly or impliedly include a duty not to disclose or a duty to keep the information recorded confidential.

      Record: *See* ¶ 148, *supra*.

152.    Wazir testified that she had no recollection that during the time she worked at Plaintiffs' Offices as an intern and then as Chris Gaubatz's supervisor did any of Plaintiffs' employees or representative ever indicate to her that she would be dealing with confidential information. .

      Record: Wazir Dep. at 25:7-28:8; 29:15-31:17 at Ex. 13 to Muise Decl. at Ex. A.

153.    Wazir testified that she understood by implication that there were confidential matters dealt with at Plaintiffs' Offices because people would meet behind closed doors, some materials were kept on secure drives to which interns would not have access, and documents were shredded.

      Record: Wazir Dep. at 38:2-45:16 at Ex. 13 to Muise Decl. at Ex. A.

154.    Chris Gaubatz never recorded conversations that took place behind closed doors nor did Chris Gaubatz ever remove documents from any shared drive or email server.

      Record: *See* ¶¶ 137, *supra*; Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 7-8 at Muise Decl. at ¶ 32 at Ex. A; Chris Gaubatz Dep. at 254:10-256:3 at Ex. 10 to Muise Decl. at Ex. A.

155.    As Chris Gaubatz's supervisor, Wazir asked him to shred documents.  Wazir testified that she was not aware of what was in those documents, and that if she knew they contained evidence of a crime, she would not have shredded them.

      Record: Wazir Dep. at 238:1-17 at Ex. 13 to Muise Decl. at Ex. A.

156.    Chris Gaubatz never removed documents from locations within Plaintiffs' Offices to

which he was not given open and unfettered access and authority.

Record: Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 4, 7-8 at Muise Decl. at ¶ 32 at Ex. A; Chris Gaubatz Dep. at 246:2-247:13; 249:22-252:7; 253:23-254:9; 264:9-266:3 at Ex. 10 to Muise Decl. at Ex. 4; Wazir Dep. at 101:15-102:11; 103:1-104:16; 105:12-108:21 at Ex. 13 to Muise Decl. at Ex. A; Chris Gaubatz's Answers to Pls.' Second Set of Interrogs. at Ans. No. 1 at Muise Decl. at ¶ 48 at Ex. A; Dave Gaubatz's Answers to Pls.' Second Set of Interrogs. at Ans. No. 1 at Muise Decl. at ¶ 47 at Ex. A; Saylor Dep. at 117:8-119:5 at Ex. 3 to Muise Decl. at Ex. A.

157.    Plaintiffs have no evidence that Chris Gaubatz recorded conversations that took place behind closed doors, nor do they have evidence that Chris Gaubatz ever removed documents from any shared drive or email server.

Record: See ¶ 148, supra; Pls.' Third Suppl. Answers to CSP Defs.' First Set of Interrogs at Ans. No. 9 at Muise Decl. at ¶ 22 at Ex. A.

158.    Specifically, during Corey Saylor's deposition, personally and on behalf of both Plaintiffs, he described the computer system and that Chris had no password access to the email server or to password protected "segmented folders" on the shared drive that he was not authorized to access.

Record: Saylor Dep. at 106:15-117:3; 142:13-153:15 at Ex. 3 to Muise Decl. at Ex. A.

159.    When pressed for any factual evidence that Chris removed documents from the shared drive or email server, Saylor provided no facts other than his assumption that Chris did so.

Record: Saylor Dep. at 142:13-153:15 at Ex. 3 to Muise Decl. at Ex. A.

### f.    Audio-Video Recordings Only of Conversations to Which Chris Gaubatz Was a Party.

160.    The Gaubatz Defendants and CSP intended to comply with Yerushalmi's legal advice

that during Chris Gaubatz's volunteer internship at Plaintiffs' Offices, Chris Gaubatz would wear an inconspicuous Recording Device that would only be capable of recording conversations to which Chris Gaubatz was a party.

Record: Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 3-16 at Muise Decl. at ¶ 32 at Ex. A; Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 3-13 at Muise Decl. at ¶ 33 at Ex. A; CSP Defs.' Answers to Pls.' First Set of Interrogs. at Ans. Nos. 3-14 at Muise Decl. at ¶ 41 at Ex. A; *See* ¶¶ 77, 132, 138, *supra*; CSP Dep. at 49:15-50:13 at Ex. 4 to Muise Decl. at Ex. A.

161.    In fact, the audio quality of the Recording Device used by Chris Gaubatz at Plaintiffs' Offices was poorer than "earshot" as evidenced by the Audio-Video Recordings.

Record: *See* ¶¶ 58-59, *supra*; Muise Decl. at ¶¶ 34-37 at Ex. A; Savit Decl. at ¶ 6 at Ex. D.

162.    Chris Gaubatz was physically and visually present and a party to all conversations he recorded at Plaintiffs' Offices.

Record: Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 3 at Muise Decl. at ¶ 32 at Ex. A.

