### IN THE UNITED SATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

COUNCIL ON AMERICAN-ISLAMIC )
RELATIONS  ACTION NETWORK, INC., )
*et. al.*, )
 )
   Plaintiffs, )  Civil Action No. 09-cv-2030 (CKK-JMF)
  v. )
 )
PAUL DAVID GAUBATZ, *et. al.*, )
 )
   Defendants. )
_____ )

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR

## SUMMARY JUDGMENT

   Plaintiffs hereby submit this memorandum in opposition to Defendants' Motion for

Summary Judgment.  For the reasons set forth in this memorandum, Plaintiffs request that

Defendants' Motion for Summary Judgment be denied in its entirety.

Dated this 17th day of June 2013.

        Respectfully submitted,

        _____/s/  Nadhira Al-Khalili_____
        Nadhira Al-Khalili (Bar No. 997827)
        Council on American-Islamic Relations
        453 New Jersey Avenue, S.E.
        Washington, D.C. 20003
        (202) 646-6034 (Phone)
        (202) 488-3305 (Fax)
        nalkhalili@cair.com

## LIST OF EXHIBITS

Exhibit 48: Chris Gaubatz Deposition Transcript (January 10, 2013)

Exhibit 49: Christine Brim Deposition Transcript (January 15, 2013)

Exhibit 50: David Yerushalmi Deposition Transcript (January 17, 2013)

Exhibit 51: Emails from davidmarshall1215@gmail.com to davidmarshall1215@yahoo.com, *Contact Lists*, (July 8, 2008)

Exhibit 52: Plaintiffs' Third Supplementary Response to Interrogatories

Exhibit 53: CSP Defendants' First Set of Interrogatories

Exhibit 54: Paul David Gaubatz Deposition Transcript (January 14, 2013)

Exhibit 55: Corey Saylor Deposition Transcript (January 8, 2013)

Exhibit 56: First Response to First Interrogatories (December 14, 2011)

Exhibit 57: Pls.' Supp. Answer to CSP's First Set of Interrogatories.

Exhibit 58: CSP Def. Second Request for Production.

Exhibit 59: Nihad Awad Deposition Transcript

Exhibit 60: SANE Deposition Transcript (January 18, 2013)

Exhibit 61: Frank Gaffney Deposition Transcript (December 26, 2012)

Exhibit 62: CSP Deposition Transcript (January 17, 2013)

Ex. 63, Draft Agreement between Center for Security Policy and World Net Daily (October 2010) (on file with CSP document production 988-991).)

Exhibit 64: DCRA certificate of good standing

Exhibit 65: Excerpts of *Muslim Mafia*

Exhibit 66: Email from Yasser Tabbara to Chris Gaubatz (July 17, 2008)

Exhibit 67: Email from Raabia Wazir to Chris Gaubatz and CAIR Volunteers (June 25, 2008)

Exhibit 68: Email and Letter from David Gaubatz to Christine Brim, Chris Gaubatz, and Frank Gaffney, Meeting documents video (April 4, 2009)

Exhibit 69: Email from Christine Brim to David Gaubatz, Chris Gaubatz, and Frank Gaffney, *Re draft letter to Frank Gaffney* (April 3, 2009)

Exhibit 70: ADL Report: David Yerushalmi, *available at http://www.adl.org/civil-rights/discrimination/c/david-yerushalmi-a-driving.html*

Exhibit 71: Screenshot of SPLC's Anti-Muslim Inner Circle

Exhibit 72: Screenshot of SANE Muslim Immigration Proposal (December 4, 2008)

Exhibit 73: Screenshot of SANE War Manifesto

Exhibit 74: Screenshot of the Law Office of David Yerushalmi Website

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... vi

FACTUAL BACKGROUND ...................................................................................................... 1

Agreements and Preparations to Infiltrate CAIR ......................................................................... 4

Chris Gaubatz's Internship at CAIR ........................................................................................... 6

After Chris Gaubatz's Internship ................................................................................................. 9

PROCEDURAL HISTORY ......................................................................................................... 10

LEGAL STANDARD .................................................................................................................. 11

ARGUMENT ............................................................................................................................... 12

   I.    Defendants have failed to demonstrate that there is no genuine issue as to whether they breached Chris Gaubatz's fiduciary duty to CAIR ................................................................ 12

      A.    Chris Gaubatz owed a fiduciary duty to Plaintiffs, and he breached that duty. ......................... 12

      B.    All other Defendants also aided and abetted Chris Gaubatz's breach of fiduciary duty ............ 16

   II.    Defendants have failed to show that any the Federal and D.C. Wiretap Act claims should be dismissed ......................................................................................................................... 19

      A. Because Defendants have failed to demonstrate that they did not participate in intercepting Plaintiffs' communications in order to breach Chris Gaubatz's fiduciary duties to CAIR, Plaintiffs' Wiretap Act claims must survive. ....................................................................... 20

      B. Defendants have failed to demonstrate that the one-party rule bars the entirety of Plaintiffs' Wiretap Act claims. ................................................................................................... 22

      C. All Defendants are directly liable under the Wiretap Acts ............................................................ 23

      D. CSP and SANE Defendants are liable for Gaubatz's Violations of the Wiretap Act because David Gaubatz was their agent. ......................................................................................... 28

      E. Defendants are vicariously liable for violating the Wiretap Acts because they aided and abetted the Gaubatz Defendants in committing the wrong ............................................................. 30

   III.    Defendants have failed to show that the Stored Communications Act Claims should be dismissed ......................................................................................................................... 31

   IV.    Defendants have failed to show that the D.C. Uniform Trade Secrets Act claims should be dismissed or that the Act preempts the rest of Plaintiffs' claims ................................................... 32

   V.    Defendants have failed to show that Plaintiffs cannot prove compensable damages on the common law claims at trial ................................................................................................. 35

      A.    The record shows Plaintiffs suffered non-speculative past and present damages, including for conversion. ........................................................................................................... 35

      B.    A jury could make awards of the damages enumerated by Plaintiffs based on their reasonable bases for making calculations. .................................................................... 37

C.    Defendants gloss over the fact that all of these damages can be claimed by Plaintiffs on an unjust enrichment theory.................................................................................................................41

VI.    Because Plaintiffs Maintain Contractual and Fiduciary Privity with Chris Gaubatz, Their Claims Subsist.................................................................................................................................41

CONCLUSION ...............................................................................................................................45

# TABLE OF AUTHORITIES

**CASES**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ...................................................................11

*Am. Serv. Ctr. Assocs. v. Helton*, 867 A.2d 235 (D.C. 2005) ...................................................37

*\*Amtrak v. Veolia Transp. Servs.*, 791 F. Supp. 2d 33 (D.D.C. 2011) ............................... passim

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..............................................................11

*Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*, 607 F. Supp. 2d 185 (D.D.C. 2009) .12

*Azzam v. Rightway Dev. Inc.*, 789 F. Supp. 2d 110 (D.D.C. 2011). .........................................30

*Berger v. New York*, 388 U.S. 41 (1967) ...................................................................................37

*Bowler v. Joyner*, 562 A.2d 1210 (D.C. 1989) .....................................................................38, 40

*Caro v. Weintraub*, 618 F.3d 94 (2d Cir. 2010) ........................................................................22

*Carroll v. Freemont Inv. & Loan*, 636 F. Supp. 2d 41 (D.D.C. 2009) ....................................31

*Catalyst & Chem. Servs. v. Global Ground Support*, 350 F. Supp. 2d 1 (D.D.C. 2004) ........33

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................11, 12

*\*Church of Scientology Int'l v. Eli Lilly & Co.*, 848 F. Supp. 1018 (D.D.C. 1994) ............12, 13

*Council on American-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311 (D.D.C. 2011). ........11, 42

*Diamond v. Atwood*, 43 F.3d 1538 (D.C. Cir. 1995) ................................................................11

*Draim v. Virtual Geosatellite Holdings, Inc.*, 631 F. Supp. 2d 32 (D.D.C. 2009) ..............13, 15

*DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68 (D.D.C. 2007) .....................................33, 34

*Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543 (D.C. 1981) .....................................................37

Fed. R. Civ. P. 56(c) ..................................................................................................................11

*Firestone v. Firestone*, 76 F.3d 1205 (D.C. Cir. 1996) ............................................................13

*Giles v. Shell Oil Corp.*, 487 A.2d 610 (D.C. 1985) .................................................................29

*Gross v. Akin, Gump, Strauss, Hauer & Feld, LLP*, 599 F. Supp. 2d 23 (D.D.C. 2009) .........13

*\*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ...................................................17, 18, 31

*Hartford Accident & Indem. Co. v. Dikomey Mfg. Jewelers, Inc.*, 409 A.2d 1076, 1082 (D.C. 1979) ...............37, 38

*Hawthorne v. Canavan*, 756 A.2d 397, 401 (D.C. 2000) ..........................................................39

*Hickey v. Bomers*, 28 A.3d 1119 (D.C. 2011) ..........................................................................30

*In re Grand Jury Subpoena to Carter*, No. 98-068, 1998 U.S. Dist. LEXIS 19497 (D.D.C. Apr. 28, 1998). .......20, 21

*Judah v. Reiner*, 744 A.2d 1037 (D.C. 2000) ...........................................................................13

*Khaalis v. United States*, 408 A.2d 313 (D.C. 1979). ...............................................................19

*Laningham v. U.S. Navy*, 813 F.2d 1236 (D.C. Cir. 1987) ........................................................11

*LeGrand v. Insurance Co. of North America*, 241 A.2d 734 (D.C. 1968) ...............................28

*NLRB v. Downtown BID Servs. Corp.*, 682 F.3d 109 (D.C. Cir. 2012) ....................................28

*Paul v. Howard Univ.*, 754 A.2d 297 (D.C. 2000) ...................................................................19

*Pearson v. Dodd*, 410 F.2d 701 (D.C. Cir. 1969) .....................................................................37

*Pietras v. Board of Fire Comm'rs*, 180 F.3d 468 (2d Cir. 1999) ............................................15

*Schmidt v. Bishop*, 779 F. Supp. 321 (S.D.N.Y. 1991) ............................................................12

*Thompson v. Dulaney* 970 F.2d 744 (10th Cir. 1992) ...............................................................24

*\*Trustees of the University of the Dist. of Columbia v. Vossoughi*, 963 A.2d 1162 (D.C. 2009). ....................... passim

*United States v. Dale*, 991 F.2d 819 (D.C. Cir. 1993) .............................................................21

*United States v. Larios*, 593 F.3d 82 (1st Cir. 2010). ..............................................................22

*United States v. Longoria*, 177 F.3d 1179 (10th Cir. 1999) ..................................................................22
*United States v. Maryland*, 322 F.2d 1009 (1963).............................................................................38, 40
*United States v. Vest*, 639 F. Supp. 899 (D. Mass. 1986) ..................................................................21
*Walker v. Darby*, 911 F.2d 1573 (11th Cir. 1990) ..............................................................................22
*Withers v. Wilson*, 989 A.2d 1117 (D.C. 2010) ................................................................................36

## STATUTES

18 U.S.C. § 2511(2)(d) ..........................................................................................................20, 21
18 U.S.C. §§ 2701(a), 2707(a) ....................................................................................................32
18 U.S.C. §2520(a). ..................................................................................................................19
D.C. Code § 23-542(a)(1)..........................................................................................................19
D.C. Code § 23-542(b)(3)......................................................................................................20, 21
D.C. Code § 23-554(a)(1)..........................................................................................................27
D.C. Code § 36-401 ..................................................................................................................33
D.C. Code § 36-407 ..................................................................................................................34
Federal Wiretap Act, D.C. Code § 23-542..................................................................................19
Restatement (Second) Torts § 911 (1) ....................................................................................38, 40
Restatement Agency (Third) § 1.01..............................................................................................13

## OTHER AUTHORITIES

*Cf.* U.S. Dep't of Labor, Wage & Hour Div., Fact Sheet (April 2010) ........................................15

# INTRODUCTION

Several common law and statutory claims are being brought by Plaintiffs, Council on American-Islamic Relations Action Network Inc., and CAIR-Foundation, Inc. (collectively "Plaintiffs") against three groups of Defendants: (i) the Center for Security Policy and its employees Christine Brim, Adam Savit, and Sarah Pavlis; (ii) the Society of Americans for National Existence and its founder David Yerushalmi; and (iii) Chris Gaubatz and Paul David Gaubatz. These include claims for breach of fiduciary duty, violations of the federal and D.C. Wiretap Acts, and statutory trade secret misappropriation claims.

