# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS ACTION NETWORK, INC., *et al.*,

   Plaintiffs,

  v.

PAUL DAVID GAUBATZ, *et al.*,

   Defendants.

Civil Action No. 09-02030 (CKK)

## MEMORANDUM OPINION
(March 27, 2014)

   Plaintiffs Council on American-Islamic Relations Action Network, Inc. ("CAIR-AN") and CAIR-Foundation, Inc. ("CAIR-F") bring this action against Chris Gaubatz, his father Paul David Gaubatz ("David Gaubatz"), the Center for Security Policy, Inc. ("CSP") and three of its employees, Christine Brim, Adam Savit, and Sarah Pavlis, the Society of Americans for National Existence ("SANE"), and David Yerushalmi. Plaintiffs allege that Defendants conceived and carried out a scheme to place Chris Gaubatz in an internship with Plaintiffs under an assumed identity, which allowed him to remove and copy thousands of Plaintiffs' internal documents and to record private conversations involving Plaintiffs' employees without consent or authorization. In this action, Plaintiffs seek relief under the Federal Wiretap Act, 18 U.S.C. §§ 2510-2522, the District of Columbia analog (the "D.C. Wiretap Act"), D.C. CODE §§ 23-541-23-556, the Stored Communications Act, 18 U.S.C. §§ 2701-2712, and the common law of the District of

Columbia.[1]  Presently before the Court are Defendants' [154] Motion for Summary Judgment and Plaintiff CAIR-F's [156] Motion for Partial Summary Judgment.  Upon consideration of the parties' submissions,[2] the applicable authorities, and the entire record, the Court shall DENY Plaintiff CAIR-F's [156] Motion for Partial Summary Judgment, and GRANT IN PART and DENY IN PART Defendants' [154] Motion for Summary Judgment.  With respect to Plaintiffs' Wiretap Act claims (Count I), the Defendants' motion is GRANTED as to: (1) claims by Plaintiff CAIR-AN; (2) Plaintiff CAIR-F's claims for use and disclosure liability against Defendants Savit, Pavlis, SANE, and Yerushalmi; (3) Plaintiff CAIR-F's claims for procurement liability against Defendants Savit and Pavlis; (4) Plaintiff CAIR-F's claims for conspiring and aiding and abetting liability against all Defendants; and (5) Plaintiff CAIR-F's *respondeat superior* claims against Defendants Savit, Pavlis, and SANE.  With respect to Count I, Defendants' motion is DENIED as to: (1) Plaintiff CAIR-F's claims against Chris Gaubatz; (2) Plaintiff CAIR-F's claims for use and disclosure liability against Defendants David Gaubatz,

---

[1] The Federal Wiretap Act and the Stored Communications Act are commonly used alternate names for Titles I and II of the Electronic Communications Privacy Act of 1986 (the "ECPA"), 18 U.S.C. §§ 2510-2712.  *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 891 F.Supp.2d 13, 16 n. 1 (D.D.C. 2012).

[2] While the Court renders its decision on the record as a whole, its consideration has focused on the following documents: Third Amended Complaint, ECF No. [126] ("TAC"); Defs.' Mot. for Summ. J and Stmt. of Undisp. Material Facts, ECF No. [154] ("Defs.' Facts"); Defs.' Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J., ECF No. [154-64] ("Defs.' MSJ"); Pl. CAIR Foundation's Stmt. of Undis. Material Facts, ECF No. [156] ("Pls.' Facts"); Pl.'s Mem. of Law in Supp. of its Mot. for Partial Summ. J., ECF No. [157] ("Pls.' MSJ"); Defs.' Mem. of P. & A. in Opp'n to Pl. CAIR-Foundation, Inc.'s Mot. for Partial Summ. J., ECF No. [163] ("Defs.' Opp'n"); Defs.' Separate Stmt. of Disp. Facts and Undisp. Facts, ECF No. [163-1] ("Defs.' Resp. Stmt."); Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J., ECF No. [164] ("Pls.' Opp'n"); Pls.' Resp. to Defs.' Stmt. of Facts, ECF No. [164-1] ("Pls.' Resp. Stmt."); Pls.' Reply to Defs.' Opp'n to CAIR-Foundation's Summary Judgment, ECF No. [165] ("Pls.' Reply"); Defs.' Reply Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J., ECF No. [167] ("Defs.' Reply").  In an exercise of its discretion, the Court finds that holding oral argument on the instant motions would not be of assistance in rendering a decision.  *See* LCvR 7(f).

CSP, and Brim; (3) Plaintiff CAIR-F's claims for procurement liability against Defendants David Gaubatz, CSP, Brim, SANE, and Yerushalmi; and (4) Plaintiff CAIR-F's *respondeat superior* claims against Defendants David Gaubatz, CSP, Brim, and Yerushalmi. With respect to Plaintiffs' Stored Communications Act claims (Count II), Defendants' motion is GRANTED as to: (1) claims by Plaintiff CAIR-AN; (2) Plaintiff CAIR-F's claims for conspiring and aiding and abetting liability against all Defendants; (3) Plaintiff CAIR-F's *respondeat superior* claims against Defendants Savit, Pavlis, and SANE. With respect to Count II, Defendants' motion is DENIED as to: (1) Plaintiff CAIR-F's claims against Chris Gaubatz; and (2) Plaintiff CAIR-F's *respondeat superior* claims against Defendants David Gaubatz, CSP, Brim, and Yerushalmi. Defendants' motion is GRANTED with respect to Plaintiffs' claims for breach of contract (Count V) and tortious interference with contract (Count VI). Defendants' motion is DENIED WITHOUT PREJUDICE as to all of Plaintiffs' remaining claims. The parties shall submit additional briefing as to these claims as set out in this Opinion and the accompanying Order.

## I. BACKGROUND

### A. Factual Background

Plaintiff Council on American-Islamic Relations Action Network, Inc. ("CAIR-AN") is a self-described Muslim advocacy group with a mission that includes enhancing the understanding of Islam and promoting a positive image of Muslims in the United States. TAC ¶ 10. Plaintiff Council on American-Islamic Relations Foundation ("CAIR-F") is an organization related to CAIR-AN that was created on February 15, 2005. Defs.' Facts ¶ 10. Although Plaintiff CAIR-AN was initially named Council on American-Islamic Relations, Inc., *id.* ¶ 6, CAIR-AN has used the name CAIR as its de facto public name since its' founding. *Id.* "CAIR" is not a registered trade name or otherwise legal d/b/a in the District of Columbia. *Id.* ¶ 7. On June 15,

2007, CAIR-AN officially changed its name from Council on American-Islamic Relations, Inc. to its current name Council on American-Islamic Relations Action Network, Inc. *Id.* ¶ 8. CAIR-AN owns the real property at 453 New Jersey Avenue SE, Washington, DC, the location of Plaintiffs' offices at issue in this suit. *Id.* ¶ 11. As best as the Court can understand, CAIR-F occupies the offices as a tenant by virtue of an unwritten agreement. *Id.* ¶ 12.[3]

Defendant Center for Security Policy, Inc. ("CSP") is an IRC § 501(c)(3) non-profit, Washington, D.C. based think tank founded in 1988 by Frank Gaffney. *Id.* ¶ 1. Defendant Christine Brim is currently the chief operating officer of CSP. Pls.' Facts ¶ 3. CSP believes CAIR (the public term apparently used to refer to CAIR-AN and CAIR-F) to be a Muslim Brotherhood front group operating in the United States. *Id.* ¶ 6. CSP often focuses its efforts on CAIR because it regards CAIR as an organization that is "hostile to American security interests." *Id.* ¶ 7.

In late 2007 and early 2008, Defendant CSP initiated a documentary film project, referred to by Defendants as the "CAIR Documentary Film Project." Defs.' Facts ¶ 29. Defendants describe the film as a study of Islamism and organizations linked to the Muslim Brotherhood in the United States, with a particular emphasis on Plaintiffs. *Id.* ¶¶ 29, 31. The parties agree that the purpose of the documentary was in part to portray CSP's beliefs about CAIR and the Muslim Brotherhood in America. Pls.' Facts ¶ 15. CSP gave the project a working title of "CAIR Film Project" and Gaffney described the project as "an effort to make a film about the Council on American-Islamic Relations." *Id.* ¶ 17; Pls.' Ex. 7 (Gaffney Dep.) at 106:12-16.

---

[3] Plaintiffs purport to dispute this fact set out by Defendants, but provide no record citation disputing Defendants' characterization. *See* Pl.'s Resp. Stmt. ¶ 12. Accordingly, the Court deems this fact admitted. *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion.").

In order to produce this documentary, CSP and non-party Manifold Productions created Publius Productions, LLC, an entity in which both companies had a 50 percent ownership interest. Defs.' Facts ¶ 38. Defendants state that pursuant to this agreement, Manifold would act as the producer of the documentary and CSP would act primarily as its financier. *Id.* Internally, Publius referred to the CAIR Documentary Film Project as a "film proposal" called "Islam and America." *Id.* ¶ 40.

Defendants state that CSP conceived of and proposed the film as a series of interviews with individuals in the national security field relating to the relationship between the Muslim Brotherhood and CAIR-AN. *Id.* ¶ 30. In order to provide background video to air alongside these interviews, Defendants state that they planned for the proposed film to include "B-roll" video of Plaintiffs and other organizations Defendants believed to be affiliated with the Muslim Brotherhood. *Id.* B-roll is a term in film production for "general imagery" or more specifically "visuals which support the audio that's gathered in an interview." *Id.* ¶ 33.

Defendants state that in order to obtain this B-roll, CSP contacted another organization, Defendant Society of Americans for National Existence ("SANE"). *Id.* ¶ 42. SANE is a non-profit organization founded by, among others, Defendant David Yerushalmi and his wife. Pls.' Facts ¶ 10. CSP reached out to SANE though it's then-president Yerushalmi, who also served at this time as general counsel to CSP. Defs.' Facts ¶ 42.

Defendant SANE, through Yerushalmi, recommended Defendant David Gaubatz to Defendant CSP to conduct "field research" for the film. *Id.* ¶ 44. David Gaubatz had an ongoing contractual relationship with SANE to conduct field research for an unrelated project entitled "Mapping Sharia." *Id.* ¶ 43-44. Apparently because of this pre-existing relationship, CSP, SANE, and David Gaubatz decided that SANE would contract with David Gaubatz to

provide, according to Defendants, "the field research services required to obtain the B-roll for the CAIR Documentary Film Project." *Id.* ¶ 47. Defendant SANE also entered into a contract with Publius "to provide researchers to obtain B-roll", in effect creating a relationship between Publius and David Gaubatz. *Id.* ¶ 48. Defendants state that all parties understood that SANE was acting as a contractual intermediary and that all funding to pay David Gaubatz would be paid by CSP, either through Publius or directly from CSP. *Id.* ¶ 52. In March 2008, Manifold terminated its involvement in the CAIR Documentary Film Project. *Id.* ¶ 53. At this point, CSP became the sole operator of Publius. *Id.* ¶ 54.

As part of the film proposal, CSP hoped to gather video footage from inside Plaintiffs' office. Pls.' Facts ¶ 18. Prior to entering into these contracts, Frank Gaffney and David Gaubatz discussed Gaubatz's ability to obtain B-roll from inside CAIR offices. *Id.* ¶ 25. Gaffney and Gaubatz also discussed David Gaubatz hiring individuals who would volunteer to work as interns in CAIR offices and obtain film for the project. *Id.* According to Defendants, in mid-March 2008, Publius, David Gaubatz, and CSP decided that David Gaubatz would employ, train, and supervise researchers to volunteer at offices affiliated with Plaintiff CAIR-AN or at CAIR-AN itself, and use an audio-video recorder in an attempt to capture B-roll for the documentary film proposal. Defs.' Facts ¶ 57.

Defendants state that David Gaubatz was responsible for all aspects of obtaining the B-roll, including employing the researchers, training them in how they were to obtain volunteer positions at Plaintiffs' offices, and supervising the researchers during their volunteer internships. *Id.* ¶ 122. However, Defendants concede that CSP understood that it was paying David Gaubatz to identify, train, and supervise interns, and to instruct them on how to covertly obtain audio/video recordings from inside Plaintiffs' offices. Pls.' Facts ¶ 40. CSP further understood

that these interns would be wearing inconspicuous audio/video recorders as part of their conduct while interning at CAIR offices. *Id. ¶* 38. Defendants state that while Publius or CSP could ultimately reject a proposed researcher, the researchers would be David Gaubatz's employees whom he would choose. Defs.' Facts ¶ 122. Defendants state that David Gaubatz supervised and managed the day-to-day work relating to the researchers he employed to volunteer at Plaintiffs' offices. *Id.* ¶ 127. Defendants state that CSP had no day-to-day involvement in the work supervised by David Gaubatz and had no substantive contact with the researchers during the volunteer internships at Plaintiffs' offices. *Id.* ¶ 128. Publius employees did play a role in the decision as to which camera gear to purchase for use in "undercover filming," and in training one of the researchers in how to use the video camera. Pls.' Facts ¶¶ 33-35.

Defendants state that the contracts among CSP, SANE, and David Gaubatz expressly and substantively created independent contractor relationships between CSP and SANE, and SANE and David Gaubatz, respectively. Defs.' Facts ¶¶ 49, 50. Plaintiffs dispute this description of the relationship, pointing to statements by David Gaubatz in which he appears to state that CSP and Yerushalmi had the power to direct him on how to perform the tasks that would lead to the acquisition of audio and video recordings from Plaintiffs' offices. Pls.' Facts ¶ 28 (citing Pls.' Ex. 5 (David Gaubatz Dep.) at 77:24-78:3). *See also* Pls.' Ex. 5 at 72:13-14 (David Gaubatz describing Yerushalmi as his "supervisor"). Plaintiffs further dispute the role of SANE, pointing to a March 2008 agreement between Publius and SANE for SANE to provide a team of "researchers" to covertly enter CAIR and create audio-video recordings for a documentary. *Id.* ¶ 20 (citing Pls.' Ex. 26 (Publius-SANE Agreement) at 9). Defendants state that SANE had no knowledge that the project would require researchers to enter Plaintiffs' offices and SANE had no knowledge that the project would require researchers to obtain B-roll from inside Plaintiffs'

offices. Defs.' Resp. Stmt. ¶ 20. Rather, Defendants state that SANE simply contracted to provide researchers to Publius via its contract with David Gaubatz, who would actually hire, train, and supervise the researchers to obtain B-roll. Defendants state that SANE's only role in the CAIR Documentary Film Project after the execution of these contracts was to transfer all funding received from Publius to David Gaubatz. Defs.' Facts ¶ 52.