163.    During the course of the CAIR Documentary Film Project, none of the Defendants had any intent, expectation, or knowledge of recordings at Plaintiffs' Offices in which Chris Gaubatz (or any other researcher employed by Dave Gaubatz for the CAIR Documentary Film Project) was not present and a party to the conversations recorded.

Record: *See* ¶ 160, *supra*.  Muise Decl. at ¶¶ 34-37 at Ex. A; Savit Decl. at ¶ 6 at Ex. D; CSP Dep. at 98:13-20 at Ex. 5 to Muise Decl. at Ex. A.

g.    **CSP Only Disclosed 16 Edited, Short Clips Taken from the Audio-Video Recordings to World Net Daily ("WND").**

164.    From among all of the Audio-Video Recordings CSP obtained from the Gaubatz Defendants during the CAIR Documentary Film Project, CSP sent WND 16 edited, short clips ("WND clips"); the WND clips contain no confidential or proprietary information.

Record: CSP Defs.' Answers to Pls.' First Set of Interrogs. at Ans. No. 12 at Muise Decl. at ¶ 41 at Ex. A; Muise Decl. at ¶ 42 (WND clips) at Ex. A; Brim Dep. at 215:14-216:21 at Ex. 11 to Muise Decl. at Ex. A; CSP Dep. at 194:6-195:8; 195:21-197:5 at Ex. 5 to Muise Decl. at Ex. A.

165.    Other than the WND clips, the CSP Defendants did not use or disclose to any third-party any of the Audio-Video Recordings.  Only CSP via Brim disclosed the WND Clips to WND. Neither SANE, Yerushalmi, Pavlis, or Savit used or disclosed the WND Clips or any other of the Audio-Video Recordings.

Record: *See* ¶ 164, *supra*; SANE Dep. at 67:11-68:2; 79:2-80:21 at Ex. 9 to Muise Decl. at Ex. A; Yerushalmi Dep. at 80:19-81:19 at Ex. 7 to Muise Decl. at Ex. A.

h.    **Taking Possession of Plaintiffs' Documents Was Never Part of the CAIR Documentary Project.**

166.    Contractually and factually, the CAIR Documentary Film Project did not contemplate, require, or in any way involve any of the researchers employed by Dave Gaubatz for the CAIR Documentary Film Project in, the taking of documents from Plaintiffs' Offices (or, for that matter, from CAIR-MD/VA).

Record: CSP Defs.' Answers to Pls.' First Set of Interrogs. at Ans. Nos. 11, 14 at Muise Decl. at ¶ 41 at Ex. A; Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 3 at Muise Decl. at ¶ 32 at Ex. A; Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No.

9 at Muise Decl. at ¶ 33 at Ex. A; *see* ¶¶ 188-192, *infra*.

167.    None of the CSP Defendants, Yerushalmi, or SANE intended, expected, or advocated for, any of the researchers employed by Dave Gaubatz for the CAIR Documentary Film Project to obtain documents from Plaintiffs' Offices (or, for that matter, from CAIR-MD/VA).

    Record: *See* ¶ 166, *supra*.

168.    Dave Gaubatz gratuitously provided CSP via Brim some of the documents he indicated that Chris Gaubatz removed from Plaintiffs' Offices.  At the time, Dave Gaubatz informed Brim that he believed these documents were evidence of crimes by Plaintiffs.

    Record: *See* ¶ 166, *supra;* Brim Dep. at 142:8-21 at Ex. 11 to Muise Decl. at Ex. A.

169.    None of the CSP Defendants, Yerushalmi, or SANE had any knowledge that Chris Gaubatz removed documents from Plaintiffs' Offices in violation of any statutory, contractual, or common law duty owed to Plaintiffs.

    Record: *See* ¶ 166-168, *supra*.

170.    None of the CSP Defendants reviewed any of the documents purportedly removed from Plaintiffs' Offices by Chris Gaubatz except in response to subpoenas served upon CSP by the FBI and ICE in an effort to prepare a summary report for the FBI and ICE as to the content and context of the documents.

    Record: CSP Dep. at 175:10-178:11 at Ex. 5 to Muise Dec. at Ex. A; CSP Defs.' Answers to Pls.' First Set of Interrogs. at Ans. No. 5 at Muise Decl. at ¶ 41 at Ex. A.

171.    Except in response to the subpoenas served upon CSP by the FBI and ICE, and except for Plaintiffs' production requests in this litigation, none of the CSP Defendants disclosed any of the documents CSP received from Dave Gaubatz to any third-party.

    Record: *See* ¶ 170, *supra*.

> **i.    CSP Did Not Profit in Any Way From the CAIR Documentary Film Project.**

172.    CSP received no outside funding from any donor or any other source earmarked for or based upon the CAIR Documentary Film Project.

Record: CSP Dep. at 29:15-30:9 at Ex. 4 to Muise Decl. at Ex. A; CSP Dep. at 192:11-193:7 at Ex. 5 to Muise Decl. at Ex. A.