Plaintiffs' claims are all based on all Defendants' collective effort to infiltrate Plaintiffs' premises, take covert audio-video recordings of sensitive and trade secret information, and steal confidential documents. The material facts are established in favor of liability against all Defendants, and they are largely established by Defendants' own deposition testimony and the audio-video recordings themselves. In addition, Defendants' arguments about damages and standing misconstrue both the prevailing law and the factual record. Therefore, Defendants' request for summary judgment must be denied in its entirety.

# FACTUAL BACKGROUND

## Defendants CSP and SANE

The Center for Security Policy ("CSP") seeks to educate the public on national security issues by writing articles, papers, producing videos, having meetings and conferences, and making speeches regarding various issues of national security. (Ex. 61 Gaffney Dep. 17:23-18:9

(Dec. 6, 2012)). Its General Counsel is David Yerushalmi. (Plaintiffs' Statement of Material Facts ¶ 1 (hereinafter, "Pl.'s SMF ¶ __").) Frank Gaffney is the founder, President, and CEO of CSP. (Pl.'s SMF ¶ 4.) Pursuant to this role, Gaffney is responsible to his Board of Directors for the program and management of CSP. (*Id.*) Gaffney is also responsible for raising funds for CSP, which requires him to talk to donors to persuade them to donate to CSP, sometimes about the Council on American-Islamic Relations ("CAIR"). (*Id.* at ¶ 5.)

CSP takes particular interest in CAIR because it believes CAIR is the "noisiest of the Muslim Brotherhood front groups" that operate in the US, "hostile to American security interests." (Pl. SMF ¶¶ 6 & 7; Ex. 50 Yerushalmi Dep. 33:15-18 (Jan 17, 2013).) In fact, CSP believes CAIR is part of a larger movement to wage "civilization jihad" in America. (Pl. SMF ¶ 6.) CSP had specific projects related to CAIR, including a project called "The CAIR Observatory" and a report on CAIR and the Foreign Agents Registration Act, contributed to by CSP staff Christina Brim and Adam Savit. (*Id.* at ¶ 8.) Its book, "Shariah: The Threat to America" also discusses CAIR. (*Id.*) CSP's obsessions with CAIR extend to its participation in activities and briefings on what CAIR is and what it does. (*Id.* at ¶ 9.) Gaffney explains CSP's fixation on CAIR by stating, "[CSP's] purpose is to ensure that people who have positions of responsibility for government policy understand who they are dealing with when they deal with CAIR and in so doing equip them to deal with them much more carefully than they might otherwise do." (Ex. 61, Gaffney Dep. 102:3-8.)

Defendant CSP is not alone in its fascination. Defendant, Society of Americans for National Existence ("SANE") is a nonprofit organization founded by Defendant David Yerushalmi and his wife. (Pl. SMF ¶ 10.) Yerushalmi was once the President of SANE. (*Id.*). In his words, "SANE understood that there were various threats to national existence in the West

and in America particularly . . . And its purpose was to investigate those threats or problems or dilemmas." (Ex. 60, SANE Dep. 12:15-19.) To that end, SANE published on its website a piece titled *War Manifesto: The War Against Islam* in which Yerushalmi stated that the Global War on Terrorism "should be a WAR AGAINST ISLAM and all Muslim faithful." (Ex 73, Screenshot of SANE War Manifesto). SANE disseminated through its website proposed federal legislation which would make "knowingly act[ing] in furtherance of, or to support the, adherence to Islam" a felony "punishable by 20 years in prison." (Ex. 72, Screenshot of SANE Muslim Immigration Proposal (December 4, 2008).). This proposed legislation further directs Congress to declare the United States to be "at war with the Muslim Nation or Umma" and the president to "immediately declare that all non-US citizen Muslims are Alien Enemies…subject to immediate deportation." (*Id.*) David Yerushalmi also wrote template legislation targeting Muslims that has been introduced in state legislatures across the country. (Ex 74, Screenshot of the Law Office of David Yerushalmi Website.) The Southern Poverty Law Center named David Yerushalmi and David Gaubatz to "The Anti-Muslim Inner Circle." (Ex. 71, Screenshot of SPLC's Anti-Muslim Inner Circle.) Similarly, the Anti-Defamation League described Yerushalmi as seeking to "portray all Muslims as a threat." (Ex. 70, ADL Report: David Yerushalmi, *available at* http://www.adl.org/civil-rights/discrimination/c/david-yerushalmi-a-driving.html (last accessed June 17, 2013.)

SANE contracted with Defendant Paul David Gaubatz in July 2007 for its "Mapping Shari'a" project. (Pl. SMF ¶ 12.) Pursuant to this project, David Gaubatz researched mosques throughout the US. (*Id.*) According to Yerushalmi, the Mapping Shari'a project was related to SANE's mission because of its views that a war existed, a "war… with what is variously termed

'radical Islam,' 'extremist Islam,' 'jihadist,' 'Islamism'….," (Ex. 60, SANE Dep. 33:23–34:6, 34:6–36:21.)

Agreements and Preparations to Infiltrate CAIR

CSP decided to produce a documentary on "Islamism in America" that would focus on the influence of the "Muslim Brotherhood" in America and CAIR. (Pl. SMF ¶¶ 14-16.) CSP referred to the documentary as the "CAIR Film Project." (*Id.* at ¶ 17.) The Project entailed interviews with "experts" on CAIR in attempt to link CAIR to the Muslim Brotherhood. (*Id.* at ¶ 18.) The documentary was to be of high quality, able to produce "maximum educational impact." (*Id.* at ¶ 95.) CSP dreamed big, hoping to gather video footage from inside CAIR to include in the documentary. (*Id.* at ¶ 18.) However, CSP did not believe that CAIR would simply open its doors and allow CSP to openly film "B-Roll" footage. (Pl. SMF ¶ 37.)

Therefore, in order to produce the documentary, CSP contracted with Manifold Productions. (*Id.* at ¶ 19.) CSP and Manifold Productions executed an agreement to create an entity named Publius Productions that would research, develop, produce, and distribute the CAIR documentary.  (*Id.* at ¶ 19.) Publius Productions was run by Michael Pack's entity, Manifold Production, who collaborated with CSP through CSP's employee Alex Alexiev. (Ex. 50, Yerushalmi Dep. 31:8-20 (Jan. 17, 2013).) Indeed, CSP was paying Manifold Productions to prepare for the technical aspects of making the film. (Ex. 62, CSP Dep. at 152:19 – 155:7-9.)

Publius Productions hired television producer Paul DonVito to research and work on the documentary. (Pl. SMF ¶ 29.)  DonVito's planning for the documentary contemplated, in part, using video recordings obtained from inside the CAIR office through clandestine means and including it as "B-Roll" for the documentary. (*Id.* at ¶¶ 28-30.)

In March 2008, Publius Productions entered into an agreement with SANE to facilitate the production of the documentary. (Pl. SMF ¶ 20.) In it, SANE agreed to provide "researchers" to enter CAIR covertly and create covert audio-video recordings for the CAIR documentary. (*Id.*) SANE eventually received $30,750 from Publius. (Pl. SMF ¶ 112.) Frank Gaffney of CSP was aware of the agreement. (*Id.* at ¶ 96.) Yerushalmi recommended Paul David Gaubatz to Gaffney as someone who may be able to obtain video for the CAIR film project. (*Id.* at ¶ 24.)

Also, in March 2008, SANE entered into an agreement with David Gaubatz  (Pl. SMF ¶ 23.) Under this agreement, David Gaubatz was to provide SANE with "researchers" to take covert videos inside CAIR. (*Id.*) Yerushalmi and Christine Brim encouraged David Gaubatz to bring together researchers who would create audio-video recordings inside CAIR.  (Pl. SMF ¶¶ 46, 49, 52.)  Jut prior to contracting, Gaffney and Gaubatz discussed Gaubatz's ability to obtain B-Roll from inside CAIR offices. (Pl. SMF ¶ 98.) Gaffney and Gaubatz also discussed Gaubatz hiring individuals who would volunteer to work as interns in CAIR offices and obtain film for the Project. (*Id.*) It was pursuant to these discussions that CSP paid David Gaubatz to obtain B-Roll video from inside CAIR offices. (*Id.*)

David Gaubatz's activities conducting secret audio-video recordings inside CAIR were funded by CSP.  (Pl. SMF ¶¶ 40, 97, 98, 99.) CSP was intentionally paying David Gaubatz to identify, train, and supervise "researchers" who would work as interns at CAIR. (Pl. SMF ¶ 40.) CSP was also paying David Gaubatz to instruct the intern-researchers as to how to obtain audio-video recordings inside CAIR. (*Id.*) CSP expected to be delivered the recordings taken by David Gaubatz's intern-researchers. (*Id.* at ¶ 44.)

David Gaubatz hired four researchers pursuant to his agreement with CSP. (*Id.* at ¶¶ 51, 52.) One of the four researchers was David Gabuatz's son, Chris Gaubatz. (*Id.* at ¶ 51.) David

Gaubatz trained the four researchers about how to appear Muslim when they were not. (Pl. SMF at ¶ 53.) This process included having Chris Gaubatz undergo an Islamic conversation ceremony at a mosque in Virginia. (*Id.* at ¶ 54.) David Gaubatz furthered instructed Chris Gaubatz to wear a beard and publicly identify as Muslim in order to "fit in" at CAIR's National office. (*Id.* at ¶ 55.)

Publius / CSP were specifically paying for the infiltration of Plaintiff's offices. (*Id.* at ¶ 113.) Publius or CSP would deposit funds into SANE's bank account that SANE then paid to David Gaubatz. (*Id.*) Indeed, CSP's intentions of wanting to acquire "clandestine[]" camera equipment to take "undercover" footage inside CAIR for its documentary were clear. (*Id.* at ¶ 32.) It understood that researchers like Chris Gaubatz would be wearing an inconspicuous camera to take video recordings while working as interns at CAIR. (*Id.* at ¶¶ 32 & 99.) Publius Productions purchased this camera gear (*Id.* at ¶ 33), and DonVito assisted David Gaubatz to find a suitable button camera for his researchers to wear. (*Id.* at ¶ 34.) DonVito trained Chris Gaubatz to use the camera, who in turn trained the other "researchers." (Pl. SMF at ¶ 35.)

Chris Gaubatz's Internship at CAIR

Chris Gaubatz sought an internship at CAIR using a false resume. (Pl. SMF ¶ 59.) For example, he misstated the name of his college. (*Id.*) He also gave the false name David Marshall. (*Id.* at ¶¶ 60-61), and he falsely represented himself as a Muslim. (*Id.* at ¶¶ 62-64). He did not reveal to anyone at CAIR that he was being paid by his father, David Gaubatz, to volunteer at CAIR. (*Id.* at ¶ 65.)

CAIR gave Chris Gaubatz an internship offer, which he accepted. (Pl. SMF ¶ 69.) On his first day as a CAIR intern, CAIR staff presented him with an internship manual, a confidentiality agreement, and a description of the internship program and the tasks he was expected to work on.

(*Id.* at ¶ 70.) He never revealed to anyone at CAIR that he was wearing an inconspicuous camera. (*Id.* at ¶ 82.) During the duration of his internship at CAIR, Chris and David Gaubatz sent Brim email summaries of Chris's activities as a CAIR intern pursuant to the CAIR film project. (*Id.* at ¶ 89.)

As part of the internship, CAIR employees gave Chris Gaubatz access to confidential, proprietary, and trade secret information about CAIR. (SMF 43.) Chris Gaubatz was given access to sensitive lists of contacts at mosques, CAIR's legislative strategies, and agreements with mosques. (*Id.* at ¶¶ 72-75.) CAIR further entrusted Chris Gaubatz with tasks that required him to act and present himself as a representative of CAIR, such as scheduling sermons for CAIR's Executive director, and facilitating a national census of mosques. (*Id.* at ¶ 76.) Chris Gaubatz continually received assignments, oversight, and feedback from CAIR staff on his work as an intern. (*Id.* at ¶ 77.)