In addition, the parties dispute the motivations for using interns to obtain B-roll from inside Plaintiffs' offices. Defendants state that the purpose of the B-roll was cinematic, and not investigative. *Id.* ¶ 35. Defendants state that they did not plan to expose Plaintiffs' confidences, secrets, or proprietary information. *Id.* "Specifically, the B-roll of a volunteer in Plaintiffs' offices was to capture background and context of the broader examination of the Muslim Brotherhood's operation in the U.S." *Id.* Defendants state that the purpose of wearing the inconspicuous button camera was so that the audio-video recordings, which would serve as B-roll, would capture the "natural life" of an intern at CAIR National and that the natural quality of the B-roll would be lost if the subjects of the recording knew they were being recorded. Plaintiffs disagree, stating that Defendants acted with an investigative purpose, and that the button camera was used for "undercover filming" of Plaintiffs in order to obtain secret, confidential, or proprietary information regarding Plaintiffs' offices. They point to statements that Chris Gaubatz used "clandestine camera gear" during his internship in order to record footage that would not have otherwise been revealed "openly." Pls.' Facts ¶ 36. Plaintiffs also point to statements that CSP believed that CAIR would not approve or enable them to openly obtain B-roll for their film project if they knew of its intentions with the proposal. *Id.*

CSP, Publius, and David Gaubatz first decided to obtain B-roll of an intern volunteering inside the offices of an affiliate of Plaintiffs, referred to as CAIR MD/VA, located in Herndon,

Virginia. Defs.' Facts ¶ 32. This intern was Defendant Chris Gaubatz, David Gaubatz's son. *Id.* Defendant Yerushalmi states that in preparation for this internship, he advised David Gaubatz of what he believed to be the circumstances under which the use of a recording device in the CAIR MD/VA offices would be legally permissible. *Id.* ¶¶ 133, 134.

Chris Gaubatz began his volunteer work at the CAIR MD/VA offices in Herndon, Virginia in approximately late March 2008. *Id.* ¶ 60. Chris Gaubatz made audio-video recordings while interning at CAIR MD/VA by using an inconspicuous button camera. *Id.* ¶ 57. He also removed documents from the CAIR MD/VA offices. *Id.* ¶ 76. Plaintiffs have stipulated that no audio recordings made by Chris Gaubatz at CAIR MD/VA are a basis for any of their claims against Defendants. *Id.* ¶ 78. Further, Plaintiffs have expressly stipulated that Chris Gaubatz's removal of documents from the CAIR MD/VA offices are not the basis for any of their claims against Defendants. *Id.* ¶ 79. During this internship, at the request of David Gaubatz, David Yerushalmi provided legal advice to David Gaubatz regarding the circumstances under which he believed Chris Gaubatz could legally remove documents from the CAIR MD/VA offices. *Id.* ¶ 135.

After the CAIR MD/VA offices closed down, its former staff recommended to Chris Gaubatz and CAIR-F that Chris Gaubatz volunteer at Plaintiffs' offices as an unpaid intern. *Id.* ¶ 81. Chris Gaubatz informed his father about this opportunity and David Gaubatz instructed him to apply for the position as a volunteer intern. *Id.* ¶ 111.

Subsequently, Chris Gaubatz presented himself to CAIR's national office located in Washington, D.C. as an applicant for a volunteer intern position. *Id.* ¶ 108. In applying, Chris Gaubatz used the alias "David Marshall" which he had used earlier at CAIR MD/VA. *Id.* ¶ 112. Defendants state that Chris Gaubatz used this alias as a security measure so that Plaintiffs would

not suspect that he was related to David Gaubatz, who was known to Plaintiffs as a critic of the CAIR organizations.  *Id.* ¶ 113.  Defendants state that the decision to use an alias was David Gaubatz's idea.  *Id.* ¶ 131.  Defendant Yerushalmi states that, as part of his responsibilities to provide legal advice regarding the CAIR Documentary Film Project, he advised David Gaubatz that there was no material legal risk to Chris Gaubatz using an alias if he (1) did not present false documentation, (2) did not accept payment or out-of-pocket expenses for his work, (3) conducted himself legally in performing his duties, and (4) had no intent to violate laws, breach agreements, or breach duties incumbent upon him.  *Id.* ¶ 132.

Chris Gaubatz also sent an e-mail "resume" to Plaintiffs' in-house counsel, Nadhira Al-Khalili, which contained additional untrue information, namely that he was attending Ferrum College and that he had worked in a family-owned construction business.  *Id.* ¶ 114.  Defendants state that the CSP Defendants, SANE, and Yerushalmi were not aware that Chris had provided Plaintiffs this additional information.  *Id.*

Pursuant to his agreement with CSP, David Gaubatz hired three additional researchers to pose as interns in Plaintiffs' offices: Charity Zhe, Stephanie Creswell, Daniel Ryder.  P51.  David Gaubatz notified CSP of his intent to hire these researchers.  Pls.' Facts ¶ 52.  David Gaubatz directed the researchers to appear Muslim as part of their internship, instructing Chris Gaubatz to grow a beard and identify himself as Muslim, *id.* ¶ 55, and directing Zhe and Creswell to wear hijabs – the traditional scarf worn by Muslim women to cover their hair, *id.* ¶ 58.

On or about June 16, 2008, Chris Gaubatz began his volunteer internship at Plaintiffs' offices.  Defs.' Facts ¶ 85.  Chris Gaubatz did not indicate to any staff member that he was wearing a button camera and recording video and audio during his internship.  Pls.' Facts ¶ 66.

Over the course of his internship, Chris Gaubatz disseminated the covert recordings he made at Plaintiffs' offices to David Gaubatz. *Id.* ¶ 86. Chris Gaubatz and David Gaubatz also disseminated the recordings made at Plaintiffs' office to Defendants CSP and Christine Brim. *Id.* ¶ 87. In addition, Chris Gaubatz and David Gaubatz disseminated email summaries of Chris Gaubatz's activities as an intern to Christine Brim pursuant to the CAIR Documentary Film Project. *Id.* ¶ 89.

The parties dispute the role of Christine Brim in the CAIR Documentary Film Project. Defendants point out that at the start of the Project, Brim was a contract employee at Defendant CSP. *Id.* ¶ 177. In approximately August 2008, Brim became a full-time employee of CSP with the title of senior vice president. *Id.* Since approximately April 2010, Brim has served as chief operating officer of CSP. *Id.* Brim's involvement with the CAIR Documentary Film Project as a contract employee, Defendants state, was limited to administrative work to coordinate the receipt of the audio-video recordings from the Gaubatz Defendants, to receive oral and written reports from David Gaubatz, and to be a liaison between David Gaubatz and Brim's supervisors at CSP. *Id.* ¶ 178. Brim was not responsible for assessing the audio-video recordings or the daily reports. Rather, according to Defendants, her role was only to receive them, make certain that the audio-video files had recordings on them, and to make copies as needed by her supervisors. *Id.* ¶ 182. Plaintiffs dispute that this was Brim's only role, pointing to David Gaubatz's statement in his deposition that he was approached by Christine Brim and David Yerushalmi with a proposal to hire individuals to obtain audio video recordings from Plaintiffs' offices. Pls.' Facts ¶ 2 (citing Pls.' Ex. 5 at 76:12-15). In addition, Plaintiffs note that Christine Brim disseminated a compilation of covert videos Chris Gaubatz took at Plaintiffs' offices to third party Joseph Farah and representatives of World Net Daily. Defs.' Facts ¶ 164, 165. At the very least, the parties do

not dispute that Christine Brim knew that David Gaubatz's researchers were going to make audio-video recordings at Plaintiffs' offices. Pls.' Facts ¶ 49.

CSP paid SANE a total of $103,865 in 2008 with the expectation that the money would go from SANE to David Gaubatz as compensation for his work obtaining audio/video recordings from Plaintiffs' office. *Id.* ¶ 41. David Gaubatz understood that CSP was paying him to obtain audio/video recordings from inside Plaintiffs' office. *Id.* ¶ 42. Pursuant to its agreement with David Gaubatz, CSP expected delivery of the recordings his researchers obtained from CAIR's office. *Id.* ¶ 43. According to Defendants, sometime between August 21, 2008 and September 15, 2008, CSP entered into a contract directly with David Gaubatz to continue his services to produce field researchers to obtain B-roll from Plaintiffs' Offices. Defs.' Facts ¶ 55.

During Chris Gaubatz's internship at Plaintiffs' Offices, his direct supervisor was Raabia Wazir. *Id.* ¶ 86. Raabia Wazir was the CAIR-F employee responsible for overall supervision of interns. *Id.* ¶ 87. On his first formal day of his internship, Chris Gaubatz met with Wazir for orientation, *id.* ¶ 89, and she presented him with what she described as a confidentiality agreement for him to sign. *Id.* ¶ 90. When Chris Gaubatz asked if he should sign it then, Wazir told him to "read it on your own time." *Id.* Chris Gaubatz states that he never read or signed the purported confidentiality agreement and Plaintiffs have not produce a signed version to contradict this statement. *Id.* ¶ 95.

Chris Gaubatz further states that he never orally agreed to be subject to any form of confidentiality. *Id.* Plaintiffs dispute this statement noting that Chris Gaubatz discussed a non-disclosure agreement in a recorded telephone conversation with a representative of World Net

Daily, implying that he understood himself to be bound by a confidentiality agreement.[4]  Pls.'

Resp. Stmt. ¶ 95 (citing Pls.' Ex. 37 (Recorded Telephone Conversation of Chris Gaubatz)).

Aside from this confidentiality agreement, Plaintiffs do not dispute that no one at Plaintiffs'

offices provided Chris Gaubatz with a manual or written or oral set of rules, policies, or

procedures relating to the existence of, or the treatment of confidential, proprietary, or personal

information.  Defs.' Facts ¶ 100.  Of the 24 volunteer interns working at Plaintiffs' offices during

the time period relevant to this litigation, Plaintiffs could only produce 13 signed confidentiality

agreements.  *Id.* ¶¶ 103, 104.

The parties disagree as to whether Chris Gaubatz was ever explicitly provided

confidential, proprietary, or private information during his internship at Plaintiffs' office.

Defendants state that at no time did Wazir or anyone at Plaintiffs' offices ever inform Chris

Gaubatz that he was being provided confidential, proprietary, or private information.  *Id.* ¶ 101.

Plaintiffs state that Chris Gaubatz was given access to confidential, proprietary, and trade secret

---

[4] Defendants argue that Plaintiffs' Exhibit 37 providing the transcript of this telephone conversation is not properly before the Court as it has not been authenticated and it is hearsay. The Court notes that despite Defendants' arguments to the contrary, Plaintiffs have provided an authenticating declaration with their exhibits, which describes this exhibit as "[a] true and correct transcript of a telephone conversation Chris Gaubatz had outside of CAIR's office during his internship. . . ."  *See* Decl. of Gadeir Abbas, Esq., ECF No. [156-46] ¶ 39.  Furthermore, in their motion for summary judgment, Defendants state "[t]here is evidence of a telephone call on August 9, 2008, at the time of Chris's internship at Plaintiffs' Offices, during which we can hear Chris speaking to someone at WND, and it is clear from the conversation that he is discussing the internship and the Audio-Video Recordings."  Defs.' MSJ at 21.  In light of Plaintiffs' affidavit (and given Defendants apparent acknowledgment of this video), the Court is puzzled by Defendants' objection that this exhibit is an "unsworn, unauthenticated document[]" that "cannot be considered on a motion for summary judgment."  Defs.' Reply at 12 (quoting *Akers v. Liberty Mut. Group*, 744 F.Supp.2d 92, 97 (D.D.C. 2010)).  Moreover, to the extent that Defendants object to this exhibit as hearsay, the Court rejects this objection on the present record.  While "sheer hearsay . . . counts for nothing on summary judgment", *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (internal quotation marks omitted), this telephone conversation arguably falls within the exception to hearsay for party admissions. Fed. R. Evid. 801(d)(2).  This issue may be conclusively resolved by a fully briefed motion *in limine* at a later date.

information about Plaintiffs by CAIR-F employees as part of his internship, specifically sensitive lists of mosque contacts, as well as access to information about CAIR's legislative advocacy strategies and its personnel. Pls.' Facts ¶¶ 73-75. Plaintiffs also state that Chris Gaubatz recorded CAIR discussions about sensitive and confidential matters with the button camera. *Id.* ¶ 105. As support for this position, Plaintiffs point to videos recorded by Chris Gaubatz which discuss plans for *non-public* meetings between members of Plaintiffs' Executive Board with various imams and other mosque leaders in the region. Pls.' Ex. 1 (Recorded Videos) at June 16, 2008, 2:38:59. In addition, the videos also discuss a mosque database containing research and contacts at local mosques. One of these videos records another intern on the phone conducting a survey of a mosque as part of CAIR's mosque survey research project. *Id.* at July 14, 2008, 35:00. At the close of the interview, he states "[t]his information is confidential and it will not be shared with anyone." *Id.*

Regarding the role of the other Defendants in this matter, Defendants also state that based upon the information provided to them from David Gaubatz and from the audio-video recordings provided to CSP, the CSP Defendants, Yerushalmi, and SANE had no knowledge of any fiduciary duty owed to Plaintiffs by Chris Gaubatz. Defs.' Facts ¶ 145. These Defendants further state that they did not have knowledge of any statutory, contractual, or common law duty of confidentiality or non-disclosure owed to Plaintiffs by Chris Gaubatz. *Id.* ¶ 144. In response, Plaintiffs state and Defendants do not dispute that CSP knew that Chris Gaubatz's duties at Plaintiffs' offices were "no different from any other intern," and that Chris Gaubatz was instructed to, and did, follow instructions from staff during his internship. Pls.' Facts ¶ 71.

Apparently in his capacity as CSP's General Counsel, Defendant Yerushalmi provided legal advice to David Gaubatz regarding various aspects of the CAIR Documentary Film Project.