173.    CSP knows of no outside funding from any donor or any other source paid to CSP as a result of CSP's involvement in the CAIR Documentary Film Project.

Record: See ¶ 172, supra.

174.    CSP made no effort to fundraise for the CAIR Documentary Film Project nor did CSP attempt to raise funds based upon its involvement in the CAIR Documentary Film Project.

Record: See ¶ 172, supra.

175.    Other than their normal salaries from CSP, CSP employees Brim and Savit, and former employee Pavlis, received no monies for their involvement in the CAIR Documentary Film Project.

Record: Brim Decl. at ¶ 3 at Ex. C; Savit Decl. at ¶ 4 at Ex. D; Pavlis Decl. at ¶ 4 at Ex. E.

176.    The CSP Defendants, Yerushalmi, and SANE were not involved in any way in the publication of the book *Muslim Mafia* by WND, nor did they receive any funds directly or indirectly as a result of the writing, publication, or sale of the book.

Record: CSP Dep. at 192:11-193:7 at Ex. 5 to Muise Decl. at Ex. A; Yerushalmi Dep. 116:9-117:19 at Ex. 7 to Muise Decl. at Ex. A; Yerushalmi Decl. at ¶ 24 at Ex. F; Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 11 at Muise Decl. at ¶ 33 at Ex. A.

## 2.    Christine Brim's Limited Role in the CAIR Documentary Film Project.

177.    At the start of the CAIR Documentary Film Project, Brim was a contract employee hired for specific tasks such as to conduct open source research and to assist in the administration of certain CSP Projects.  Brim was employed full-time and given the title senior vice president in or about August 2008 and remained in that capacity through the end of the CAIR Documentary Film Project.  Since approximately April 2010, Brim has served as chief operating officer of CSP.

Record: Brim Dep. at 9:11-16; 10:3-20; 11:11-15; 55:15-56:5; 56:20-57:18; 59:1-6; 60:4-19; 73:4-74:3; 83:21-84:20; 119:20-120:2; 148:13-22; 179:1-8; 181:21-185:20; 188:12-189:10 at Ex. 11 to Muise Decl. at Ex. A; CSP Dep. at 15:17-16:4; 22:5-25:19; 27:2-6; 27:10-28:2; 38:9-39:12; 41:6-42:21 at Ex. 4 to Muise Decl. at Ex. A; Brim Decl. at ¶ 1 at Ex. C.

178.    Brim's involvement with the CAIR Documentary Film Project as a contract employee was strictly limited to administrative work to coordinate the receipt of the Audio-Video Recordings from the Gaubatz Defendants, to receive oral and written reports from Dave Gaubatz, and to be a liaison between Dave Gaubatz and Brim's supervisors at CSP.

Record: *See* ¶ 177, *supra*.

179.    Brim was not involved in the conceptualization of the CAIR Documentary Film Project or its methodology.

Record: *See* ¶ 177, *supra*.

180.    Brim had no substantive contact with Publius, Manifold, Pack, or SANE relative to the CAIR Documentary Film Project.

Record: *See* ¶ 177, *supra*.

181.    Brim did not begin her administrative work on the CAIR Documentary Film Project until

after Chris Gaubatz had begun volunteering at CAIR-MD/VA.

Record: *See* ¶ 177, *supra*.

182.    Brim was not responsible for assessing the Audi-Video Recordings or the daily reports, but to receive them, make certain that the audio-video files had recordings on them, and to make copies as needed for her supervisors.

Record: Brim Dep. at 96:22-97:19; 142:8-144:16; 148:13-22; 148:25-149:22; 211:4-16 at Ex. 11 to Muise Decl. at Ex. A.

183.    Brim in fact did not assess the Audio-Video Recordings or the daily reports.

Record: *See* ¶¶ 177, 182, *supra*.

184.    During Chris Gaubatz's volunteer work at CAIR-MD/VA and during his volunteer internship at Plaintiffs' Offices, Dave Gaubatz provided Brim with documents that he said were removed from CAIR-MD/VA and Plaintiffs' Offices, respectively.

Record: Brim Dep. at 142:82-144:16; 148:13-22; 148:25-149:22; 150:4-152:15; 157:21-158:5; 167:-169-5; 211:4-16 at Ex. 11 to Muise Decl. at Ex. A.

185.    Dave Gaubatz informed Brim that he believed these documents were evidence of crimes by Plaintiffs.

Record: *See* ¶184, *supra*.

186.    Brim did not consider these documents to be a part of the CAIR Documentary Film Project and, upon instruction from her supervisors, she saved them to a secure drive without reviewing them until they were subpoenaed by the FBI and ICE.

Record: *See* ¶184, *supra*; CSP Defs.' Answers to Pls.' First Set of Interrogs. at Ans. No. 6 at Muise Decl. at ¶ 41 at Ex. A; Brim Dep. at 155:5-156:17 at Ex. 11 to Muise Decl. at Ex. A.