Chris Gaubatz began removing from CAIR premises without the permission of any CAIR staff. (Pl. SMF ¶ 78.) He would sometimes ask CAIR employees if he could go to the basement and shred documents, but then remove those documents and place them in his car. (*Id.*) He would give the documents he took to his father David Gaubatz. (Ex. 48, Chris Gaubatz Dep. 30:19-33:13; Ex. 54 Paul David Gaubatz 136:24-135:11, 158:14-19). According to David Gaubatz's estimate, he took an estimated 12,000 documents. (Ex. 54, Paul David Gaubatz Dep. 167:17-21.) They did not return these documents to CAIR before this litigation commenced. (Ex. 48, Chris Gaubatz Dep. 149:19-153:16.) David Gaubatz further disseminated the documents to David Yerushalmi, CSP, internet media site World Net Daily ("WND"), and law enforcement. (Pl.'s Ex. 54, Paul David Gaubatz Dep. 161:6-12; Ex. 50, David Yerushalmi Dep. 82:4-87:10, 92:7-16, 105:19-113:25 (January 17, 2013); Ex. 50, Brim Dep. 142:19-22, 150:13-19, 152:4-13;

229:4-21 (January 15, 2013).) CAIR documents were sent to David Gaubatz and Paul Sperry from Chris Gaubatz's email account during his internship. (Ex. 51, Email from Yasser Tabbara, Council on American Islamic Relations to Chris Gaubatz (July 17, 2008) (on file with Chris Gaubatz Production 574-76); Ex. 51, Email from Raabia Wazir, Outreach Coordinator, Council on American Islamic Relations to Chris Gaubatz and CAIR Volunteers (June 25, 2008) (on file with Chris Gaubatz Production 847-58).)

Chris Gaubatz was also taking clandestine video during his CAIR internship with the button camera he was fitted for by DonVito and purchased by Publius. (Pl. SMF at ¶¶ 36, 85.) He took the videos according to David Gaubatz's instructions and pursuant to his payments. (*Id.* at ¶ 85.) In total, he took hundreds of hours of video. (*Id.* at ¶ 80.) He used the camera to record conversations in which he was not participating. (*Id.* at ¶ 81.) He did not inform anyone of CAIR that he was wearing the camera, and he knew that CAIR staff would have disallowed it if they had known about it. (*Id.* at ¶¶ 82 & 83.) He also used the button camera to capture confidential CAIR information stored in documents, such as by reading bank statements out loud and capturing images of documents he was either not supposed to look at or was supposed to shred. (*Id.* at ¶ 84.)

He gave these videos to David Gaubatz. (*E.g.*, Pl.'s Mot., Ex. 37, Transcript of Recorded Telephone Conversation of Chris Gaubatz 23:3-22.) The Gaubatzes also gave these recordings to CSP and Christine Brim. (Pl. SMF at ¶ 83.) After the initial stages of the CAIR Film Project, Christine Brim became CSP's liaison with Gaubatz and Manifold productions. (*Id.* at ¶ 50.) CSP paid Gaubatz for these videos. (*Id.* at ¶ 104.) CSP also understood that the recordings it received were pursuant to agreements Publius had with David Gaubatz and that CSP had with David Gaubatz. (*Id.* at ¶ 111.) CSP in turn disseminated the videos to third parties like Joseph Farah.

(*Id.* at ¶ 90.) CSP and Farah's news site, World Net Daily, discussed and drafted an agreement for CSP to share videos with WND. (Ex. 63, Draft Agreement between Center for Security Policy and World Net Daily (October 2010) (on file with CSP document production 988-991).)

During the course of Chris Gaubatz's internship with CAIR, CSP had general knowledge that Chris Gaubatz was an unpaid volunteer who was to fulfill his duties as a CAIR intern. (Pl. SMF ¶ 71.) CSP knew that Chris Gaubatz's duties were "no different from any other intern." *Id.* CSP also knew that Chirs Gaubatz was to wear an inconspicuous audio/video recorder as part of his conduct while interning with CAIR. (*Id.* at ¶ 38.) And it understood that Chris Gaubatz was instructed to, and did, follow instructions given to him by CAIR staff while interning at the CAIR office in Washington, D.C. (*Id.* at ¶ 71.)

CSP paid SANE a total of $103,865 in 2008 for SANE to pass that money on to David Gaubatz for his work on the CAIR film project. (*Id.* at ¶ 114.) CSP also directly paid David Gaubatz $74,100 in 2008.  (Pl.'s Mot., Ex. 4, CSP dep. at 55:9–17.

<u>After Chris Gaubatz's Internship</u>

In 2009, after Chris Gaubatz's internship, he worked for CSP on the CAIR film project under a fellowship. (Pl. SMF ¶ 92.) Chris Gaubatz worked for Brim on reviewing and editing the covert recordings he made during his CAIR internship. (*Id.*) CSP paid him $5,000. (*Id.*)

CSP paid Manifold Productions $22,500 to take control of Publius. (Pl. SMF ¶ 110.) Publius was dissolved (*Id.*), and CSP essentially took over Publius and eliminated it. (*Id.*)

After Chris Gaubatz's internship, David Gaubatz also revealed his intention to write a book about CAIR based on the covert recordings and purloined documents from Chris Gaubatz's time as a CAIR intern.  (Ex. 68, Email and Letter from David Gaubatz to Christine Brim, Chris Gaubatz, and Frank Gaffney, *Meeting documents video* (April 4, 2009) (on file in CSP document

production as Bates Nos. 695-98).)   CSP conditionally objected to this, stating that "the contracts [David Gaubatz] signed…all stated clearly that all of the materials, findings, and the fact of the research itself were proprietary and confidential to CSP."  (Ex. 69, Email from Christine Brim to David Gaubatz, Chris Gaubatz, and Frank Gaffney, *Re draft letter to Frank Gaffney* (April 3, 2009) (on file in CSP document production as Bates Nos. 693-94.)  David Gaubatz co-authored a book with Paul Sperry which was published as Muslim Mafia and copyrighted by both authors in 2009.  (Ex.65, P. David Gaubatz & Paul Sperry, Muslim Mafia (WND Books) (2009).)  The dust jacket of Muslim Mafia states that "as part of a daring undercover operation organized by his father, P. David Gaubatz, Chris [Gaubatz] and his team revealed a well-funded conspiracy to destroy American society."  (*Id.*)

## PROCEDURAL HISTORY

On October 29, 2009, Plaintiff CAIR-AN filed its complaint against Chris and David Gaubatz with this Court for violations of Plaintiff's common law and statutory rights.  Dkt. 1, October 29, 2009.  Along with its complaint, Plaintiff-CAIR-AN sought a Motion for a Temporary Restraining Order to prevent the further dissemination of stolen documents and unauthorized recordings.  Dkt. 2, October 29, 2009.  This Court granted in part Plaintiff CAIR-AN's  motion on November 3, 2009 and subsequently entered a Consent Order to Grant the Preliminary Injunction on November 19, 2009.  Dkt. 15, November 12, 2009 and Dkt. 18, November 2009.

Plaintiff CAIR-AN first sought to amend the complaint on March 1, 2010 in order to, among other things, add CAIR-F as a second plaintiff to "pursue virtually identical legal claims" against Defendants as Plaintiff CAIR-AN was pursuing.  *Council on American-Islamic Rels.*

*Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 323 (D.D.C. 2011). Plaintiff again sought

leave to amend the complaint on April 12, 2011 to add CSP and some of its employees as

defendants. Dkt. 48, April 12, 2012. The Court granted both amendments on June 24, 2011.

Dkt. 75 and 76, June 24, 2011. During discovery, Plaintiffs moved for leave to amend the

complaint to add SANE and David Yerushalmi as defendants, which the Court granted in part.

Dkt. 125, September 17, 2012.

The discovery period for this case ended on January 18, 2013, and this Court held a

Status Conference hearing on April 10, 2013. Dkt. 149, April 10, 2013. On May 20, 2013, the

parties filed cross-motions for summary judgment.


**LEGAL STANDARD**

A court should not grant summary judgment unless "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

*Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). In deciding whether a genuine issue

of material fact exists, the court is to view the record in the light most favorable to the party

opposing the motion, giving the non-movant the benefit of all favorable inferences that can

reasonably be drawn from the record and the benefit of any doubt as to the existence of any

genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970).

To determine whether facts are "material," a court must look to the substantive law on which

each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be a "material,"

the factual assertion must be capable of affecting the substantive outcome of the litigation.

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43, (D.C. Cir. 1987) (citing *Anderson*, 477 U.S. at

11

251). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.


## ARGUMENT

I.    Defendants have failed to demonstrate that there is no genuine issue as to whether they breached Chris Gaubatz's fiduciary duty to CAIR.

To demonstrate a breach of fiduciary duty, a plaintiff must show (1) the existence of a fiduciary relationship; (2) a breach of the duties that were associated with this fiduciary relationship; and (3) injuries that were caused by the breach of the fiduciary duties. *Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*, 607 F. Supp. 2d 185, 190–91 (D.D.C. 2009). Defendants argue that they did not breach any fiduciary duty to CAIR. But the record shows that Chris Gaubatz owed a fiduciary duty to Plaintiffs, that he breached that duty, and the other Defendants all aided and abetted that breach.

A.    Chris Gaubatz owed a fiduciary duty to Plaintiffs, and he breached that duty.

A fiduciary relationship is one of "trust or confidence reposed by one person in the integrity and fidelity of another." *Church of Scientology Int'l v. Eli Lilly & Co.*, 848 F. Supp. 1018, 1028 (D.D.C. 1994) (quoting *Schmidt v. Bishop*, 779 F. Supp. 321, 325 (S.D.N.Y. 1991)) (other internal citations omitted) (internal quotation marks omitted). "The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another. . . ." *Church of Scientology Int'l*, 848 F. Supp. at 1028 (quoting *Schmidt*, 779 F. Supp. at 325) (other internal citations omitted) (internal quotation marks omitted). Because "the existence of a 'fiduciary relationship is a fact-intensive question,

involving a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties,'. . . it may not be appropriate to resolve this issue on a motion for summary judgment. . . ."  *Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C. Cir. 1996) (quoting *Church of Scientology Int'l*, 848 F. Supp. 1028). Plaintiffs have not identified any legal ruling that exists on the issue of whether an intern can ever owe a fiduciary duty to the employer, and Defendants have not cited any such ruling in their brief.

In addition, a fiduciary relationship exists when an agency relationship exists, and the two parties assent that the "agent shall act on the principal's behalf and subject to the principal's control." Restatement Agency (Third) § 1.01.  *See also Amtrak v. Veolia Transp. Servs.*, 791 F. Supp. 2d 33, 46(D.D.C. 2011) (quoting *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000) (explaining that agency relationship exists where an employer has "the right to control and direct the servant"). An agent "owes a fiduciary duty to his principal to 'to act solely for the benefit of the principal in all matters concerned with his agency.'" *Amtrak v. Veolia Transp. Servs.*, 791 F. Supp. 2d 33, 46-48 (D.D.C. 2011) (quoting *Gross v. Akin, Gump, Strauss, Hauer & Feld, LLP*, 599 F. Supp. 2d 23, 32 (D.D.C. 2009)). A written employment contract is not required to demonstrate an agency relationship. *Draim v. Virtual Geosatellite Holdings, Inc.*, 631 F. Supp. 2d 32, 39 (D.D.C. 2009).

The record shows that Chris Gaubatz owed a fiduciary duty to Plaintiffs and that he breached that duty. Plaintiffs placed "trust" in the "integrity and fidelity" of Chris Gaubatz, and they had the legitimate expectation that Gaubatz would not covertly record them, take documents from them, disseminate those documents to third parties, or further an effort to discredit Plaintiffs. *Church of Scientology Int'l v. Eli Lilly & Co.*, 848 F. Supp. 1018, 1028 (D.D.C. 1994).