14

Defs.' Facts ¶ 130.  Yerushalmi knew that Chris Gaubatz was wearing an inconspicuous device to make audio-video recordings at CAIR.  Pls.' Facts ¶ 48.  Yerushalmi states that he advised David Gaubatz as to whether information identified by Chris Gaubatz at Plaintiffs' offices amounted to evidence of tax fraud by Plaintiffs.  Defs.' Facts ¶ 136.  Yerushalmi also states that he advised David Gaubatz that Chris Gaubatz should not remove documents from a network, shared server or e-mail server.  *Id.* ¶ 137.

Defendants state that Chris Gaubatz never recorded conversations that took place behind closed doors.  *Id.* ¶ 154.  Defendants also state that Chris Gaubatz was physically and visually present and a party to all conversations he recorded at Plaintiffs' offices.  *Id.* ¶ 162.  Plaintiffs disagree, pointing to videos in which Chris Gaubatz used his button camera to record conversations at CAIR in which he was not participating or was not visible to the speakers.  Pls.' Facts ¶ 81.  For example, in a section of the recording made on August 7, 2008, Chris Gaubatz appears to stand behind a speaker apparently involved in a telephone conversation.  *See* Pl.'s Ex. 1 at August 7, 2008, 01:21:40-01:22:05.  This speaker has his back turned to Chris Gaubatz. Defendants state that in all the recorded conversations, Chris Gaubatz was standing nearby, in plain sight, and the conversations were taking place such that Chris and others could hear the conversation.  Defs.' Resp. Stmt. ¶ 81.  Defendants also note that none of the remaining Defendants had an expectation that Chris Gaubatz would not be present and a party to the conversations recorded.  Defs.' Facts ¶ 163.

At various points during his internship, Chris Gaubatz was asked to shred documents by Wazir.  *Id.* ¶ 155.  Defendants state that Chris Gaubatz did not take any documents from locations in Plaintiffs' offices to which he was not given open and unfettered access and authority.  *Id.* ¶ 156.  Defendants state that Chris Gaubatz never removed documents from a

shared drive or e-mail server.  *Id.* ¶ 154.  Plaintiffs dispute this assertion, stating that based on their review, Chris Gaubatz removed documents that could have only come from shared folders on their network drive.  Defs.' Ex. A., Ex. 3 (Saylor Dep.) at 143:19-144:5.  Defendants also point to evidence that the CAIR Documentary Film Project did not contemplate or require the taking of documents from Plaintiffs' offices.  Defs.' Facts ¶ 166.

On or about September 3, 2008, upon the completion of his volunteer internship, Chris Gaubatz received a "Certificate of Completion" from "CAIR" for successfully fulfilling his duties as a volunteer intern.  *Id.* ¶ 116.  On February 9, 2009, after all field work had ended on the CAIR Documentary Film Project and after Chris Gaubatz had terminated his internship at Plaintiffs' offices, CSP entered into a contract with Chris Gaubatz to review potential B-roll audio-video recordings he obtained from the CAIR MD/VA offices and Plaintiffs' Offices, assess them, and log them in some coherent fashion.  *Id.* ¶ 56.  Christine Brim supervised Chris Gaubatz in this work.  *Id.* ¶ 187.

### B.      Procedural Background

CAIR-AN filed its original Complaint on October 29, 2009, naming as Defendants Chris and David Gaubatz and ten John and Jane Does whose identities were then unknown but who were alleged to have participated in and benefitted from the activities alleged in the Complaint. *See* Compl., ECF No. [1], ¶¶ 12-14.  CAIR-AN asserted a single claim under the Stored Communications Act and common law claims for conversion, breach of fiduciary duty, breach of contract, and trespass.  *See id.* ¶¶ 49-77.

Contemporaneous with the filing of the Complaint, CAIR-AN moved for a temporary restraining order and a preliminary injunction.  *See* Mem. in Supp. of Pl.'s Mot. for a TRO & Prelim. Inj., ECF No. [2-1].  On November 2, 2009, after repeated efforts to contact the Gaubatz

Defendants proved fruitless, the Court held an *ex parte* hearing to address CAIR-AN's request for a temporary restraining order. *See* Min. Entry (Nov. 2, 2009). On November 3, 2009, the Court granted in part and denied in part CAIR-AN's motion for a temporary restraining order, temporarily prohibiting the Gaubatz Defendants from making certain uses of materials obtained from Plaintiffs' offices and requiring the return of such materials to CAIR-AN's counsel. *See Council on American-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67 (D.D.C. 2009) ("*CAIR I*").

On November 19, 2009, CAIR-AN and the Gaubatz Defendants jointly moved for a consent order granting CAIR-AN's motion for a preliminary injunction. *See* Joint Mot. to Enter Consent Order Granting Prelim. Inj., ECF No. [19]. That same day, the Court entered the proposed consent order. *See* Consent Order Granting Prelim. Inj., ECF No. [22]. Pursuant to that order, the Gaubatz Defendants are (1) enjoined from making any use, disclosure, or publication of any document obtained from any office or facility of CAIR-AN, any recording of meetings of or conversations involving CAIR-AN's officials or employees, and any copies of such documents or recordings, (2) required to remove from any website or blog under their control any such documents or recordings, and (3) required to return any such documents or recordings, including any copies, to CAIR-AN's counsel. *See id.* ¶¶ 1-4. Subsequently, the Court clarified that its order permits the Gaubatz Defendants' counsel, but not the Gaubatz Defendants themselves, to retain copies of the documents at issue for indexing purposes. *See* Order (Dec. 10, 2009), ECF No. [30], at 2. Absent further action from the Court, the preliminary injunction will remain in effect throughout this action. *See* Consent Order Granting Prelim. Inj., ECF No. [22], ¶ 5.

On December 20, 2009, Defendants Chris and David Gaubatz moved to dismiss the original Complaint. On March 1, 2010 and April 12, 2011, Plaintiffs moved to amend the Complaint. The Court resolved all these motions on June 24, 2011, granting in part and denying in part the Gaubatz Defendants' motion to dismiss and granting both of Plaintiffs' motion to amend. *See Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311 (D.D.C. 2011) ("*CAIR II*"). First, the Court granted Plaintiffs leave to amend the Complaint to (1) clarify that references to the "Council of American Islamic Relations" in the Complaint are to CAIR-AN, (2) add CAIR-F as a second plaintiff, (3) add CSP, Brim, Savit, and Pavlis as defendants, (4) assert statutory claims under the Federal Wiretap Act, the D.C. Wiretap Act, and common law claims for unjust enrichment and tortious interference with contract, and (5) introduce a handful of supplemental factual allegations in support of extant claims. *See id.* at 322-30. Second, the Court granted the Gaubatz Defendants' motion to dismiss insofar as it sought dismissal of Plaintiffs' claim for the conversion of electronic data (one component of Count Three of the Second Amended Complaint) and otherwise denied the motion, including insofar as it sought dismissal of Plaintiffs' claim for the conversion of physical documents (the remainder of Count Three of the Second Amended Complaint). *See id.* at 330-45.

Subsequently, Defendants CSP, Brim, Savit, and Pavlis filed a Motion to Dismiss the Second Amended Complaint. *See* Mem. of P. & A. in Supp. of Mot. to Dismiss Counts I & II, ECF No. [97]. In addition, on March 5, 2012, Plaintiffs filed another motion to amend their Complaint, seeking to add David Yerushalmi and SANE as Defendants. *See* Pls.' Mot. for Leave to File Third Am. Compl. & Mem. in Supp. of Mot. for Leave to File Third Am. Compl., ECF No. [112]. The Court resolved all these motions on September 17, 2012, granting in part and denying in part the CSP Defendants' motion to dismiss and granting in part and denying in part

Plaintiffs' motion to amend. *See Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 891 F.Supp.2d 13 (D.D.C. 2012) ("*CAIR III*"). The Court dismissed Count One of the Second Amended Complaint, based on the Federal and D.C. Wiretap Acts, insofar as Plaintiffs sought to hold liable the CSP Defendants (or any other Defendant) (1) under a theory of secondary liability, with respect to both the Federal and D.C. Wiretap Acts and (2) under a theory of procurement liability, with respect to the Federal Wiretap Act. *Id.* at 23-26. The Court also dismissed Count Two of the Second Amended Complaint, based on the Stored Communications Act, (1) against the CSP Defendants (and any other Defendant) insofar as Plaintiffs relied on a theory of secondary liability and (2) against the CSP Defendants insofar as Plaintiffs relied on a theory of primary liability. *Id.* at 26-29. In all other respects, the motion was denied. Regarding Plaintiffs' Motion to Amend, the Court denied the motion insofar as Plaintiffs sought to assert claims against either SANE or Yerushalmi (1) under the Federal Wiretap Act using a theory of procurement liability, (2) under the Federal or D.C. Wiretap Acts using a theory of secondary liability, and (3) under the Stored Communications Act using a theory of secondary liability. *Id.* at 35.

On May 19, 2013, after the parties completed discovery, Defendants filed their [154] Motion for Summary Judgment seeking dismissal of this lawsuit in its entirety. On the same date, Plaintiff CAIR-F filed its [156] Motion for Partial Summary Judgment, seeking a judgment in its favor on its claims under the Federal and D.C. Wiretap Acts and for breach of fiduciary duty.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id*. Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in its favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

## III. DISCUSSION

### A.     Count I (Federal and D.C. Wiretap Act)

Plaintiffs bring Count One of the Third Amended Complaint under the Federal Wiretap Act (Title I of the ECPA), 18 U.S.C. §§ 2510-2522, and the D.C. Wiretap Act, D.C. CODE §§ 23-541-23-556. TAC ¶¶ 79-88. Both statutes proscribe, among other conduct, the intentional interception of oral communications. *See* 18 U.S.C. § 2511(1)(a); D.C. CODE § 23-542(a)(1). Of the various Defendants in this case, only one – Chris Gaubatz – is alleged to have directly intercepted oral communications. However, Plaintiffs also bring claims against the remaining Defendants under these statutes. These claims fall into four categories. First, Plaintiffs claim that the remaining Defendants are liable under 18 U.S.C. § 2511(1)(c)-(d), and the parallel District of Columbia provisions, D.C. CODE § 23-542(a)(2)-(3), which prohibit the disclosure and use, respectively, of the contents of an intercepted communication. Second, Plaintiffs contend that the remaining Defendants "procured" Chris Gaubatz to intercept their communications in violation of D.C. CODE § 23-542(a)(1). Third, Plaintiffs allege that the remaining Defendants are liable because they "conspired with" and "aided and abetted" Chris Gaubatz in intercepting oral communications of Plaintiffs' employees. Finally, Plaintiffs seek to

attribute any liability for Chris Gaubatz under 18 U.S.C. § 2511(1)(a) and D.C. CODE § 23-542(a)(1) to the remaining Defendants under a theory of *respondeat superior*. The Court addresses each of these arguments, some of which have been discussed at length in prior opinions in this case.

### 1.    Chris Gaubatz's Primary Liability

Under 18 U.S.C. § 2511(1)(a) civil liability exists "[e]xcept as otherwise specifically provided in this chapter [against] any person who – (a) intentionally intercepts [or] endeavors to intercept . . . any wire, oral, or electronic communication." Similarly, D.C. CODE § 23-542(a)(1) creates liability "[e]xcept as otherwise specifically provided in this subchapter, [against] any person who in the District of Columbia – (1) willfully intercepts [or] endeavors to intercept . . . any wire or oral communication." Here, Plaintiffs argue that Chris Gaubatz violated these provisions by intercepting the conversations of their employees. Pls.' MSJ at 13-20.

As an initial matter, the Court must clarify *which* Plaintiff's conversations were allegedly intercepted, and which Plaintiff is properly asserting claims under the Federal Wiretap Act and the D.C. Wiretap Act. Apparently conceding arguments made by Defendants, *see* Defs.' Opp'n at 5, Plaintiffs have stated that "[u]ndisputed evidence makes clear that all the employees present during Chris Gaubatz's internship were CAIR-Foundation's." Pls.' Reply at 4. They go on to state that "the evidence is clear: Chris Gaubatz never interacted with any CAIR-AN employee, volunteer or intern, because there were not any during his internship." *Id.* Importantly, the civil liability provision of the Federal Wiretap Act states that "any person whose wire, oral, or electronic communication is intercepted . . . in violation of this chapter may in a civil action recover from the person or entity . . . which engaged in that violation." 18 U.S.C. § 2520(a). Similarly, the D.C. Wiretap Act states that "[a]ny person whose wire or oral communication is

intercepted . . . in violation of this subchapter shall – (1) have a civil cause of action against any person who intercepts . . . such communications."[5] D.C. CODE § 23-554(a). Here, by Plaintiffs' own admission, only communications of CAIR-F have been intercepted. Plaintiffs admit that CAIR-AN had no employees, and thus no conversations, which implies that no conversations could have been intercepted. Accordingly, Plaintiff CAIR-AN's claims under the Federal Wiretap Act and the D.C. Wiretap Act are dismissed, and the remaining discussion of Count I will focus on CAIR-F's claims under these provisions.

In arguing that CAIR-F's claims against Chris Gaubatz should be dismissed, Defendants concede for purposes of this motion that all the intercepted communications were "oral communications" within the meaning of the statutes. *See* Defs.' Opp'n at 32-33. However, Defendants argue dismissal of these claims is nevertheless appropriate because Chris Gaubatz's interception of these communications is protected by the one-party consent rule, which functions as a defense to the wiretap provisions at issue here. Defs.' MSJ at 30-34. Specifically, Congress has created an exception to criminal and civil liability for a private party "where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Similarly, D.C. CODE § 23-542(b)(3) states that "[i]t shall not be unlawful under this section for – (3) a person not acting under color of law to intercept a wire or oral communication, where such person is a party to the communication . . .

---

[5] Defendants have not contested CAIR-F's personhood under these provisions and the Court sees no reason to do so here, as the Federal Wiretap Act defines "person" to include "any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6). Similarly, the D.C. Wiretap does not expressly exclude corporations from its coverage.

unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States, any State, or the District of Columbia, or for the purpose of committing any other injurious act."