187.    After the conclusion of the field work involving researchers employed by Dave Gaubatz

to obtain Audio-Video Recordings from Plaintiffs' Offices, CSP contracted with Chris Gaubatz to review, assess, and create a log of the Audio-Video Recordings.  Brim supervised this work.

<u>Record</u>: *See* ¶ 56, *supra*.

188.    Brim's other substantive involvement with the CAIR Documentary Film Project occurred when Dave Gaubatz sent an email (on Chris Gaubatz's email and signed by both Chris and Dave Gaubatz) to Frank Gaffney on April 3, 2009, informing him of Dave Gaubatz's interest in publishing a book with WND about the CAIR Documentary Film Project.

<u>Record</u>: Muise Decl. at ¶ 43 at Ex. A.

189.    Brim responded to the email on April 4, 2009, attempting in a gentle but clear way to inform Dave Gaubatz that CSP desired that the CAIR Documentary Film Project remain confidential pursuant to the terms of the relevant contracts.

<u>Record</u>: Muise Decl. at ¶ 44 at Ex. A.

190.    On April 4, 2009, Dave Gaubatz sent a lengthy letter addressed to Brim as an attachment to an email.  In this letter, Dave Gaubatz made it clear that the documents Chris Gaubatz removed from Plaintiffs' Offices (and implicitly from CAIR-MD/VA) had absolutely nothing to do with the CAIR Documentary Film Project, that Yerushalmi, CSP, and the Publius documentarian professionals wanted no documents from Plaintiffs' Offices only video, and that he was instructed not to conduct any investigation into criminal activity, only to obtain video for "drama" (*i.e.,* B-roll).

<u>Record</u>: Muise Decl. at ¶ 45 at Ex. A.

191.    The testimony from Dave Gaubatz, Brim, and CSP about this correspondence demonstrates beyond cavil that all of the parties accepted that the documents removed from Plaintiffs' Offices were <u>not</u> part of the CAIR Documentary Film Project and <u>not</u> wanted by the

CSP Defendants, SANE, or Yerushalmi.  Moreover, all parties understood that CSP's concerns were that the existence of the CAIR Documentary Film Project would be revealed through the publication of such a book and that the Audio-Video Recordings as well as the written and oral reports that Dave Gaubatz provided to CSP would be exposed in violation of the confidentiality provisions of the contracts Dave Gaubatz had entered into with SANE and directly with CSP.

Record: Dave Gaubatz Dep. at 181:6-12; 183:8-184:8; 186:16-187:2; 187:25-188:3; 189:10-16; 190:21-192:15; 192:21-195:25; 196:10-18; 198:8-22; 203:5-16 at Ex. 8 to Muise Decl. at Ex. A; Brim Dep. at 179:11-20; 171:14-16; 172:17-173:12; 174:24-175:2; 176:9-14; 177:8-178:2; 178:20-179:8; 181:21-185:20; 190:1-24 at Ex. 11 to Muise Decl. at Ex. A; CSP Dep. at 127:17-130:8; 138:23-139:12 at Ex. 5 to Muise Decl. at Ex. A.

192.    Ultimately, in an effort to clarify the understanding of the parties—to wit, that the documents removed from Plaintiffs' Offices had nothing to do with the CAIR Documentary Film Project and that CSP did not claim a proprietary interest in such documents but did wish to protect the confidentiality of the film project—CSP entered into an agreement with Dave Gaubatz on or about April 9, 2010, setting forth these terms.

Record: Muise Decl. at ¶ 46; CSP Dep. at 127:17-130:8 at Ex. 5 to Muise Decl. at Ex. A.

193.    During all of her work at CSP on the CAIR Documentary Film Project, Brim had no duties not set forth above and had no involvement in any of the financial relationships of the participants in the CAIR Documentary Film Project.

Record: Brim Decl. at ¶ 2 at Ex. C; see ¶ 177, supra.

194.    Other than her salary as a contract employee and later as senior vice president, Brim received no monies from any aspect of the CAIR Documentary Film Project or the writing, publishing, or selling of the book Muslim Mafia.

Record: Brim Decl. at ¶ 3 at Ex. C

### 3.     David Yerushalmi's Limited Role in the CAIR Documentary Film Project.

195.    Yerushalmi played two separate and distinct roles in the CAIR Documentary Film Project.  Initially, he represented SANE as its president recommending Dave Gaubatz to CSP to manage the field research portion of the CAIR Documentary Film Project.  Once SANE entered into the Publius-SANE Contract and the SANE-Gaubatz Contact, Yerushalmi's role on behalf of SANE ended.   (*See* below the discussion of SANE's role in the CAIR Documentary Film Project).

Record: *See* ¶¶ 42-44, 47-52, 54-55, 77, 117-139, *supra*.

196.    Yerushalmi's second and more substantive involvement in the CAIR Documentary Film Project was as CSP's general counsel.  In that capacity, he provided legal advice to CSP and Dave Gaubatz about the CAIR Documentary Film Project when asked.