In addition, Chris Gaubatz owed CAIR a fiduciary duty because CAIR had the "right to control" Chris Gaubatz through his internship as their agent. *Amtrak v. Veolia Transp. Servs.*, 791 F. Supp. 2d 33, 46 (D.D.C. 2011).

Chris Gaubatz was part of a summer internship program at CAIR, for which he was presented with a confidentiality agreement and assignments from CAIR staff. (Pl.'s Mot., Ex. 37, Transcript of Recorded Telephone Conversation of Chris Gaubatz 7:1-10.; Pl.'s Mot. Ex. 39, Wazir Aff. ¶ 3; Ex. 38, Transcript of Gaubatz Recordings 69:6-75:15; Ex. 1, June 16, 2008 at 00:09:10-00:15:46.) Chris Gaubatz had to follow the instructions of CAIR staff at his internship. (*Id.*; Pl.'s Mot. Ex. 3, Chris Gaubatz Dep. 205:16-210:18 (Chris Gaubatz followed instructions as intern and was told by CAIR staff what he could not take); Pl.'s Mot., Ex. 46, Defendant Paul David Gaubatz's Ans. to interrogatory, 5; Ex.45, Defendant Chris Gaubatz's Ans. to interrogatory, 5.) As part of his everyday internship experience, staff gave Chris Gaubatz access to confidential, proprietary, and trade secret information about CAIR. (*E.g.*, Pl.'s Ex. 1, June 16 pt 2 00:22:50-00:23:30 (recording an internal CAIR discussion on strategy for a CAIR event), June 24, 2008 at 02:13:05-02:19:10, July 9, 2008 at 1:27:30-1:29:40 (recording CAIR employee instructing him on the creation of internal document for CAIR's constituency, revealing internal details about CAIR's outreach strategy), July 9, pt 2 at 01:37:06-01:46:48 (recording CAIR director sharing organizational strategy), August 14 at 02:21:47-02:23:00 (recording Director of Communications and Civil Rights Manager discussing facts related to cases in the Civil Rights Department); Pl.'s Mot. Ex. 37, Transcript of Recorded Telephone Conversation of Chris Gaubatz 9:1-22.) As part of that fiduciary duty, Chris Gaubatz understood that Plaintiffs expected him to not to disclose information or act in such a way as to harm the organization, including working with his father Dave Gaubatz to discredit Plaintiffs. (Pl.'s Mot., Ex. 1,

August 31, 2008, at 3:09:00, 3:11:00) (CAIR staff explaining to Chris Gaubatz that Dave Gaubatz was trying to harm them).

Defendants attempt to establish an absence of any fiduciary duty by citing the Department of Labor's guidelines for unpaid internships. (Def.'s Mot. 31-32.) However, these guidelines do not reference, let alone refute the likelihood, that employers may have a relationship of trust with interns, and that in the course of an internship, an intern may be expected to safeguard sensitive employer information and to not behave in such a way as to violate that trust. *Cf.* U.S. Dep't of Labor, Wage & Hour Div., Fact Sheet #71 (April 2010) at http://www.dol.gov/whd/regs/compliance/whdfs71.htm (*last visited* June 13, 2013). Defendants also emphasize that Chris Gaubatz was not a paid employee to show that he did not owe a fiduciary duty. (Def.'s Mot. 32 (citing *Pietras v. Board of Fire Comm'rs*, 180 F.3d 468, 473 (2d Cir. 1999) (discussing whether someone is an employee depends on whether they get paid but not relevant to fiduciary duty inquiry).) However, there is no case law Plaintiffs are aware of, and Defendants have cited none, stating that only paid employees owe fiduciary duties. Instead, case law says that a written employment contract is not required to demonstrate an agency relationship. *Cf. Draim v. Virtual Geosatellite Holdings, Inc.,* 631 F. Supp. 2d 32, 39 (D.D.C. 2009). And even if remuneration were some indicator of an intern's fiduciary duty, Plaintiffs did offer Chris Gaubatz remuneration for some of his duties. (Pl.'s Mot., Ex. 1, August 31, 2008, at 3:09:00, 3:11:00) (CAIR staff explaining to Chris Gaubatz that Dave Gaubatz was trying to harm them.)

There is also ample evidence in the record demonstrating that Chris Gaubatz violated this fiduciary duty. Because Gaubatz was presented with a confidentiality agreement, he was well aware that part of his duties comprised discretion; even so, he still disseminated the videos and

stolen documents widely to other Defendants, and he discussed his CAIR internship experience with third parties at World Net Daily and disseminated documents to third party Paul Sperry. (Pl.'s Mot., Ex. 37, Transcript of Recorded Telephone Conversation of Chris Gaubatz 23:3-22; Pl.'s Mot., Ex. 2, Brim Dep. 95:10-15, 96:1-6, 129:16-19, 131:20-22, 213:4-11; Pl.'s Mot., Ex. 3, Chris Gaubatz Dep. 90:4; Ex. 21, Email from Christine Brim, Center for Security Policy to Paul David Gaubatz (April 23, 2008) (on file with CSP Production 191, 198, 290); Pl.'s Mot., Ex. 5, David Gaubatz Dep. 125:6-8; Ex. 2, Brim Dep. 142:12-15, 143:2-14.)  Therefore, the record shows clearly that Chris Gaubatz owed a fiduciary duty to Plaintiffs, and that he breached that duty, and summary judgment cannot be granted to Defendants.


     B.  All other Defendants also aided and abetted Chris Gaubatz's breach of fiduciary duty.

     Contrary to Defendant's assertions, a defendant can aid and abet a breach of fiduciary duty, a point widely recognized in this district. *See Ehlen v. Lewis*, 984 F. Supp. 5, 10 (D.D.C. 1997); *Amtrak v. Veolia Transp. Servs*., 791 F. Supp. 2d 33 (D.D.C. 2011).  Defendants' confuse aiding and abetting of fiduciary duty with the independent tort of aiding and abetting; but as explained in detail in Argument Section II.E *infra*, Plaintiffs did not bring claims under the independent aiding and abetting tort. Instead, Plaintiffs are seeking to hold Defendants vicariously liable for breach of fiduciary duty, an action repeatedly recognized in this jurisdiction.  *E.g. id.*

     A Defendant is considered to have aided and abetted the commission of a tort when three elements are present: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must

knowingly and substantially assist the principal violation." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983. As it relates to breach of fiduciary duty, this Court has stated that Defendants aid and abet a breach of fiduciary duty when they have knowledge of a breach of fiduciary duty and provide substantial assistance in breaching that duty. *Amtrak v. Veolia Transp. Servs.*, 791 F.Supp. 2d 33, 46 (D.D.C. 2011). As discussed in Argument Section I.B *supra*, Chris Gaubatz clearly had a fiduciary duty to CAIR.

"A general awareness of wrongdoing on the part of one being aided and abetted is sufficient to show knowledge on the part of the aider and abettor." *Amtrak v. Veolia Transp. Servs.*, 592 F. Supp. 2d 86, 96 (D.D.C 2009). Defendants all had general awareness of Chris Gaubatz's fiduciary duty to CAIR. CSP understood that Chris had responsibilities to CAIR as an intern, noting that they were "no different from any other intern," and that he was instructed to, and did, follow instructions from CAIR staff while he was interning. (Pl.'s Mot., Ex. 4, CSP Dep. 39:10-23; 39:14-18; 41:2-5.) As explained by Defendant David Gaubatz, "The specific purposes of the Internship were twofold: (1) Chris was to perform any tasks asked of him by CAIR during the Internship fully and in exemplary fashion…" (Pl.'s Mot., Ex. 46, Defendant Paul David Gaubatz's Ans. to interrogatory, 5; Pl.'s Mot., Ex.45, Defendant Chris Gaubatz's Ans. to interrogatory, 5.) Based on CSP's knowledge of Chris Gabuatz's role at CAIR, and based on the agreement to have him disseminate the video, Defendants had more than adequate knowledge of Chris's duties to his employers and that recording and disseminating video would violate that duty.

Because they received stolen documents and video footage from Chris, Defendants had a general awareness that Defendant Chris Gaubatz breached the duty he owed CAIR. (Pl.'s Mot. Ex. 37, Transcript of Recorded Telephone Conversation of Chris Gaubatz 23:3-22; Ex. 2, Brim

Dep. 95:10-15, 96:1-6, 129:16-19, 131:20-22, 213:4-11; Ex. 3, Chris Gaubatz Dep. 90:4; *see* Ex.

9, Yerushalmi Dep. 158:8-161:11.) Defendants understood that Chris Gaubatz was, pursuant to

their arrangement with David Gaubatz, to obtain a position of trust and violate it by

disseminating videos and stealing documents. (Ex. 4, CSP Dep. 39:14-18, 41:2-5; Ex. 4, CSP

Dep. 48:4-7.)  Defendants were also aware of Chris Gaubatz's distinct violations as the occurred,

receiving notification of his theft of CAIR documents.  (Ex. 48, Chris Gaubatz Dep. 73:2-5, Ex.

49, Brim Dep. 142:12-15, 143:2-14, Pl.'s Mot. Ex. 5, Paul David Gaubatz Dep. 62:21-24, 63:1-4,

108:8-11.)  Defendants Yerushalmi and SANE were also aware of Defendant Chris Gaubatz's

breach because they received the stolen documents from Chris Gaubatz. (Ex. 50, David

Yerushalmi Dep. 82:4-87:10, 92:7-16, 105:19-113:25 (January 17, 2013).)

   In addition to being aware of Chris Gaubatz's breach, Defendants substantially assisted in

the commission of Defendant Chris Gaubatz's breach.  *Amtrak v. Veolia Transp. Servs.*, 791

F.Supp. 2d 33, 46 (D.D.C. 2011). Five factors are addressed to determine what is a substantial

factor in the commission of a tort: (i) the nature of the act encouraged, (ii) the amount and kind

of assistance given, (iii) the defendant's absence or presence at the time of the tort, (iv)

defendant's relation to the tortious actor, and (v) the defendant's state of mind. *Halberstam v.*

*Welch*, 705 F.2d 472, 483–84 (D.C. Cir. 1983) (quoting (Rst. 2d of Torts § 876)). All of these

factors are present here.  In addition to creating the contract and effectively acting as his

employer for purposes of the infiltration, Defendants were clearly in a position of authority over

David Gaubatz and Chris Gaubatz, instructing them on how, when, and where to make the

recordings.  (Pl.'s Mot., Ex. 7, Gaffney Dep.,  110:15-21, 113:17-21, 116:13-23; Pl.'s Mot., Ex.

5, Paul David Gaubatz Dep. 72:17-73:15, 77:24-78:3, 79:18-21; Pl.'s Mot., Ex. 4, CSP Dep.

39:5-12, 58:14-59:8, 63:14-65:7.)  In addition, CSP paid David Gaubatz a substantial amount of

money for the video recordings and documents.  (Pl.'s Mot., Ex. 4, CSP Dep. 68:7-17.)

Throughout the commission of the tort, the Gaubatz Defendants were providing the Defendants

with regular updates and information regarding their progress.  (Pl.'s Mot., Ex. 2, Brim Dep.

142:12-15, 143:2-14.)

For those reasons, all Defendants had knowledge of a breach of fiduciary duty and

provide substantial assistance in breaching that duty. *Amtrak v. Veolia Transp. Servs.*, 791

F.Supp. 2d 33, 46 (D.D.C. 2011).  Summary judgment to Defendants on any of the breach of

fiduciary duty claims is unwarranted.[1]


II.       Defendants have failed to show that any the Federal and D.C. Wiretap Act claims

          should be dismissed.

There is liability under the federal Wiretap Act for "any person whose… oral

communication… is intercepted, disclosed or intentionally used in violation of this chapter." 18

U.S.C. §2520(a).  And the D.C. Code holds liable persons who "willfully intercep[t]" or

"procur[e] any other person to intercept" any "oral communication."  D.C. Code § 23-542(a)(1).