Here, the applicability of the one-party consent rule is in dispute. The parties disagree as to whether Chris Gaubatz was a party to all of the communications he intercepted. Defendants argue that Chris Gaubatz was a party to the intercepted communications because he was physically present and visible for all conversations he recorded at Plaintiffs' offices, even if he did not engage in all of these conversations. Defs.' MSJ at 30. Plaintiffs, by contrast, argue that Chris Gaubatz used his button camera to record conversations in which he was not participating, but merely standing near the speaker. Pls.' MSJ at 14-15. Plaintiffs cite four instances in which Chris Gaubatz recorded conversations at CAIR in which he was not participating. Pls.' Facts ¶ 81.

Other courts to consider the scope of the one-party consent rule have concluded that "a person whose presence is apparent in the midst of a communication is considered a party, whether or not that person actually participates verbally in the communication." *United States v. Brown*, No. 10-100-BAJ-SCR, 2011 WL 576901, at *3 (M.D. La. Feb. 9, 2011). *See also Grandbouche v. Adams*, 529 F.Supp. 545, 548 (D. Col. 1982) (noting lack of distinction between individual "speaking to a person" and "speaker who holds a conversation in the presence of a third party."); *Caro v. Weintraub*, 618 F.3d 94, 97 (2d Cir. 2010) (finding "no support for the proposition that one must be invited to a conversation in order to be a party to it."). By contrast, courts have expressed concern where the intercepting individual was unseen to those being intercepted. *See Pitts Sales, Inc. v. King World Productions, Inc.*, 383 F.Supp.2d 1354, 1361 (S.D. Fla. 2005) ("the instant case does not present a situation where a communication was

intercepted by an unseen auditor."); *Smith v. Wunker*, 356 F.Supp. 44, 46 (S.D. Ohio 1972) (noting, in discussion of section 2511(2)(d) exception, that "the concern of Congress was with the interception of private conversations by an unseen auditor"), *overruled on other grounds*, *Boddie v. American Broadcasting Companies, Inc.*, 731 F.2d 333 (6th Cir. 1984). Accordingly, in light of this precedent, while the interceptor need not actively participate in the conversation for the one-party consent rule to apply, at the very least, his or her presence must be apparent to those individuals whose conversation is being intercepted.[6]

Having reviewed the videos cited by Plaintiff as instances in which Chris Gaubatz was not a party to the conversation, the Court finds that there is a genuine issue of material fact as to whether the one-party consent rule applies to all of these recordings. In a section of the recording made on August 7, 2008, Chris Gaubatz appears to stand behind a speaker apparently involved in a telephone conversation. *See* Pl.'s Ex. 1 at August 7, 2008, 01:21:40-01:22:05. This speaker has his back turned to Chris Gaubatz and it is not clear from the video or from any other facts in the record whether Chris Gaubatz's presence would have been apparent to this speaker, or if Chris Gaubatz was instead acting as an "unseen auditor" to whom the one-party consent rule would not apply. *Pitts Sales, Inc.*, 383 F.Supp.2d at 1361. Because resolution of this factual dispute would be inappropriate at the summary judgment stage, the Court will deny summary judgment as to both parties regarding Plaintiff CAIR-F's claim that Chris Gaubatz violated the Federal and D.C. Wiretap Act.

Of course, this is just one recording. For the vast majority of the recordings, CAIR-F does not contest that Chris Gaubatz was a party to the conversation recorded. However, with

---

[6] Defendants do not argue for, and the Court does not find case law suggesting, a distinction on this point between the Federal and D.C. Wiretap Act.

respect to these remaining recordings, CAIR-F argues that the one-party consent rule does not apply because of Chris Gaubatz's purpose in making these recordings. Pls.' MSJ at 15. As noted, *supra*, pursuant to § 2511(2)(d), the one-party consent rule applies under the Federal Wiretap Act, "unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Similarly, D.C. Code § 23-542(d)(3) provides that "[i]t shall not be unlawful under this section for – (3) a person not acting under color of law to intercept a wire or oral communication, where such person is a party to the communication . . . unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States, any State, or the District of Columbia, or for the purpose of committing any other injurious act."[7]

---

[7] It is true that D.C. Code § 23-542(d)(3) states that the one-party consent rule does not apply where the communication is "intercepted . . . for the purpose of committing any other injurious act," rather than simply a criminal or tortious act. Plaintiffs attempt to rely on this language in arguing that they need not show that Chris Gaubatz acted with a *tortious* purpose in intercepting CAIR-F's communications. In response, Defendants note that at the motion to dismiss stage, in response to Defendants' argument that the "other injurious act" language in D.C. Code § 23-542(d)(3) was unconstitutionally vague, Plaintiffs expressly restricted their "for the purpose of" claims to actions by Chris Gaubatz with a tortious purpose. *See* CSP Defs.' Mot. to Dismiss, ECF No. [97] at 26-28; Pls.' Opp'n to Mot. to Dismiss, ECF No. [102] at 22. Indeed, in their filing at the motion to dismiss stage, Plaintiffs stated that deciding the constitutionality of the injurious act exception was "unnecessary" because they pled that the recordings were made for the purpose of committing the tortious acts of breach of fiduciary duty and tortious interference with contract. Pls.' Opp'n to Mot. to Dismiss, ECF No. [102] at 22. The Court need not decide whether this statement by Plaintiffs constitutes a waiver of the argument at the motion to dismiss stage because Plaintiffs have waived reliance on the "injurious act" language by failing to respond to Defendants' argument *at the summary judgment stage*. Indeed, despite repeated opportunities to do so, Plaintiffs provide no rebuttal to Defendants' argument that they have waived reliance on the "other injurious purpose" language in D.C. Code § 23-542(d)(3). *See, e.g.,* Defs.' MSJ at 23 n. 15. This conclusion is further supported by principles of constitutional avoidance, as courts "have an obligation to avoid constitutional questions if at all possible." *Deaver v. Seymour*, 822 F.2d 66, 71 (D.C. Cir. 1987) (citing *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346-48 (1936) (Brandeis, J., concurring).

Here, CAIR-F argues that Chris Gaubatz acted with a tortious purpose in intercepting their employees' communications, rendering the one-party consent rule inapplicable. In order to prevail, CAIR-F must show "either (1) that the primary motivation, or (2) that a determinative factor in the actor's motivation in intercepting the conversation was to commit" a criminal or tortious act. *United States v. Dale*, 991 F.2d 819, 841 (D.C. Cir. 1993) (quoting *United States v. Vest*, 639 F.Supp. 899, 904 (D. Mass. 1986), *aff'd*, 813 F.2d 477 (1st Cir. 1987)). *See also Sussman v. American Broadcasting Companies, Inc.*, 186 F.3d 1200, 1202-03 (9th Cir. 1999) ("Under section 2511, the focus is not upon whether the interception itself violated another law; it is upon whether the *purpose* for the interception – its intended use – was criminal or tortious.") (internal citation omitted).

CAIR-F primarily argues that Chris Gaubatz intercepted the communications of CAIR-F's employees for the purpose of committing a breach of fiduciary duty, a tortious act. Pls.' MSJ at 14-15. This contention raises two questions: (1) whether Chris Gaubatz had a fiduciary duty to Plaintiff CAIR-F, and (2) whether the breach of this fiduciary duty was either the primary motivation for, or at least a determinative factor motivating Chris Gaubatz when he intercepted conversations at CAIR-F.

On the first question, the Court concludes that there is a genuine issue of material fact as to whether Chris Gaubatz understood himself as bound to a fiduciary duty of non-disclosure to Plaintiff CAIR-F. "[T]he District of Columbia courts have deliberately left the definition of a 'fiduciary relationship' open-ended, allowing the concept to fit a wide array of factual circumstances." *CAIR II*, 793 F.Supp.2d at 341 (citing *High v. McLean Fin. Corp.*, 659 F.Supp. 1561, 1568 (D.D.C. 1987)). *See also United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F.Supp.2d 198, 218 (S.D.N.Y. 2002) ("[T]he exact limits of what constitutes

27

a fiduciary relationship are impossible of statement.") (quotation marks omitted). "Deciding whether a fiduciary relationship exists in a particular case requires 'a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties." *CAIR II*, 793 F.Supp.2d at 341 (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C. Cir. 1996)). Indeed, in its previous opinions, this Court emphasized that "[b]ecause the inquiry is fact-intensive, it is often inappropriate to decide whether a fiduciary relationship existed even in the context of a motion for summary judgment." *Id.*

CAIR-F argues that Chris Gaubatz owed it a fiduciary duty primarily because he functioned in a position of trust, enjoying access to CAIR-F's confidential, proprietary, and secret information, such that his relationship with CAIR-F and its employees "was grounded in a higher level of trust than is normally present between those involved in arm's length business transactions." *Id.* at 342. "Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. . . .The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another . . . ." *Church of Scientology Intern. v. Eli Lilly & Co.*, 848 F.Supp. 1018, 1028 (D.D.C. 1994) (quoting *Schmidt v. Bishop*, 779 F.Supp. 321, 325 (S.D.N.Y. 1991). Here, evidence in the record could be read to suggest that Chris Gaubatz actively sought to gain the trust of his employers. *See* Pl.'s Ex. 37 at 3:14-17 ("I did the whole, you know, convert kind of thing because I felt like with him all I did – he was – seemed more conservative and trusting of somebody that was already Muslim, so."); *id.* at 5:10-13 ("I would literally work with them, they liked me, they trusted me, so I had access to everything when nobody was in there I would find things and photocopy them."). Furthermore, there is evidence that CAIR-F

did repose a measure of trust in Chris Gaubatz based on his actions and representations. *See* Pl.'s Ex. 37, 10:1-4 ("[B]ut the way we worked it out is they like me a lot and the work I've done for them, you know, for a lot of this – 80% of my time I really am, you know, working hard for them. So they, you know, I have to build that trust with them."); *id.*, 15:14-19 ("I mean, yeah, their security as far as letting people in and everything is pretty tight, but . . . once you're in with them, they don't – they're not looking at me [INDISCERNIBLE] suspicious or anything.")

Plaintiffs also argue that Chris owed CAIR-F a fiduciary duty as its agent. Pls.' Opp'n at 13. As other courts of this district have noted, "'[u]nless otherwise agreed, an agent' owes a fiduciary duty to his principal 'to act solely for the benefit of the principal in all matters concerned with his agency.'" *National R.R. Passenger Corp. v. Veolia Transp. Services, Inc.*, 791 F.Supp.2d 33, 46 (D.D.C. 2011) (quoting *Gross v. Akin, Gump, Strauss, Hauer & Feld, LLP*, 599 F.Supp.2d 23, 32 (D.D.C. 2009)). *See also* Restatement (Third) of Agency § 8.01 (2006). ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."). Whether an agency relationship existed between Plaintiffs and Chris Gaubatz is a fact-intensive inquiry that "depends, in part, on (1) the selection and engagement of the [employee], (2) the payment of wages, (3) [Plaintiffs'] power to discharge [the employee], (4) [Plaintiffs'] power to control the [employees'] conduct, (5) and whether the work [or conduct at issue] is part of the regular business of the employer." *National R.R. Passenger Corp.*, 791 F.Supp.2d at 46 (quoting *LeGrand v. Ins. Co. of N. Am.*, 241 A.2d 734, 735 (D.C. 1968)). "The District of Columbia Court of Appeals has noted that when 'the employer has the right to control or direct the servant,' then an agency relationship will generally be found." *Id.* (quoting *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000)). "However, it is not the 'actual exercise' of control or supervision that is determinative, but merely 'the right [of the

employer] to control' an employee that 'is usually dispositive of whether there is an agency relationship." *Id.* Here, because CAIR-F selected and controlled Chris Gaubatz in performing the regular work of their business, Plaintiffs argue that he functioned as their agent.

Defendants reject the existence of any fiduciary duty here, arguing that an unpaid intern with no written employment contract cannot rise to the level of a fiduciary. Defs.' MSJ at 31. As support for this point, Defendants cite to Department of Labor guidance materials which state that in order to avoid paying interns, employers must affirm that the interns provide them with no real value and that the internship experience is purely for the benefit of the intern. *Id.* at 31-32 (citing U.S. Dep't of Labor, Wage & Hour Div., Fact Sheet #1, *available at* http://www.dol.gov/whd/regs/compliance/whdfs71.htm). However, in *CAIR II*, the Court rejected the proposition that "a fiduciary relationship can never exist between an intern and the entity engaging the intern" and allowed Plaintiffs to engage in discovery as to whether the relationship between Chris Gaubatz and Plaintiffs "was grounded in a higher level of trust than is normally present between those involved in arm's-length business transactions." 793 F.Supp.2d at 341-42. In keeping with this ruling, and other decisions of this circuit, the Court focuses its analysis here on the specific facts of the relationship between Chris Gaubatz and CAIR-F, rather than broad generalizations about whether interns or individuals lacking employment contracts are or are not fiduciaries in all cases.

Defendants also argue that no fiduciary duty can exist here between Chris Gaubatz and CAIR-F because Chris Gaubatz did not understand himself to be an intern for CAIR-F. Defs.' Opp'n at 6-12. Rather, Defendants state, Chris Gaubatz was unaware of the existence of any organization named CAIR-F and saw himself as interning for an organization (which apparently does not exist) named CAIR National. Accordingly, because Chris did not understand himself to

be bound to CAIR-F, he could not be a fiduciary of this Plaintiff, either through a "trust" relationship or as CAIR-F's agent. While the Court notes that the distinctions between the various CAIR organizations, and Plaintiffs' carelessness in distinguishing between these organizations, are important for other facets of this case, *see infra* Section III.C, this is not one of those instances. The fact that Chris Gaubatz did not know the exact name of the organization he was interning for is not dispositive here. As discussed, *supra*, genuine issues of material fact exist as to whether, through their conduct during Chris Gaubatz's internship, the employees of CAIR-F and Chris Gaubatz formed a relationship that "was grounded in a higher level of trust than is normally present between those involved in arm's length business transactions." *CAIR II*, 793 F.Supp.2d at 342. *See also Church of Scientology*, 848 F.Supp. at 1028 ("The existence of a fiduciary relationship would depend on whether the parties, through the past history of the relationship and their conduct, had extended their relationship beyond the limits of the contractual obligations."). Similarly, an agency relationship can be formed through conduct, rather than through express assent to a specific principal. *See* Restatement (Third) of Agency § 1.03. ("A person manifests assent or intention through written or spoken words *or other conduct.*") (emphasis added).