Record: *See* ¶¶ 42-44, 47-52, 54-55, 77, 117-139, *supra*; Yerushalmi Dep. at 70:25-72:25 at Ex. 7 to Muise Decl. at Ex. A.

197.    Other than the legal advice set forth above, Yerushalmi was not asked about any other legal matters relating to the CAIR Documentary Film Project, nor did he provide any other legal advice to any of the Defendants.

Record: *See* ¶ 196, *supra*.

198.    Yerushalmi only received reports from Dave Gaubatz on the daily activities if it was "pertinent" to a legal question about what Dave Gaubatz thought was evidence of Plaintiffs' criminal activity.  Yerushalmi received none of the Audio-Video Recordings during any time prior to the start of this litigation nor did he review any of the Audio-Video Recordings during this time.

Record: Dave Gaubatz Dep. at 166:1-12; 171:10-24 at Ex. 8 to Muise Decl. at Ex. A.; Yerushalmi Dep. at 80:19-81:19 at Ex. 7 to Muise Decl. at Ex. A.

199.    Yerushalmi received only a few documents from Dave Gaubatz that were purportedly removed from Plaintiffs' Offices and CAIR-MD/VA by Chris Gaubatz during the CAIR Documentary Film Project, and only then in the context of Dave Gaubatz asking Yerushalmi whether he thought the documents evidenced criminal behavior by Plaintiffs.  Yerushalmi was fairly certain the documents he reviewed relating to the Morris Days Fraud evidenced a serious criminal fraud.  Yerushalmi advised Dave Gaubatz of his opinion.

Record: *See* ¶ 135, *supra*; Yerushalmi Dep. at 102:11-109:23 at Ex. 7 to Muise Decl. at Ex. A.

200.    Yerushalmi also reviewed some documents he received from Dave Gaubatz relating to Plaintiffs' failure to file the requisite tax returns, violation of IRS regulations relating to maintaining a corporate and financial separation between CAIR-F (as a putative IRC § 501(c)(3)) and CAIR-AN (as a putative IRC § 501(c)(4)), and the receipt of funds from foreign sovereign sources that might violate the Foreign Agent Registration Act.  Yerushalmi concluded that these documents were potentially evidence of felony violations of federal criminal law and advised Dave Gaubatz of his opinion.

Record: *See* ¶136, *supra*; Yerushalmi Dep. at 102:11-109:23 at Ex. 7 to Muise Decl. at Ex. A.

201.    Yerushalmi did not review any other documents and provided no other legal advice to Dave Gaubatz relating to the CAIR Documentary Film Project.

Record: *See* ¶¶ 199-200, *supra*.

202.    Yerushalmi had no other role in the CAIR Documentary Film Project.

Record: *See* ¶¶ 195-200, *supra.*

203.    Yerushalmi received no monies for any of his involvement in the CAIR Documentary Film Project—neither in his initial role as president of SANE nor as general counsel to CSP and legal advisor to the CAIR Documentary Film Project.  His work on behalf of SANE as president and on behalf of CSP as general counsel are volunteer, unpaid positions.

Record: Yerushalmi Decl. at ¶ 25 at Ex. F.

204.    Yerushalmi had no involvement in, nor received any monies from, the writing, publication, or selling of the book *Muslim Mafia.*

Record: Yerushalmi Decl. at ¶ 26 at Ex. F.

### 4.    Adam Savit's Limited Role in the CAIR Documentary Film Project.

205.    Savit, a CSP employee, had no knowledge of or role in the CAIR Documentary Film Project until July 2009, long after the volunteer internships at Plaintiffs' Offices had ended.

Record: Savit Decl. at ¶ 1 at Ex. D.

206.    Savit only began working at CSP as an intern in 2009 and was employed full-time as a senior research associate on July 1, 2010.

Record: Savit Decl. at ¶ 2 at Ex. D.

207.    Savit's roles in the CAIR Documentary Film Project included only minor tasks relating to copying the digital files that make up the Audio-Video Recordings and working on the summary reports provided to the FBI and ICE relating to CSP's production in response to the Government's subpoenas.

Record: Savit Decl. at ¶ 3 at Ex. D.

208.    Other than his salary as an employee, Savit received no monies from any aspect of the CAIR Documentary Film Project or the writing, publishing, or selling of the book *Muslim Mafia.*

Record: Savit Decl. at ¶ 4 at Ex. D.

**4.    Sarah Pavlis's Limited Role in the CAIR Documentary Film Project.**

209.    Pavlis, a CSP employee, had no knowledge of or role in the CAIR Documentary Film Project until late February/early March 2009, long after the volunteer internships at Plaintiffs' Offices had ended.

Record: Pavlis Decl. at ¶ 1 at Ex. E.

210.    Pavlis began her employment at CSP on January 2, 2008.  She served as the receptionist and as a research associate during the time relevant to this litigation.  (Pavlis's employment with CSP ended in December 2010).