The D.C. Wiretap statute is "virtually identical" to the federal statute. *Khaalis v. United States*,

408 A.2d 313, 341 (D.C. 1979).

Defendants argue that Plaintiffs' federal and D.C. wiretap act claims must be dismissed

by inventing a new legal standard and making factual assertions that are unsupported by the

---

[1] To the extent that Defendants  present an  argument for summary judgment on the breach of contract claims, there
is a genuine issue of material fact as to whether the other Defendants procured Chris Gaubatz's breach of contract.
The record is clear that Chris Gaubatz had an implied contract of confidentiality with CAIR, and that Defendants
knew of this obligation, and interfered with contract, causing damage to CAIR.  (Pl.'s Mot., Ex. 38, Transcript of
Gaubatz Recordings 69:6-75:15; Pls Mot., Ex. 1, June 16, 2008 at 00:09:10-00:15:46.)  Therefore, Defendants
procured Gaubatz's breach of contract.  *Paul v. Howard Univ.,* 754 A.2d 297, 308-09 (D.C. 2000).

record.  But there is ample evidence demonstrating that Chris Gaubatz's camera was not visible

and that he was not present for some of the conversations his camera recorded.  And because

Defendants intercepted communications in order to commit the tort of breach of fiduciary duty,

as discussed above, the evidence supports liability under the Wiretap Acts against all

Defendants.  And Defendants CSP and Yerushalmi are directly liable for violation of Title III

because they contracted with Defendant David Gaubatz to unlawfully intercept and disseminate

recordings of oral communications, directly assisted and planned in the production of the

recordings, and reviewed them as Chris Gaubatz was filming during his internship. For these

reasons, Plaintiffs' Wiretap Act claims must survive.


A. Because Defendants have failed to demonstrate that they did not participate in

intercepting Plaintiffs' communications in order to breach Chris Gaubatz's fiduciary duties to

CAIR, Plaintiffs' Wiretap Act claims must survive.


Under both the federal and D.C. Wiretap acts, where a "party to the communication"

causes the interception, they are liable when such interception is done "for the purpose of

committing any criminal, [] tortious," or any other "injurious act."  18 U.S.C. § 2511(2)(d); D.C.

Code § 23-542(b)(3); *In re Grand Jury Subpoena to Carter*, No. 98-068, 1998 U.S. Dist. LEXIS

19497, *13-14 (D.D.C. Apr. 28, 1998).

Defendants argue falsely that the record does not support that Defendants made the

recordings for some further tortious purpose, when there is a mountain of evidence that

Defendants sought the recordings to breach Chris Gaubatz's fiduciary duty to CAIR by

disseminating sensitive and confidential information belonging to CAIR.  For the reasons

articulated in Argument Section I.B *supra*, Defendants have failed to show that there is no genuine issue of material fact as to whether they are liable for breach of fiduciary duty.

And indeed, for Wiretap Act liability, Defendants do not even need to be held liable for breach of fiduciary duty; they must have just intercepted communications "for the purpose" of committing that breach of fiduciary duty. 18 U.S.C. § 2511(2)(d); D.C. Code § 23-542(b)(3); *In re Grand Jury Subpoena to Carter*, No. 98-068, 1998 U.S. Dist. LEXIS 19497, *13-14 (D.D.C. Apr. 28, 1998). Liability "is established when 'it is shown either (1) that the primary motivation, or (2) that a determinative factor in the actor's motivation for intercepting the conversation was to commit a criminal, tortious, or other injurious act.'" *United States v. Dale*, 991 F.2d 819, 841-842 (D.C. Cir. 1993) (quoting *United States v. Vest*, 639 F. Supp. 899, 904 (D. Mass. 1986), *aff'd*, 813 F.2d 477 (1st Cir. 1987), *cert. denied*, 488 U.S. 965 (1988)). This is satisfied here. The evidence shows that the parties all sought to breach that fiduciary duty by intentionally sending Chris Gaubatz into CAIR to intercept communications for them. (Pl.'s Mot., Ex. 7, Gaffney Dep., 110:15-21, 113:17-21, 116:13-23; Pl.'s Mot., Ex. 5, Paul David Gaubatz Dep. 72:17-73:15, 77:24-78:3, 79:18-21; Pl.'s Mot., Ex. 4, CSP Dep. 39:5-12, 58:14-59:8, 63:14-65:7, 68:7-17.) Further, Defendants' deposition testimony shows that they affirmatively sought that interception in order to disseminate the recordings to themselves and other third parties. (Ex. 9, Yerushalmi Dep. 58:14-59:13, 63:3-10; Ex. 7, Gaffney Dep. 164:18-22, 109:15-25, 110:15-21. Ex. 5, Paul David Gaubatz Dep. 74:7-9, 76:2-4; Ex. 2, Brim Dep. 216:9-12.) Defendant Dave Gaubatz also sought the recordings to help compile an unflattering book, *Muslim Mafia*, about Plaintiffs. (Pl.'s Mot., Ex. 17, P. David Gaubatz & Paul Sperry, Muslim Mafia 2 (WND Books) (2009).) Therefore, Defendants have failed to show that there is

no genuine issue of material fact as to whether they intercepted communications in order to breach fiduciary duty, and summary judgment on the Wiretap Act claims must be denied.

B. Defendants have failed to demonstrate that the one-party rule bars the entirety of Plaintiffs' Wiretap Act claims.

Because Defendants intercepted oral communications for the purpose of breaching fiduciary duties, they are liable under both Wiretap Acts. But even if Defendants had not planned to commit breach of fiduciary duty, the "one party rule" does not defeat Plaintiffs' claims.

In order to find Defendants liable, the court must find that (i) plaintiffs had a subjective expectation that no one was intercepting their conversations and (ii) this expectation is one society considers reasonable. *United States v. Larios*, 593 F.3d 82, 92 (1st Cir. 2010) (quoting *United States v. Longoria*, 177 F.3d 1179, 1181-82 (10th Cir. 1999)). *See also Walker v. Darby*, 911 F.2d 1573, 1579 (11th Cir. 1990) ("[C]ourts distinguish between an expectation of privacy and the expectation of noninterception.") "[A] party to the conversation is one who takes part in the conversation." *Caro v. Weintraub*, 618 F.3d 94, 97 (2d Cir. 2010). Plaintiffs had a subjective expectation of noninterception; everyone would enter CAIR premises through a call box, controlling the traffic into the office. (Pl.'s Mot., Ex. 37, 8:7-14, Transcript of Chris Gaubatz Phone Call.) And this was reasonable, because private conversations, including about confidential strategies and client matters, were held in the office. (*E.g.* Ex. 55, Deposition of Corey Saylor, at 105:5–19 (January 8, 2013).) It is reasonable for people to expect that their conversations at work will not be intercepted. *See Walker v. Darby*, 911 F.2d 1573, 1578-79 (11th Cir. 1990); *see also Berger v. New York*, 388 U.S. 41, 49 (1967).

And in any event, Defendants have misconstrued the factual record even in trying to apply the one-party rule. First, Defendants do not support the contention that the recording device worked less well than the human ear, and there are numerous examples of Chris Gaubatz recording conversations in which he was not among the group having the recorded conversation. (Pl.'s Mot., Ex. 1, July 22, 2008 at 04:22:28-04:23:35 (recording another intern doing a client call, capturing info about client matters and their full name), August 7, 2008 at 1:21:40-01:22:05 (Defendant stands near speaker, who is a Capitol Hill staffer, and records a discussion on CAIR's policy and strategy as it relates to establishing coalitions), June 16 pt 2 at 00:23:00-00:23:30 (recording two CAIR staffers discuss political action breakfast), July 9, 2008 Pt 2 at 02:16:38-02:18:15 (recording a conversation between another intern and his supervisor in which he was not participating).)

Second, Defendants argue that the one-party rule applies because the recording device was "visible." (Def.'s Mot. 30.) This was clearly not the case. In all of the videos, the people captured on film were clearly unaware that they were being taped. (*See* Pl.'s Mot. Ex. 1.) And Defendants purposely selected a camera that was "clandestine" and "inconspicuous" and would not be visible to the wearer. (Pl.'s Mot., Ex. 4, CSP Dep. 39:5-12; Pl.'s Mot., Ex. 6, DonVito Dep. 38:25-39:7, 43:15-44:10, 83:19-23, 163:23-164:5; Pl.'s Mot., Ex. 7, Gaffney Dep. 119:2-9; Pl.'s Mot., Ex. 8, SANE Dep. 67:11-68:2; Pl.'s Mot., Ex. 9, Yerushalmi Dep. 158:8-161:11.) Therefore, Defendants have failed to meet their burden of showing that the one-party rule precludes liability on any of the federal of D.C. Wiretap Act claims.

C. All Defendants are directly liable under the Wiretap Acts.

Defendants CSP, Brim, SANE, and Yerushalmi also argue that they had no knowledge of the Wiretap statute violations and those claims against them should be dismissed.  But they fail to cite any controlling case law on whether they had knowledge or reason to know of the Wiretap violations at issue. Of the cases that Defendants do cite, Defendants fail to find any support. (Defs.' Mot. 24.)  In *Thompson v. Dulaney*, the Tenth Circuit states that liability for a Title III violation rests upon a defendant knowing "1) information used or disclosed came from an intercepted communication, and 2) sufficient fact concerning the circumstances of the interceptions such that the defendant could, with presumed knowledge of the law, determine that the interception was prohibited in light of Title III." 970 F.2d 744, 749 (10th Cir. 1992). In sum, the court states, "a defendant must be shown to have been aware of the *factual circumstances* that *would* violate the statute." *Id.* (emphasis added).  Even under this standard, Defendants CSP, SANE, and Yerushalmi were not only aware of the factual circumstances of surrounding the Gaubatz Defendants' interceptions, but were actively involved in the interceptions.

First, Defendants CSP, Brim, SANE, and Yerushalmi had knowledge that Chris Gaubatz would be intercepting oral communications from CAIR because they contracted with Gaubatz to make the recordings at issue.  Understanding that CAIR would not approve or give permission of Defendants' recording and distributing audio-video of the internal workings and private affairs of the CAIR office, Defendants CSP, SANE, and Yerushalmi sought to make secret recordings of CAIR facilities and staff. (Pl.'s Mot., Ex. 4, CSP Dep. 39:5-12.)  To achieve that end, CSP contracted with Manifold Productions to create Publius Productions, an entity that would develop, produce and distribute a documentary about CAIR. (Pl.'s Mot., Ex. 27, CSP and Manifold agreement (December 21, 2007) (on file with CSP Production, 923-29).)[2] Publius

---

[2] *See also* Pl.'s Mot., Ex. 20, Grant Agreement between Center for Security Policy and Paul David Gaubatz (September 14, 2008) (on file with CSP Production 169-177) (hereinafter "CSP and Gaubatz Agreement"); Ex. 26,

Productions then entered into a grant agreement with Defendant SANE in 2008, requiring them to provide a team of researchers to enter CAIR and create the audio-video recordings for a documentary. (Pl.'s Mot., Ex. 9, Yerushalmi Dep. 43:5-44:1; Ex. 26, Publius and SANE Agreement. )

Defendants' plan, therefore, was to infiltrate CAIR, gain CAIR's trust, break that trust by recording and distributing video, and produce the documentary. The record shows that Defendant CSP met with Defendant David Gaubatz to discuss Gaubatz's ability to obtain B-Roll from inside CAIR offices, and formed their contract based on Gaubatz's purported ability to do so. (Pl.'s Mot., Ex. 7, Gaffney Dep. 110:15-21.)  As a result of these conversations, CSP paid David Gaubatz to obtain video from inside CAIR offices. (*Id.* at 164:18-22.)  Additionally, Defendants Yerushalmi and SANE were directly involved in defining the scope of David Gaubatz's responsibilities in obtaining the video recordings, and enlisted, together with Defendant Brim, Gaubatz's services to hire an individual who could intercept the recordings from CAIR's office. (Pl.'s Mot., Ex. 5, Paul David Gaubatz Dep. 72:17-73:15, 77:24-78:3, 79:18-21. (January 14, 2013).)