Failing in these arguments, Defendants concede that generally speaking a "trust" relationship may create a fiduciary relationship and that "control" may create an agency relationship. Defs.' Opp'n at 13. However, they argue that the relationship here does not create the *broad* fiduciary duty of loyalty asserted by Plaintiffs. Defendants assert that, even if a fiduciary duty existed here, it would be limited to following the instructions of Plaintiffs' employees. However, Defendants contend that this performance of tasks by Chris Gaubatz *did not* create a fiduciary duty of non-disclosure. Accordingly, the crucial issue here is whether

Chris Gaubatz was instructed or implicitly understood that the conversations and tasks at CAIR were covered by a duty of confidentiality or non-disclosure.

This issue – the scope of any fiduciary duty – also relates to the question of whether the breach of a fiduciary duty was the primary motivation for, or at least a determinative factor motivating Chris Gaubatz when he intercepted conversations at CAIR-F, the second prong of the tortious conduct exception to the one-party consent rule. *See Dale*, 991 F.2d at 841. If Chris Gaubatz understood himself to be bound by a fiduciary duty of non-disclosure, then it appears obvious that the breach of this fiduciary duty was the primary motivation, or at least a motivating factor, in his interception of the communications at issue. No one disputes that Chris Gaubatz's purpose in making these recordings was to provide them to individuals outside of CAIR. Such a purpose would be inconsistent with, and a breach of, any duty of non-disclosure Chris Gaubatz understood himself to be bound by. Accordingly, it seems fair to say that if he understood himself to be bound by a fiduciary duty of non-disclosure, Chris Gaubatz intercepted CAIR-F's oral communications "for the purpose of committing" the tortious act of breaching this duty. Indeed, there is some evidence in the record to suggest he did act with this purpose or at least that it was a determinative factor. Specifically, the Court notes that Chris Gaubatz stated in a recorded telephone call that in entering Plaintiffs' offices, he was looking for "first-hand, on the ground Intel", Pl.'s Ex. 37, 8:22-9:1, as well as "smoking gun stuff," *id.*, 29:1-2.

On the crucial question of whether Chris Gaubatz understood himself as bound to a fiduciary duty of *non-disclosure*, the parties disagree. Defendants contend that Plaintiffs' staff never spoke to Chris Gaubatz about the confidential or proprietary nature of any information with which Chris Gaubatz might come into contact, and CAIR-F had no oral or written policies about such matters. They also state that Chris Gaubatz made no promises, oral or written, either

about confidentiality or about the nature of the internship. In response, Plaintiffs state that Chris Gaubatz was presented with a confidentiality agreement on the first day of his internship that he was instructed to "to read on his own time." However, Plaintiffs concede that they do not know if Chris Gaubatz ever signed this agreement, and Chris Gaubatz has stated that he never read or signed this document. However, the Court notes statements by Chris Gaubatz in which he appears to acknowledge reading a document that could be the non-disclosure agreement and showing this agreement to his father. Pl.'s Ex. 37 at 14:8-15 ("There was a non-disclosure agreement, something like that, but what we looked at and my dad had one of his people look at is that once we determined, it was like a whistle blower type thing, once we determined that they had – had somebody that was not representing themselves correctly and it was an ethical legal thing that we could probe further and that's basically what we're putting everything under, is that we're probing further illegalities that they've committed, so.").[8] This statement casts doubt on Chris Gaubatz's claim that he never read the confidentiality agreement and did not recognize CAIR-F's desire that he not disclose office communications. In addition, Plaintiffs also state that Chris Gaubatz was given access to confidential, proprietary, and trade secret information about CAIR-F, which apparently should have placed him on notice of a duty of non-disclosure. Pls.' Facts ¶ 72. Although Defendants question the proprietary, non-public nature of this information, the Court notes that it includes CAIR-F's contacts lists at mosques, outreach strategy, and

---

[8] Defendants attempt to explain away this statement by providing additional excerpts from Chris Gaubatz's deposition in their Reply brief. In these excerpts, Chris Gaubatz states that the non-disclosure agreement he was referring to was an "an agreement between my father and CSP." Defs.' Reply, Ex. A (Muise Decl.), Ex. 1 (Chris Gaubatz Dep. Excerpts) at 103:17-20. While Defendants may ultimately persuade a jury as to this issue, the Court finds that at this point, based on the language used by Chris Gaubatz in the recorded telephone conversation, there is a genuine issue of material fact as to which agreement he was speaking about and whether he understood himself as bound by a duty of non-disclosure.

legislative advocacy plans, information which Plaintiffs claim they kept secret. *Id.* ¶¶ 73-75. Plaintiffs also state that based on conversations describing individuals, such as David Gaubatz, who were opposed to CAIR-F's interests, Chris Gaubatz understood that Plaintiffs expected him not to disclose information or act in such a way as to harm the organization. Pls.' Ex. 1 at August 31, 2008 at 3:09:00, 3:11:00. Chris Gaubatz also understood that Plaintiffs had a "very strict" policy for outsiders entering the building. Pls.' Ex. 37 at 6:22. In light of this body of conflicting evidence, the Court concludes there is a genuine issue of material fact as to whether Chris Gaubatz understood himself to be bound by a fiduciary duty of non-disclosure to CAIR-F. The question of whether Chris Gaubatz understood himself to be bound by and violating a duty of confidentiality and non-disclosure in recording conversations from Plaintiffs' offices is a factual dispute appropriately resolved by a jury. If he did, his interception of conversations at CAIR-F, even in cases where he was party to the conversation, would not be protected by the one-party consent rule. Accordingly, the Court will deny summary judgment to both parties as to Plaintiffs' claims against Chris Gaubatz under the Federal Wiretap Act and the D.C. Wiretap Act.[9]

### 2. Use and Disclosure Liability

Plaintiffs next allege that Defendants willfully disclosed and used or endeavored to disclose and use the contents of the intercepted communications and evidence derived therefrom

---

[9] Plaintiffs also argue that the one-party consent rule does not apply because Chris Gaubatz intercepted the communications at issue while committing the tortious act of trespassing. Pls.' Reply at 7-10. Plaintiffs allege that Chris Gaubatz trespassed because he entered Plaintiffs' premises under wrongfully gained consent. This argument is unavailing. The alleged trespassing was not Chris Gaubatz's primary motivation or even a determinative factor in intercepting the conversations. Rather, the alleged trespassing was the *means* by which Chris Gaubatz gained the opportunity to intercept. As other courts have noted in construing section 2511, "[w]here the purpose is not illegal or tortious, but the means are, the victims must seek redress elsewhere." *Sussman*, 176 F.3d at 1202-03.

knowing or having reason to know that the information was obtained through the interception of oral communications in violation of 18 U.S.C. § 2511(1)(c)-(d) and D.C. CODE § 23-542(a)(2)-(3). The Court will address the federal and District of Columbia statutes separately.

### a. Federal Use and Disclosure Liability

Under 18 U.S.C. § 2511(1)(c), liability exists for one who "intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." Restated, "[s]ection 2511(1)(c) makes intentional disclosure of any illegally intercepted conversation a criminal offense if the person disclosing the communication knew or had 'reason to know' that it was so acquired." *Boehner v. McDermott*, 484 F.3d 573 (D.C. Cir. 2007). Similarly, § 2511(1)(d) creates a "use" violation for a person who "intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." 18 U.S.C. § 2511(1)(d).

Based on the text of the statute, "the prohibition on use or disclosure only applies to those 'knowing or having reason to know that the information was obtained through the interception of a . . . communication *in violation of this subsection*.'" *Berry v. Funk*, 146 F.3d 1003, 1012 (D.C. Cir. 1998) (quoting 18 U.S.C. § 2511(c) & (d)) (emphasis added). Accordingly, "[t]o be liable under § 2511(1)(c) or § 2511(1)(d), a defendant must know or have reason to know 'sufficient facts concerning the circumstances of the interception such that the defendant could, with presumed knowledge of the law, determine that the interception was prohibited in light of the Wiretap Act.'" *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 753 (7th Cir. 2010) (quoting

*Nix v. O'Malley*, 160 F.3d 343, 349-50 (6th Cir. 1998). *See also Thompson v. Dulaney*, 970 F.2d 744, 749 (10th Cir. 1992). "It is not enough to know that the conversation was intercepted; the defendant must also be able to tell that none of the statutory exceptions apply." *McCann*, 622 F.3d at 753 (citing *Williams v. Poulos*, 11 F.3d 271, 284 (1st Cir. 1993) and *Thompson*, 970 F.2d at 749). Accordingly, in order to establish liability under § 2511(1)(c) and (d), "the use or disclosure must . . . be intentional" and "[t]he defendant must know 1) the information used or disclosed came from an intercepted communication, and 2) sufficient facts concerning the circumstances of the interception such that the defendant could, with presumed knowledge of the law, determine that the interception was prohibited in light of Title III." *Thompson*, 970 F.2d at 749.

Consequently, in order to be liable here for use or disclosure under the Federal Wiretap Act, Plaintiffs must show that the Defendants besides Chris Gaubatz (1) intentionally used or disclosed the contents of an intercepted communication, (2) knew or had reason to know that the information used or disclosed came from an intercepted communication, and (3) knew or had reason to know that the intercepted communication was made in violation of 18 U.S.C. § 2511. Here, Defendants argue that these claims should be dismissed because Plaintiffs have failed to satisfy these elements. Defs.' MSJ at 23-26. The primary issue here is whether Defendants knew or had reason to know sufficient facts concerning the circumstances of Chris Gaubatz's interception of Plaintiffs' communications such that they could determine that the interception was prohibited in light of the Wiretap Act and that that none of the statutory exceptions – including the one-party consent rule – applied.

As discussed, *supra*, there are genuine issues of material fact as to whether the one-party consent rule applies to all of the conversations intercepted by Chris Gaubatz. For at least one

conversation, it is not clear whether Chris Gaubatz's presence was apparent to the person he was recording, or whether he was functioning as an "unseen auditor" unprotected by the one-party consent rule. For the remaining conversations, there is a genuine issue of material fact as to whether Chris Gaubatz understood himself as bound by a fiduciary duty of non-disclosure, such that he operated with the tortious purpose of breaching this duty in making the recordings and thus was not protected by the one-party consent rule. If Defendants were on notice of facts suggesting that these conversations were not protected by the one-party consent rule, then they may be liable for use and disclosure of these communications. The Court addresses potential use and disclosure liability for each Defendant other than Chris Gaubatz below.

First, with respect to David Gaubatz, the parties do not dispute that Chris Gaubatz gave all of the recordings he made and documents he took from CAIR to his father David Gaubatz. Defs.' Facts ¶ 86. If David Gaubatz reviewed the intercepted communication in which Chris Gaubatz's presence was not clearly apparent, then, with presumed knowledge of the law, David Gaubatz would have reason to know that the one-party consent rule did not apply. Similarly, for the remaining recordings, there is a genuine issue of material fact as to whether David Gaubatz understood his son to be bound by a duty of non-disclosure. David Gaubatz had access to the recordings in which CAIR-F arguably disclosed confidential or proprietary information to Chris Gaubatz. In addition, the videos also reveal that Chris Gaubatz was presented with a confidentiality agreement that he was instructed to "read on his own time." Moreover, in a recorded conversation, Chris Gaubatz states that he shared a non-disclosure agreement (although possibly not the confidentiality agreement presented to him) with his father. *See* Pls.' Ex. 37, 14:8-15 ("There was a non-disclosure agreement, something like that, but what we looked at and my dad had one of his people look at . . . ."). Accordingly, to the extent that there is a factual

dispute as to whether the actions of CAIR-F placed Chris Gaubatz on notice of a duty of non-disclosure, because David Gaubatz had access to almost all of this information as well, the same factual dispute carries over to David Gaubatz.

The same can be said of Christine Brim and Defendant CSP. Brim, as CSP's liaison to David Gaubatz, was provided the audio-video recordings made by Chris Gaubatz. The parties do not dispute that Christine Brim intentionally used or disclosed the contents of these intercepted communications and that she knew or had reason to know that the information came from an intercepted communication. *See* Pls.' Facts ¶ 49; Defs.' Facts ¶ 165 ("Only CSP via Brim disclosed the WND Clips to WND."). However, the parties disagree about Brim's role in a way that affects the third prong of the use or disclosure analysis. Brim states that she would only review the recordings to be certain there was content on the digital files. However, Plaintiffs argue that Brim took a more involved role in reviewing the recordings provided by the Gaubatzes, pointing to the fact that she disseminated edited portions of these recordings to individuals outside of CSP. Pl.'s Ex. 33 (E-mail from Paul Sperry to Christine Brim). If Brim did take a more involved role in reviewing the content of these recordings, and observed that Chris Gaubatz (1) may not have been a party to all conversations intercepted, and (2) may have been bound by a duty of non-disclosure, she could have known or had reason to know, with presumed knowledge of the law, that these recordings were in violation of the Federal Wiretap Act. Since Brim acted as CSP's representative with the Gaubatzes her knowledge is imputed to CSP. Accordingly, at this point in time, the Court will not dismiss Plaintiff's claims for use and disclosure liability under the Federal Wiretap Act against Defendants CSP and Christine Brim.

However, the same cannot be said of Defendants Adam Savit and Sarah Pavlis. Plaintiffs have provided no facts showing that these Defendants used or disclosed the intercepted

communications, that they knew these communications were obtained via interception, or that they knew or had reason to know that these communications were intercepted in violation of 18 U.S.C. § 2511. Indeed, Plaintiffs entirely fail to respond to (and therefore concede) Defendants' statements that Savit and Pavlis had no role in the CAIR Documentary Film Project during the time relevant to this litigation. Defs.' Facts ¶¶ 205-212. Accordingly, the Court dismisses the Federal Wiretap claims against Defendants Savit and Pavlis.

In addition, the Court notes that Plaintiffs provide no evidence that Defendants SANE and Yerushalmi used or disclosed the recordings. Indeed, it is unclear from the Complaint whether Plaintiffs are even alleging use and disclosure violations against these Defendants. Although the factual allegations of use and disclosure of the recordings are limited to the other Defendants besides SANE and Yerushalmi, *see* TAC ¶ 57, Plaintiffs appear to allege use and disclosure violations against all Defendants, *see* TAC ¶ 87. Accordingly, to the extent Plaintiffs are alleging use and disclosure claims under the Federal Wiretap Act against Defendants SANE and Yerushalmi, these claims are dismissed.