Record: Pavlis Decl. at ¶ 2 at Ex. E.

211.    Pavlis had no knowledge of or role in the CAIR Documentary Film Project until February 2009, and her role was strictly to assist Chris Gaubatz in his work relating to the CSP-C. Gaubatz Contract.

Record: Pavlis Decl. at ¶ 3 at Ex. E.

212.    Other than her salary as an employee, Pavlis received no monies from any aspect of the CAIR Documentary Film Project or the writing, publishing, or selling of the book *Muslim Mafia*.

Record: Pavlis Decl. at ¶ 4 at Ex. E.

**B.    SANE Defendants.**

213.    SANE had no role in the conceptualization or logistical planning of the CAIR Documentary Film Project.

Record: *See* ¶¶ 117-128, *supra*.

214.    SANE had only two roles in the matters relevant to this litigation.  First, through its president, David Yerushalmi, it recommended Dave Gaubatz to CSP as uniquely suited to

manage all of the field work to obtain B-roll for the CAIR Documentary Film Project.

Record: *See* ¶¶ 42-55, *supra*.

215.    SANE recommended Dave Gaubatz to CSP for this role based upon Dave Gaubatz's exemplary work conducting field research for the Mapping Sharia research project.

Record: *See* ¶¶ 42-55, *supra*.

216.    SANE's second role in the CAIR Documentary Film Project was to serve as a contractual intermediary between Publius and CSP on the one hand, and Dave Gaubatz on the other hand to facilitate the payments to Dave Gaubatz from Publius and CSP.

Record: *See* ¶¶ 42-55, *supra*.

217.    SANE was unaware of the specifics of any volunteer work by researchers employed by Dave Gaubatz at Plaintiffs' Offices (or at the CAIR-MD/VA offices) and had no knowledge of the Audio-Video Recordings or of the documents removed from CAIR-MD/VA or from Plaintiffs' Offices by Chris Gaubatz.

Record: *See* ¶¶ 42-55, *supra*; SANE Dep. at 44:13-46:19 at Ex. 9 to Muise Decl. at Ex. A.

218.    All monies SANE received from Publius or from CSP for the CAIR Documentary Film Project were paid to SANE pursuant to the Publius-SANE Contract and 100 percent of those funds were paid by SANE to Dave Gaubatz pursuant to the SANE-Gaubatz Contract.

Record: *See* ¶¶ 42-55, *supra*; SANE Dep. at 44:13-45:2 at Ex. 9 to Muise Decl. at Ex. A.

219.    SANE received no other monies from any source for, or as a result of, the CAIR Documentary Film Project.  SANE had no role in the writing, publishing, or sale of the book *Muslim Mafia.*   And SANE received no monies directly or indirectly from the writing, publishing, or sale of the book *Muslim Mafia.*

Record: *See* ¶¶ 42-55, *supra*; SANE Dep. at 39:4-19; 44:13-45:2; 51:19-52:8; 54:14-56:4; 64:5-19; 67:11-68:2;  at Ex. 9 to Muise Decl. at Ex. A.

220.    Yerushalmi's role in the CAIR Documentary Film Project on behalf of SANE ended the moment the Publius-SANE Contract and the SANE-Gaubatz Contract were signed.  Yerushalmi had no involvement in the subsequent transfer of payments from Publius and CSP to SANE or from SANE to Gaubatz, these matters were handled exclusively by SANE's bookkeeper.

Record: *See* ¶¶ 195-204, *supra*.

**B.    Gaubatz Defendants.**

221.    Chris Gaubatz was employed by Dave Gaubatz to obtain B-roll for the CAIR Documentary Film Project.

Record: Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 3 at Muise Decl. at ¶ 32 at Ex. A; *see* ¶¶ 32-36, 108-116, *supra*.

222.    To do so, Chris Gaubatz volunteered at CAIR-MD/VA and subsequently at Plaintiffs' Offices.

Record: *See* ¶¶ 57-116, *supra*.

223.    Prior to Chris Gaubatz's volunteer work at CAIR-MD/VA, Dave Gaubatz sought legal advice from Yerushalmi about the legality of recording Chris Gaubatz's routine activities as a volunteer at CAIR-MD/VA and at Plaintiffs' Offices.

Record: *See* ¶¶ 76-77, 129-138, *supra*.

224.    Dave Gaubatz relied upon his own experience in military and civilian law enforcement and upon the legal advice he received from Yerushalmi as set forth above and instructed Chris Gaubatz to act accordingly.

Record: Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 9, 16 at

Muise Decl. at ¶ 33 at Ex. A.

225.    Dave Gaubatz received regular daily reports from Chris Gaubatz in an effort to carefully supervise Chris Gaubatz's activities at CAIR-MD/VA and at Plaintiffs' Offices in order to be certain that Chris Gaubatz acted according to his instructions so as not to violate any statutory, contractual, or common law duty to any third-party, including Plaintiffs.