Second, Defendants CSP, SANE, and Yerushalmi had knowledge of the Gaubatz Defendants' wrongdoing because they provided them with camera equipment, legal counsel, and instructions on how to make the clandestine recordings.  After contracting for the interception of audio and video from CAIR, Defendants CSP, SANE, and Yerushalmi were also involved with creating the recordings, assisting David Gaubatz as he acquired the proper video equipment and

---

Grant Agreement between Publius Publications, LLC and the Society of Americans for National Security, Inc. 3-11; Ex. 28, Agreement between Paul David Gaubatz and the Society of Americans for National Existence, Inc. 1-11 (September 3, 2004); Ex. 30, Email from David Yerushalmi, Society of Americans for National Existence, to Christine Brim, Center for Security Policy (June 17, 2008) (on file with CSP Production, 985); Ex. 30, Email from Christine Brim, Senior Vice President for Policy and Program Management, Center for Security Policy, to Frank Gaffney, Center for Security Policy, David Yerushalmi, and Paul David Gaubatz (April 20, 2008) (on file with CSP Production, 987); Ex. 7, Gaffney Dep. 108:6-9.

reviewing video for quality control purposes. To accomplish this task, Publius Productions hired

Paul DonVito to work on the documentary and provide assistance to David Gaubatz to acquire

the camera that would be used to make the recordings. (Pl.'s Mot., Ex. 6, DonVito Dep. 83:19-

23, 163:23-164:5.)  DonVito then trained Chris Gaubatz to use the video camera, and Chris

Gaubatz trained the other "researchers" to obtain footage from CAIR's office.  (Pl.'s Mot., Ex. 6,

DonVito Dep. 40:9-11; Ex. 5, Paul David Gaubatz Dep. 118:1-8.) Defendants Yerushalmi and

CSP assisted Defendant Gaubatz in assembling a "team to conduct video and audio recording

inside CAIR national."  (Pl.'s Mot., Ex. 5, Paul David Gaubatz Dep. 79:18-21 (January 14,

2013).)  Considered separately or together, these facts indicate Defendants' intimate and detailed

knowledge of the factual circumstances surrounding the violation of the statute.

Third, because Defendants knew that the recordings were being intercepted with tortious

purpose of breaching Chris Gaubatz's fiduciary duty to CAIR, Defendants had knowledge of the

unlawful nature of the Gaubatz Defendants' actions.   For the reasons set forth in Argument

Section I.B *supra*, Defendants were aware of Chris Gaubatz's fiduciary duties to CAIR and that

making and disseminating the recordings would breach them. Defendants understood that David

Gaubatz would be sending infiltrators to trespass on CAIR premises to make recordings for

purposes of disseminating them in violation of a duty Defendant Chris Gaubatz owed to CAIR.

Indeed, Defendants believed that Chris Gaubatz would not have been privy to any

communication or granted access into CAIR's office had he been forthcoming about his true

identity.  (Pl.'s Mot., Ex. 9, Yerushalmi Dep. 68:21-70:24.)[3] Further, all Defendants also knew

---

[3] The record is also clear that Chris Gaubatz only obtained access to the CAIR facilities after providing CAIR with a
copy of a resume containing false information, identified himself as Muslim when he did not see himself as Muslim,
and used a false name. (Pl.'s Mot., Ex. 3, Chris Gaubatz Dep. 25:5-20 (January 10, 2013); Pl.'s Mot., Ex. 11, Email
from Chris Gaubatz to Nadhira Al-Khalili, Legal Counsel, Council on American Islamic Relations (June 3, 2008)
(on file with Chris Gaubatz Production, 171-75); Id. at 203:4-17.)

that Chris Gaubatz would be wearing an inconspicuous recording device to make the recordings. (Pl.'s Mot., Ex. 9, Yerushalmi Dep. 158:8-161:11; Ex. 2, Brim Dep. 89:8-11.)

Defendants seemed unconcerned about the legality of their actions prior to the litigation. Defendant Yerushalmi even advised David Gaubatz that the secret recordings would be legal. (Pl.'s Mot., Ex. 5, Paul David Gaubatz Dep. 99:11-20.) Defendant Yerushalmi also spoke with an agent of CSP about the legality of using "researchers" to make the covert recordings. (Pl.'s Mot., Ex. 9, Yerushalmi Dep. 75:20-78:24.) It is because Defendants had notice that the Gaubatz Defendants were creating and disseminating recordings of oral communications that Defendants are directly liable under the Act. Because Defendants instructed David Gaubatz to have his researchers to actively conceal his identity and lie to gain the trust of CAIR to obtain the recordings, Defendants knew that Chris Gaubatz would be breaching a duty of loyalty owed to his employer, CAIR. As such, they are directly liable for violation of the Wiretap Acts.

Fourth, with respect to the D.C. Wiretap Act, Defendants CSP, SANE, and Yerushalmi are directly liable for knowingly acting to procure the Gaubatz Defendants to use, intercept, and disclose oral communications. The District of Columbia Wiretap Act expressly creates a cause of action against a person who "procures any other person to intercept, disclose, or use [wire or oral] communications." D.C. Code § 23-554(a)(1). Defendants altogether ignore this provision in their response and instead claim ignorance of any wrongdoing, which as discussed above is simply false. In addition to being aware of the factual circumstances surrounding the Gaubatz's violation Wiretap Act, Defendants actually induced the violations when they contracted with Gaubatz to clandestinely record discussions at CAIR with the purpose of disseminating them in a documentary. Because the evidence clearly indicates that Defendants CSP, SANE, and

Yerushalmi induced the Gaubatz Defendant's violation, a finding of their direct liability under the D.C. Wiretap Act is appropriate.

Therefore, Defendants have failed to show that no juror could find any of them primarily liable for either Federal and D.C. Wiretap Act violations.  Summary judgment for Defendants on the wiretap claims should be denied.

D. CSP and SANE Defendants are liable for Gaubatz's Violations of the Wiretap Act because David Gaubatz was their agent.

The evidence in the record also supports a finding of liability against CSP and SANE Defendants because Dave Gaubatz was their agent. CSP and SANE Defendants authorized, induced, planned for, and participated in the Gaubatz Defendants' violations, and they are vicariously liable for violation of the Wiretap Acts.

The record is clear that David Gaubatz was an agent of Defendants CSP, SANE, and Yerushalmi, his principals. The existence of an agency relationship is determined by common law agency principles. *NLRB v. Downtown BID Servs. Corp.*, 682 F.3d 109, 113 (D.C. Cir. 2012). Whether an agency relationship is present depends on the facts of a particular case. *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000). However, there are certain factors considered in the creation of an agency relationship, which include, but are not limited to, the (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer. *Id.* at 1040 (quoting *LeGrand v. Insurance Co. of North America*, 241 A.2d 734, 735 (D.C. 1968)). Of the above factors, "the determinative one" is usually an employer's right to

control and direct the servant in the servant's performance of the work and the manner in which the work is done. *Id.*

The record establishes that Defendants CSP, SANE, and Yerushalmi had the right to control and exercised control over the Gaubatz Defendants' infiltration and clandestine recording of the CAIR offices. When a principal "'has the right to control and direct the servant,' an agency relationship will generally be found." *Amtrak v. Veolia Transp. Servs.* 791 F. Supp. 2d 33, 46 (D.D.C. 2011) (quoting *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000)). Courts deciding the agency question look to the terms of a contract and the course of dealing between the parties. *Id.* However, it is the parties' actual relationship that may be the conclusive factor. *Giles v. Shell Oil Corp.,* 487 A.2d 610, 613 (D.C. 1985). In this case, Defendants CSP, SANE, and Yerushalmi exercised a great deal of control over the Gaubatz Defendants. They were actively involved in Defendant David Gaubatz's planned infiltration and recording of CAIR. Defendant Yerushalmi, with a CSP agent, defined the scope of David Gaubatz's responsibilities in obtaining the video recordings. (Pl.'s Mot., Ex. 5, Paul David Gaubatz Dep. 72:17-73:15, 77:24-78:3, 79:18-21.) Defendants Yerushalmi and SANE advised David Gaubatz on infiltrating Plaintiff's offices, including telling him that Chris Gaubatz should use a false name during his internship and informing him that making the recordings would be legal. (Pl.'s Mot., Ex. 9, Yerushalmi Dep. 68:21-70:24; Pl.'s Mot., Ex. 5, Paul David Gaubatz Dep. 99:11-20.)

Defendant CSP also exercised independent control of Defendant David Gaubatz in his violations. In addition to contracting for his services to infiltrate CAIR, CSP defined the scope of Gaubatz's role in the film project, paying him specifically to produce B-Roll from inside of Plaintiff's offices. (Pl.'s Mot., Ex. 7, Gaffney Dep. 110:15-21, 164:18-22.) CSP's President discussed with Gaubatz the specifics of how he was to infiltrate CAIR. (Pl.'s Mot., Ex. 7,

Gaffney Dep. 110:15-21; 117:6-9.) CSP also went so far as to appoint Christine Brim to become CSP's liaison with Gaubatz and Manifold productions. (Pl.'s Mot., Ex. 7, Gaffney Dep. at 169:17-24.)

Defendants misuse case law regarding independent contractors by stating that David Gaubatz was an "arms-length" independent contractor, as opposed to an agent. (Defs.' Mot. 27.) However, the single case Defendants site to support this contention, *Hickey v. Bomers*, only serves to delineate the differences between an employee and an independent contractor and makes no distinction between agents and independent contractors. *Hickey v. Bomers*, 28 A.3d 1119, 1125 (D.C. 2011). Indeed a principal can still be held liable for torts committed by an independent contractor for directing the contractor to perform a tortious act. *Azzam v. Rightway Dev. Inc.*, 789 F. Supp. 2d 110, 116 (D.D.C. 2011). Therefore, a finding that David Gaubatz was an independent contractor is not dispositive of the existence of an agency relationship. Because they exercised control over David Gaubatz, engaged him on a regular basis through his updates, paid him for his work, and had the right to discharge him, David Gaubatz was clearly an agent of Defendants CSP, SANE, and Yerushalmi. *Reiner*, 744 A.2d at 1040.

E. Defendants are vicariously liable for violating the Wiretap Acts because they aided and abetted the Gaubatz Defendants in committing the wrong.

Defendants misinterpret the case law on aiding and abetting and conflate the independent tort of aiding and abetting with Plaintiffs' separate causes of action. Plaintiffs are not seeking direct liability under the independent tort of aiding and abetting against Defendants. (*See* Third Am. Compl. ¶¶1-9.) Rather, Plaintiffs are demonstrating Defendants' liability through their

aiding and abetting the commission of the torts at hand. Though the independent tort of aiding and abetting has not been recognized in this circuit, aiding and abetting is still used means of establishing vicarious liability. *Carroll v. Freemont Inv. & Loan*, 636 F. Supp. 2d 41, 53 (D.D.C. 2009). To determine whether a Defendant aided and abetted the commission of a tort, thus making that Defendant vicariously liable, three elements must be present: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C. Cir. 1983).

As discussed in Argument Sections II.C & D *supra*, Defendants CSP, SANE, and Yerushalmi aided the Gaubatz Defendants in their violation of the Wiretap Acts by providing them with money to carry out their infiltration, audio-video equipment, instruction on how to use the equipment, a plan and requirements for their recordings, and review of the recordings they made. Together, all of these things surpass this District's threshold for "assistance" in the tortious activity. Further, the record is also clear that Defendants knowingly assisted in the principal violation as they also disseminated videos to a third party, Joseph Farah. (Pl.'s Mot., Ex. 2, Brim Dep. 216:9-12.)  Given these facts, there is a genuine dispute as to whether Defendants aided and abetted the Wiretap Act violations.


III.    Defendants have failed to show that the Stored Communications Act Claims should be dismissed.

Under the Stored Communications Act ("SCA"), a defendant is liable if he "intentionally exceeds an authorization to access that facility and thereby obtains" access. 18 U.S.C. §§

2701(a), 2707(a).  Defendant's argument for summary judgment on the SCA counts misses two key points: 1) that interns like Chris Gaubatz only had limited authority to access the certain areas of the shared drive, and 2) that Chris Gaubatz exceeded his authorization to access the shared drive by removing and disseminating from it electronic documents to third parties.