### b. D.C. Use and Disclosure Liability

The Court next addresses Defendants' use and disclosure liability under the D.C. Wiretap Act. Although Defendants assert that the same standard for liability applies as the Federal Wiretap Act, the Court's review of the text of the statutes reveals otherwise. Under D.C. CODE § 23-542(a)(2) "disclosure" liability exists "[e]xcept as otherwise specifically provided in this subchapter, [for] any person who in the District of Columbia . . . willfully discloses or endeavors to disclose to any other person the contents of any wire or oral communication, or evidence derived therefrom, knowing or having reason to know that the communication was obtained through the interception of an oral or wire communication." Similarly, D.C. CODE § 23-

542(a)(3) creates "use" liability "[e]xcept as otherwise specifically provided in this subchapter, [for] any person who in the District of Columbia . . . willfully uses or endeavors to use the contents of any wire or oral communication, or evidence derived therefrom, knowing or having reason to know that the communication was obtained through the interception of an oral or wire communication." This language is similar, but not identical to 18 U.S.C. § 2511(1)(c)-(d). Crucially, the D.C. Wiretap Act does not include the language "in violation of this subsection" which is included in the Federal Wiretap Act. *See* 18 U.S.C. § 2511(1)(c)-(d). Based on this missing language, the D.C. Wiretap Act, unlike the Federal Wiretap Act, does not appear to require that the party using or disclosing the communication know or have reason to know that the communication was obtained through the interception of an oral or wire communication "in violation of this subsection." As discussed, under the Federal Wiretap Act, in order to create use or disclosure liability, a party must know "sufficient facts concerning the circumstances of the interception such that the defendant could, with presumed knowledge of the law, determine that the interception was prohibited in light of Title III." *Thompson*, 970 F.2d at 749. However, based on the different language in the D.C. Wiretap Act, it appears that in order to be liable, a defendant must only (1) have acted "willfully" in disclosing or using the contents of an intercepted communication, and (2) know that the communication was intercepted.[10] A defendant need not know the communication was intercepted "in violation of this subsection."

---

[10] It is worth noting that the Federal Wiretap Act uses the term "intentionally" while the D.C. Wiretap Act uses the word "willfully." *Compare* 18 U.S.C. 2511(1)(c)-(d) *with* D.C. Code § 23-542(a)(2)-(3). However, the bare use of the word "willfully" likely does not signal that the statute implies a requirement that the defendant act with knowledge that his conduct was prohibited by law. Accordingly, the Court does not read into the use of this term here the requirement that the defendant know the interception was in violation of the statute. Although "[t]he word 'willfully' can mean different things in different contexts", "in civil or administrative proceedings, willful conduct is most often defined simply as that which is intentional, rather than

40

Accordingly, in order to establish use or disclosure liability under the D.C. Wiretap Act, Plaintiffs must show that the Defendants other than Chris Gaubatz intentionally used and disclosed the contents of the intercepted communications knowing that these communications were intercepted. Here, that standard is plainly satisfied for Defendants David Gaubatz, Christine Brim and CSP. No party contests that Gaubatz and Brim knew these recordings were the product of interception and that these Defendants used and disclosed the communications. In addition, because Brim was acting as the representative of CSP in its dealings with David Gaubatz, her knowledge is imputed to CSP. Accordingly, summary judgment is denied as to the use and disclosure claims under the D.C. Wiretap Act against these Defendants. However, for the reasons discussed above, these claims must fail against Defendants Yerushalmi, SANE, Savit, and Pavlis. Plaintiffs have produced no evidence that Defendants Yerushalmi and SANE used or disclosed the interceptions at issue. Similarly, Plaintiffs have not provided any evidence that Defendants Savit and Pavlis knew that these communications were obtained via interception.

### 3. Procurement Liability

CAIR-F next alleges that the remaining Defendants in this action, apparently meaning all Defendants besides Chris Gaubatz, are liable for procuring Chris Gaubatz to intercept the oral communications of CAIR-F employees. Pls.' MSJ at 20. The statutory basis for this claim is D.C. CODE § 23-542(a)(1), which provides civil penalties for anyone who "willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire or oral communication." In *CAIR III*, the Court held that Plaintiffs could not pursue a claim

---

inadvertent or accidental." *Hager v. District of Columbia Department of Consumer & Regulatory Affairs*, 475 A.2d 367, 368 (D.C. 1984). Indeed, willful generally "means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law." *Id.* (quoting *Townsend v. United States*, 95 F.2d 352, 358 (D.C. Cir. 1938)).

for procurement liability against any Defendant under the Federal Wiretap Act, as this statute did not recognize *civil* liability for procurement. *See* 891 F.Supp.2d at 24 ("Plaintiffs cannot pursue a claim for procurement liability against the CSP Defendants (or, for that matter, against any other Defendant) under the Federal Wiretap Act."). However, the Court also held that Plaintiffs' procurement theory remained viable under the D.C. Wiretap Act, which had retained civil liability for procurement. *See id.* ("Plaintiffs' procurement theory under the D.C. Wiretap Act, which has not been and cannot be challenged on this basis, remains viable.").

In evaluating the boundaries of Defendants' procurement liability under D.C. CODE § 23-542(a)(1), the Court looks to the text of the statute. Under this provision, liability exists, "[e]xcept as otherwise specifically provided in this subchapter, [against] any person who in the District of Columbia – (1) willfully intercepts, endeavors to intercept, or *procures* any other person to intercept or endeavor to intercept any wire or oral communication." D.C. CODE § 23-542(a)(1) (emphasis added). The civil liability provision of the statute also states that "[a]ny person whose wire or oral communication is intercepted, disclosed, or used in violation of this subchapter shall – (1) have a civil cause of action against any person who intercepts, discloses, or uses, *or procures* any other person to intercept, disclose, or use, such communications." D.C. CODE § 23-554(a)(1) (emphasis added).

There is little case law in the District of Columbia construing the meaning of these anti-procurement provisions, but based on the text of the statute, the Court concludes that the statute requires that the procurement be "willful[]", meaning that a defendant intentionally procure another to intercept. *See Hager*, 475 A.2d at 368 ("in civil or administrative proceedings, willful conduct is most often defined simply as that which is intentional, rather than inadvertent or accidental."). In addition, although the term procure is not defined in the statute and its meaning

has not been elaborated on in subsequent District of Columbia case law, other courts considering the meaning of this term in analogous provisions of federal law have noted that "'[p]rocure' is generally understood to mean actively bringing about, causing or instigating something to be done." *Flowers v. Tandy Corp.*, 773 F.2d 585 (4th Cir. 1985) (quoting Black's Law Dictionary 1087 (5th ed. 1979)). Furthermore, based on the language "[e]xcept as otherwise specifically provided in this subchapter", D.C. CODE § 23-542(a), the Court also concludes that the underlying interception or attempted interception allegedly procured by a defendant must violate the statute. By this, the Court means that the underlying interception or attempted interception must not be permissible under another provision of the statute, such as the one-party consent rule of D.C. CODE § 23-542(b)(3). This reading is supported by the civil liability provision, which creates a cause of action for procurement liability in "[a]ny person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter." D.C. CODE § 23-554(a)(1). Under the opposite result, a party could be liable for willfully procuring an otherwise lawful interception of another's communication, which would seem to represent a nonsensical reading of the statute. Accordingly, based on these conclusions, in order to prevail on their claims of procurement liability under D.C. CODE § 23-542(a)(1), Plaintiffs must show that Defendants willfully brought about, caused, or instigated Chris Gaubatz's interception of CAIR-F's communications which were in violation of the D.C. Wiretap Act.

However, the Court *does not* find in this provision a requirement that the procuring defendant know or have reason to know that the underlying interception was made in violation of the D.C. Wiretap Act. As discussed, *supra*, the D.C. Wiretap Act's use and disclosure provisions differ from the Federal Wiretap Act in that they do not require the party using or disclosing the intercepting communication to know or have reason to know that the interception was obtained

in violation of the statute. The Court finds no language in the procurement provision of the D.C. Wiretap Act suggesting that such a requirement exists for procurement liability.

Having laid this groundwork, the Court proceeds to analyze the claims of procurement liability against each of the Defendants other than Chris Gaubatz. First, with respect to David Gaubatz, there does not appear to be any dispute that the elder Gaubatz "actively br[ought] about, caus[ed], or instigat[ed]" the recordings of Plaintiffs' offices. However, as discussed, any liability for procurement against David Gaubatz is predicated on the underlying interceptions by Chris Gaubatz being in violation of the D.C. Wiretap Act. And since there are genuine issues of material fact on this point which preclude summary judgment, summary judgment must also be denied as to Plaintiff's claims of procurement liability against David Gaubatz under the D.C. Wiretap Act.

Similarly, the parties do not dispute that CSP hired David Gaubatz to obtain audio-video recordings of CAIR-F employees. Defs.' Facts ¶ 57. To be sure, the parties disagree about CSP's purpose in making this request. Defendants argue that CSP was merely seeking B-roll for its documentary, while Plaintiffs argue that CSP sought to launch an undercover investigation of Plaintiffs' offices. But this dispute is immaterial on this issue. Regardless of its purpose, by hiring Gaubatz to make recordings of Plaintiffs, CSP "actively br[ought] about, caus[ed], or instigat[ed]" the recordings of Plaintiffs' offices. Accordingly, summary judgment is denied as to the procurement claims against CSP, as the outcome of these claims hinges on the permissibility of the underlying interceptions made by Chris Gaubatz.

The same can be said of Defendants SANE and Yerushalmi. Defendant SANE, through Yerushalmi, recommended David Gaubatz to CSP and served as a contractual intermediary between David Gaubatz and CSP for the purposes of making the recordings. In addition,

although Defendants argue that Yerushalmi had only a limited role in the planning of the CAIR Documentary Film Project, Plaintiffs point to testimony from David Gaubatz in which Gaubatz appears to state that Yerushalmi gave him the responsibility to hire researchers to obtain audio/video recordings from Plaintiffs' office. Pls.' Ex. 5, 72:7-15. Accordingly, the claims against SANE and Yerushalmi for procurement liability are not dismissed because of genuine issues of material fact as to whether they "procured" the recordings and whether the underlying recordings violated the D.C. Wiretap Act.

With respect to Defendant Brim, the parties disagree about her role in planning the CAIR Documentary Film Project. Defendants assert that Brim had no role in the formation of the project, stating that at the outset of the project she was simply a contract employee who aided in the administration of certain CSP projects. In response, Plaintiffs argue that Brim was involved in the CAIR Documentary Film Project from the outset. As support, they point to deposition testimony from David Gaubatz in which he appears to state that Christine Brim (along with David Yerushalmi) gave him the responsibility to hire researchers to obtain audio/video recordings from Plaintiffs' office. *See* Pls.' Ex. 5, 72:7-15. Accordingly, a genuine issue of material fact exists as to Brim's involvement and whether she "procured" the recordings at issue. And as with the other Defendants, her liability as to these claims is predicated on the permissibility of the underlying interceptions made by Chris Gaubatz.

However, the Court dismisses CAIR-F's claims for procurement liability against Defendants Adam Savit and Sarah Pavlis. Plaintiffs provide no evidence to show that Savit and Pavlis brought about or caused the interceptions by Chris Gaubatz and indeed concede that Savit and Pavlis had no role in the development of the CAIR Documentary Film Project. Accordingly,

Plaintiffs' claims for procurement liability under the D.C. Wiretap Act against these Defendants are dismissed.

### 4. Conspiring and Aiding & Abetting Liability

Plaintiffs next appear to allege that the Defendants other than Chris Gaubatz "conspired with" or "aided and abetted" Chris Gaubatz in violation of the Federal and D.C. Wiretap Acts. *See* Pls.' Opp'n at 30 ("Defendants are vicariously liable for violating the Wiretap Acts because they aided and abetted the Gaubatz Defendants in committing the wrong."). However, these claims have already been dismissed by this Court. *See CAIR III*, 891 F.Supp.2d at 24. In *CAIR III*, Defendants argued that Plaintiffs could not pursue this "secondary liability" theory because it was not cognizable under either statute. *Id.* Plaintiffs failed to offer a rejoinder to Defendants' argument that, as a purely legal matter, no theory of secondary liability for "conspiring with" or "aiding and abetting" is available under the Federal and D.C. Wiretap Acts. *Id.* Accordingly, the Court deemed this argument conceded by Plaintiffs.[11] *Id.* Consequently, Plaintiffs will not be permitted to reassert a claim at the summary judgment stage that they waived at the motion to dismiss stage. Plaintiffs have provided no reason why this argument should not be deemed waived, and the Court does not find one.

### 5. Respondeat Superior Liability

---

[11] In addition, the Court noted that even if not conceded, this theory of secondary liability for "aiding and abetting" and "conspiring with" an interceptor was likely not viable under the ECPA. *See id. See also Kirch v. Embarq Mgmt. Co.*, No. 10-2047-JAR, 2011 WL 3651359, at *7 (D. Kan. Aug. 19, 2011) (rejecting attempt to hold party "indirectly liable as a procurer, aider, abettor, or co-conspirator" because "[t]he civil liability provision of the ECPA . . . does not provide for secondary liability, as liability attaches only to the party that actually intercepted the communication."); *In re Toys R Us, Inc., Privacy Litig.*, No. 00-CV-2746, 2001 WL 34517252, at *7 (N.D. Cal Oct. 9, 2001) (finding no "cause of action against aiders and abettors.").