Record: Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 3-4 at Muise Decl. at ¶ 33 at Ex. A; Dave Gaubatz Dep. at 170:22-171:8 at Ex. 8 to Muise Decl. at Ex. A.

226.    At no time did Dave Gaubatz have any knowledge that Chris Gaubatz had acted in any way during his work on behalf of the CAIR Documentary Film Project that would violate a statutory, contractual, or common law duty to any third-party, including Plaintiffs.

Record: Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 3-4, 6, 8, 13 at Muise Decl. at ¶ 33 at Ex. A; Dave Gaubatz Dep. at 271:17-274:5 at Ex. 8 to Muise Decl. at Ex. A.

227.    Chris Gaubatz did not record any conversations at Plaintiffs' Offices in which he was not a party to the conversation, either by actually speaking or by virtue of the fact that he was physically present and visible to all those participating in the conversation being recorded.

Record: See ¶¶ 160-163, supra.

228.    Chris Gaubatz did not take any document from Plaintiffs' Offices that he did not have expressed or implied authority to remove.

Record: See ¶ 156, supra.

229.    At no time during his volunteer internship at Plaintiffs' Offices did any employees or representatives of Plaintiffs' Offices ever inform Chris Gaubatz that any of the documents he would be given access to were confidential, proprietary, or personal.

Record: *See* ¶¶ 140-157, *supra*.

230.    In fact, Chris Gaubatz was instructed by his supervisor, Wazir, to go to the document storage room and to remove documents for his outreach work without ever providing him instructions about which documents to utilize.

Record: *See* ¶ 156, *supra*.

231.    Moreover, Wazir and other Plaintiffs' employees would encourage Chris Gaubatz to review and take home documents freely to learn more about Plaintiffs and about Islam.

Record: *See* ¶ 156, *supra*.

232.    In addition, Chris Gaubatz was instructed by Dave Gaubatz to preserve evidence of the Morris Days Fraud, terrorism connections, tax fraud, and violations of the Foreign Agent Registration Act.  Specifically, Dave Gaubatz instructed Chris Gaubatz not to shred these documents if asked to do so, but, instead, to provide them to Dave Gaubatz for review.

Record: Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 4 at Muise Decl. at ¶ 33 at Ex. A; Dave Gaubatz Dep. at 135:5-11 at Ex. 8 to Muise Decl. at Ex. A.

233.    Chris Gaubatz provided all of the documents he removed from Plaintiffs' Offices to Dave Gaubatz because he understood that (1) he was expressly and impliedly authorized by Wazir to remove documents he felt he needed for his outreach work as a volunteer intern, or in order to learn more about Plaintiffs and Islam; and (2) that he had a legal duty to preserve evidence of a crime when Plaintiffs sought to conceal that evidence or to shred that evidence.

Record: *See* ¶ 156, *supra*.

234.    At no time during his tenure as a volunteer intern at Plaintiffs' Offices (or during his volunteer work at CAIR-MD/VA) did Chris Gaubatz expect or intend to violate any statutory, contractual, or common law duty owed to any third-party, including Plaintiffs.

Record: *See* ¶ 115, *supra*.

235.    At no time during the CAIR Documentary Film Project did the Gaubatz Defendants understand that the CSP Defendants, Yerushalmi, or SANE expected or intended that the Gaubatz Defendants violate a statutory, contractual, or common law duty owed to any third-party, including Plaintiffs.

Record: Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. Nos. 9, 16 at Muise Decl. at ¶ 33 at Ex. A.

236.    Chris Gaubatz had no role in the writing, publishing, or selling of the book *Muslim Mafia*, and received no funds from any of his work relating to the CAIR Documentary Film Project other than the monies Dave Gaubatz paid him and monies he received for his work in 2009 pursuant to the CSP-C. Gaubatz Contract.

Record: Chris Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 16 at Muise Decl. at ¶ 32 at Ex. A.

237.    Dave Gaubatz, after reviewing documentary evidence, correctly concluded that Plaintiffs were not reporting millions of dollars of payments from foreign governments (*i.e.*, Plaintiffs were not filing the requisite federal tax statements [IRS 990 forms], which ultimately led to the IRS revocation of the IRC § 501(c) status of both organizations.

Record: Dave Gaubatz Dep. at 140:6-141:20; *see* ¶ 136, *supra*; Dave Gaubatz's Answers to Pls.' First Set of Interrogs. at Ans. No. 4 at Muise Decl. at ¶ 33 at Ex. A; Yerushalmi Decl. at ¶¶ 3-10.

## V.    PLAINTIFFS' HAVE NO COMPENSABLE CONTRACTUAL OR COMMON LAW DAMAGES

238.    Plaintiffs have repudiated any reputational damages.

Record: *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz,* 793 F. Supp.

2d 311, 332 (D.D.C. 2011) ("Plaintiffs have expressly disclaimed damages for reputational or emotional harm, *see* Pls.' MTD Opp'n at 8, and the Court will hold them to that representation.")