In Chris Gaubatz's own words, he was given access to shared drive folders only for his department, the Outreach Department.  (Ex. 48, Chris Gaubatz Dep. 185:3 – 187:4 (discussing his access to Community Outreach shared drive).  Chris Gaubatz also gave electronic access to third parties of documents that appear to be from the shared drive but not from the community outreach portion.  (*Id.* 187:21-192:4.)   Chris Gaubatz also stored documents on the shared drive in his email with no apparent internship-related reason for doing so. (Ex. 51, Emails from davidmarshall1215@gmail.com to davidmarshall1215@yahoo.com, Contact Lists, (July 8, 2008) (on file in Chris Gabuatz document production as Bates Nos. 625-627).) Therefore, there is ample evidence that Chris Gaubatz exceeded his authorization to access the shared drive, and the Stored Communications Act claims should not be dismissed.


IV.    Defendants have failed to show that the D.C. Uniform Trade Secrets Act claims
        should be dismissed or that the Act preempts the rest of Plaintiffs' claims.

Defendants make two arguments concerning Plaintiff's Uniform Trade Secrets Act claims.  First, they seek dismissal of the claims by again ignoring the evidentiary record.  Second, Defendants argue that the Act preempts Plaintiff's common law claims.  Both arguments are off the mark.

"To establish a trade secret misappropriation claim, [a plaintiff] must demonstrate (1) the existence of a trade secret; and (2) acquisition of the trade secret by improper means, or improper

use or disclosure by one under a duty not to disclose." *DSMC, Inc. v. Convera Corp.*, 479 F.

Supp. 2d 68, 77 (D.D.C. 2007) (citing D.C. Code § 36-401).  For a piece of information to

qualify as a protected trade secret, "(a) the information must be secret; (b) "its value must derive

from the secrecy; and (c) the owner . . . must use reasonable efforts to safeguard the

confidentiality of the information."  *Catalyst & Chem. Servs. v. Global Ground Support*, 350 F.

Supp. 2d 1, 8 (D.D.C. 2004) (internal quotation marks omitted).[4]

      First, Defendants try to argue that there are no protected trade secrets at issue in the

litigation.  But Plaintiffs have adequately shown that the information taken from their premises

by Chris Gaubatz has independent economic value deriving from its secrecy and that Plaintiffs

used reasonable efforts to safeguard the confidentiality of that information.  *Catalyst & Chem.*

*Servs. v. Global Ground Support*, 350 F. Supp. 2d 1, 9-10 (D.D.C. 2004).  Chris Gaubatz

recorded and disseminated video of CAIR staff talking about outreach strategy and techniques,

(Pl.'s Mot., Ex. 1, June 16, 2008 at 9:10, 25:00, 2:38:59; July 7, 2008 at 3:35; July 9 pt 2 at

42:20), internal communications strategy, (*id.* at 2:42:30), such as the mosque survey research

project, (Pl.'s Mot., Ex. 1, June 23, at 2:25:00; July 14 at 35:00; July 15, 2008 pt 2 at 1:00:26),

grant writing strategies, (Pl.'s Mot., Ex. 1, April2008chris at 1;14:00), internal research about

anti-Muslim activity, (Pl.'s Mot., Ex. 1, Chris 10apr08 at 1:29:00), internal legislative advocacy

strategy, (Pl.'s Mot., Ex. 1, June 24 pt 2 at 2:30:00, July 24, 2008 p3 at 3:21, 21:00).  This is all

information providing CAIR with a competitive advantage; it improves CAIR's effectiveness as

a civil rights advocacy organization if it remains secret.  Disclosure of this information would

allow competing organizations to poach Plaintiffs' strategies and for people and organizations,

like Defendants, who make it their mission to reduce CAIR's effectiveness to sabotage those

strategies.  And Plaintiffs only give this trade secret information to employees and interns, (*see*

---

[4] Defendants subtly misstate this legal test.  (Def.'s Mot. 35-36 (citing *Catalyst & Chem Servs*).)

*generally* Pls.' Mot. Ex. 1), and they also protect this information by maintaining security procedures for entering their premises, (Pl.'s Mot., Ex. 37, 8:7-14, Transcript of Chris Gaubatz Phone Call; Pls.' Mot., Ex. 1, June 16, 2008 at 00:03:58-00:04:20).  Defendants simply ignore the weight of this evidence, and have thus failed to show that they should win summary judgment on these counts.

Second, Defendants' argument that the statutory trade secrets claims preempt the rest of Plaintiffs' claims ignores the plain text of the statute and misapprehends the concept of preemption.  Defendants cite D.C. Code § 36-407 but leave out the entire section, which reads:

> (a) Except as provided in subsection (b) of this section, this chapter supersedes conflicting tort, restitution and other law of the District of Columbia providing civil remedies for misappropriation of a trade secret.

> (b) This chapter does not affect:   (1) Contractual remedies, whether or not based upon misappropriation of a trade secret; (2) Other civil remedies that are not based upon misappropriation of a trade secret. . . .

*Id.*  The text of the statute alone indicates that Plaintiffs' intentional interference with contract claims and claims that are not based upon trade secret misappropriation—including claims about covert audio-video recordings and theft of non-trade secret confidential and sensitive documents—are not preempted by statutory trade secret misappropriation claims.

Defendants assert that Plaintiffs are only bringing a set of claims targeting misappropriation of trade secrets, (Def.'s Mot. 36-37), but this is clearly not the case.  Defendants cite *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 83-84 (D.D.C. 2007), and a comparison with this case demonstrates why preemption is inappropriate here.  In *DSMC, Inc.*, a common law claim was preempted because, quoting the complaint in that matter, it was based on

provision of "access to the trade secrets and labor of [plaintiff], so that [defendant] could and did wrongfully engineer, misappropriate, copy, prepare derivatives from and circumvent [plaintiff]'s right in its trade secrets and MAS software, and wrongfully avail itself to [plaintiff's] labors." *Id.* at 83 (quoting complaint) (internal quotation marks omitted).  In *DSMC*, the preempted claims were coterminous with any Uniform Trade Secrets Act claims.  Here, Plaintiffs bring conversion claims for unauthorized removal of documents from the premises, including non-trade secret documents, (Third Am. Compl. ¶¶96-100), breach of fiduciary duty for stealing documents, making covert records, and dissemination of that material, (*id.* ¶¶101-109), breach of contract and tortious interference with contract, and trespassing onto Plaintiffs' premises (*id.* ¶¶ 127-136), unjust enrichment based on all of the recordings and stolen documents, (*id.* ¶¶137-141), and fraud.  For these reasons, the statutory trade secret misappropriation claims do not preempt Plaintiffs' common law claims.

V.    Defendants have failed to show that Plaintiffs cannot prove compensable damages on the common law claims at trial.

Defendants make three sets of arguments in attempting to demonstrate that Plaintiffs cannot prove compensable damages for their common law claims.  All of these arguments ignore the record and miss the mark. In addition, Defendants simply ignore Plaintiffs' request for restitution based on Defendants' unjust enrichment.

A.    The record shows Plaintiffs suffered non-speculative past and present damages, including for conversion.

Defendants present an array of brief arguments claiming that Plaintiffs' damages are all speculative which all misunderstand the nature of Plaintiffs' damages and the standard for acceptable valuation of damages.

First, they attempt to characterize the harms to Plaintiffs as all happening in the future, when the bulk of the harms are actually past and present ones. To the extent that Defendants stole documents that were the product of CAIR staff time that had labor value, the damage was done to CAIR at the time the documents were taken from them. In addition, in order to locate the source of the leaks of CAIR documents, and in order to regain possession and control of the covert recordings and documents, Plaintiffs expended significant staff time and legal fees up to and including the costs of gaining an injunction ordering Defendants to give Plaintiffs that material. *See* Argument Section V.B *infra*.

Defendants also argue very briefly that there is no proximate cause for damages. (Def.'s Mot. 37-38.) However, (1) Defendants taking documents from CAIR proximately caused the harm of the loss of those documents, and (2) Defendants taking videos and documents was a proximate cause of Plaintiffs' reasonable efforts to gain control of those items, which incurred staff and legal costs.

Next, Defendants also characterized the value of the stolen documents as speculative for the conversion claims in particular. But conversion damages can be calculated in different ways, including but not limited to fair market value. "'Fair market value cannot be determined or would be inadequate, as when, for example, the article destroyed was unique or possessed qualities the special nature of which could only be appreciated by the owner.'" *Withers v. Wilson*, 989 A.2d 1117, 1120 (D.C. 2010) (quoting *Trustees of the University of the Dist. of Columbia v. Vossoughi*, 963 A.2d 1162, 1175 (D.C. 2009). "Nonetheless, 'personal property is

not valueless because its value may be difficult to establish or proof of the exact amount of loss is unavailable.'" *Id.* at 1174 (quoting *Hartford Accident & Indem. Co. v. Dikomey Mfg. Jewelers, Inc.*, 409 A.2d 1076, 1082 (D.C. 1979)). "Thus, while an award of damages 'may not be based on speculation or guesswork, it may be a just and reasonable estimate based on relevant data. Probable and inferential considerations as well as direct and positive proof may provide the basis for an award.'" *Vossoughi*, 963 A.2d at 1175 (quoting *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 549 (D.C. 1981)). "[N]o single fixed rule for recovery of damages for injury to personal property will invariably make an injured party whole; rather, the measure of damages depends upon the facts of the particular case." *Am. Serv. Ctr. Assocs. v. Helton*, 867 A.2d 235, 242 (D.C. 2005).

This is an instance in which fair market value is inadequate. Much of the documents that were stolen were one-of-a-kind, including confidential client files, strategy plans and reports. (Ex. 52, Plaintiffs' Third Supplementary Response to Interrogatories 4-5.) This is akin to the "course materials, research and fabricated instruments" that warranted less traditional market valuation, as in *Vossoughi*. *Vossoughi*, 963 A.2d at 1174. And one value of a commodity, as with the stolen documents, is the value of labor used to create it. Finally, Defendants also ignore the fact that conversion claims may proceed with only nominal damages. *Pearson v. Dodd*, 410 F.2d 701, 707 (D.C. Cir. 1969).

For all of these reasons, Defendants have failed to show that Plaintiff's damages are too speculative for the claims to proceed.

B. A jury could make awards of the damages enumerated by Plaintiffs based on their reasonable bases for making calculations.

Defendants also argue that Plaintiffs' "specific damages" claims fail based on some of Plaintiff's interrogatory answers. Defendants' arguments with respect to "specific damages" have two material flaws. First, Defendants attempt to criticize Plaintiffs for categorizing their damages as having commercial, intrinsic, confidential, and investment value, though these are the categories created by Defendants in their interrogatory requests to Plaintiffs. (Ex. 53, CSP Defendants' First Set of Interrogs., ¶¶5-8.)    In responding to the interrogatories, Plaintiffs accounted for their damages by evaluating how Defendants themselves defined these categories, because Defendants never did so. (*Id.*) In their motion, Defendants then assign definitions of their own to these categories, and criticize Plaintiffs' enumerations of damages under these categories.