Plaintiffs next argue that the Defendants other than Chris Gaubatz are liable under the Federal Wiretap Act and the D.C. Wiretap Act pursuant to a theory of *respondeat superior*. Pls.' Opp'n at 28. The Court has dealt with the issue of *respondeat superior* liability in its previous opinions in this case, albeit in the context of Plaintiffs' claims under the Stored Communications Act. *See CAIR III*, 891 F.Supp.2d at 27-29. In its discussion of Plaintiffs' agency theory under the Stored Communications Act, the Court noted that Plaintiffs' Complaint had failed to sufficiently allege an agency relationship between Chris Gaubatz and CSP, or for that matter its employees, Christine Brim, Adam Savit, and Sarah Pavlis. 891 F.Supp.2d at 27-29. The Court concluded that Plaintiffs' "allegations [did] not suggest that CSP had 'the right to control and direct [Chris Gaubatz] in the performance of his work and the manner in which the work [was] to be done' – the *sine qua non* of an agency relationship." *Id.* at 29 (quoting *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000)). Accordingly, the Court concluded that Plaintiffs' agency theory failed because Plaintiffs' allegations "do not plausibly suggest that an agency relationship existed between CSP and Chris Gaubatz." *Id.* Although the Court analyzed this issue in the context of Count II, this logic was not confined to that claim. Rather, the Court noted in its discussion of Plaintiffs' Wiretap Act claims that if required to reach the issue of Defendants' *respondeat superior* liability under Count I, "it would find that Plaintiffs' agency theory under the Federal and D.C. Wiretap Acts would fail for the same reasons such a theory fails under the Stored Communications Act." *Id.* at 25 n. 4. Defendants argue that based on this language in *CAIR III*, Plaintiffs' claims of *respondeat superior* liability against CSP, Brim, Savit, and Pavlis under Count I have been considered and rejected by this Court. To the extent Plaintiffs premise their claim on a direct agency relationship between Chris Gaubatz and CSP, Brim, Savit, and Pavlis, Defendants are correct.

47

However, at the summary judgment stage, Plaintiffs appear to be alleging a different theory of *respondeat superior* liability than the one rejected by the Court in *CAIR III*. Plaintiffs now argue that David Gaubatz was an agent of the remaining Defendants. Pls.' Opp'n at 28. Defendants concede that David Gaubatz is liable under a theory of *respondeat superior* for the actions of Chris Gaubatz. *See* Defs.' Opp'n at 25 n. 4 ("there is little doubt that Chris was employed by David Gaubatz and the doctrine of *respondeat superior* would apply in this instance."). Accordingly, Plaintiffs appear to be arguing that a sub-agent relationship existed between Chris Gaubatz and the remaining Defendants through David Gaubatz. *See* Restatement (Third) of Agency § 3.15(1) ("A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal. The relationship . . . between the subagent and the appointing agent's principal [is a] relationship of agency . . . ."). The Court notes that *CAIR III* did not specifically foreclose this avenue. *See* 891 F.Supp.2d at 28 (stating that in the Third Amended Complaint, "Plaintiffs specifically identify several agreements that they claim provide the structure to the alleged conspiracy between the Defendants, all of which were entered into by David Gaubatz, not Chris Gaubatz.").

Accordingly, in order to assess *respondeat superior* liability under this theory for Defendants CSP, Brim, Savit, Pavlis, SANE and Yerushalmi, the Court looks to whether David Gaubatz functioned as their agent. In making this assessment, the Court must primarily assess whether these Defendants each had "the right to control and direct [David Gaubatz] in the

performance of his work and the manner in which the work [was] to be done – the *sine qua non* of an agency relationship." *CAIR III*, 891 F.Supp.2d at 29 (quoting *Judah*, 744 A.2d at 1040). [12]

Here, the Court finds that a genuine issue of material fact exists as to whether CSP had the right to control and direct David Gaubatz. Although Defendants characterize the relationship as an arms-length, independent contractor arrangement, there is evidence to suggest that CSP did direct David Gaubatz in the manner of his work. Specifically, Plaintiffs point to statements by David Gaubatz in which he appears to state that CSP had the power to direct him on how to perform the tasks that would lead to the acquisition of audio and video recordings from Plaintiffs' offices. *See* Pls.' Ex. 5 at 77:24-78:3; *id.* at 79:1-20 (describing CSP as having the authority typically associated with employers). Accordingly, to the extent CSP had an agency relationship with David Gaubatz, it may be subject to *respondeat superior* liability for the actions of Chris Gaubatz, who Defendants concede functioned as David Gaubatz's agent.

However, the same is not true for Defendant SANE. While Plaintiffs point to a contract between SANE and David Gaubatz to provide a team of researchers, they do not provide any evidence that SANE had the power to control or direct David Gaubatz. Rather, the contract and Defendants' description of the arrangement, which Plaintiffs only partially rebut, suggests "an ordinary arms-length contractual relationship." *CAIR III*, 891 F.Supp.2d at 29. The Court finds lacking the sort of agency relationship between SANE and David Gaubatz necessary to create a sub-agent relationship between Chris Gaubatz and SANE. Accordingly, there is no *respondeat superior* liability under the Wiretap Acts for Defendant SANE.

---

[12] The Court notes that Defendants do not argue that *respondeat superior* liability is not cognizable under the Federal and D.C. Wiretap Acts. Therefore, the Court does not address this issue.

Defendants Yerushalmi and Brim are somewhat closer calls. Although Yerushalmi disclaims any supervisory role over David Gaubatz, in his deposition David Gaubatz repeatedly suggests that Yerushalmi had power to direct his actions and functioned as his supervisor. Pls.' Ex. 5 at 72:13-14; *id.* at 77:24-78:3. Based on this conflicting evidence, the Court finds that a genuine issue of material fact exists as to whether David Gaubatz functioned as Yerushalmi's agent and thus Chris Gaubatz operated as a sub-agent of Yerushalmi. Similarly, although Defendants describe only a limited role for Brim, they do concede that she functioned as CSP's liaison to the Gaubatzes. Defs.' Facts ¶ 178. Given David Gaubatz's apparent statement that CSP had the power to control and direct his work, Pls.' Ex. 5 at 77:24-78:3, a reasonable jury could infer that David Gaubatz meant CSP, *through Brim.* Consequently, at this point, the Court will not dismiss Plaintiff's Wiretap Act claims against Yerushalmi and Brim premised on *respondeat superior* liability.

However, Plaintiffs have produced no evidence that Savit and Pavlis, even as employees of CSP, played a role in controlling or directing David Gaubatz. Accordingly, any claims premised on *respondeat superior* liability against these Defendants are dismissed.

**B. The Stored Communications Act**

Plaintiffs bring Count Two of the Third Amended Complaint under the Stored Communications Act (Title II of the ECPA), 18 U.S.C. §§ 2701-2712. Specifically, Plaintiffs claim that Defendants violated 18 U.S.C. § 2701(a), which provides:

> [W]hoever--
>
> (1)     intentionally accesses without authorization a facility through which an electronic communication service is provided; or

<blockquote>
(2)      intentionally exceeds an authorization to access that facility;

and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.
</blockquote>

18 U.S.C. § 2701(a). Congress created a civil cause of action for violations of Section 2701(a) (and other parts of the Stored Communications Act not at issue in this case) through 18 U.S.C. § 2707(a). That section provides:

<blockquote>
[A]ny . . . person aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity . . . which engaged in that violation such relief as may be appropriate.
</blockquote>

*Id.* § 2707(a). Plaintiffs allege that Defendants violated Section 2710(a) when Chris Gaubatz "knowingly and intentionally accessed CAIR and CAIR-Foundation's computer or computer servers, networks, or systems without authorization and/or knowingly or intentionally exceeded any authorization he did have to access CAIR and CAIR-Foundation's computers or computer servers, networks, or systems." TAC ¶ 90. Accordingly, they allege that Chris Gaubatz "obtained access to wire or electronic communications while they were in electronic storage in CAIR and CAIR-Foundation's computers or computer servers, networks, or systems." *Id.* ¶ 91. Plaintiffs also allege that the remaining Defendants "conspired with" and "aided and abetted" Chris Gaubatz in taking these actions. *Id.* ¶¶ 92-93.

The Court has addressed Plaintiffs' claims under the Stored Communications Act in its previous opinions in this case. *See CAIR II*, 793 F.Supp.2d at 332-339; *CAIR III*, 891 F.Supp.2d at 26-29. For liability to arise under Section § 2710(a), a defendant must access "a facility through which an electronic communication service is provided." 18 U.S.C. § 2710(a).

Interpreting this term in *CAIR II*, this Court noted that "the statute clearly is triggered when a defendant directly or indirectly accesses the physical server-side computer dedicated to running an e-mail client by, for instance, downloading e-mails from the server." *CAIR II*, 793 F.Supp.2d at 335. By the same token, "the statute clearly is not triggered when a defendant merely accesses a physical client-side computer and limits his access to documents stored on the computer's local hard drive or other physical media." *Id.* Accordingly, the Court held that with respect to this case, "[w]hile . . . liability under Section 2710(a) would *not* arise if any unauthorized activity was limited to Plaintiffs' office computers, liability may arise if discovery reveals that Chris Gaubatz accessed Plaintiffs' computer servers and that those servers were the physical means 'through which' a 'service which provides to users thereof the ability to send or receive wire or electronic communications' was 'provided.'" *Id.* at 335-36 (quoting 28 U.S.C. §§ 2701(a), 2510(15), 2711(1)). "Resolving [this] issue" the Court concluded, "will require the parties to conduct discovery as to which of Plaintiffs' systems, if any, were accessed by Chris Gaubatz and whether those systems were used to provide an electronic communication service." *Id.* at 336. In light of this holding, the Court declined to dismiss Plaintiffs' SCA claim and instead permitted the parties "to conduct discovery as to which of Plaintiffs' systems, if any, were accessed by Chris Gaubatz and whether those systems were used to provide an electronic communication service." *Id.* This inquiry, the Court found, would prove crucial in assessing whether Chris Gaubatz accessed a "facility through which an electronic communication service is provided." 18 U.S.C. § 2701(a).

Now, with the benefit of this discovery, Defendants argue that Plaintiffs' SCA claims against Chris Gaubatz should be dismissed. Defs.' MSJ at 34. As an initial matter, the Court notes that Plaintiff CAIR-AN's claims under the SCA must be dismissed because none of the

documents at issue in this litigation belonged to CAIR-AN. Plaintiffs' 30(b)(6) witness stated as much in his deposition, making clear that CAIR-AN had neither documents nor computers at CAIR's National Office. *See* Defs.' Ex. A., Ex. 3 (Saylor Dep.) at 156:7-9 (Plaintiffs' 30(b)(6) witness answering "Yes" to the question "So any documents that are at issue in this litigation are CAIR Foundation's documents?"); *id.* at 156:24-157:1 (answering "No" to the question "Is CAIR-AN claiming that any of its documents with a confidential value were taken by Chris Gaubatz in this litigation?"); *id.* at 108:21-109:6 (stating that no computers at the National Office belonged to CAIR-AN). Accordingly, any claims under the SCA belong only to CAIR-F.

In support of its position that this claim should be dismissed, Defendants point to Chris Gaubatz's sworn statement that he never removed documents from a shared drive or e-mail server. Defs.' Ex. A (Muise Decl.), Ex. 10 (Chris Gaubatz Dep.) at 255:3-17 (Chris Gaubatz stating that he "never" "enter[ed]" into a CAIR e-mail server, "never" took "any electronic documents including e-mails from any electronic or computer server", and "never" took "any electronic documents of any kind from the shared drive and provide[d] them to anyone other than CAIR personnel[.]"). In his deposition, Chris Gaubatz further stated that while he did remove some documents that originated as electronic documents on a computer, he only removed these documents from hard drives of CAIR's desktop computers. *Id.* at 255:18-25. According to Chris Gaubatz this is because it was common practice for interns to take documents from the shared drive that they had been given full access to and then save them on the hard drive and leave them there. *Id.* at 265:2-6. Because interns shared desktop computers, Chris Gaubatz states that he had access to the materials saved by others to these desktops. *Id.* Similarly, in his answers to interrogatories, Chris Gaubatz states that "the only electronic or digital files [he] copied were files available to [him] on desk top computer hard drives belonging

53

to desk top computers I had full authority to access and use freely." Defs.' Ex. A, Ex. 30 (Chris Gaubatz's Answers to Pls.' First Set of Interrogs.) at 11-12 ("I copied and removed from CAIR no electronic or digital files from servers or shared drives."). Based on this testimony that Chris Gaubatz did not remove materials from Plaintiffs' shared drives, Defendants argue it is clear that Chris Gaubatz did not improperly remove documents from a "facility through which an electronic communication service is provided." 18 U.S.C. § 2701(a).

In response, Plaintiffs provide their own sworn testimony that Chris Gaubatz *did* remove documents from the shared drive. When asked for evidence that Chris Gaubatz removed documents from the shared drive, Plaintiffs' 30(b)(6) witness stated that "[t]he documents that were returned to us were reviewed by our attorneys, and a number of them did not appear to be available to Mr. Gaubatz in either print form or on his desktop, leaving the server as the other option." Defs.' Ex. A., Ex. 3 (Saylor Dep.) at 143:19-144:5. *See also id.* 148:8-12 ("And in review of the documents once they were returned to us, there were those that were determined, there were no other places that Mr. Gaubatz could have obtained them from other than the server.").

Based on this conflicting testimony, the Court concludes that there is a genuine issue of material fact as to whether Chris Gaubatz removed documents from the shared drive and thus ran afoul of the SCA. Defendants criticize Plaintiffs for failing to provide more specific examples of documents that could *only* be from the shared drive, rather than generalized statements. Defs.' Reply at 4. To be sure, such evidence would prove powerful, but it is not necessary to survive summary judgment as to this claim. Here, Plaintiffs' 30(b)(6) witness, speaking on behalf of Plaintiffs, who presumably possess the greatest familiarity with the location and storage of their own digital files, has stated that these documents could have only been obtained from Plaintiffs'

server.  Consequently, at this point, the Court is faced with sworn statements from both sides that are in direct conflict.  Neither side produces any evidence that conclusively establishes the falsity of the opposition's sworn testimony.  To resolve this dispute now would require the kind of credibility determinations properly reserved for a jury.

However, while the Court denies summary judgment as to Plaintiffs' claims against Chris Gaubatz under the SCA, Plaintiffs' claims against the remaining Defendants only survive in part. First, to the extent Plaintiffs are still alleging that the remaining Defendants "conspired with" and "aided and abetted" Chris Gaubatz in taking these actions, TAC ¶¶ 92-93, these claims are dismissed.  In *CAIR III*, the Court held that a theory of secondary liability, based on allegations that a defendant "conspired with" or "aided and abetted" a primary actor, is not cognizable under the Stored Communications Act.  891 F.Supp.2d at 26-27.  Accordingly, the Court concluded there, and reiterates here, that Plaintiffs may not pursue their SCA claims against *any* Defendant under a theory of secondary liability.