239.    Plaintiffs have repudiated any damages from loss of donations or diminution in lobbying influence.

Record: Muise Decl. at ¶ 18 at Ex. A; TAC, Prayer for Relief at ¶¶ 7-9 at 29-30 [Doc. No. 126].

240.    Plaintiff CAIR-AN has repudiated any damages arising from the taking of documents because it owned no documents.

Record: Saylor Dep. at 153:18-156:9 at Ex. 3 to Muise Decl. at Ex. A.

241.    Plaintiff CAIR-AN cannot claim damages from the Audio-Video Recordings because it had no employees at Plaintiffs' Offices.

Record: *See* ¶¶ 13-14, *supra*.

242.    Specifically, in its supplemental answers to interrogatories filed on October 25, 2012, Plaintiffs claim 4 types of compensable damages (excluding statutory "liquidated" damages and punitive damages): (1) deprivation of commercial value; (2) deprivation of intrinsic value; (3) diminishment of confidential value; and (4) loss of proprietary/investment value.  In Plaintiffs' supplemented Initial Disclosures served on January 8, 2013, Plaintiffs claim 5 types of compensable damages: (1) unjust enrichment; (2) deprivation of commercial value; (3) deprivation of confidential value; (4) diminishment of trade secret value; and (5) loss of proprietary value.

Record: Muise Decl. at ¶¶ 16, 22 at Ex. A.

243.     Plaintiffs cannot explain how they arrived at a "confidential value" of $10 per document: they have provided no documentation to support that value; they have provided no expert

testimony to support that value; and they have not even provided lay testimony beyond conclusory statements to support that value.

Record: Saylor Dep. at 153:18-190:17 at Ex. 3 to Muise Decl. at Ex. A.

244.    Plaintiffs cannot explain how they arrived at a diminishment of trade secret value of five percent of CAIR-F's expenditures during certain years: they have provided no documentation to support that value; they have provided no expert testimony to support that value; and they have not provided lay testimony beyond conclusory statements to support that value.

Record: Saylor Dep. at 190:18-196:8 at Ex. 3 to Muise Decl. at Ex. A.

245.    Plaintiffs cannot explain how they arrived at any valuation for the diminishment of value of Plaintiffs' alleged trade secrets: they have provided no documentation to support that value; they have provided no expert testimony to support that value; and they have not provided lay testimony beyond conclusory statements to support that value.

Record: Saylor Dep. at 196:9-208:22; 246:3-255:15 at Ex. 3 to Muise Decl. at Ex. A.

Respectfully submitted,

/s/ David Yerushalmi
David Yerushalmi, Esq. (DC Bar No. 978179)
LAW OFFICES OF DAVID YERUSHALMI, P.C.
1901 Pennsylvania Avenue NW, Suite 201
Washington, D.C. 20001
david.yerushalmi@verizon.net
Tel: (646) 262-0500; Fax: (801) 760-3901
*Lead Counsel for Defendants Center for Security Policy,*
*Christine Brim, Adam Savit, Sara Pavlis, and SANE*

/s/ Robert J. Muise
Robert J. Muise, Esq. (D.C. Court Bar No. MI 0052)
AMERICAN FREEDOM LAW CENTER
P.O. Box 131098, Ann Arbor, Michigan 48113
Tel (734) 635-3756 / Fax (801) 760-3901
rmuise@americanfreedomlawcenter.org
*Co-Counsel for Defendants Center for Security Policy, Christine*
*Brim, Adam Savit, Sara Pavlis, SANE, and David Yerushalmi*

/s/ J. Thomas Smith
J. Thomas Smith (admitted *pro hac vice*)
J. THOMAS SMITH ATTORNEY AT LAW
2020 Fieldstone Parkway, Suite 900-264
Franklin, TN 37069-4337
Tel: (615) 790-2150
jthomsmith@gmail.com
*Co-Counsel for Defendants Center for Security Policy,*
*Christine Brim, Adam Savit, Sara Pavlis, and SANE*

/s/ Martin Garbus
Martin Garbus (admitted *pro hac vice*)
Eaton & Van Winkle LLP
3 Park Avenue, 16th Floor
New York, NY 10016
Tel: (212) 561- 3625
mgarbus@evw.com
*Co-Counsel for Gaubatz Defendants*

/s/ Dan Horowitz
Dan Horowitz (admitted *pro hac vice*)
Law Office of Daniel Horowitz
P.O. Box 1547
Lafayette, California 94549
Tel: (925) 283-1863
horowitz@whitecollar.us
*Co-Counsel for Gaubatz Defendants*

/s/ J. William Eshelman
J. William Eshelman  (D.C. Bar No. 141317)
1747 Pennsylvania Avenue NW, Suite 300
Washington, DC 20006
Tel: 202- 454-2830
WEshelman@butzeltp.com
*Co-Counsel for Gaubatz Defendants*

63

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2013, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: none.

LAW OFFICES OF DAVID YERUSHALMI, P.C.

/s/ David Yerushalmi
David Yerushalmi, Esq.