In a more fundamental flaw, Defendants also neglect the fact that plaintiffs are not required to prove exact damages. "'An injured party will not be precluded from recovering damages because he cannot prove his exact damages so long as there is a reasonable basis for approximation.'" *Vossoughi*, 963 A.2d at 1174 (quoting *Bowler v. Joyner*, 562 A.2d 1210, 1214 (D.C. 1989)). Damages calculations do not require "mathematical precision" but only "a fair degree of probability." *Vossoughi*, 963 A.2d at 1174-1175 (quoting *Hartford Accident & Indem. Co. v. Dikomey Mfg. Jewelers, Inc.*, 409 A.2d 1076, 1082 (D.C. 1979)). For claims of loss of property where fair market value cannot be determined or the property was unique, courts often allow a damages calculation based on the value of the items to the owner. *E.g.*, *Vossoughi*, 963 A.2d at 1175; *United States v. Maryland*, 322 F.2d 1009, 1016 (1963); *see also* Restatement (Second) Torts § 911 (1) (citing examples, including personal manuscripts, that may be valued by value to owner). Ultimately, it is for the jury to consider the evidence supporting damages and whether to credit it. "[D]efinitive and precise proof of damages is rarely possible and not

required. Rough justice in the ascertainment of damages is often the most that can be achieved, and it is better than nothing. The evidence need only furnish a reasonable basis for approximation." *Vossoughi*, 963 A.2d at 1177-1178. This is a "lenient test." *Id.*

Going through all of these "specific damages" categories in light of the two flaws Defendants made in analyzing them, it is clear that Defendants have failed to demonstrate that a jury could not award Plaintiffs any of these damages.  First, as to commercial value, Plaintiffs approximated a floor for the market value in its interrogatories.  Market value depends on a buyer's willingness to pay for goods.  Here, there was no open market for the documents – they were stolen.  Therefore, Plaintiffs' reasonably approximated a buyer's willingness to pay for them based on the amount it spent to acquire them. *Vossoughi*, 963 A.2d at 1177-1178; *see also id.* at 1175 ("the courts quite reasonably have been very liberal in permitting the jury to award damages where the uncertainty as to their extent arises from the nature of the wrong itself, for which the defendant, and not the plaintiff, is responsible" (quoting *Hawthorne v. Canavan*, 756 A.2d 397, 401 (D.C. 2000)) (other internal citations omitted) (quotation marks omitted)). And here, that reasonable approximation is based in part on the amount of money that CSP paid to Dave Gaubatz to facilitate the infiltration of CAIR.  (Pl.'s Mot., Ex. 4, CSP Dep. 68:7-17.) Defendants' claim that Defendant CSP did not attempt to obtain the stolen documents through the Gaubatzes is also false, (Defs.' Mot. 40), as shown by the Gaubatz Defendants sharing of those documents with CSP, (Ex. 48, Chris Gaubatz Dep. 73:2-5, Ex. 54, Paul David Gaubatz Dep. 161:6-12; Ex. 49, Brim Dep. 142:19-22, 150:13-19, 152:4-13).

Second, Defendants also try to pigeonhole Plaintiffs' claims under the "intrinsic damages" by arguing that they are simply impermissible attorney's fee requests.  The labeling of the damages here is not binding and beside the point, as noted above.  A part of Plaintiffs'

damages includes the costs Plaintiffs expended to regain control of the material stolen from their

offices, and this was noted in Plaintiffs' interrogatory responses.  (Ex. 52, Plaintiffs' Third

Supplementary Response to Interrogatories 4.)  But Defendants do not understand the distinction

between attorney's fees requests and fees to regain and maintain control over confidential CAIR

information.  (Defs.' Mot. 40-41.) These damages encompass legal fees to the extent that they

were expended to regain and maintain control over that information.  And Plaintiffs have

included reasonable estimates of the staff time and legal fees expended in order to regain control

of their property, (Ex. 52, Plaintiffs' Third Supplementary Response to Interrogatories 4), thus

satisfying *Vossoughi*.

Third, as to the confidential / trade secret information and investment value, Plaintiffs

have explained in Argument Section IV *supra* how ample evidence shows trade secret damages.

But in addition, the deposition testimony of Plaintiffs shows that it was an educated estimate as

to the confidential and investment value of this information.  (Ex. 55, Deposition of Corey

Saylor, at 158:1-19, 173:6-18, 177:24-178:19 (January 8, 2013); ex. 59, Deposition of Nihad

Awad, at 120:20-121:5; ex. 52, Plaintiffs' Third Supplementary Response to Interrogatories 4-5.)

Again, Plaintiffs are only required to have a "reasonable basis for approximation,'" *Vossoughi*,

963 A.2d at 1174 (quoting *Bowler v. Joyner*, 562 A.2d 1210, 1214 (D.C. 1989)).  And because

fair market value cannot be determined and the documents were unique, a damages calculation

based on the value of the items to Plaintiffs, as reasonably approximated, is permissible.  *See*

*e.g.*, *Vossoughi*, 963 A.2d at 1175; *United States v. Maryland*, 322 F.2d 1009, 1016 (1963);

Restatement (Second) Torts § 911 (1).  For these reasons, Defendants have failed to demonstrate

that the evidence supporting damages does not meet the "lenient" standard required to reach a

jury, *Vossoughi*, 963 A.2d at 1177-1178, and their arguments for summary judgment on this basis fail.

    C.   Defendants gloss over the fact that all of these damages can be claimed by Plaintiffs on an unjust enrichment theory.

Finally, all of Defendants' arguments about damages also neglect the fact that Plaintiffs can seek recovery on their common law claims based on Defendants' unjust enrichment. *Bangor & A. R. Co. v. Brotherhood of Locomotive Firemen & Enginemen*, 442 F.2d 812, 821 (D.C. Cir. 1971). Where a defendant has engaged in "consciously tortious conduct," the court can award the plaintiff restitution based on unjust enrichment. *Id.* (quoting Restatement, Restitution (Quasi Contracts and Constructive Trusts) § 151). Even if Defendants' arguments about damages had merit, they are not entitled to summary judgment because Plaintiffs can also seek restitution for the common law claims.

    VI.   Because Plaintiffs Maintain Contractual and Fiduciary Privity with Chris Gaubatz, Their Claims Subsist

Defendants misrepresent both Plaintiffs' discovery responses and the Third Amended Complaint to argue that Plaintiffs lack privity to sustain their claims against them. A review of Plaintiffs' Third Amended Complaint and discovery responses, however, establishes Plaintiff CAIR-Foundation's fiduciary and contractual privity to maintain its common law claims against Defendants.

First, beginning with the Third Amended Complaint, Plaintiffs have made clear their claims were based upon, in part, a fiduciary duty that Chris Gaubatz owed CAIR Foundation. In no less than 8 separate paragraphs, Plaintiffs allege that there was a fiduciary duty between CAIR-Foundation and Chris Gaubatz, stating for example, that "Chris Gaubatz sought and obtained the confidence and trust of CAIR-Foundation" and that "CAIR-Foundation…suffered and continue[s] to suffer as a result of Defendant Chris Gaubatz's breach of his fiduciary duties." (Third Am. Compl. ¶¶103, 108; *see id.* ¶52 ("Chris Gaubatz conducted these recordings for the purpose of committing criminal and/or tortious acts, including…breaching his fiduciary duties to Plaintiffs"), ¶104 ("Chris Gaubatz breached his fiduciary duties to both CAIR and CAIR Foundation"); *see also* ¶¶105-109.) Indeed, this Court also noted that CAIR Foundation was alleging a breach of fiduciary duty claim as a part of Plaintiffs' claims as early as the Second Amended Complaint that sought to add CAIR-Foundation as a part, noting that "CAIR-AN and CAIR-F intend to pursue virtually identical legal claims in connection with these alleged events." *Council on American-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 323 (D.D.C. 2011).

Similarly, the Third Amended Complaint also alleges facts that provide the basis for contract privity with Defendant Chris Gaubatz and CAIR Foundation. In three paragraphs, Plaintiffs make clear that the contractual relations they allege were between "Defendant Chris Gaubatz and Plaintiffs." (Third Am. Compl. ¶¶118; *see also id.* at 122 (a valid contractual relationship existed between Plaintiffs and Defendant Chris Gaubatz), *id.* at ¶123 (Defendants "were aware of the relationship that existed between Plaintiffs and Defendant Chris Gaubatz").)

Second, Plaintiffs' answers to discovery requests, from the very beginning and as early as December 14, 2011, supply the factual basis for CAIR-Foundation's fiduciary privity to Chris

Gaubatz.  In their Answers to Defendant CSP's First Set of Interrogatories, Plaintiffs made clear

that "volunteers volunteered for CAIR-Foundation."  (Ex. 56, First Response to First Interoggs.

4.)  Plaintiffs also indicated that Raabia Wazir, the employee that Defendants concede supervised

Chris Gaubatz, was "paid by CAIR-Foundation."  (*Id.*)  While these answers do differ from some

of the allegations in the complaint, those differences are simply a product of Plaintiffs' clarifying

internally, when asked by Defendants, that no employees were paid by CAIR-AN during Chris

Gaubatz's internship, and thus as a result, the fiduciary privity was between Chris Gaubatz and

CAIR-Foundation.

Likewise, as early as December 14, 2011, shortly after discovery started, Plaintiffs'

response to discovery requests set out the basis for contractual privity, by making clear that

"Raabia Wazir hired Chris Gaubatz to work as an intern on behalf of CAIR-Foundation."  *Id.* at

13.  And while Plaintiffs' answers state in colloquial, non-technical language that "CAIR is an

entity comprised of two different corporations," Plaintiffs resolved this ambiguity through its

supplemental answers as well as a stipulation that addressed it specifically.  (Def.'s Mot. 44.).

Indeed, when Defendants deposed Plaintiffs, the relationship between Plaintiff CAIR-F as a

licensee and CAIR-AN as a licensee was clear: CAIR-AN allows CAIR-F to utilize its marks,

including "CAIR" and "Council on American-Islamic Relations."  (Ex. 55, Saylor Dep., 45:18 -

46:12 and 66:3-67:4.)

Indeed, because Plaintiffs' answers to the December 14, 2011 requests referred to both

CAIR-AN and CAIR-F as "CAIR," there was some ambiguity that Defendants sought to clarify.

(*Id.* at 1.)  Based on this ambiguity, Plaintiffs supplemented their interrogatory answers on May

10, 2012. In this supplement, Plaintiffs made clear that, during all times relevant to the litigation,

references to "'CAIR' employees" meant persons who "worked for CAIR-Foundation and were

43

paid by CAIR-Foundation." (Ex. 57, Pls.' Supp. Answer to CSP's First Set of Interrogs. 6.) The supplement reiterated that "volunteers volunteered for CAIR-Foundation and identified all interns that worked alongside Chris Gaubatz as "persons [who] were interns for CAIR-Foundation." (*Id.*) This factual basis is more than sufficient to demonstrate fiduciary privity between CAIR-F and Chris Gaubatz.

From Defendants' perspective, this second supplement, however, did not resolve the ambiguity and Defendants served on Plaintiffs CSP's Second Request for the Production of Documents. This request sought, among other things, "any and all documents evidencing the existence of [CAIR] as a distinct legal entity from CAIR-F and CAIR-AN." (Ex. 58, CSP Def. Second Request for Production 4.) When the parties discussed outstanding discovery issues, it became clear to Plaintiffs that Defendants were misunderstanding their previous responses, and so, in an effort to clear up this misunderstanding, Plaintiffs stipulated that there was no non-party entity that Plaintiffs were arguing had claims in this litigation. (*See* Defs.' Mot. 44.)

In sum, Plaintiffs are not now contradicting its prior interrogatory answers. Rather, as Plaintiffs conducted their discovery in response to Defendants' requests, Plaintiffs supplemented its answers to reflect what it knew about the corporate arrangements between and within both CAIR-AN and CAIR-F. And those facts, which are undisputed, indicate that all employees at Plaintiffs' office were employees of CAIR-Foundation. Because of this, Plaintiffs have established facts that provide a basis of fiduciary and contractual privity. Defendants' arguments to the contrary are simply misguided.[5]

---

[5] In a footnote, Defendants allege that CAIR-AN's "corporate status was revoked…and has never been reinstated." (Defs.' Mot. 44 n.2.) This, however, is not true. CAIR-AN's corporate status is subsisting. *See* Ex. 64, DCRA Record, *available at* https://corp.dcra.dc.gov/BizEntity.aspx/ViewEntityData?entityId=2834404.

**CONCLUSION**

For the above reasons, Defendants' Motion for Summary Judgment should be denied.


Dated this 17th day of June 2013.

                                              Respectfully submitted,

                                              _____/s/   Nadhira Al-Khalili_____
                                              Nadhira Al-Khalili (Bar No. 997827)
                                              Council on American-Islamic Relations
                                              453 New Jersey Avenue, S.E.
                                              Washington, D.C. 20003
                                              (202) 646-6034 (Phone)
                                              (202) 488-3305 (Fax)
                                              nalkhalili@cair.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of June, 2013, true and correct copies of the foregoing were served via ECF upon all counsel of record.

/s/   Nadhira Al-Khalili
Nadhira Al-Khalili (Bar No. 997827)
Council on American-Islamic Relations
453 New Jersey Avenue, S.E.
Washington, D.C. 20003
(202) 646-6034 (Phone)
(202) 488-3305 (Fax)
nalkhalili@cair.com