Second, to the extent Plaintiffs are seeking to hold the remaining Defendants primarily liable under the SCA pursuant to a theory of *respondeat superior*, these claims were addressed in the Court's prior opinion.  *See CAIR III*, 891 F.Supp.2d at 27-29.  In *CAIR III*, the Court found that Plaintiffs did not adequately plead claims for primary liability under a theory of *respondeat superior* against CSP, Christine Brim, Adam Savit, and Sarah Pavlis based on an agency relationship between these Defendants and Chris Gaubatz.  *Id.* at 28-29.  This theory remains rejected.  However, as noted, Plaintiffs now appear to be asserting a different basis for *respondeat superior* liability, based on the agency of David Gaubatz and the sub-agency of Chris Gaubatz.  *See* Restatement (Third) of Agency § 3.15(1) ("[t]he relationship[] . . . between the subagent and the appointing agent's principal [is a] relationship [] of agency . . . .").  And, as

discussed, *CAIR III* did not foreclose this possibility. *See id.* at 28 (stating that in the Third Amended Complaint, "Plaintiffs specifically identify several agreements that they claim provide the structure to the alleged conspiracy between the Defendants, all of which were entered into by David Gaubatz, not Chris Gaubatz.").

The Court's analysis of agency relationships between David Gaubatz and the remaining Defendants with respect to Count I applies equally here. Accordingly, genuine issues of material fact exist as to whether David Gaubatz functioned as the agent of Defendants CSP, Brim, and Yerushalmi. Therefore, these Defendants may be liable under the SCA on the basis that Chris Gaubatz functioned as David Gaubatz's sub-agent. However, because there is insufficient evidence of an agency relationship between David Gaubatz and Defendants SANE, Pavlis, and Savit, there is no *respondeat superior* liability against these Defendants under the SCA.

### C. Breach of Contract and Tortious Interference with Contractual Relations

Count Five of the Third Amended Complaint alleges breach of contract by Chris Gaubatz. Plaintiffs' Complaint alleges that "Chris Gaubatz entered into a Confidentiality and Non-Disclosure Agreement with CAIR." TAC ¶ 111. The Complaint also alleges that Chris Gaubatz breached his contractual obligations to CAIR. *Id.* ¶¶ 114-117, 120. The Complaint defines "CAIR" as the Council on American-Islamic Relations Action Network, Inc., *see* TAC ¶ 10, the organization this opinion refers to as CAIR-AN. *See also* TAC ¶ 3-6, 21, 33-35, 40, 49, 63, 64, 67, 68, 70-78 (referring to CAIR and CAIR-F as distinct entities). Indeed, this request by Plaintiffs to make clear that all references to CAIR in the Complaint referred to CAIR-AN was specifically addressed by the Court in *CAIR II.* *See* 793 F.Supp.2d at 322-23 (granting "Plaintiffs leave to clarify that references to the 'Council on American-Islamic Relations' are intended to be references to CAIR-AN."). The Complaint states that Chris Gaubatz was "hired

to work for CAIR" and as "a condition of his employment" "signed a Confidentiality and Non-Disclosure Agreement." TAC ¶ 36.

However, at the summary judgment stage, it appears Plaintiffs are no longer alleging a contractual relationship between Chris Gaubatz and CAIR-AN. Rather, Plaintiffs concede that Chris Gaubatz was not an intern of CAIR-AN, as this organization had no interns. Pls.' Reply at 4 ("the evidence is clear: Chris Gaubatz never interacted with any CAIR-AN employee, volunteer or intern, because there were not any during his internship."). Instead, Plaintiffs now attempt to show a contractual relationship between Chris Gaubatz and CAIR-F. Plaintiffs argue that their Complaint should be read liberally, *id.* at 10-12, but even a liberal reading has its limits. In contrast to the clear and consistent allegations of a contract between Chris Gaubatz and CAIR-AN, the Complaint does not discuss a contract with CAIR-F. Indeed, the only potential reference to a contract with CAIR-F is the stray mention of a contract between Chris Gaubatz and "Plaintiffs" in the separate allegations regarding Plaintiffs' claim for tortious interference with contract. *See* TAC ¶ 122. This fleeting, ambiguous reference, in contrast to the specific, repeated allegations elsewhere in the Complaint, is insufficient.

Plaintiffs' Complaint clearly alleges breach of a contractual relationship with one Plaintiff, CAIR-AN. Now, Plaintiffs are attempting to prove breach of a contractual relationship with another Plaintiff, CAIR-F. Having learned that the contractual relationships were different from what Plaintiffs assumed when drafting the Third Amended Complaint, they could have easily sought leave to amend their Complaint again to correct these allegations in light of discovery. Indeed, such leave likely would have been granted, in light of the absence of prejudice to Defendants from simply having the Complaint conform to the record as viewed by Plaintiffs. But Plaintiffs did not choose this option. Instead, now, at the summary judgment

57

stage, they seek to broaden their claim, distorting the allegations made in the Complaint. Yet "[i]t is well established that a party may not amend its complaint or broaden its claims through summary judgment briefing." *District of Columbia v. Barrie*, 741 F.Supp.2d 250, 263 (D.D.C. 2010). *See also DSMC, Inc. v. Convera Corp.*, 479 F.Supp.2d 68, 84 (D.D.C. 2007) (rejecting plaintiff's attempt to broaden claims and thereby amend its complaint in opposition to defendant's motion for summary judgment."); *Quinn v. District of Columbia*, 740 F.Supp.2d 112, 130-31 (D.D.C. 2010). Rather, the proper course for Plaintiffs, once they realized the actual contractual relationship, was to amend their Complaint. *See Sharp v. Rosa Mexicano*, 496 F.Supp.2d 93, 97 n. 3 (D.D.C. 2007) ("[P]laintiff may not, through summary judgment briefs, raise the new claims . . . because plaintiff did not raise them in his complaint, and did not file an amended complaint."); *Sloan v. Urban Title Servs., Inc.*, 652 F.Supp.2d 51, 62 (D.D.C. 2009) ("Plaintiff cannot amend her complaint by . . . filing a motion for summary judgment; she must amend her complaint in accordance with Fed. R. Civ. P. 15(a)."). Accordingly, because Plaintiffs no longer purport to prove the allegations made in their Complaint, Plaintiffs' breach of contract claim is dismissed.

For the same reasons, Plaintiffs' claim for tortious interference with contractual relations is also dismissed. The underlying contract alleged by Plaintiffs in their Complaint was between Chris Gaubatz and CAIR-AN. In the absence of the contract Plaintiffs pled, there is no cause of action for tortious interference with contractual relations. *See Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1305 (D.C. Cir. 2002) (noting that the "existence of a contract" is an element of "tortious interference with contract" under D.C. law).

### D. Plaintiffs' Remaining Claims

Plaintiffs allege six remaining claims: (1) Breach of Fiduciary Duty, (2) Trespass, (3) Conversion, (4) Fraud, (5) Unjust Enrichment, and (6) Misappropriation of Trade Secrets. TAC ¶¶ 96-109, 127-163. Defendants argue that these claims fail because Plaintiffs have failed to show injury suffered by each Plaintiff or a coherent theory of compensable damages to quantify this injury. Defs.' MSJ at 37-45. Defendants argue that there is no evidence that Plaintiffs were either actually damaged by the relatively short period of time that Defendants had possession of their documents and materials, or that the disclosure of this information harmed Plaintiffs. In the end, Defendants argue, Plaintiffs can point to no injury from Defendants' actions, but only to their "outraged sensibilities." *Day v. Avery*, 548 F.2d 1018, 1028 (D.C. Cir. 1976). *See also Meeker v. Stuart*, 188 F.Supp. 272 (D.D.C. 1960) ("It is a well established principle that while the fact of damages must be established definitely, the amount need not be proven mathematically.").

The Court finds that Plaintiffs have thus far been frustratingly unclear as to the injuries at issue for each of the claims. In addition, Plaintiffs have not specified which injury, if any, corresponds to which of the Plaintiffs, and have made little effort to explain the proximate cause linking the alleged tortious conduct to the injuries at issue. Instead, Plaintiffs speak in broad generalizations, asserting injuries and damages and proximate cause across multiple counts and multiple Plaintiffs. Pls.' Opp'n at 35-41. As a result, the Court has received only opaque and largely unhelpful briefing from both parties on the issues of injury, proximate cause, and damages. Plaintiffs are not specific as to these issues, making resolution of the threshold questions of injury and proximate cause next to impossible for the Court. For their part, Defendants appear to be guessing at what injuries and which damages theories Plaintiffs are

asserting for each of these claims, which provides no further assistance to the Court. Defs.' Reply at 22-23.

In light of the obscure and imprecise briefing submitted thus far on this issue, the Court will deny without prejudice Defendants' Motion for Summary Judgment as to these claims.[13] Following the schedule set out in the Order accompanying this Memorandum Opinion, the parties will provide the Court with more focused and specific briefing. Plaintiffs shall file a notice with both the Court and Defendants that sets out in clear terms *with citations to the record*, for each of these remaining claims, the conduct underlying this claim, the injury proximately caused by this conduct, and the theory of damages associated with this injury. This briefing should specifically set out the conduct engaged in by *each Defendant*. This filing should also explain how this conduct proximately caused the injury claimed by Plaintiffs. Furthermore, in making this explanation, Plaintiffs should set out the injury to *each Plaintiff*, CAIR-AN and CAIR-F, that was proximately caused by the alleged conduct. Plaintiffs must also explain whether this injury is legally cognizable under each specific claim. The Court notes that Plaintiffs have specifically disclaimed any damages based on harm to their reputation from Defendants' alleged actions, as well as damages based on a loss in donations as well as a diminution in their ability to lobby. Defs.' Facts ¶¶ 238-240. Accordingly, Plaintiffs may not rely on these theories of injury to support their remaining claims. To the extent Plaintiffs are premising their injury for a particular claim or Plaintiff on the alleged disclosure of confidential or proprietary information, they must explain specifically which documents they refer to, why

---

[13] The Court will also deny Plaintiff CAIR-F's motion for partial summary judgment as to its breach of fiduciary duty claim. Even if Plaintiffs show injury, proximate cause, and a theory of compensable damages as to this claim, summary judgment would still be inappropriate for Plaintiffs in light of the fact that genuine issues of material fact exist to whether Chris Gaubatz owed CAIR-F a fiduciary duty here, as discussed, *supra.*

these documents are confidential or proprietary, and how this disclosure harmed them. In explaining any harm from disclosure, Plaintiffs should address the fact that some or all of the documents were returned to Plaintiffs and not destroyed or lost and that some or all of the documents were designated by Plaintiffs to be destroyed as no longer having value to Plaintiffs. Finally, Plaintiffs should specifically describe which specific theory of damages of the many asserted by Plaintiffs is used to quantify the injury asserted for each specific claim, and explain why this theory quantifies the injury with "a fair degree of probability." *Trustees of Univ. of Dist. of Columbia v. Vossoughi*, 963 A.2d 1162, 1175 (D.C. 2009) (quoting *Hartford Accident & Indem. Co. v. Dikomey Mfg. Jewelers, Inc.*, 409 A.2d 1076 (D.C. 1979)).

Once Plaintiffs provide this specific statement of the injuries at issue for each claim and each Plaintiff, their causal relationship to the allegedly tortious conduct of each Defendant, and an explanation the theory of damages used to quantify these injuries, the Court will have a clearer understanding of these issues. At this point, Defendants may re-file their motion for summary judgment as to these claims. The Court notes that the issues of each Plaintiffs' injury, proximate cause, and compensable damages appear to be threshold issues, for most, if not all of these claims. Accordingly, the Court does not, at this time, address in the hypothetical Defendants' remaining arguments for dismissal of these claims. However, upon any renewed motion for summary judgment filed by Defendants, the Court will of course address the alternative grounds for dismissing these claims provided by Defendants' current motion.

## IV. CONCLUSION

For all of the reasons stated herein, the Court GRANTS IN PART and DENIES IN PART Defendants' [156] Motion for Summary Judgment, and DENIES Plaintiff [156] CAIR-F's Motion for Partial Summary Judgment. With respect to Plaintiffs' Wiretap Act claims (Count I),

Defendants' motion is GRANTED as to: (1) claims by Plaintiff CAIR-AN; (2) Plaintiff CAIR-F's claims for use and disclosure liability against Defendants Savit, Pavlis, SANE, and Yerushalmi; (3) Plaintiff CAIR-F's claims for procurement liability against Defendants Savit and Pavlis; (4) Plaintiff CAIR-F's claims for conspiring and aiding and abetting liability against all Defendants; and (5) Plaintiff CAIR-F's *respondeat superior* claims against Defendants Savit, Pavlis, and SANE.  With respect to Count I, Defendants' motion is DENIED as to: (1) Plaintiff CAIR-F's claims against Chris Gaubatz; (2) Plaintiff CAIR-F's claims for use and disclosure liability against Defendants David Gaubatz, CSP, and Brim; (3) Plaintiff CAIR-F's claims for procurement liability against Defendants David Gaubatz, CSP, Brim, SANE, and Yerushalmi; and (4) Plaintiff CAIR-F's *respondeat superior* claims against Defendants David Gaubatz, CSP, Brim, and Yerushalmi.  With respect to Plaintiffs' Stored Communications Act claims (Count II), Defendants' motion is GRANTED as to: (1) claims by Plaintiff CAIR-AN; (2) Plaintiff CAIR-F's claims for conspiring and aiding and abetting liability against all Defendants; (3) Plaintiff CAIR-F's *respondeat superior* claims against Defendants Savit, Pavlis, and SANE. With respect to Count II, Defendants' motion is DENIED as to: (1) Plaintiff CAIR-F's claims against Chris Gaubatz; and (2) Plaintiff CAIR-F's *respondeat superior* claims against Defendants David Gaubatz, CSP, Brim, and Yerushalmi.  Defendants' motion is GRANTED with respect to Plaintiffs' claims for breach of contract (Count V) and tortious interference with contract (Count VI).  Defendants' motion is DENIED WITHOUT PREJUDICE as to all of Plaintiffs' remaining claims to allow the parties to submit additional briefing as to these claims. An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge